# 19-3457-CV

## United States Court of Appeals
### for the
## Second Circuit

LYNDA BEIERWALTES and WILLIAM BEIERWALTES,

*Plaintiffs-Appellants,*

– v. –

L'OFFICE FEDERALE DE LA CULTURE DE LA CONFEDERATION
SUISSE, Federal Office of Culture of The Swiss Confederation,
L'ADMINISTRATION FEDERALE DES DOUANES DE LA
CONFEDERATION SUISSE, Federal Customs Administration of The Swiss
Confederation, LA REPUBLIQUE ET CANTON DE GENEVE, Republic
and Canton of Geneva,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 3 of 3 (Pages A-470 to A-646)

ROBERT REEVES ANDERSON
MARCUS A. ASNER
ARNOLD & PORTER
  KAYE SCHOLER LLP
*Attorneys for Defendant-Appellee*
  *Republic and Canton of Geneva*
370 Seventeenth Street, Suite 4400
Denver, Colorado 80202
(303) 863-1000

ANJU UCHIMA
WILLIAM G. PEARLSTEIN
PEARLSTEIN & MCCULLOUGH, LLP
*Attorneys for Plaintiffs-Appellants*
641 Lexington Avenue, Suite 1327
New York, New York 10022
(646) 762-7263

STEPHAN E. BECKER
MICHAEL E. JAFFE
PILLSBURY WINTHROP SHAW PITTMAN LLP
*Attorneys for Defendants-Appellees*
  *L'Administration Federale des Douanes de*
  *la Confederation Suisse and L'Office*
  *Federale de la Culture de la Confederation*
  *Suisse*
1200 17th Street NW
Washington, DC 20036
(202) 663-8000

**i**

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, dated August 6, 2018............................. A-16

    Exhibit A to Complaint -
    Geneva Prosecutor Search Warrant, dated
    February 24, 2017 .................................... A-41

    Exhibit B to Complaint -
    Swiss Customs Administration Seizure Order,
    executed February 28, 2017 ................................... A-51

    Exhibit C to Complaint -
    Letter from Pearlstein McCullough & Lederman
    LLP to Claudio Mascotto, *Procureur, Pouvoir*
    *judiciare, Ministere public*, dated May 7, 2018 ..... A-75

    Exhibit D to Complaint -
    Letter from Claudio Mascotto, *Procureur,*
    *Pouvoir judiciare, Ministere public* to Pearlstein
    McCullough & Lederman LLP, dated
    May 11, 2018 ......................................... A-78

    Exhibit E to Complaint -
    Letter from Pearlstein McCullough & Lederman
    LLP to Claudio Mascotto, *Procureur, Pouvoir*
    *judiciare, Ministere public*, dated June 6, 2018 ..... A-86

    Exhibit F to Complaint -
    Letter from Claudio Mascotto, *Procureur,*
    *Pouvoir judiciare, Ministere public* to Pearlstein
    McCullough & Lederman LLP, dated
    June 12, 2018 ......................................... A-89

Complaint Cover Sheet............................................. A-97

ii

**Page**

Complaint in Aboutaam Matter
  (Omitted herein)

Exhibit E to Complaint -
Letters, dated July 5, 2018, from Pearlstein
McCullough & Lederman LLP to Dr. Christian
Bock, *Directeur*, Swiss Customs Administration;
Mr. Pierre Maudet, *Président du Conseil d'État*,
Canton of Geneva; Mr. Ueli Maurer, *Conseiller
Fédéral, Département Fédéral des Finances*; and
Mr. Olivier Jornot, *Procureur general, Pouvoir
judiciare, Ministère public* ...................................... A-99

Exhibit F to Complaint -
Letter, dated July 20, 2018, from Mr. Christian
Bock, *Directeur*, Swiss Customs Administration .. A-116

Exhibit G to Complaint -
Letter, dated August 2, 2018, from Mr. Pierre
Maudet, *Président du Conseil d'État*, Canton of
Geneva ................................................................. A-124

Exhibit H to Complaint -
Letter, dated August 2, 2018, from Claudio
Mascotto, *Procurer, Pouvoir judiciare, Ministère
public* ................................................................. A-126

Memo Endorsement and Joint Management Plan,
  dated December 7, 2018 ....................................... A-134

Notice of Motion by Defendants, for an Order to
  Dismiss the Complaint, dated January 25, 2019.... A-137

Declaration of Stephen E. Becker, for Defendants,
  in Support of Motion, dated January 25, 2019 ...... A-140

iii

Page

Exhibit 1 to Becker Declaration -
Screenshot from the website of the *L'Office
Federal De La Culture De La Confederation
Suisse* ("Swiss Federal Customs
Administration"), available at
https://www.ezv.admin.ch/ezv/en/home.html ........  A-143

Exhibit 2 to Becker Declaration -
Screenshot from the website of *L'administration
Federale Des Douanes De La Confederation
Suisse* ("Swiss Federal Office of Culture"),
available at
https://www.bak.admin.ch/bak/en/home.html .......  A-146

Exhibit 3 to Becker Declaration -
Switzerland's Annex 1 to the World Trade
Organization's Government Procurement
Agreement Coverage Schedules ...........................  A-149

Exhibit 4 to Becker Declaration -
Screenshot from the website of the Swiss Federal
Customs Administration entitled "Mandate,"
available at
https://www.ezv.admin.ch/ezv/en/home/the-
fca/mandate.html ....................................................  A-159

Exhibit 5 to Becker Declaration -
Screenshot of the Website of the Swiss Federal
Office of Culture entitled "Mission," available at
https://www.bak.admin.ch/bak/en/home/the-foe/
mission.html............................................................  A-163

Exhibit 6 to Becker Declaration -
Publication of U.S. Customs and Border
Protection, *Bonded Warehouse,* available at
https://www.cbp.gov/sites/default/files/document
s/bonded_20wh2_2.pdf...........................................  A-165

iv

**Page**

Exhibit 7 to Becker Declaration -
Article published in the New York Times on June
24, 2004, titled "Art Dealer Pleads Guilty In
Import Case," available at
https://www.nytimes.com/2004/06/24/arts/art-
dealer-pleads-guilty-in-import-case.html .............. A-170

Exhibit 8 to Becker Declaration -
Press Release of the District Attorney for New
York County, titled "Manhattan District
Attorney's Office Returns Three Ancient Statues
to Lebanese Republic," available at https://www.
manhattanda.org/manhattan-district-attorneys-
office-returnsthree-ancient-statues-lebanese-
republic/ ................................................................. A-173

Declaration of Hans Georg Nussbaum, dated
January 24, 2019 .................................................... A-178

Exhibit 1 to Nussbaum Declaration -
Articles 21 and 25 of *Loi sur les douanes du 19
mars 2005* (the Customs Act of 18 March 2005)
("Customs Act") (SR 631.0) .................................. A-183

Exhibit 2 to Nussbaum Declaration -
Articles 50-53 of the *Loi federale regissant la
taxe sur la valeur ajoutee du 12 juin 2009*
(Federal Act on Value Added Tax of 12 June
2009) ("VAT Act") (SR 641.20)............................. A-191

Exhibit 3 to Nussbaum Declaration -
Articles 26, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54,
55, 56, 57, 58, 59, 60, 92 de 313.0 *Loi federale
sur le droit pénal administratif* .............................. A-198

Exhibit 4 to Nussbaum Declaration -
*Decision de Perception subsequente - 2 protomes
I no d'inventaire* TR.PR0.009................................ A-212

v

**Page**

Notice of Motion by Defendant *La République et Canton de Genève,* for an Order to Dismiss the Complaint, dated January 25, 2019 ...................... A-239

Declaration of Kevin N. Ainsworth, for Plaintiff, in Opposition to Motion, dated March 29, 2019........ A-241

Exhibit 1 to Ainsworth Declaration - UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, adopted November 14, 1970 ................. A-245

Exhibit 2 to Ainsworth Declaration - Report titled "International Transfer of Cultural Objects: UNESCO Convention of 1970 and Unidroit Convention of 1995: Report of the Working Group" ..................................................... A-269

Exhibit 3 to Ainsworth Declaration - English language version of Switzerland's Cultural Property Transfer Act............................... A-323

Exhibit 4 to Ainsworth Declaration - English language version of Switzerland's Cultural Property Transfer Ordinance ................... A-336

Exhibit 5 to Ainsworth Declaration - Fact Sheet concerning Bilateral Agreements published by the FOC ............................................ A-348

Exhibit 6 to Ainsworth Declaration - Memorandum published by the FOC and titled Import, Transit and Export of Cultural Property ... A-350

Exhibit 7 to Ainsworth Declaration - Excerpts from the Federal Constitution of the Swiss Confederation .............................................. A-357

vi

**Page**

Exhibit 8 to Ainsworth Declaration -
Association of Art Museum Directors' "New
Report on Acquisition of Archaeological
Materials and Ancient Art," dated June 4, 2008 ....  A-369

Exhibit 9 to Ainsworth Declaration -
Association of Art Museum Directors' Guidelines
on the Acquisition of Archaeological Material
and Ancient Art (revised 2013) ............................  A-376

Exhibit 10 to Ainsworth Declaration -
Collection of *New York Times* articles regarding
antiquities ...............................................................  A-386

Exhibit 11 to Ainsworth Declaration -
*New York Times* article, dated February 3, 2006,
titled "The Met, Ending 30-Year Stance, Is Set to
Yield Prized Vase to Italy." ...................................  A-411

Exhibit 12 to Ainsworth Declaration -
Printout from United States Copyright Office
showing registration of a copyright in the name
of "Swiss Federal Office of Culture" for a book
titled "Tschumi on architecture: conversations
with Enrique Walker." ...........................................  A-416

Exhibit 13 to Ainsworth Declaration -
Printout from Amazon.com showing the book
titled "Tschumi on architecture: conversations
with Enrique Walker" ............................................  A-418

Exhibit 14 to Ainsworth Declaration -
Printout from Amazon.com showing a number of
books that list the Swiss Federal Office of
Culture as either the author, publisher, or editor ....  A-421

vii

**Page**

Exhibit 15 to Ainsworth Declaration -
Articles dated September 11, 2017, from the
website swissinfo.ch, with the title "Priceless
Roman sarcophagus heads home after legal
saga." ...................................................................... A-470

Exhibit 16 to Ainsworth Declaration -
Article, dated January 24, 2018, from the website
www.letemps.ch, titled: "Teodorin Obiang
inquiry: a rejected Geneva prosecutor."................. A-477

Exhibit 17 to Ainsworth Declaration -
Article, dated May 13, 2018, printed from the
website www.letemps.ch, with the title: "*A
Genève, des antiquités séquestrées par la justice
ont été volées*"......................................................... A-481

Exhibit 18 to Ainsworth Declaration -
Article, dated August 17, 2018, printed from the
website www.letemps.ch with the title: "*La
justice genevoise rend 5000 oeuvres à un
marchand d'art.*".................................................... A-491

Exhibit 19 to Ainsworth Declaration -
Article, dated August 31, 2018, printed from the
website of www.theartnewspaper.com titled:
"Swiss Prosecutor returns 'Mesopotamian'
terracotta animal made by dealer's 11-year-old-
daughter—along with 5,000 seized antiquities".... A-501

Exhibit 20 to Ainsworth Declaration -
Letter (with certified translation) from the Public
Prosecutor of Geneva to attorney Didier Bottge,
Esq. (attorney for Ali Aboutaam), dated
August 8, 2018...................................................... A-507

viii

**Page**

Exhibit 21 to Ainsworth Declaration -
Excerpts from the FOC's 2017 Annual Report, as
well as translations of the excerpts ........................ A-515

Exhibit 22 to Ainsworth Declaration -
Mission Statement printed from the FOC's
website .................................................................. A-547

Letter from Mintz, Levin, Cohen, Ferris, Glovsky
and Popeo, P.C. to the Honorable Ronnie
Abrams, dated May 7, 2019.................................. A-552

Exhibit A to Ainsworth Letter -
Letter from Federal Department of Finances DFF
to Inanna Art Services SA, dated April 11, 2019... A-556

Exhibit B to Ainsworth Letter -
Letter from Federal Department of Finances DFF
to Phoenix Ancient Art SA, dated April 3, 2019.... A-565

Exhibit C to Ainsworth Letter -
Mandate of Expertise, dated April 5, 2017 ........... A-570

Letter from Pillsbury Winthrop Shaw Pittman, LLP
to the Honorable Ronnie Abrams, dated
May 15, 2019 ........................................................ A-579

Letter from Arnold & Porter to the Honorable
Ronnie Abrams, dated May 15, 2019 ................... A-582

Letter from Mintz, Levin, Cohen, Ferris, Glovsky
and Popeo, P.C. to the Honorable Ronnie
Abrams, dated May 21, 2019................................. A-586

Exhibit A to Marmur Letter -
Minutes of the Public Prosecutor's hearing on
August 29, 2018.................................................... A-588

ix

**Page**

Letter from Mintz, Levin, Cohen, Ferris, Glovsky
   and Popeo, P.C. to the Honorable Ronnie
   Abrams, dated July 11, 2019.................................. A-596

Letter from Pillsbury Winthrop Shaw Pittman, LLP
   to the Honorable Ronnie Abrams, dated
   July 12, 2019.......................................................... A-599

Transcript of Proceedings held before the
   Honorable Ronnie Abrams, dated July 8, 2019 ..... A-601

Notice of Appeal, dated October 22, 2019................. A-646

A-470

# EXHIBIT 15

A-471



**GENEVA TO TURKEY**

# Priceless Roman sarcophagus heads home after legal saga

*By Simon Bradley*

SEP 11, 2017 - 12:08



The three-tonne marble sarcophagus that dates from the second century AD is carved with detailed images of the 12 Labours of Hercules

*(Ministère public genevois)*

A-472

Priceless Roman sarcophagus heads home after legal saga - SWI swissinfo.ch

**Seven years after it was discovered in a Geneva free port, a rare Roman Empire-era sarcophagus carved with the 12 Labours of Hercules is returning to Turkey this week. The long-running legal saga symbolises the huge challenges surrounding the restitution of artefacts and Swiss free ports.**

This Wednesday the ornately decorated ☑ 2nd-century AD marble sarcophagus, one of only four of its kind in the world which experts say is the most beautiful, is due to be loaded onto a cargo plane at Zurich airport. From there it will be flown to Turkey, where it will be displayed in the ☑ Archaeological Museum in Antalya.

This marks the culmination of a drawn-out ownership battle over the three-tonne marble coffin that has involved prosecutors, lawyers, customs and police officers, art dealers, archaeologists and numerous other specialists.

"It was a huge work," said Turkey's consul general Barbaros Dicle. "There has been massive cooperation between Swiss and Turkish authorities and prosecutors' offices. They did a thorough investigation and finally convinced the Geneva authorities that the sarcophagus was originally from Turkey and it was excavated illegally so needed to return to Turkey."

The sarcophagus is thought to have been smuggled out of Turkey in the 1970s before Swiss customs officials stumbled upon it during checks at Geneva's huge free port warehouse complex in 2010.



A-473

Priceless Roman sarcophagus heads home after legal saga - SWI swissinfo.ch

*(Ministère public genevois)*

## A 'long legal battle'

Geneva-based antiques dealer ⤢ Phoenix Ancient Art, which had legal possession of the sarcophagus, had tried to block the restitution before finally abandoning its efforts before the Swiss courts in March 2016. The company had appealed ⤢ a decision in September 2015 by the Geneva public prosecutor's office to hand over the sarcophagus to Turkey.

"I inherited the sarcophagus from my father who bought it totally legally, like all the objects he bought, in accordance with the laws of the time," said co-owner Ali Aboutaam. His deceased father Sleiman Aboutaam, a Lebanese art dealer, allegedly purchased the object in the 1990s.

During the restitution procedure, Geneva and Antalya prosecutors found that the sarcophagus had been removed from Turkey after being dug up in illegal archaeological excavations in the 1970s on the site of the necropolis in the ancient town of Perga in Antalya.

But it is unclear exactly how the priceless sarcophagus ended up being sold and transferred to the Geneva free port warehouse.

In 1998, Sleiman Aboutaam died in a Swissair plane crash off the coast of Nova Scotia. The Geneva prosecutor's office closed its criminal investigation into the sarcophagus in 2015.

Ali Aboutaam said he had cooperated with the Swiss and Turkish authorities over the restitution and was "satisfied" how the case had been resolved.

"It's been a long legal battle," Aboutaam told swissinfo.ch. "A page has been turned. I'm now thinking about the future."

This is an iframe content

A-474

Priceless Roman sarcophagus heads home after legal saga - SWI swissinfo.ch
Case 1:18-cv-08248-RA   Document 46-15   Filed 03/29/19   Page 5 of 7



**HERCULES SAGA**
## Ancient smuggled sarcophagus prepares to return to Turkey

An ancient marble sarcophagus dating from the second century AD that was smuggled out of Turkey in the 1970s is on its way home this week after a ...

## Opaque storage

But the Hercules sarcophagus affair has once again put the spotlight on Switzerland's efforts to prevent looted cultural goods from ending up in its warehouses.

Originally designed to temporarily store commodities and later manufactured goods in transit, Swiss free ports are increasingly used as permanent homes by investors and collectors. Geneva is known as the world's largest tax-free storage site for art.

But free ports are not risk-free. A 2014 report by the Swiss Federal Audit Office warned free ports could be used for fiscal optimisation or to circumvent laws on "cultural goods, war materials, medicines or the trade in raw diamonds". External pressure has come via bodies such as the ⬀ International Financial Action Task Force (GAFI).

While slow to react, over the past decade the small alpine nation has been steadily tightening relevant laws and procedures. In 2005, Switzerland introduced legislation to verify provenance and ownership of all cultural goods and in 2009 it made complete

Case 19-3457, Document 52, 01/31/2020, 2767022, Page16 of 187

A-475

Priceless Roman sarcophagus heads home after legal saga - SWI swissinfo.ch
Case 1:18-cv-08248-RA    Document 46-15    Filed 03/29/19    Page 6 of 7

inventories obligatory. Since 1 January 2016, art collectors and businesses must comply with a new stricter anti-money laundering law and the Geneva free port management also claims to have gone beyond the current minimum legal framework to introduce tougher internal measures such as identifying final beneficiaries.

"There is a new dynamic," said Geneva prosecutor Claudio Mascotto. "Since the introduction of the 2005 law on international transfer of cultural goods, we have a customs notification system that has led to intensified checks. Swiss customs have become more aware of their increasingly important role and taken on people like archaeologists to investigate cases."

## Good cooperation

For the Hercules sarcophagus, cooperation between Swiss customs, the Federal Police Office, the Federal Office for Culture and the scientific community was excellent, he added.

⧉ Lawyer Marc-Andre Renold, an expert in cultural artefacts who represented the Turkish government, agreed.

"The main lesson is that you shouldn't feel discouraged in such cases," he said. "It's difficult but we have the means and legal tools to get there. The biggest difficulty for the state was to prove the origin of the sarcophagus but we managed to do so thanks to help from the archaeologists, scientists and prosecutor's office."

Despite this apparent legal progress, other cultural goods controversies are likely to continue to surface.

"There are lots of other cases, I can assure you," said Renold.

Last November, Geneva's art world suffered a blow to its reputation when prosecutors seized cultural relics looted from Syria's ancient city of Palmyra, as well as from Libya and Yemen, which were being stored in the Geneva free port. Nine of these objects seized by the Geneva attorney general's office are currently on display to the public at ⧉ Geneva's Art and History Museum.

"In such a big art warehouse as the Geneva free port there are probably some old cases and maybe some new ones too, as some people take much longer to realise that a paradigm change has taken place," said Mascotto.

*swissinfo.ch*

A-476

Priceless Roman sarcophagus heads home after legal saga - SWI swissinfo.ch

 SWI swissinfo.ch, a branch of the Swiss Broadcasting Corporation 

A-477

EXHIBIT 16

A-478

# LE TEMPS



The son of the president of Equatorial Guinea, Teodorin Obiang, in Malabo in 2013.
© AFP / JEROME LEROY

**JUSTICE**

## Teodorin Obiang inquiry: a rejected Geneva prosecutor

**The Federal Court disavowed Claudio Mascotto for lack of impartiality in the criminal investigation opened by the Geneva Public Ministry against the son of the President of Equatorial Guinea. The latter is accused of money laundering**

**2 minutes** of reading

🏷 Geneva 🏷 Justice 🏷 Africa

**Sylvia Revello**
Published Wednesday, January 24, 2018 at 11:58, modified Wednesday, January 24, 2018 at 12:13.

The Federal Court ordered the challenge of Claudio Mascotto, one of the two prosecutors in charge of the investigation of the son of the President of Equatorial Guinea Teodorin Obiang. A rare decision. The judges of Mon Repos thus accede to the

Still **9** free articles to read

access our content changes ✕



A-479

request of the Government of Equatorial Guinea and a lawyer of the Geneva study AS who denounced a lack of impartiality. Aged 48, Teodorin Obiang is accused of money laundering by the Geneva Public Ministry.

Revealed by the site of *La Tribune de Genève* , the information complicates the investigation opened in autumn 2016 against Teodorin Obiang. The criminal proceedings include the suspicious acquisition of two yachts. The A. S. study, which reportedly took part in the transaction, is also warned of bleaching coactivity. In November 2016, eleven luxury cars belonging to the president's son had been seized by the courts on the tarmac of Cointrin airport. The following month, the ship named *Ebony Shine* , estimated at one hundred million dollars, had also been confiscated.

**Read also:** These Swiss who managed the ill-gotten money of the Obiang clan

In 2015 already, a survey of the *time* had revealed the links of Teodoro Nguema Obiang Mongue with Switzerland as part of the procedure of "ill-gotten gains" started in France. Accused of money laundering, misappropriation of public funds and corruption, the son of the president was sentenced in November 2017 in Paris to three years in prison and 30 million euros in fines, all of them suspended. He appealed this decision.

**See also:** The Geneva Public Ministry seizes 11 cars belonging to Teodorin Obiang

Uncertainty remains as to the continuation of the Geneva training. Will Claudio Mascotto be replaced or will the other appointed prosecutor, Johan Droz, officiate alone? *The Tribune de Genève* states that the decisions taken so far by the challenged magistrate are not invalidated.

PUBLICITY

---

Sylvia Revello
@sylviarevello

Journalist, Swiss politics, society, migration history

**Still 9 free articles to read**

access our content changes ✕



PUBLICITY

Still   9   free articles to read

access our content changes                    ✕



A-481

EXHIBIT 17

# LE TEMPS



This mosaic of Christ, dating from the Byzantine period (6th-7th centuries) was made with glass mosaic tiles, some covered with gold leaf.
© DR

**ART MARKET**

## In Geneva, antiquities seized by Swiss authorities have been stolen

**A surprising twist in the Ali Aboutaam Affair, involving the Geneva-based art dealer under investigation. About 20 of his seized objects have disappeared while in the custody of Swiss authorities. A new investigation has been opened**

**4 minutes** of reading

🏷 **Geneva**   🏷 **Justice**

**Laure Lugon**
Published on Sunday May 13, 2018 at 16:58, modified on Sunday May 13, 2018 at 16:58.

The case involving Ali Aboutaam has gone from the fantastic to the surreal. The Geneva-based owner of Phoenix Ancient Art had all of his ancient art objects seized by the Geneva Public Prosecutor's Office on suspicions of illicit provenance, but now an unlikely twist has added some spice to the story: 23 objects of inestimable cultural value have been stolen from under Swiss authorities' eyes, Le Temps has learned. "A separate proceeding has been opened following the discovery of the disappearance of seized objects," Henri Della Casa, spokesman for the Public Prosecutor's Office, confirmed. "Investigations are underway, and the Public Prosecutor's Office has no comment."

A-483

It's an outrageous story for the observer, but a sad one for the owner, who's lost 4 million Swiss francs in all. They include frescoes, a Sumerian tablet from the 3rd millennium BC and, above all, sumptuous mosaics, including one of Christ from the Byzantine period (6th-7th century CE), made of glass mosaic tiles, some covered in gold leaf and stones of varied colors. "This marvelous Christ as well as a Madonna, which has also disappeared, were hung for many years in my apartment," the Geneva art dealer of Lebanese origin explained. "They came from my father. I'm stupefied by the negligence of the authorities who had these objects in their custody." Ali Aboutaam has transformed from defendant into plaintiff after filing suit in this case of theft.

**Related article:** The confessions of Ali Aboutaam, powerful and controversial art dealer

## A happy coincidence

What actually happened? February 2017. The Public Prosecutor's Office seized all the objects belonging to the ancient art dealer. His wife was jailed under suspicion of violating the law on the transfer of cultural assets. She was seen moving objects in a mysterious warehouse in Carouge. Two weeks later, she was released under circumstances that could be described as a happy coincidence: it came on the same day on which Ali Aboutaam withdrew his lawsuit in the Federal Court about the Roman sarcophagus that had been seized and promised to cooperate with investigators (Le Temps, October 7, 2017). He would help investigators read his software, which is the memory of his business, and pay experts in charge of shining light on the provenance of these pieces.

Faced with the enormity of this task — Customs authorities and law enforcement seized 15,000 objects - they distributed them between a Confederation warehouse in Ports Francs and that notorious depot in Carouge. "In either case, they were under the responsibility of Swiss authorities," Mr. Didier Bottge, Ali Aboutaam's attorney, stated.

**Related article:** A Geneva-based art dealer recovers his second sarcophagus. According to the minutes of a meeting between prosecutor Claudio Mascotto and Ali Aboutaam, which Le Temps has examined, the truth was uncovered on December 8 of last year, when the prosecutor asked for an additional expert report on objects stored in Carouge. Customs official went to the depot and observed that it was empty. The lock was no longer there.

But Ali Aboutaam had to wait until April 20 to learn of this mysterious disappearance: "The prosecutor asked me if I had spoken about this warehouse to anyone, and I told him no," Ali Aboutaam explained. "That's when he told me about the theft. I fell off my chair. Not only wasn't he able to take care of my pieces, but he didn't tell me about it until after four months!"

## Request for recusal of prosecutors

His attorney then decided to ask the prosecutors Claudio Mascotto and Gregory Orci as well as Jean-Marc Renaud, head of the investigation with the anti-fraud section of the Federal Customs Administration, all to recuse themselves. "The prosecutors rejected this request, and the matter has been referred to the Court, in a separate proceeding, and is currently under review," the spokesman for the Public Prosecutor's Office added. The second recusal request is being examined by the Federal Customs Administration.

Who got their hands on the shimmering, golden Christ and Madonna, which are "so similar to the mosaics in the basilica of Ravenna?" Ali Aboutaam complained, not far from considering that men and the gods were in league against him. If we reject the theory of a curse and confine ourselves to the facts - given that there was no sign of forced entry - we can suspect that the guilty party was aware of the proceeding. This excludes a common thief and makes the police, Customs officers, expert archeologists and Ali Aboutaam's friends and family into potential suspects: "Since my client is clearly the victim, it's preposterous to suspect him of this loss," Didier Bottge declared. "That's what the Public Prosecutor's Office attempted to do for four months when they hid this from him, before finally informing him."

Whatever the case, the Public Prosecutor's Office has opened an investigation against persons unknown, and the case will now also be handled by the Inspection générale des services (IGS), Switzerland's version of Internal Affairs. Photos of the 23 stolen objects have been distributed by Interpol. The seemingly endless investigation hanging over the art dealer now has an additional element: a Christ on the lam.

A-485

**Laure Lugon**
**@laurelugon**

Investigative reporter in the Geneva newsroom

A-486



TRANSPERFECT

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"A Genève, des antiquités séquestrées par la justice ont été volées - Le Temps"** is, to the best of my knowledge and belief, a true and accurate translation from French into English.

_____
Aurora Landman

Sworn to before me this
March 28, 2019

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016 l T 212.689.5555 l F 212.689.1059 l WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# LE TEMPS



Cette mosaïque du Christ, datant de la période byzantine (VIe-VIIe siècle), a été réalisée en tesselles de pâte de verre, certaines couvertes de feuille d'or.
© DR

**MARCHÉ DE L'ART**

## A Genève, des antiquités séquestrées par la justice ont été volées

**Ebouriffant rebondissement dans l'affaire Ali Aboutaam, le marchand d'art genevois sous enquête. Une vingtaine de ses objets séquestrés ont disparu alors qu'ils étaient sous la responsabilité de la justice. Une nouvelle enquête a été ouverte**

**4 minutes** de lecture

🏷 **Genève** 🏷 **Justice**

**Laure Lugon**
Publié dimanche 13 mai 2018 à 16:58, modifié dimanche 13 mai 2018 à 16:58.

De rocambolesque, l'affaire du marchand d'art Ali Aboutaam vire au romanesque. Alors que le Genevois, patron de la galerie Phoenix Ancient Art, s'est vu séquestrer tous ses objets antiques, suspectés par le Ministère public genevois d'être d'origine illicite, voilà qu'un improbable rebondissement vient ajouter au piquant de l'histoire: 23 objets d'une valeur culturelle inestimable ont été dérobés aux autorités de poursuite, a appris *Le Temps*. «Une procédure distincte a été ouverte suite à la

A-488

découverte de la disparition d'objets placés sous séquestre, confirme le porte-parole du Ministère public, Henri Della Casa. Les investigations sont en cours et aucun commentaire ne sera fait par le Ministère public.»

Extravagant pour l'observateur, mais lamentable pour le propriétaire, qui déplore l'envol de 4 millions de francs au total. Il s'agit de fresques, d'une stèle sumérienne du IIIe millénaire et, surtout, de mosaïques somptueuses, dont un Christ de la période byzantine (VIe-VIIe siècle ap. J.-C.), réalisé en tesselles en pâte de verre, certaines couvertes de feuille d'or et de pierres de couleurs variées. «Ce merveilleux Christ ainsi qu'une Vierge, également disparue, ont longtemps trôné dans mon appartement, raconte le marchand d'art libano-genevois. Ils me venaient de mon père. Je suis stupéfait devant l'incurie des autorités qui en avaient la garde.» D'accusé, Ali Aboutaam se retrouve plaignant, constitué partie civile dans l'affaire de ce vol.

**Lire aussi:** Les confessions d'Ali Aboutaam, marchand d'art aussi puissant que controversé

## Heureuse concomitance

Que s'est-il donc passé? Février 2017. Le Ministère public saisit tous les objets appartenant au commerçant d'antiquités. Son épouse est incarcérée, soupçonnée d'infraction à la loi sur le transfert de biens culturels (LTBC). Elle a été aperçue déménageant des objets dans un mystérieux entrepôt à Carouge. Quinze jours plus tard, elle est libérée dans des circonstances qu'on peut qualifier d'heureuse concomitance: le jour où Ali Aboutaam retire son recours au Tribunal fédéral sur un sarcophage romain séquestré et promet de collaborer avec les enquêteurs (*Le Temps,* 7 octobre 2017). Il va désormais aider les limiers à lire son logiciel, mémoire de son commerce, et payer les experts chargés de faire la lumière sur l'origine des pièces.

Devant l'énormité de la tâche – les autorités douanières et judiciaires ont saisi la bagatelle de 15 000 objets – elles ventilent ceux-ci entre un entrepôt de la Confédération aux Ports Francs et le fameux dépôt de Carouge. «Dans un cas comme dans l'autre, ils étaient sous la responsabilité des autorités judiciaires», affirme Me Didier Bottge, avocat d'Ali Aboutaam.

**Lire aussi:** Le marchand d'art genevois récupère son deuxième sarcophage

A-489

Selon le procès-verbal d'une séance entre le procureur Claudio Mascotto et Ali Aboutaam, que *Le Temps* a consulté, le pot aux roses est découvert le 8 décembre dernier, alors que le procureur demande une expertise complémentaire sur des objets demeurés à Carouge. Les douanes se rendent sur place et constatent que l'abri est vide. Le cadenas a disparu.

Mais Ali Aboutaam devra attendre le 20 avril pour être mis au parfum de l'énigmatique disparition: «Le procureur m'a demandé si j'avais parlé de cet entrepôt à quelqu'un, ce à quoi j'ai répondu par la négative», explique Ali Aboutaam. «C'est alors qu'il m'a annoncé la nouvelle du vol. J'en suis tombé de ma chaise. Non seulement il n'a pas été capable de veiller sur mes pièces, mais en plus il ne m'a averti que quatre mois plus tard!»

## Récusation des procureurs demandée

Son avocat décide alors de demander la récusation des procureurs Claudio Mascotto et Gregory Orci ainsi que celle de Jean-Marc Renaud, chef de l'enquête à la section antifraude de l'Administration fédérale des douanes. «Les procureurs ont rejeté cette requête et la Cour de justice est désormais saisie, dans une procédure distincte, en cours d'instruction», complète le porte-parole du Ministère public. La seconde demande de récusation, elle, est traitée par l'Administration fédérale des douanes.

Qui a bien pu mettre la main sur le Christ et la Vierge chatoyants et dorés, «si similaires aux mosaïques de la basilique de Ravenne»? se lamente Ali Aboutaam, pas loin de considérer que les hommes et les dieux se sont ligués dans une même alliance. Si l'on rejette la malédiction pour s'en tenir aux faits – étant entendu qu'il n'y a pas eu d'effraction visible – on peut subodorer que le coupable connaît la procédure en cours. Ce qui exclut par conséquent le mauvais larron et fait des policiers, des douaniers, des archéologues experts et de l'entourage d'Ali Aboutaam des suspects potentiels: «Alors que mon client est clairement victime, le comble serait qu'on le suspecte de ce forfait, déclare Me Didier Bottge. Comme le Ministère public a tenté de le faire pendant les quatre mois où il a caché son existence, avant de se résigner.»

Quoi qu'il en soit, le Ministère public a ouvert une instruction contre inconnu et l'enquête revient désormais également à la police des polices, l'Inspection générale des services (IGS). Les photos des 23 objets dérobés ont été diffusées par Interpol. A

A-490

l'enquête interminable que le marchand d'art doit continuer à affronter s'ajoute donc,

Case 1:18-cv-08248-RA   Document 46-17   Filed 03/29/19   Page 10 of 10

désormais, un Christ en cavale.

---

Laure Lugon
**@laurelugon**

Journaliste enquêtrice à la rédaction de Genève

---

A-491

EXHIBIT 18

# LE TEMPS



Head of Caracalla. Early third century CE. One of the 5,000 antiquities released by the Public Prosecutor's Office.
© Hughes Dubois

**ANTIQUITIES**

# Geneva authorities return 5,000 works of art to an art dealer

**The Public Prosecutor's Office of Geneva ordered the release of nearly 5,000 antiquities belonging to the art dealer Ali Aboutaam. Almost all of his objects were seized last year based on suspicions of illicit provenance**

**4 minutes** of reading

🏷 **Geneva**   🏷 **Justice**

**Laure Lugon**
Published on Friday August 17, 2018 at 18:51, modified on Saturday August 18, 2018 at 10:51.

This is a victory for the Geneva-based art dealer Ali Aboutaam in the power struggle that has pitted him against the Geneva prosecutor's office for several years. Le Temps has learned that on August 8 the Public Prosecutor's Office of Geneva released nearly 5,000 objects seized in 2017. The prosecutor Claudio Mascotto let it be known that he would not comment on this proceeding. For his part, Ali Aboutaam, owner of the Geneva-based gallery Phoenix Ancient Art, is still not celebrating, since 6,000 other objects remain frozen. He continues to denounce "baseless ideological harassment."

**Related article:** "The war on collectors has become an ideological struggle"

The Aboutaam saga began in 2015, when the Public Prosecutor's Office seized three sarcophagi belonging to him. The courts returned two of them to him, whereas the third was the subject of a lawsuit in the Federal Court. The art dealer's wife and his chauffeur were placed in preventive detention in Champ-Dollon, after his wife was observed moving art objects from one warehouse to another. She was released two weeks later, when her husband withdrew his lawsuit concerning the third sarcophagus, which in the end was returned to Turkey by Geneva. However, almost all of the couple's ancient art objects were confiscated after the search, since Swiss authorities suspected the Geneva-based dealer of Lebanese origin of being in possession of art objects looted from Syria and Iraq, which he has always forcefully denied.

**Related article:** The confessions of Ali Aboutaam, powerful and controversial art dealer

## "They cannot seize objects in this manner without the slightest proof of possible illicit provenance."

- Didier Bottge, Ali Aboutaam's attorney

Last May, a new twist added some extra spice to a case already worthy of Tintin's Cigars of the Pharaoh: 23 objects of inestimable cultural value - but with a market value of about 4 million Swiss francs - were stolen from the authorities in charge of guarding the seized works. It was a new setback for the art dealer, who denounced their negligence and filed charges of his own. At present, these objects, including a Christ from the Byzantine period and a Madonna, are still missing.

**Related article:** In Geneva, antiquities seized by Swiss authorities have been stolen

According to Ali Aboutaam's attorney, Didier Bottge, the recent release of seized objects has come very late: "This decision is perfectly logical, since these pieces should never have been seized in the first place. They cannot seize objects in this manner without the slightest proof of possible illicit provenance. Such proof has never materialized. The existence of these pieces and their presence in Switzerland were documented with an eye to the introduction of the Swiss law on the transfer of cultural assets in 2005."

These objects were in fact inventoried by a court officer. However, the Public Prosecutor's Office added, in a letter which Le Temps has obtained, that this inventory "cannot be invoked to establish the licit provenance of the pieces." Should we understand from this clever formulation that the prosecutors are releasing these objects without the certainty that they are above all suspicion? The prosecutor did not respond to this question either.

**Related article:** New investigation involving a Geneva art dealer

## A cascade of legal consequences

Whatever the case may be, the release of 5,000 ancient art objects comes at the right time for the art dealer, since his business has been at a standstill for more than a year. Owners who had entrusted him with the sale of their assets are getting impatient. An example? On August 8 of last year, the date of the partial release of the objects in Geneva, a US court announced that "a couple from Colorado are suing the Swiss government in a federal court for having seized 18 Greek, Roman and Egyptian antiquities shipped to Geneva in order to be sold by Ali Aboutaam."

According to them, "neither the Federal Office of Culture nor the Federal Customs Administration set forth an appropriate legal basis for the seizure of their assets." They are asking for $24 million in damages. This lawsuit has no relation with the partial release of the seized objects, since the objects in question were not released. But it does demonstrate that the duration of the proceeding has triggered a cascade of legal consequences.

While the Aboutaam case in Geneva is far from over, a few thousand objects may nonetheless go back on sale. All of them? No. In the rush of last year's search, a terracotta animal was seized by the police and inventoried as a Mesopotamian object. It was released a few weeks later. It turned out to be the work of Aboutaam's 11-year-old daughter, with a label reading "With love, for Daddy."

A-495

---

**Laure Lugon**
**@laurelugon**

Investigative reporter in the Geneva newsroom

---

Latest video                                                        all videos

A-496



TRANSPERFECT

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"La justice genevoise rend 5000 œuvres à un marchand d'art - Le Temps"** is, to the best of my knowledge and belief, a true and accurate translation from French into English.

Aurora Landman

Sworn to before me this
March 28, 2019

Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# LE TEMPS



Tête de Caracalla, début du troisième siècle après J.-C.,
une des 5000 antiquités libérées par le Ministère
public.
© Hughes Dubois

**ANTIQUITÉS**

# La justice genevoise rend 5000 œuvres à un marchand d'art

**Le Ministère public genevois a ordonné la levée du séquestre sur près de 5000 antiquités appartenant au marchand d'art Ali Aboutaam. La quasi-totalité de ses objets, suspectés de provenance illicite, avaient été saisis l'année dernière**

**4 minutes** de lecture

🏷 **Justice** 🏷 **Genève**

**Laure Lugon**
Publié vendredi 17 août 2018 à 18:51, modifié samedi 18 août 2018 à 10:51.

C'est une victoire d'étape pour le marchand d'art genevois Ali Aboutaam, dans le bras de fer qui le met aux prises avec la justice genevoise depuis des années. Le Ministère public genevois vient de lever le séquestre, le 8 août dernier, sur près de 5000 objets saisis en 2017, a appris *Le Temps*. Le procureur Claudio Mascotto fait savoir qu'il ne commentera pas cette procédure. De son côté, Ali Aboutaam, patron de la galerie

A-498

genevoise Phoenix Ancient Art, ne pavoise pas pour autant, puisque 6000 objets sont toujours bloqués et qu'il continue de dénoncer un «acharnement idéologique sans fondement».

**Lire également:** «La chasse aux collectionneurs est devenue un combat idéologique»

La saga Aboutaam commence en 2015, quand le Ministère public saisit trois sarcophages lui appartenant. Les tribunaux vont lui en restituer deux, alors que le troisième fait l'objet d'un recours au Tribunal fédéral. L'épouse du marchand d'art et son chauffeur sont placés en détention préventive à Champ-Dollon, la première ayant été observée en train de déplacer des objets d'art d'un dépôt à l'autre. Elle est libérée quinze jours plus tard, quand son mari retire son recours sur le troisième sarcophage, qui sera finalement restitué par Genève à la Turquie. Mais la quasi-totalité des antiquités des époux est confisquée après perquisition, la justice suspectant le Genevois d'origine libanaise de détenir des objets d'art pillés en Syrie et en Irak, ce que l'intéressé a toujours farouchement nié.

**Lire aussi:** Les confessions d'Ali Aboutaam, marchand d'art aussi puissant que controversé

peut pas bloquer un patrimoine de la sorte sans avoir le

re élément sur une éventuelle provenance illicite. »

r Bottge, avocat d'Ali Aboutaam

En mai dernier, un nouveau rebondissement vient ajouter du rocambolesque à une affaire déjà digne des *Cigares du pharaon*: 23 objets d'une valeur culturelle inestimable – mais d'une valeur marchande d'environ 4 millions de francs – sont dérobés aux autorités de poursuite qui en avaient la garde. C'est un nouveau coup dur pour le marchand d'art, qui dénonce l'incurie et porte plainte à son tour. A ce jour ces objets, dont un Christ de la période byzantine et une Vierge, sont toujours introuvables.

**Lire aussi:** A Genève, des antiquités séquestrées par la justice ont été volées

A-499

Pour l'avocat d'Ali Aboutaam, Didier Bottge, la récente levée de séquestre arrive bien tard: «Il est parfaitement logique que cette décision survienne, car ces pièces n'auraient jamais dû être saisies. On ne peut pas bloquer un patrimoine de la sorte sans avoir le moindre élément sur une éventuelle provenance illicite. De tels éléments ne sont jamais apparus. Ce sont des pièces dont l'existence et la présence en Suisse ont été documentées en prévision de l'entrée en vigueur de la loi sur le transfert des biens culturels (LTBC) en 2005.»

Ces objets avaient en effet été inventoriés par un huissier. Mais le Ministère public ajoute, dans le courrier que *Le Temps* s'est procuré, que cette levée «ne peut être invoquée pour établir l'origine licite des pièces». Faut-il comprendre par cette formulation rusée que le parquet libère ces objets sans avoir la certitude qu'ils sont au-dessus de tout soupçon? Le procureur n'a pas non plus répondu à cette question.

**Lire aussi:** Nouvelle enquête autour d'un marchand d'art genevois

## Une cascade de conséquences judiciaires

Quoi qu'il en soit, la libération de 5000 antiquités tombe bien pour le marchand d'art, alors que ses affaires sont à l'arrêt depuis plus d'un an. Car les propriétaires qui lui avaient confié la vente de leurs biens s'impatientent. Exemple? Un tribunal états-unien annonce le 8 août dernier, date de la levée partielle du séquestre à Genève, «qu'un couple du Colorado a poursuivi le gouvernement suisse devant un tribunal fédéral pour avoir saisi dix-huit antiquités grecques, romaines et égyptiennes envoyées à Genève pour être vendues par Ali Aboutaam».

Selon eux, «ni l'Office fédéral de la culture ni l'Administration fédérale des douanes n'ont invoqué une base juridique appropriée pour la saisie de leurs biens». Ils réclament une indemnité de 24 millions de dollars. Cette action judiciaire n'a aucun lien avec la levée partielle du séquestre, puisque ces objets ne font pas partie du lot libéré. Mais elle démontre que la durée de la procédure déclenche des conséquences judiciaires en cascade.

Si l'affaire Aboutaam à Genève n'est de loin pas terminée, quelques milliers d'objets pourront néanmoins retourner à la vente. Tous? Non. Dans la précipitation de la perquisition l'année dernière, une terre cuite représentant un animal a été saisie par

A-500

les policiers et répertoriée comme objet mésopotamien. Elle a été libérée quelques semaines plus tard. Il s'agissait en fait d'une création artistique de la fille des Aboutaam, 11 ans, portant la griffe «With love, for Daddy».

---

**Laure Lugon**
**@laurelugon**

Journaliste enquêtrice à la rédaction de Genève

---

La dernière vidéo ——————————————————————————— toutes les vidéos

A-501

# EXHIBIT 19

NEWS  →  ART MARKET

# Swiss prosecutor returns 'Mesopotamian' terracotta animal made by dealer's 11-year-old-daughter—along with 5,000 seized antiquities

A further 6,000 items belonging to Ali Aboutaam of Phoenix Ancient Art are still held by authorities in Geneva

ANNA BRADY

31st August 2018 11:59 GMT

A-503



Ali Aboutaam, left, and brother Hicham Aboutaam of the Phoenix Ancient Art Company pose with a monumental marble head of the Emperor Tiberius, which is not believed to be among the seized items

© Alastair Miller/Bloomberg via Getty Images

A court in Geneva has released around 5,000 antiquities belonging to Ali Aboutaam of Phoenix Ancient Art ⧉ which were seized in October 2017 on suspicion of having illicit provenances. A further 6,000 ancient items belonging to the New York- and Geneva-based dealer Aboutaam remain in the hands of the Swiss authorities, who believe them to be suspect.

However, according to a report in the Swiss publication Le Temps, one item had already been released—a terracotta animal which was labelled by Swiss police as Mesopotamian when it was seized last year. It was relinquished a

A-504

few weeks later, when found to have been in fact made by Aboutaam's 11-year-old daughter. The label attached reading "With love, for Daddy" may have been a give-away.

Neither the prosecutor, Claudio Mascotto, nor the Public Prosecutor's Office of Geneva would provide any comment on the case.

Aboutaam's lawyer Didier Bottge, says: "These items should never have been frozen by the Swiss justice system, which is why we are very happy that they have been released. There is no proof of illicit provenance." He adds: "They are still withholding around 6,000 items which are currently under expert consideration. I am confident that in a couple of months, more items will be released." The 11,000 items withheld accounted for "a large part of the Geneva gallery's stock" making business "very difficult", Bottge's says. Their total value, he says, is hard to calculate "as some items have been in the family's possession for many years" but he estimates their total worth to amount to "dozens of millions".

This is only a stage victory for Aboutaam, whose business Phoenix Ancient Art has been scrutinised by US ↗, Egyptian and European ↗ authorities in the past. In January, the recently formed New York District Attorney's Antiquities Trafficking Unit, led by the Assistant District Attorney Matthew Bogdanos, seized six ancient Hellenic artefacts ↗ from Phoenix Ancient Art. The search warrant named the artefacts as potential evidence related to charges of stolen property, but Phoenix Ancient Art said in a statement: "Those pieces were consigned to us from an American collection that acquired them in the mid 1990s in London. Before that, we were happy to learn that these pieces were on loan to the Musée d'art et d'histoire in Geneva from October 1978-October 1981, and then for over a decade at the Getty Museum. This was information we had. What more can a dealer do?"

Among the 6,000 items still held by Swiss authorities are 18 Greek, Roman and Egyptian antiquities, valued at around $8m, which had been sent by a Colorado couple, Lynda and William Beierwaltes, to be sold by Aboutaam.

They were among the items seized by Swiss authorities from a Geneva warehouse in February 2017. On 8 August (the same day that the Geneva court partially released Aboutaam's items), the Beierwaltes filed a lawsuit ⬀ in a Colorado court suing the Swiss government. According to the lawsuit, "neither the Office of Culture of the Swiss Confederation nor the Federal Customs Administration have asserted any proper legal basis for the seizure of the Beierwaltes property pursuant to international or Swiss law." The Beierwaltes are seeking $24m in damages.

The Beierwaltes' lawyer, Jessica Black Livingston of Hogan Lovells in Denver, tells The Art Newspaper: "The Swiss government took this action prior to any decision by the US court in connection with the Beierwaltes' complaint, so we do not know whether filing the complaint impacted the Swiss government's decision." She confirms that "the 18 items have not been returned to the Beierwaltes, nor have they been released to Phoenix to sell. The Beierwaltes' suit is still pending, and they have not received the requested damages."

More News    Topics    Law    Antiquities & Archaeology

Phoenix Ancient Art gallery    Switzerland

# Related content





**The good, the pricey and...**    **London's Masterpiece fair**

**white Signac glows at
Christie's sale**

**preserving Syria's war-
torn heritage**

**scheme over \$1.2m
Chagall painting**

**Basel and UBS Global Art
Market Report finds**

**Gallery's ownership of a
Matisse**

EXHIBIT 20

**A-508**

[logo]                    Republic and Canton of Geneva
POST TENEBRAS LUX    **DEPARTMENT OF JUSTICE**          Geneva, August 8, 2018
                      **Public Prosecutor**

Public Prosecutor            [stamp:]                              P/2949/2017/MSC - Box 216
Route de Chancy, 6B      **RECEIVED on**            1211 GENEVA 3
P.O. Box 3565             **10 AUG 2018**          R        [bar code]
CH-1211 GENEVA 3                                          98.41.900053.10267365
www.ge.ch/justice                                  [logo:] LA POSTE

                                          Mr. Didier Bottge, Esq.
                                          Bottge & Partners SA
                                          Rue François-Bellot 1
                                          1260 Geneva

| Ref.: **P/2949/2017 MSC** |
| To be included in all correspondence |

**Subject:**      partial lifting of sequester

Dear Sir,

In the case referenced above, the Public Prosecutor hereby orders

➤ The lifting of the sequester of

    o   the items inventoried by court bailiff and currently held at the customs office at the Free Port;

    o   with the exception of

        •   the items identified by the archeologists and removed by the Finance Brigade to a local owned by the Federal Customs Administration by order of the Public Prosecutor (Appendix 1);

        •   the items identified by the archeologists and subject to examination by the appraiser CAVIGNEAUX, in accordance with the Appendix to the draft appointment of an appraiser (Appendix 2).

This partial lifting of sequester is due to the foreseeable material impossibility of conducting all of the inspections necessary to allay the suspicion of unlawful origin of some items. It may not be relied upon as evidence of the lawful origin of the items.

The Public Prosecutor would like to remind you that you are invited to comment on the draft appointment of the appraiser CAVIGNEAUX.

Yours sincerely,

                                          [stamp :]
                                          *PUBLIC
                      [signature]          PROSECUTOR*

                      Claudio Mascotto
                      Public Prosecutor       [emblem]

                                          of the REPUBLIC &
Appendices referenced                      CANTON of
CC: AFD and BFIN

---

MP_M_211          Public Prosecutor - Tel.: +41 22 327 64 63/64 - Fax: +41 22 237 65 00          MSC
Certified mail      **Opening hours: 8:00 a.m.-12:00 p.m. / 2:00- 5:00 p.m/ Tel. 8:30 a.m. - 12:00 p.m. 2:00- 5:00 p.m.**
                   Directions to Geneva Courthouse: line 14, Quidort stop / lines 2 & 19, Claire Vue stop

A-509



TRANSPERFECT

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATION

I, Aurora Landman, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided French into English translation(s) of the source document(s) listed below are true and accurate:

- Scan_10082018085030 (2)

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

_____
Aurora Landman, Project Assistant

Sworn to before me this
Thursday, March 28, 2019

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356764
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**A-510**



République et canton de Genève
**POUVOIR JUDICIAIRE**
**Ministère public**

Genève, le 8 août 2018

REÇU le
1 0 AOÛT 2018

P/2949/2017 MSC - Case 216

Ministère public
Route de Chancy 6 B
Case postale 3565
CH - 1211 GENEVE 3
www.ge.ch/justice

**R** 1211 GENEVE 3
‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
98.41.900053.10267365

Maître
BOTTGE Didier
Bottge & Associés SA
Rue François-Bellot 1
1206 Genève

Réf : **P/2949/2017** MSC
à rappeler lors de toute communication

<u>Concerne</u> :  levée partielle de séquestres

Maître,

Dans la procédure citée en marge, le Ministère public ordonne par la présente

➢ la levée du séquestre portant sur

    o les objets inventoriés par huissier et se trouvant sous douane aux Ports-Francs ;

    o à l'exception

        ▪ des objets identifiés par les archéologues et déplacés par la Brigade Financière dans un local de l'Administration Fédérale des Douanes sur mandat du Ministère Public (annexe 1) ;

        ▪ des objets identifiés par les archéologues et devant être soumis à l'expert CAVIGNEAUX, selon annexe au projet de mandat d'expertise (annexe 2).

La présente levée partielle de séquestre est motivée par l'impossibilité matérielle prévisible de conduire l'intégralité des contrôles nécessaires pour dissiper les soupçons de provenance illicite de certaines pièces. Elle ne peut être invoquée pour établir l'origine licite des pièces.

Le Ministère Public saisit l'occasion pour vous rappeler l'invitation à vous déterminer sur le projet d'expertise CAVIGNEAUX.

Je vous prie de croire, Maître, en l'assurance de ma parfaite considération.

Claudio MASCOTTO
Procureur

Annexes mentionnées
CC : AFD et BFIN

MP_M_211
Recommandé

Ministère public - Tél : +41 22 327 64 63/64 - Fax : +41 22 327 65 00
Horaire guichet : 8h-12h 14h-17h / tél : 8h30-12h 14h-17h
Accès TPG : 14 arrêt Quidort / 2, 19 arrêt Claire-Vue

MSC

A-511

## Annexe 1
## 51 objets déplacés par la BFIN
## pour examen complémentaire

| | |
|---|---|
| ALA.VA.043 | ALA.VSL.023 |
| ALA.VSL.052 | BAS.ALT.012 |
| BON.ID.012 | BR.AN.240 |
| BR.BOW.075 | BR.FIG.365 |
| BR.LA.066 | BRE.BOW.001 |
| CER.VSL.013 | CER.VSL.014 |
| COR.AMU.029 | COR.ING.052 |
| COR.ING.054 | CR.ING.009 |
| ELE.SEA3.001 | GD.RIN.873 |
| GD.RIN.874 | GD.RIN.875 |
| GL.BOT.309 | GL.BOT.397 |
| GL.BOW.241 | GL.FLA4.014 |
| GL.PEN.032 | GL11.CUP.001 |
| GL5.FLA.001 | GL5.FLA.002 |
| GL5.FLA.003 | GRA.HD.009 |
| GRA.REL.006 | LIM.WEI.001 |
| MA.GR.001 | MA.ID.083 |
| MA.TOR.069 | MA6.HD.001 |
| OBS.HD.001 | RDF.CUP.005 |
| RDF.KY.031 | SL.BOW.077 |
| SL.BOW.078 | SL.OLP.001 |
| SL.PHI.031 | SL.PHI.032 |
| SL.PHI.033 | SL.PHI.035 |
| SL.PHI.036 | SL.PLT.036 |
| ST.HD.021 | TR.ID.160 |
| WO.FIG.006 | |

**A-512**

Annexe au mandat d'expertise de M. Antoine CAVIGNEAUX

| Référence | No de série | Raison |
|---|---|---|
| AG.BEAD.018 | 6740 | Irak ? |
| AG.BEAD.022 | 7293 | Irak ? |
| AG.CYL.011 | 14197 | Irak ? |
| AG.SEA.007 | 12931 | Irak ? |
| ALA.BOW.017 | 4621 | Irak ? |
| ALA.BUS.001 | 7943 | Irak ? |
| ALA.CON.001 | 14605 | Irak ? |
| ALA.CUP.007 | 14741 | Irak ? |
| ALA.FIG.008 | 4435 | Irak ? |
| ALA.FIG.017 | 9963 | Irak ? |
| ALA.FIG.035 | 14512 | Irak ? |
| ALA.FIG.038 | 15219 | Irak ? |
| ALA.FIG.042 | 16351 | Irak ? |
| ALA.FIG.044 | 17216 | Irak ? |
| ALA.ID.005 | 5120 | Irak ? |
| ALA.ID.011 | 11023 | Irak ? |
| ALA.PAL.001 | 11536 | Irak ? |
| ALA.TBLT.001 | 10163 | Irak ? |
| ALA.VA.019 | 5117 | Irak ? |
| BAS.TBLT.001 | 18029 | Irak ? |
| BR.AX.018 | 3684 | Irak ? |
| BR.AX.019 | 3686 | Irak ? |
| BR.AX.066 | 15847 | Irak ? |
| BR.BOW.040 | 10782 | Irak ? |
| BR.BOW.044 | 10783 | Irak ? |
| CAL.BOW.003 | 14822 | Irak ? |
| CAL.WEI.002 | 14821 | Irak ? |
| COP.BASE.001 | 14663 | Irak ? |
| COP.FIG.010 | 16773 | Irak ? |
| CR.SEA.014 | 16115 | Irak ? |
| GD.PLQ.007 | 11827 | Irak ? |
| GYP.HD.003 | 7762 | Irak ? |
| GYP.HD.006 | 13169 | Irak ? |
| GYP.HD.007 | 15554 | Irak ? |
| HAE.CYL.044 | 9272 | Irak ? |
| HAE.WEI.054 | 15760 | Irak ? |
| LAP.AMU.023 | 16215 | Irak ? |
| LAP.CYL.048 | 11173 | Irak ? |
| LAP.PEN.001 | 12423 | Irak ? |
| LAP.SEA.008 | 18036 | Irak ? |
| LAP.TBLT.001 | 8891 | Irak ? |
| LIM.BOW.006 | 7782 | Irak ? |
| LIM.BOW.008 | 12680 | Irak ? |
| LIM.BOW.009 | 12681 | Irak ? |
| LIM.BOW.010 | 17144 | Irak ? |
| LIM.TBLT.001 | 22466 | Irak ? |
| MA.MAC.009 | 16753 | Irak ? |
| MA.REL.066 | 18110 | Irak ? |

A-513

Annexe au mandat d'expertise de M. Antoine CAVIGNEAUX

| Référence | No de série | Raison |
|---|---|---|
| SE.CYL.006 | 7220 | Irak ? |
| SHE.INL.012 | 11996 | Irak ? |
| SHE.INL.013 | 12406 | Irak ? |
| SL.VA.003 | 5200 | Irak ? |
| SL.VA.004 | 6794 | Irak ? |
| ST.BOW.025 | 4542 | Irak ? |
| ST.CONT.001 | 14119 | Irak ? |
| ST.CUP.007 | 8518 | Irak ? |
| ST.CYL.082 | 7598 | Irak ? |
| ST.CYL.091 | 9273 | Irak ? |
| ST.FIG.006 | 5119 | Irak ? |
| ST.FIG.011 | 9653 | Irak ? |
| ST.FRA.004 | 2147 | Irak ? |
| ST.HD.012 | 5599 | Irak ? |
| ST.HD.021 | 15805 | Irak ? |
| ST.ID.038 | 10086 | Irak ? |
| ST.ID3.037 | 12646 | Irak ? |
| ST.MAC.001 | 3100 | Irak ? |
| ST.PLQ.007 | 10814 | Irak ? |
| ST.REL.001 | 1916 | Irak ? |
| ST.TBLT.006 | 11156 | Irak ? |
| ST.TBLT.007 | 18109 | Irak ? |
| ST.WEI.016 | 12666 | Irak ? |
| TR.AN.049 | 12981 | Irak ? |
| TR.CON.005 | 23181 | Irak ? |
| TR.CUP.008 | 11371 | Irak ? |
| TR.PLQ.013 | 11048 | Irak ? |
| TR.PLQ.046 | 14093 | Irak ? |
| TR.PLQ.047 | 14094 | Irak ? |
| TR.PLQ.048 | 14095 | Irak ? |
| TR.PLQ.049 | 14096 | Irak ? |
| TR.PLQ.056 | 14739 | Irak ? |
| TR.PLQ.058 | 14792 | Irak ? |
| TR.PLQ.078 | 16449 | Irak ? |
| TR.TBLT.006 | 3872 | Irak ? |
| TR.TBLT.007 | 3982 | Irak ? |
| TR.TBLT.017 | 10064 | Irak ? |
| TR.TBLT.019 | 10408 | Irak ? |
| TR.TBLT.020 | 12151 | Irak ? |
| TR.TBLT.023 | 10955 | Irak ? |
| TR.TBLT.024 | 11402 | Irak ? |
| TR.TBLT.025 | 10959 | Irak ? |
| TR.TBLT.026 | 11865 | Irak ? |
| TR.TBLT.027 | 11922 | Irak ? |
| TR.TBLT.028 | 12382 | Irak ? |
| TR.TBLT.029 | 12464 | Irak ? |
| TR.TBLT.030 | 12668 | Irak ? |
| TR.TBLT.031 | 12691 | irak ? |

**A-514**

Annexe au mandat d'expertise de M. Antoine CAVIGNEAUX

| Référence | No de série | Raison |
|---|---|---|
| TR.TBLT.034 | 12843 | Irak ? |
| TR.TBLT.035 | 12964 | Irak ? |
| TR.TBLT.075 | 14042 | Irak ? |
| TR.TBLT.076 | 14207 | Irak ? |
| TR.TBLT.077 | 14392 | Irak ? |
| TR.TBLT.078 | 14950 | Irak ? |
| TR.TBLT.082 | 15911 | Irak ? |
| TR.TBLT.089 | 21461 | Irak ? |
| TR.TBLT.090 | 21462 | Irak ? |
| TR.TBLT.091 | 22325 | Irak ? |
| TR.TBLT.093 | 22706 | Irak ? |
| TR.TBLT.110 | 10881 | Irak ? |
| TR.TBLT.113 | 16760 | Irak ? |
| TR.TBLT.134 | 34997 | Irak ? |
| TR.TBLT.135 | 34998 | Irak ? |
| TR.TBLT.137 | 35000 | Irak ? |

A-515

EXHIBIT 21

# Federal Office of Culture

# Annual Report 2017

[logo]  Swiss Confederation          Federal Department of Home Affairs FDHA
        Confederation suisse         Federal Office of Culture FOC
        Confederazione Svizzera
        Confederaziun svizra

A-517

FOC Annual Report 2017                                                    3

| Table of Contents | The Essentials in Brief | 5 |
|---|---|---|
| | Cultural Creativity | 15 |
| | Culture and Society | 31 |
| | Film | 45 |
| | Heritage and Monument Preservation | 51 |
| | Museums and Collections | 59 |
| | The Federal Office of Culture in Numbers | 69 |

Case 19-3457, Document 52, 01/31/2020, 2767022, Page60 of 187

A-519

Case 1:18-cv-08248-RA   Document 46-21   Filed 03/29/19   Page 5 of 32

15

# Cultural Creativity

| | |
|---|---|
| Department Head | Danielle Nanchen |
| Budget Subsidies 2017 | 7.5 million francs |
| Number of Positions | 9.44 * |
| Number of Employees | 14.08 * |
| Legal Bases | Legal Bases Legal Basis Art. 21 BV [*Bundesverfassung der Schweizerischen Eidgenossenschaft* (Federal Constitution of the Swiss Confederation)] Guarantee of Freedom of Artistic Expression; Art. 69 BV Culture; Act on the Promotion of Culture KFG [*Kulturförderungsgesetz*] |

* 2017 averages, without employees, apprentices and university-level trainees financed by third-party funds

A-520

A-521

16          Cultural Creativity

The Federal Office of Culture is committed to the
promotion of diverse and high-quality cultural offerings
and supports the creation of favorable framework
conditions for cultural artists and organizations. Culture is
as diverse as its forms of expression: Art, design,
literature, dance, theater and music make up a large part
of our country's creative landscape. By supporting
cultural organizations, the Federal Office of Culture
ensures a favorable environment for cultural creativity.
Every cultural area has its own special features and
challenges. The Federal Office of Culture caters to this
diversity and the exciting developments with its funding
policy. With its prize policy, the Federal Office of Culture
honors outstanding achievements in every cultural area.

A-522

FOC Annual Report 2017                                                    17

# Art

Swiss art prizes, acquisition of works of Swiss cultural artists for the federal art collections. In this regard, the Federal Office of Culture is advised by the Federal Fine Arts Commission.

## Swiss Art Competition

Award Winners in Art

Delphine Chapuis Schmitz (1979, lives and works in Zurich)
Jean-Charles de Quillacq (1979, lives and works in Zurich)
Cedric Eisenring (1983, lives and works in Zurich)
Anne Hildbrand (1985, lives and works in Lausanne)
Florence Jung (1986, lives and works in Biel/Bienne)
Miriam Laura Leonardi (1985, lives and works in Zurich)
Tobias Madison (1985, lives and works in New York)
Manon Wertenbroek (1991, lives and works in Lausanne and Paris)
Micha Zweifel (1987, lives and works in Rotterdam)

Architecture

Rodet & Truwant (Dries Rodet, 1982, and Charlotte Truwant, 1980, live and work in Basel)

Critique, Publishing, Exhibition

Egija Inzule (1986, lives and works in Basel)

| | |
|---|---|
| Total amount of prize money in francs | 275,000 |

At the "Swiss Art Awards" exhibition, which took place during the international Basel Art expo, the works of the award winners and of the second-round art and architecture participants at the 2017 Swiss Art Competition were displayed.

A-523

18          Cultural Creativity

Swiss Grand Prize in Art / Meret Oppenheim Award

Award Winners
Daniela Keiser, artist
Peter Märkli, architect
Philip Ursprung, art and architecture historian

| | |
|---|---|
| Total amount of prize money in francs | 120,000 |

Art Purchases

The Federal Office of Culture purchased works of art from the following artists for the federal art collections:

John Armleder
Agnès Wyler
Fabrice Gygi
Christoph Büchel
Pauline Boudry & Renate Lorenz
David Hominal
Rico Scagliola & Michael Meier
Walter Pfeiffer

| | |
|---|---|
| Total amount of the purchases in francs | 245,248 |

FOC Annual Report 2017                                                                 19

# Design

Swiss design awards, "The Most Beautiful Swiss Books," acquisition of works by Swiss design artists for the federal art collections. In this regard, the Federal Office of Culture is advised by the Federal Design Commission.

### Swiss Design Competition

Award Winners

Photography

Erwan Frotin (1978, lives and works in Paris)
Jean-Vincent Simonet (1991, lives and works in Lausanne)

Graphic Design

Dinamo (Fabian Harb, 1988, lives and works in Basel)
Robert Huber (1982, lives and works in Lausanne)
Johnson/Kingston (Michael Kryenbühl, 1985 / Ivan Weiss, 1981, live and work in Lucerne and Bern)
Omnigroup (Luke Archer, 1988 / Leonardo Azzolini, 1990 / Simon Mager, 1986 / Frederik Mahler-Andersen, 1989, live and work in Lausanne)
Studio Feixen (Raphael Leutenegger, 1989 / Daniel Peter, 1983 / Felix Pfäffli, 1986, live and work in Lucerne and Bern)

Fashion and Textile Design

Vanessa Schindler (1988, lives and works in Vevey and Renens)
Julia Seemann (1990, lives and works in Zurich)
Mikael Vilchez (1990, lives and works in Geneva)

Products and Objects

Michel Charlot (1984, lives and works in Porto)
Damian Fopp (1988, lives and works in London and Zurich)
Kueng Caputo (Sarah Kueng, 1981 and Lovis Caputo, 1979, live and work in Zurich)
Bertille Laguet (1988, lives and works in Lausanne)
Sebastian Marbacher (1986, lives and works in Zurich)
Max Frommeld & Arno Mathies (Arno Mathies, 1986, lives and works in Geneva)

A-525

20          Cultural Creativity

Communication

Depot Basel (Rebekka Kiesewetter, 1976, lives and works in Basel and Berlin, Matylda Krzykowski, 1982, lives and works in Basel and London)

At the "Swiss Design Awards" exhibition, which took place during the international Art Basel expo, the works of the award winners and of the second-round participants at the 2017 Swiss Design Competition were displayed.

| | |
|---|---|
| Total amount of prize money in francs | 425,000 |

Swiss Grand Prize in Design

Award Winners

David Bielander, jewelry designer and artist
Thomas Ott, cartoonist and illustrator
Jean Widmer, graphic designer and art director

| | |
|---|---|
| Total amount of prize money in francs | 120,000 |

Design purchases

The Federal Office of Culture purchased works from the following designers for the federal art collections and placed these works in the Zurich Museum of Design as permanent loans:

Küng Caputo
Julian Zigerli
Julia Seemann
Stéphanie Baechler
Matthias Etter
Adrien Rovero
Peter Gertsch
Hans Eichenberger
Stéphane Halmaï-Voisard

FOC Annual Report 2017                                                    21

The Federal Office of Culture purchased works from the following designers for the federal art collections and placed these works in the mudac [Museum of Contemporary Design and Applied Arts], Lausanne, as permanent loans:

David Bielander
Kiko Gianocca

| | |
|---|---|
| Total amount of the purchases in francs | 66,131 |

"The Most Beautiful Swiss Books" Competition /
Jan Tschichold Award of the Federal Department of Home Affairs

In 2017, 24 publications that appeared in 2016 were distinguished as the most beautiful Swiss books. In August 2017, the catalog that communicated the results of the competition was published. The 2016 Most Beautiful Swiss Books exhibit opened at the end of August 2017 at Helmhaus Zürich and then traveled to Lavin / Engadin, the HEAD [University of Art and Design] Geneva, the St. Gallen Design School and the PROGR [Center for Cultural Production] Bern.

The most beautiful Swiss books were exhibited in the following cities abroad: Rhode Island, Providence, USA (RISD - Rhode Island School of Design), San Jose, Costa Rica (Despacio), London (Umlaut), Paris (Centre culturel suisse [Swiss Cultural Center]), Copenhagen (Officin), Oslo (Grafill), Vienna (Typographische Gesellschaft Austria) and Brussels (erg - ecole de recherche graphique et superieure des arts [School of Advanced Graphic Studies in the Arts]).

The Jan Tschichold award of 15,000 francs went to the Bon-bon duo, Valeria Bonin and Diego Bontognali.

# Federal Office of Culture in Numbers

A-529

# The Federal Office of Culture in Numbers

| | | | | |
|---|---|---|---|---|
| 2017 Calculation (in millions of francs) | | | 218.6 | 100% |
| Subsidies (in millions of francs) | | | 138.9 | 64% |
| Film | 53.6 | 39% | | |
| Heritage and Monument Preservation | 23.8 | 17% | | |
| Swiss Schools Abroad | 20.9 | 15% | | |
| Communication and Language | 12.7 | 9% | | |
| Museums and Collections | 10.8 | 8% | | |
| Promotion of Literacy | 4.2 | 3% | | |
| Cultural Organizations | 3.1 | 2% | | |
| Awards and Purchases (Cultural Creativity) | 2.9 | 2% | | |
| Music Education | 2.0 | 1% | | |
| Other | 4.9 | 4% | | |
| Total | 138.9 | 100% | | |

| | | | | |
|---|---|---|---|---|
| Own Funds (in millions of francs) | | | 37.1 | 36% |
| Staff | 37.1 | 46.5% | | |
| Other Operating Expenses (including museums, [NG] and museum operations, leases, IT) | 42.6 | 53.5% | | |
| Total | 79.7 | 100% | | |

Case 19-3457, Document 52, 01/31/2020, 2767022, Page71 of 187

A-530

Case 1:18-cv-08248-RA   Document 46-21   Filed 03/29/19   Page 16 of 32

# Federal Office of Culture Employees

| | |
|---|---|
| Number of Employees | 324.8 |
| FTEs | 246 |



| by gender | | |
|---|---|---|
| ■ women | 204.4 | 62.9% |
| ▨ men | 120.4 | 37.1% |



| by employment grade | | |
|---|---|---|
| ■ 1 - 89% | 231.9 | 71.4% |
| ▨ 90 - 100% | 92.9 | 28.6% |



| by language | | |
|---|---|---|
| ■ German | 212.3 | 66.4% |
| ▨ French | 69.7 | 21.8% |
| ▨ Italian | 35.8 | 11.2% |
| ▨ Rhaeto-Romansh | 2 | 0.6% |



| by age | | |
|---|---|---|
| ■ 15 to 49 years | 180.9 | 55.7% |
| ▨ 50 to 69 years | 143.9 | 44.3% |
| average age | 46.7 | |

2017 averages, without employees, apprentices and
university-level trainees financed by third-party funds, incl.
Swiss National Library (NB [*Nationalbibliothek*]) employees.
Breakdown by language in accordance with the Languages
Ordinance [*Sprachenverordnung*], without "other languages."

72          Legal Disclosure

| Publisher | Federal Office of Culture<br>Hallwylstrasse 15 CH-3003 Bern | [logo] | Swiss Confederation<br>Confederation suisse<br>Confederazione Svizzera<br>Confederaziun svizra |
| Editor | Nicole Fiore<br>Federal Office of Culture | | Federal Department of Home Affairs FDHA<br>**Federal Office of Culture FOC** |
| Design | Nadine Wüthrich, Zurich | | |
| | © Federal Office of Culture<br>Bern, May 2018 | | |


TRANSPERFECT

CERTIFICATION

I, Anders Ekholm, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided German into English translation(s) of the source document(s) listed below are true and accurate:

- Annual Report - 2017

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

_____
Anders Ekholm, Project Assistant

Sworn to before me this
Thursday, March 28, 2019

_____
Signature, Notary Public

AURORA ROSE LANDMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LA6380858
Qualified in New York County
My Commission Expires 09-17-2022

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 40TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# Bundesamt für Kultur

# Jahresbericht 2017

Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Eidgenössisches Departement des Innern EDI
**Bundesamt für Kultur BAK**

A-534

A-535

BAK Jahresbericht 2017                                                                      3

| Inhaltsverzeichnis | Das Wichtigste in Kürze | 5 |
| | Kulturschaffen | 15 |
| | Kultur und Gesellschaft | 31 |
| | Film | 45 |
| | Heimatschutz und Denkmalpflege | 51 |
| | Museen und Sammlungen | 59 |
| | Das Bundesamt für Kultur in Zahlen | 69 |

Case 19-3457, Document 52, 01/31/2020, 2767022, Page77 of 187

A-536

# Kulturschaffen

| | |
|---|---|
| Sektionschefin | Danielle Nanchen |
| Budget Subventionsbereich 2017 | 7,5 Millionen Franken |
| Anzahl Stellen | 9,44 * |
| Anzahl Mitarbeitende | 14,08 * |
| Gesetzliche Grundlagen | Gesetzliche Grundlagen Gesetzliche Grundlagen Art. 21 BV Gewährleistung der Kunstfreiheit; Art. 69 BV Kultur; Kulturförderungsgesetz KFG |

\* Durchschnittswerte 2017, ohne durch Drittmittel finanzierte Mitarbeitende, Lernende und Hochschulpraktikantinnen und -praktikanten

A-537

16  Kulturschaffen

Das Bundesamt für Kultur setzt sich für die Förderung eines vielfältigen und qualitativ hochstehenden
Kulturangebots ein und unterstützt die Schaffung
günstiger Rahmenbedingungen für Kulturschaffende
und kulturelle Organisationen. Die Kultur ist so
vielfältig wie ihre Ausdrucksformen: Kunst, Design,
Literatur, Tanz, Theater und Musik machen einen
grossen Teil der kreativen Landschaft unseres Landes
aus. Mit der Unterstützung kultureller Organisationen
stellt das Bundesamt für Kultur den günstigen
Nährboden für das Kulturschaffen sicher. Jede Kultursparte verfügt über ihre eigenen Besonderheiten
und Herausforderungen. Das Bundesamt für Kultur
geht mit seiner Förderpolitik auf diese Vielfalt und
die spannenden Entwicklungen ein. Mit seiner Preispolitik würdigt das Bundesamt für Kultur herausragende Leistungen in jeder Kultursparte.

BAK Jahresbericht 2017

# Kunst

Schweizer Kunstpreise, Erwerb von Werken Schweizer Kunstschaffender für die Kunstsammlungen des Bundes. Das Bundesamt für Kultur wird dabei von der Eidgenössischen Kunstkommission beraten.

### Schweizer Kunstwettbewerb

Preisträgerinnen und Preisträger

Kunst
Delphine Chapuis Schmitz (1979, lebt und arbeitet in Zürich)
Jean-Charles de Quillacq (1979, lebt und arbeitet in Zürich)
Cédric Eisenring (1983, lebt und arbeitet in Zürich)
Anne Hildbrand (1985, lebt und arbeitet in Lausanne)
Florence Jung (1986, lebt und arbeitet in Biel/Bienne)
Miriam Laura Leonardi (1985, lebt und arbeitet in Zürich)
Tobias Madison (1985, lebt und arbeitet in New York)
Manon Wertenbroek (1991, lebt und arbeitet in Lausanne und Paris)
Micha Zweifel (1987, lebt und arbeitet in Rotterdam)

Architektur
Rodet & Truwant (Dries Rodet, 1982, und Charlotte Truwant, 1980, leben und arbeiten in Basel)

Kritik, Edition, Ausstellung
Egija Inzule (1986, lebt und arbeitet in Basel)

| | |
|---|---|
| Gesamtbetrag der Preisgelder in Franken | 275 000 |

An der Ausstellung «Swiss Art Awards», die im Rahmen der internationalen Kunstmesse Art Basel stattfand, wurden die Arbeiten der Preisträgerinnen und Preisträger sowie der Teilnehmenden Kunst und Architektur der zweiten Runde am Schweizer Kunstwettbewerb 2017 gezeigt.

18   Kulturschaffen

Schweizer Grand Prix Kunst / Prix Meret Oppenheim

Preisträgerinnen und Preisträger

Daniela Keiser, Künstlerin

Peter Märkli, Architekt

Philip Ursprung, Kunst- und Architekturhistoriker

| | |
|---|---|
| Gesamtbetrag der Preisgelder in Franken | 120 000 |

Ankäufe Kunst

Das Bundesamt für Kultur erwarb für die Kunstsammlungen des Bundes Kunstwerke von folgenden Künstlerinnen und Künstlern:

John Armleder

Agnès Wyler

Fabrice Gygi

Christoph Büchel

Pauline Boudry & Renate Lorenz

David Hominal

Rico Scagliola & Michael Meier

Walter Pfeiffer

| | |
|---|---|
| Gesamtbetrag der Ankäufe in Franken | 245 248 |

# Design

Schweizer Designpreise, «Die schönsten Schweizer Bücher», Erwerb von Werken Schweizer Designschaffender für die Kunstsammlungen des Bundes. Das Bundesamt für Kultur wird dabei von der Eidgenössischen Designkommission beraten.

## Schweizer Wettbewerb für Design

Preisträgerinnen und Preisträger

Fotografie

Erwan Frotin (1978, lebt und arbeitet in Paris)

Jean-Vincent Simonet (1991, lebt und arbeitet in Lausanne)

Grafikdesign

Dinamo (Fabian Harb, 1988, lebt und arbeitet in Basel)

Robert Huber (1982, lebt und arbeitet in Lausanne)

Johnson/Kingston (Michael Kryenbühl, 1985 / Ivan Weiss, 1981, leben und arbeiten in Luzern und Bern)

Omnigroup (Luke Archer, 1988 / Leonardo Azzolini, 1990 / Simon Mager, 1986 / Frederik Mahler-Andersen, 1989, leben und arbeiten in Lausanne)

Studio Feixen (Raphael Leutenegger, 1989 / Daniel Peter, 1983 / Felix Pfäffli, 1986, leben und arbeiten in Luzern und Bern)

Mode- und Textildesign

Vanessa Schindler (1988, lebt und arbeitet in Vevey und Renens)

Julia Seemann (1990, lebt und arbeitet in Zürich)

Mikael Vilchez (1990, lebt und arbeitet in Genf)

Produkte und Objekte

Michel Charlot (1984, lebt und arbeitet in Porto)

Damian Fopp (1988, lebt und arbeitet in London und Zürich)

Kueng Caputo (Sarah Kueng, 1981 und Lovis Caputo, 1979, leben und arbeiten in Zürich)

Bertille Laguet (1988, lebt und arbeitet in Lausanne)

Sebastian Marbacher (1986, lebt und arbeitet in Zürich)

Max Frommeld & Arno Mathies (Arno Mathies,1986, lebt und arbeitet in Genf)

Vermittlung

Depot Basel (Rebekka Kiesewetter, 1976, lebt und arbeitet in Basel
und Berlin, Matylda Krzykowski, 1982, lebt und arbeitet in Basel
und London)

An der Ausstellung «Swiss Design Awards», die im Rahmen der internationa-
len Kunstmesse Art Basel stattfand, wurden die Arbeiten der Preisträgerinnen
und Preisträger sowie der Teilnehmenden der zweiten Runde am Schweizer
Wettbewerb für Design 2017 gezeigt.

| | |
|---|---:|
| Gesamtbetrag der Preisgelder in Franken | 425 000 |

## Schweizer Grand Prix Design

Preisträgerinnen und Preisträger

David Bielander, Schmuckdesigner und Künstler
Thomas Ott, Comiczeichner und Illustrator
Jean Widmer, Grafikdesigner und Art Director

| | |
|---|---:|
| Gesamtbetrag der Preisgelder in Franken | 120 000 |

## Ankäufe Design

Das Bundesamt für Kultur erwarb für die Kunstsammlungen des Bundes
Werke von folgenden Designerinnen und Designern und deponierte diese als
Dauerleihgaben im Museum für Gestaltung Zürich:

Küng Caputo
Julian Zigerli
Julia Seemann
Stéphanie Baechler
Matthias Etter
Adrien Rovero
Peter Gertsch
Hans Eichenberger
Stéphane Halmaï-Voisard

Case 19-3457, Document 52, 01/31/2020, 2767022, Page83 of 187

A-542

Das Bundesamt für Kultur erwarb für die Kunstsammlungen des Bundes Werke von folgenden Designerinnen und Designern und deponierte diese als Dauerleihgaben im mudac, Lausanne:

David Bielander

Kiko Gianocca

| | |
|---|---|
| Gesamtbetrag der Ankäufe in Franken | 66 131 |

Wettbewerb «Die schönsten Schweizer Bücher» /
Jan Tschichold-Preis des Eidgenössischen Departementes des Innern

2017 wurden 24 Publikationen, die im Jahr 2016 erschienen sind, als schönste Schweizer Bücher ausgezeichnet. Im August 2017 erschien der Katalog, der die Wettbewerbsergebnisse vermittelt. Die Ausstellung der schönsten Schweizer Bücher 2016 eröffnete Ende August 2017 im Helmhaus Zürich, und reiste anschliessend nach Lavin / Engadin, an die HEAD Genf, in die Schule für Gestaltung St. Gallen und in den Progr Bern.

Im Ausland wurden die schönsten Schweizer Bücher in folgenden Städten ausgestellt: Rhode Island, Providence, USA (RISD – Rhode Island School of Design), San José, Costa Rica (Despacio), London (Umlaut), Paris (Centre culturel suisse), Kopenhagen (Officin), Oslo (Grafill), Wien (Typographische Gesellschaft Austria) und Brüssel (erg – école de recherche graphique et supérieure des arts).

Der mit 15 000 Franken dotierte Jan Tschichold-Preis ging an das Duo Bonbon, Valeria Bonin und Diego Bontognali.

69

# Bundesamt für Kultur in Zahlen

Case 19-3457, Document 52, 01/31/2020, 2767022, Page85 of 187

**A-544**

70    Bundesamt für Kultur in Zahlen

# Das Bundesamt für Kultur in Zahlen

| | | | | |
|---|---|---|---|---|
| Rechnung 2017 (in Millionen Franken) | | | 218,6 | 100% |
| Subventionsbereich (in Millionen Franken) | | | 138,9 | 64% |
| Film | 53,6 | 39% | | |
| Heimatschutz und Denkmalpflege | 23,8 | 17% | | |
| Schweizerschulen im Ausland | 20,9 | 15% | | |
| Verständigung und Sprache | 12,7 | 9% | | |
| Museen und Sammlungen | 10,8 | 8% | | |
| Leseförderung | 4,2 | 3% | | |
| Kulturelle Organisationen | 3,1 | 2% | | |
| Preise und Ankäufe (Kulturschaffen) | 2,9 | 2% | | |
| Musikalische Bildung | 2,0 | 1% | | |
| Übrige | 4,9 | 4% | | |
| Total | 138,9 | 100% | | |

| | | | | |
|---|---|---|---|---|
| Eigenbereich (in Millionen Franken) | | | 37,1 | 36% |
| Personal | 37,1 | 46,5% | | |
| Andere Betriebsausgaben (insbesondere Museen, Betrieb NG und Museen, Mieten, IT) | 42,6 | 53,5% | | |
| Total | 79,7 | 100% | | |

Case 19-3457, Document 52, 01/31/2020, 2767022, Page86 of 187

A-545

# Mitarbeiterinnen und Mitarbeiter
# des Bundesamtes für Kultur

| Anzahl Mitarbeitende | 324,8 |
|---|---|
| FTE | 246 |



| nach Geschlecht | | |
|---|---|---|
| Frauen | 204,4 | 62,9 % |
| Männer | 120,4 | 37,1 % |



| nach Beschäftigungsgrad | | |
|---|---|---|
| 1 – 89 % | 231,9 | 71,4 % |
| 90 – 100 % | 92,9 | 28,6 % |



| nach Sprache | | |
|---|---|---|
| Deutsch | 212,3 | 66,4 % |
| Französisch | 69,7 | 21,8 % |
| Italienisch | 35,8 | 11,2 % |
| Rätoromanisch | 2 | 0,6 % |



| nach Alter | | |
|---|---|---|
| 15 bis 49 Jahre | 180,9 | 55,7 % |
| 50 bis 69 Jahre | 143,9 | 44,3 % |
| Durchschnittsalter | 46,7 | |

Durchschnittswerte 2017, ohne durch Drittmittel finanzierte
Mitarbeitende, Lernende und Hochschulpraktikantinnen
und -praktikanten, inkl. Mitarbeitende Schweizerische
Nationalbibliothek (NB). Aufteilung nach Sprachen gemäss
Sprachenverordnung ohne «übrige Sprachen».

72 Impressum

| | | |
|---|---|---|
| Herausgeber | Bundesamt für Kultur | |
| | Hallwylstrasse 15 | |
| | CH-3003 Bern | |
| Redaktion | Nicole Fiore | |
| | Bundesamt für Kultur | |
| Gestaltung | Nadine Wüthrich, Zürich | |
| | © Bundesamt für Kultur | |
| | Bern, Mai 2018 | |

Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Eidgenössisches Departement des Innern EDI
**Bundesamt für Kultur BAK**

A-547

# EXHIBIT 22

A-548

Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

**Federal Office of Culture**

# Mission



🔍



A-550



The Confederation's cultural activities within Switzerland are essentially based on the interplay of the Federal Office of Culture and Pro Helvetia, the Swiss Arts Council. The Federal Office of Culture is the strategic body responsible for drawing up and implementing the Confederation's culture policy. Its remit covers tasks that are strictly reserved to the Confederation, namely improving the institutional framework, drafting enactments in the culture sector, reviewing the compatibility of enactments in other political areas (value added tax, international free trade, vocational education, languages, etc.) with the needs of culture and - in coordination with the Federal Department of Foreign Affairs (FDFA) - negotiating agreements in the cultural sector, representing Switzerland in multilateral organisations and cultivating international relationships. Its promotion activities comprise two areas: cultural heritage (heritage protection and the preservation of historic monuments, transfer of cultural assets, museums and collections) and cultural creativity (films, prizes and awards, support for cultural organisations), also including promoting the foundations of culture (language and understanding policy, musical education, promotion of reading, travellers, Swiss schools abroad).

## Links

Swiss National Library (NL) ☑

Federal Department of Home Affairs (DHA) ☑

Organisational chart (/bak/en/home/the-foc/organisation.html)

Last modification 25.11.2016



# Contact

A-551

Federal Office for Culture

Head of Office

Hallwylstrasse 15

3003 Bern

Phone +41 58 462 92 66

✉    E-mail (mailto: info@bak.admin.ch)

https://www.bak.admin.ch/content/bak/en/home/the-foc/mission.html

A-552

**Kevin N. Ainsworth**
212 692 6745
kainsworth@mintz.com



Chrysler Center
666 Third Avenue
New York, NY  10017
212 935 3000
mintz.com

May 7, 2019

**VIA ECF**

Honorable Ronnie Abrams, U.S.D.J.
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *Aboutaam v. L'Office Federale de la Culture de la Confederation Suisse, et al.*, 18-cv-
      8248-RA; and *Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse,
      et al.*, 18-cv-11167-RA

Dear Judge Abrams:

We represent the Plaintiff, Hicham Aboutaam.[1]  On December 14, 2018, your Honor ordered that
"[i]f Plaintiffs require jurisdictional discovery, they may submit a letter to the Court."  (ECF No.
27 at 3.)  Discovery is necessary because Defendants' reply briefs on their motions to dismiss have
raised issues requiring fact-finding by the Court.  *See, e.g., Bolivarian Republic of Venez. v.
Helmerich & Payne Int'l Drilling Co.*, _ U.S. _, 137 S. Ct. 1312, 1316 (2017) ("[W]here
jurisdictional questions turn upon further factual development, the trial judge may take evidence
and resolve relevant factual disputes."); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905
F.2d 438, 449, 453 (D.C. Cir. 1990) (holding "[f]urther fact-finding is clearly needed" and
remanding for discovery and fact-finding).

Illustrating the need are the following examples, each of which relates to an element of the
expropriation exception to the Foreign Sovereign Immunities Act ("FSIA").  Indeed, every element
of that exception is impacted by the need for discovery.

**"Core Function" of Federal Office of Culture**

As Hicham's responsive brief makes clear, the FSIA's expropriation exception requires a showing
that the Swiss Federal Office of Culture ("FOC") is an *agency or instrumentality* of the State.  (28
U.S.C. §1605(a)(3).)  In their reply brief, the FOC and the Customs Administration ("Customs")
urge the Court to apply the "core function test" to determine whether FOC is an agency or

---

[1]   This letter is submitted on behalf of Plaintiffs Beirewaltes as well, who joined in Hicham's
responsive papers.

**MINTZ**

Honorable Ronnie Abrams, U.S.D.J.
May 7, 2019
Page 2



MINTZ

instrumentality of Switzerland.[2] That test would require the Court to determine whether the core functions of the FOC are "predominantly governmental or commercial." *See Garb v. Republic of Poland*, 440 F.3d 579, 594 (2d Cir. 2006). There has been no discovery into the predominant function of the FOC, yet the FOC baldly claims that the FOC is an "integral part of the Swiss Confederation" and has "self-evidently governmental functions." (*See* ECF No. 48 at 6.)

It is hardly self-evident that the *core* function of the FOC – which undeniably has substantial commercial functions (*see* ECF No. 45 at 15-17) – is predominantly governmental. If the Court is inclined to give any weight to FOC's unsworn argument about its core function (as FOC's counsel urges), Hicham should be afforded a fair opportunity to test that assertion through jurisdictional discovery followed by judicial fact-finding.

## FOC Owns or Operates Plaintiffs' Property

Proof that the agency or instrumentality owns or operates the property in question is another element of the expropriation exception. The Complaint alleges that the FOC "has initiated and overseen the seizure of the … Property" (Compl. ¶24), and Hicham's responsive brief further explained how the FOC owns or operates his property, citing evidence in support. (ECF No. 45 at 17-19.)

In their reply, the Defendants counter that Hicham's allegations and the Swiss laws cited in Hicham's responsive brief are outweighed by the FOC's evidence. (ECF 48 at 1-2.)[3] That assertion tees up a factual issue that cannot be resolved without discovery.

## Arbitrariness of the Seizure

Hicham's responsive brief also argues that Defendants acted so arbitrarily that they effected a taking of his property in violation of international law, stripping Defendants of immunity. 28 U.S.C. ¶1605(a)(3). Among the many facts cited in support, Hicham noted that the Defendants

---

[2]   FOC argues that Plaintiffs failed to address the core function test, but in fact Plaintiffs' responsive briefs addressed that test in detail. (ECF No. 45 at 15-17.)

[3]   The FOC also argues that Hicham failed to plead facts sufficient to satisfy the standard set by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), but that argument is misplaced for two reasons. First, Hicham did not have an obligation to plead facts sufficient to show that the Court has jurisdiction, which is an affirmative defense that may be waived by the sovereign. *See, e.g.,* 28 U.S.C. ¶1605(a)(1); *Canadian Overseas Ores, Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 277-78 (2d Cir. 1984). Second, the FOC did not move to dismiss under Rule 12(b)(6) for failure to allege facts sufficient to state a cause of action. (ECF Doc No. 35.) In any event, it is clear that the factual issues raised by the FOC's motion to dismiss cannot be resolved without discovery.

**MINTZ**

Honorable Ronnie Abrams, U.S.D.J.
May 7, 2019
Page 3


MINTZ

precipitously released approximately 5,000 of those items *without rationale, right after the Beierwaltes' Complaint was filed* in August 2018. (ECF No. 45 at 1, 7-13.)[4]

In its reply, Geneva argues that (a) the seizure of 12,000 items was based on "documented 'irregularities'" and (b) the subsequent release of 5000 items illustrates that the Swiss legal process is working. (ECF No. 50 at 2.) Those two assertions are self-contradicting; the release of 5000 pieces 18 months after the seizure suggests there was no basis for the seizure as to those items (*i.e.*, that the Swiss legal process is not working). In support of its argument that the "legal process is working … properly", Geneva also argues (without supporting evidence) that the 5000 pieces were released "after determining their lawful ownership." (ECF No. 50 at 1.)[5] That argument is contradicted by a Swiss prosecutor's letter dated August 8, 2018, which states the reason for the release of the 5000 as follows: "This partial lifting of sequester is due to the foreseeable material impossibility of conducting all of the inspections necessary to allay the suspicion of unlawful origin of some items. It may not be relied upon as evidence of the lawful origin of the items." (ECF No. 46-20). If the Court is inclined to give any weight to the Defendants' efforts to neutralize the significance of the release of the 5000 items, we require discovery to lay bare the true significance of that release.

In addition, after Hicham filed his responsive brief, the Defendants acted in new ways that demonstrated the arbitrariness of their seizure of the 12,000 items. Specifically, Customs sent a letter dated April 3, 2019, to Phoenix Ancient Art SA (a copy of which is attached as Exhibit B to this letter) (the "Customs Letter") denying a request made in April 2017 to release certain items. The Customs Letter cites the Swiss Cultural Property Transfer Act ("CPTA") and questions the provenance – *i.e.*, the chain of ownership – before Phoenix acquired those items. The Customs Letter further demonstrates the arbitrariness of the seizure because Customs (a) cites independent evidence that the items were acquired by a private party long before the effective date of the CPTA (the CPTA expressly is not retroactive), and (b) cites no evidence that any of those items was stolen or improperly imported.

---

[4]    The timing of that release, which occurred eighteen months after the seizure and upon the filing of the Beierwaltes' action, is highly suspicious. Moreover, Defendants released no other items for the next eight months, and then in April 2019 – again, coincidentally after Plaintiffs had filed briefs responding to Defendants' motions to dismiss – released another 100+ items. (*See* Ex. A to this letter, a letter dated April 11, 2019, identifying six items of Hicham Aboutaam that recently were released.)

[5]    Geneva argues inaccurately that Plaintiffs made such an admission. (ECF No. 50 at 1.) Plaintiffs merely cited the prosecutor's letter, which does not support Geneva's argument as to the reason for the release of the antiquities.

A-555

**MINTZ**

Honorable Ronnie Abrams, U.S.D.J.
May 7, 2019
Page 4



### Geneva's Alleged Independence

In an effort to avoid the impact of the FSIA's expropriation exception, Geneva argues that it is a separate sovereign independent from Switzerland. (ECF No. 50 at 5, 7.)  Likewise, Customs in its motion and reply brief denies having any role in the seizure of the 12,000 items (as has FOC), claiming that the Geneva prosecutor has sole authority. (*See* ECF No. 36 at 4-8; ECF No. 48 at 1-2 (arguing that Customs had no authority to direct the Geneva prosecutor)). However, there is evidence that Customs (a federal administration) was and remains involved in the seizure of and determination of whether to release the 12,000 items that were seized in February 2017.

The Customs Letter shows that agencies other than the Geneva prosecutor have a role in determining whether to release any of the seized items. Moreover, in April 2017, Customs issued a confidential "mandate" to three experts in which Customs stated that it "operates in close collaboration with the Public Ministry of the Republic and Canton of Geneva" in its "investigation." (*See* Exhibit C to this letter at 1.) The alleged separateness of the defendants, therefore, is an issue of fact to be investigated through discovery.

For the foregoing reasons, the Court should permit Hicham Aboutaam to engage in jurisdictional discovery.

\*       \*       \*

Based on the arguments raised in the reply briefs filed by Defendants, Plaintiffs also respectfully request that the Court hear oral argument on Defendants' motions to dismiss.

Respectfully submitted,

/s/ Kevin N. Ainsworth

Kevin N. Ainsworth
*Attorneys for Hicham Aboutaam*

**Joining in this request**

/s/ Nathaniel Z. Marmur
Nathaniel Z. Marmur
*Attorneys for Plaintiffs Lynda and William Beierwaltes*

Enclosures

cc:   All counsel of record

 

RushTranslate
+1 502-822-6535 | support@rushtranslate.com

ata MEMBER #263976

# Certification of Translation Accuracy

Translation of **Customs Letter** from **French** to **English**

As an authorized representative of RushTranslate, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified and competent professional translator, fluent in the above-mentioned language pair and that, in our best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. We do not make any claims or guarantees about the authenticity or content of the original document. Further, RushTranslate assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Mike Bortscheller
Authorized Representative
Order Date: May 6, 2019

RushTranslate
640 South Fourth St
Suite 300
Louisville, KY 40202
United States



A-557

 

Swiss Confederation

Federal department of finances DFF
Federal customs administration AFD
Anti-fraud customs

**CH-3003 Berne**, AFD, ZFA/SELU

Anticipated by email
Inanna Art Services SA
For M. SEGADE
Route du Grand-Lancy 6
1227 Les Acacias

Your reference: Estefan SEGADE
File reference: 71-2016.19036
File handled by: Jean-Marc Renaud

Lausanne, on 04-11-2019

**Premises of INANNA ARTS SERVICES SA, under sealing; request of release of items by email dated 04/08/2019.**

Mr SEGADE,

I am following up on your aforementioned request and determine as follows.

I notice that the following six items are part of the items claimed by M. Hicham ABOU TAAM in the legal procedure opened in the United States:

- GD.GR.023
- GD.TRQ.017
- GL.ING.003
- LAP.SEA.003
- SL.FIB.017
- TR.LA.026

**I inform you that these six items cannot be subject to a definitive importation using the VAT deferment procedure of the company PHOENIX ANCIENT ART SA.**

All of the items, taken from the court bailiff's inventory, according to the list attached, may be removed from the premises of INANNA ART SERVICES SA, under control of an employee of the customs of Genève-Routes and in compliance with the customs procedures.

Customs Anti-fraud
West Investigations
Jean-Marc Renaud
Avenue Tissot 8, 1006 Lausanne
Tel: +41 58 46 86320    Fax: +41 58 468 63 01
Jean-marc.renaud@ezv.admin.ch

A-558

 

**In any case, I inform you that you are responsible for the upholding of the other items in your premises, in fulfillment of the escrow carried out by the Public Prosecutor of the Geneva Canton.**

Once the handling is finished, you will have to go to the customs office on the quay to announce your departure. The exit is possible only via the carrousel.

Sincerely, Mr SEGADE.

Jean-Marc Renaud
Inspector
Principal anti-fraud customs division
West Investigations                                    [SIGNATURE]


Attachment:
  - Mentioned

Copy by email to :
  - Mr Didier BOTTGE
  - Mr the Prosecutor Claudio MASCOTTO
  - Office ID GE-Routes

2/2



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Département fédéral des finances DFF

**Administration fédérale des douanes AFD**
Antifraude douanière

CH-3003 Berne, AFD, ZFA/SELU

**Anticipée par courriel**
Inanna Art Services SA
A l'att de M.SEGADE
Route du Grand-Lancy 6
1227 Les Acacias

Votre référence: Estefan SEGADE
Référence du dossier: 71-2016.19036
Dossier traité par: Jean-Marc Renaud

Lausanne, le 11.04.2019

**Locaux d'INANNA ART SERVICES SA, sous scellements; demande de sortie d'objets par courriel du 08.04.2019**

Monsieur SEGADE,

Je fais suite à votre demande mentionnée ci-dessus et me détermine comme suit.

Je constate que les six objets suivants font partie des objets que M. Hicham ABOU TAAM réclame dans la procédure judiciaire ouverte aux Etats-Unis :

- GD.GR.023
- GD.TRQ.017
- GL.ING.003
- LAP.SEA.003
- SL.FIB.017
- TR.LA.026.

**Je vous informe que ces six objets ne peuvent pas faire l'objet d'une importation définitive en utilisant la procédure de report de TVA de la société PHOENIX ANCIENT ART SA.**

Tous les objets, repris dans les inventaires d'huissiers judiciaires, selon liste annexée, pourront être sortis des locaux d'INANNA ART SERVICES SA, sous contrôle d'un collaborateur de l'office de douane de Genève-Routes et en conformité avec les procédures douanières.

Antifraude douanière
Enquêtes Ouest
Jean-Marc Renaud
Avenue Tissot 8, 1006 Lausanne
Tél.: +41 58 46 86320, Fax: +41 58 468 63 01
jean-marc.renaud@ezv.admin.ch
www.ezv.admin.ch

**En tout état de cause, je vous informe que vous répondez du maintien des autres pièces dans vos locaux, en exécution du séquestre effectué par le Ministère Public du canton de Genève.**

Une fois la manutention terminée, vous devez vous rendre auprès du bureau de douane sur le quai pour vous annoncer au départ. La sortie s'effectue uniquement via le carrousel.

Je vous prie d'agréer, Monsieur SEGADE, mes meilleures salutations.


Jean-Marc Renaud
Inspecteur
Division principale Antifraude douanière
Enquêtes Ouest


Annexe:
- mentionnée

Copies par courriel à:
- Me Didier BOTTGE
- M. le Procureur Claudio MASCOTTO
- Office ID GE-Routes

**Annexe à autorisation de sortie du 11.04.2019**

| | | |
|---|---|---|
| AG.SKY.001 | 09.04.2019 15:37 | Dossier de fichiers |
| ALA.MAC.004 | 09.04.2019 15:37 | Dossier de fichiers |
| ALA.PYX.006 | 09.04.2019 15:37 | Dossier de fichiers |
| ALA.TBLT.003 | 09.04.2019 15:37 | Dossier de fichiers |
| ALA.VA.014 | 09.04.2019 15:37 | Dossier de fichiers |
| ALA.VA.021 | 09.04.2019 15:37 | Dossier de fichiers |
| ALA.VOT.001 | 09.04.2019 15:37 | Dossier de fichiers |
| BON.ID.003 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.AN.119 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.ARML.001 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.AX.005 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.AX.020 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.AX.029 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.AX.051 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.AX.063 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.BOW.011 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.BOW.026 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.BOW.039 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.BOW.045 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.CRO.025 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.FUR.001 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.HAN.006 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.HAN.007 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.HAN.024 | 09.04.2019 15:37 | Dossier de fichiers |
| BR.HAN.042 | 09.04.2019 15:37 | Dossier de fichiers |

**A-562**

| | | |
|---|---|---|
| BR.HAN.043 | 09.04.2019 15:38 | Dossier de fichiers |
| BR.INC.009 | 09.04.2019 15:38 | Dossier de fichiers |
| BR.INC.014 | 09.04.2019 15:38 | Dossier de fichiers |
| BR.LAD.010 | 09.04.2019 15:38 | Dossier de fichiers |
| BR.LAD.011 | 09.04.2019 15:38 | Dossier de fichiers |
| BR.POLY.009 | 09.04.2019 15:38 | Dossier de fichiers |
| BR3.BOT.001 | 09.04.2019 15:38 | Dossier de fichiers |
| CER.EWE.002 | 09.04.2019 15:38 | Dossier de fichiers |
| CH.BEAD.010 | 09.04.2019 15:38 | Dossier de fichiers |
| CM.GEM.010 | 09.04.2019 15:38 | Dossier de fichiers |
| FA.MAS.005 | 09.04.2019 15:38 | Dossier de fichiers |
| FA.MAS.013 | 09.04.2019 15:38 | Dossier de fichiers |
| FA.USH.051 | 09.04.2019 15:38 | Dossier de fichiers |
| FR.PA.037 | 09.04.2019 15:38 | Dossier de fichiers |
| GD.AN.004 | 09.04.2019 15:38 | Dossier de fichiers |
| GD.GR.023 | 09.04.2019 15:38 | Dossier de fichiers |
| GD.TRQ.017 | 09.04.2019 15:38 | Dossier de fichiers |
| GL.BOT.205 | 09.04.2019 15:38 | Dossier de fichiers |
| GL.BOT.217 | 09.04.2019 15:38 | Dossier de fichiers |
| GL.BOT.218 | 09.04.2019 15:38 | Dossier de fichiers |
| GL.BOT.231 | 09.04.2019 15:38 | Dossier de fichiers |
| GL.BOW.138 | 09.04.2019 15:38 | Dossier de fichiers |
| GL.ING.003 | 09.04.2019 15:38 | Dossier de fichiers |
| GL.VSL.053 | 09.04.2019 15:38 | Dossier de fichiers |
| GL1.AM.071 | 09.04.2019 15:38 | Dossier de fichiers |

| GL1.KO.T.002 | 09.04.2019 15:39 | Dossier de fichiers |
| GL2.ARY.001 | 09.04.2019 15:39 | Dossier de fichiers |
| GL9.BOT.018 | 09.04.2019 15:39 | Dossier de fichiers |
| GL9.BOT.026 | 09.04.2019 15:39 | Dossier de fichiers |
| HAE.AMU.013 | 09.04.2019 15:39 | Dossier de fichiers |
| HAE.WEI.043 | 09.04.2019 15:39 | Dossier de fichiers |
| LAP.AN.003 | 09.04.2019 15:39 | Dossier de fichiers |
| LAP.AN.006 | 09.04.2019 15:39 | Dossier de fichiers |
| LAP.FIG.002 | 09.04.2019 15:39 | Dossier de fichiers |
| LAP.SEA.003 | 09.04.2019 15:39 | Dossier de fichiers |
| LIM.HD.010 | 09.04.2019 15:39 | Dossier de fichiers |
| LIM.ID.002 | 09.04.2019 15:39 | Dossier de fichiers |
| LIM.LA.001 | 09.04.2019 15:39 | Dossier de fichiers |
| LIM.REL.018 | 09.04.2019 15:39 | Dossier de fichiers |
| LIM.VSL.006 | 09.04.2019 15:39 | Dossier de fichiers |
| LIM.VSL.008 | 08.04.2019 15:39 | Dossier de fichiers |
| MA.FIN.002 | 09.04.2019 15:39 | Dossier de fichiers |
| MA.ID.001 | 09.04.2019 15:39 | Dossier de fichiers |
| MA.ID.066 | 09.04.2019 15:39 | Dossier de fichiers |
| MA.PE.B.001 | 09.04.2019 15:39 | Dossier de fichiers |
| MA.PLT.002 | 09.04.2019 15:39 | Dossier de fichiers |
| MA.SEA3.016 | 09.04.2019 15:39 | Dossier de fichiers |
| MA.VA.003 | 09.04.2019 15:39 | Dossier de fichiers |
| SAR.BOW.001 | 09.04.2019 15:39 | Dossier de fichiers |
| SL.BOW.005 | 09.04.2019 15:39 | Dossier de fichiers |

A-564

| | | |
|---|---|---|
| SL.BOW.033 | 09.04.2019 15:40 | Dossier de fichiers |
| SL.FIB.017 | 09.04.2019 15:40 | Dossier de fichiers |
| SL.MIR.006 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.AMU.050 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.BOW.159 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.FIG.020 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.ID.010 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.JA.001 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.JA.006 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.MAC.004 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.MAC.021 | 09.04.2019 15:40 | Dossier de fichiers |
| ST.VSL.046 | 09.04.2019 15:40 | Dossier de fichiers |
| STE.LID.007 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.BOAT.004 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.FIG.110 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.FIG.114 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.FIG.133 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.JA.010 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.LA.001 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.LA.026 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.LA.032 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.RHY.038 | 09.04.2019 15:40 | Dossier de fichiers |
| TR.VSL.055 | 09.04.2019 15:40 | Dossier de fichiers |
| TR2.ARY.002 | 09.04.2019 15:40 | Dossier de fichiers |
| TR2.BOW.011 | 09.04.2019 15:40 | Dossier de fichiers |
| TR2.CHAL.001 | 09.04.2019 15:40 | Dossier de fichiers |
| TR2.KY.002 | 09.04.2019 15:40 | Dossier de fichiers |
| TR2.VSL.013 | 09.04.2019 15:40 | Dossier de fichiers |
| TRGL.JUG.010 | 09.04.2019 15:40 | Dossier de fichiers |
| TRL.BOT.003 | 09.04.2019 15:40 | Dossier de fichiers |
| WG.LEK.007 | 09.04.2019 15:40 | Dossier de fichiers |
| WO.FIG.015 | 09.04.2019 15:40 | Dossier de fichiers |

A-565


+1 502-822-6535 | support@rushtranslate.com


MEMBER #263976

# Certification of Translation Accuracy

Translation of **Document** from **French** to **English**

As an authorized representative of RushTranslate, a professional translation services agency, I hereby certify that the above-mentioned document has been translated by an experienced, qualified and competent professional translator, fluent in the above-mentioned language pair and that, in our best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a complete and accurate translation of the original document. This document has not been translated for a family member, friend, or business associate.

This is to certify the correctness of the translation only. We do not make any claims or guarantees about the authenticity or content of the original document. Further, RushTranslate assumes no liability for the way in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Mike Bortscheller
Authorized Representative
Order Date: April 3, 2019

RushTranslate
640 South Fourth St
Suite 300
Louisville, KY 40202
United States



A-566

 **Rush**Translate
+1 502-822-6535 | support@rushtranslate.com

 MEMBER #263976

Swiss Confederation | Federal Department of Finance FDF
Federal Customs Administration AFD
Customs anti-fraud

CH-3003 Bern, AFD, ZFA / SELU

Registered
Phoenix Ancient Art SA
c/o BOTTGE study
1, rue François Bellot
1206 Geneva

Anticipated by email

Your reference: Request of 03.12.2019
File of reference: 71-2016.19036
File handled by: Jean-Marc Renaud

Lausanne, 04.03.2019

**Request of Release of the 04.27.2017 and recall of the 03.12.2019 (5 items) – Position statement on the request**

Sir,
We are following up on your request for the release of the archaeological objects mentioned above and we are determining as follows.

These objects are stored in the customs premises rented by the company INANNA ART SERVICES SA to the company of the Ports Francs of Geneva, with the exception of the object under inventory number **TR.FIG.175**, which has been seized in hands of the freight forwarder ARTS-FRANC SA by the MP GE.

1. Exhibit **BON.PIN.007 / 19782** is yet insufficiently documented at the level of the LTBC. The first concrete information of the presence of this object in the hands of the company PHOENIX ANCIENT ART SA dated 10.29.2008 (IFAR). This object is not included in the inventory of bailiffs, while the acquisition date from May 10, 2002 nearby Ms. Luana KMEID, according to CRONOS.
**We ask you to provide us with additional documentation concerning this object to justify a legal provenance between June 1, 2005 and October 29, 2008, including a form 11.95 / 11.97 and especially a purchase invoice with proof of payment.**

2. Exhibit **MA.KA.010 / 22148** is yet insufficiently documented under the LTBC between June 1, 2005 and November 4, 2010.

Regarding the collection of the couple ERLENMEYER, we obtained the following information:

"This vast collection, brought together by Hans Erlenmeyer, a German professor of chemistry teaching at the University of Basel, and his wife Marie-Louise (1912-1997) was devoted to the prehistoric and classical art of Greece, as well as to Mesopotamian archeology. Much of their collection has been donated to the Museum of Antiques in Basel. "

Customs anti-fraud
West Surveys
Jean-Marc Renaud
Avenue Tissot 8, 1006 Lausanne
Tel.: + 41 58 46 86320, Fax: + 41 58 468 63 01
jean-marc.renaud@ezv.admin.ch
www.ezv.admin.ch

A-567

 

+1 502-822-6535 | support@rushtranslate.com

MEMBER #263976

"In the 1950s and 60s, the Ehrlenmeyer bought many Cycladic items from a Greek merchant (more than 150 items). The "kandila" object of the request was therefore likely to be part of this lot, strongly suspected by the Greek authorities of having been illegally extracted from the soil of the island of Keros and illegally exported. It should be noted that the Greek authorities took legal steps to Hans Erlenmeyer to recover some pieces, including marble idols, but in vain. The good faith of the collector was recognized ... "

**Therefore, please provide proof that this item was indeed part of the Erlenmeyer collection, as well as any proof of lawful provenance of this item.**

3. Exhibit **TR.PLQ.129 / 32310** is yet insufficiently documented under the LTBC. We are in possession of an invoice n ° 15-04-32 of 09.10.2015 of the company GORDIAN WEBER KUNSTHANDEL in D-Köln, relative, among others, to this object. However, it appears that no concrete documentation is given attesting to a lawful provenance of this object between the June 1, 2005 and September 10, 2015.
**Therefore, please provide proof that this object was indeed part of the van der Wielen collection, as well as any proof of lawful provenance of this object.**

4. The piece **TR.FIG.175** is part of the coins put on consignment by the couple BEIERWALTES. It is also claimed by the latter in the context of criminal proceedings opened in the USA. This object was confiscated by the MP GE in the hands of the forwarder ARTS-FRANC SA. **We note that it did not appear in the request for release of April 27, 2017.** It would come from the collection of Robin SYMES, of the 1990s.
**The AFD proposes not to release this object given the provenance of Robin SYMES.**

5. Exhibit **GD.RIN.923** was also not included in the release request of April 27, 2017. The documentation extracted from CRONOS for this object is disputed, in particular the fact that this object was acquired from Ms. Fiorella COTTIER. Discrepancies are noted as to the source: on the one hand we have an invoice for the purchase of Mrs. COTTIER and on the other hand, in the card established by the company PHOENIX ANCIENT ART SA, we note for this object the words "old private collection, London ". From a chronological point of view, the first appearance of this object in the uncontested documentation of PHOENIX ANCIENT ART SA is the IFAR certificate of 08.16.2011. This object is therefore not properly documented with respect to the LTBC between June 1, 2005 and August 16, 2011. It is also strongly suspected of having been smuggled into Switzerland.

**Please provide us with any relevant documentation or explanation relating to this object, in order to remove any doubts as to any unauthorized provenance and / or importation.**

**We also wish to make it clear that these various requests are based on the following legal provisions: "According to Article 19 of the Federal Law on the International Transfer of Cultural Property (RS 444.1, LTBC), the customs authorities control the transfer of cultural property at the border. "**

A copy of this letter is submitted to the Public Ministry of the Canton of Geneva in the framework of the procedure P/2949/2017.

We remain at your disposal for any further information.

We give you a deadline until **April 30, 2019** to provide us with any useful documentation to remove doubts about these different objects.

Looking forward to your reply, please accept, Sir, our best regards.
Jean-Marc Renaud       [SIGNATURE]
Inspector
West Surveys
• Copy to: GE Public Prosecution                                                    2/2

 Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Département fédéral des finances DFF

**Administration fédérale des douanes AFD**
Antifraude douanière

<u>CH-3003 Berne</u>, AFD, ZFA/<u>SELU</u>

**Recommandée**
Phoenix Ancient Art SA
c/o Etude BOTTGE
1, rue François Bellot
1206 Genève

**Anticipée par courriel**

Votre référence: Demande du 12.03.2019
Référence du dossier: 71-2016.19036
Dossier traité par: Jean-Marc Renaud

Lausanne, le 03.04.2019

**Demande de libération du 27.04.2017 et rappel du 12.03.2019 (5 objets) – Prise de position sur la demande**

Maître,

Nous faisons suite à votre demande de libération d'objets archéologiques susmentionnée et nous déterminons comme suit.

Ces objets sont entreposés dans les locaux sous-douane loués par la société INANNA ART SER-VICES SA à la société des Ports Francs de Genève, à l'exception de l'objet sous numéro d'inventaire **TR.FIG.175**, qui a été saisi en mains du transitaire ARTS-FRANC SA par le MP GE.

1.  La pièce **BON.PIN.007 / 19782** est en l'état insuffisamment documentée au niveau de la LTBC. La première information concrète de la présence de cet objet en mains de la société PHOENIX AN-CIENT ART SA date du 29.10.2008 (IFAR). Cet objet n'est pas repris dans les inventaires d'huissiers, alors que l'acquisition daterait du 10 mai 2002 auprès de Mme Luana KMEID, selon CRO-NOS.

    ***Nous vous prions de nous fournir de la documentation supplémentaire concernant cet objet pour justifier d'une provenance licite <u>entre le 1<sup>er</sup> juin 2005 et le 29 octobre 2008</u>, notamment une formule 11.95 / 11.97 et surtout une facture d'acquisition avec la preuve du paiement.***

2.  La pièce **MA.KA.010 / 22148** est en l'état insuffisamment documentée au regard de la LTBC <u>entre le 1<sup>er</sup> juin 2005 et la date du 4 novembre 2010</u>.

    Concernant la collection du couple ERLENMEYER, nous avons obtenu les informations suivantes :

    *« Cette vaste collection réunie par Hans Erlenmeyer, un professeur allemand de chimie enseignant à l'Université de Bâle, et par sa femme Marie-Louise (1912-1997) était consacrée à l'art préhistorique et classique de Grèce, ainsi qu'à l'archéologie mésopotamienne. Une grande partie de leur collection a été léguée au Musée des Antiques de Bâle. »*

Antifraude douanière
Enquêtes Ouest
Jean-Marc Renaud
Avenue Tissot 8, 1006 Lausanne
Tel.: +41 58 46 86320, Fax: +41 58 468 63 01
jean-marc.renaud@ezv.admin.ch
www.ezv.admin.ch

**A-569**

*« Dans les années 1950 et 60, les Ehrlenmeyer ont acquis de nombreux objets cycladiques à un marchand grec (plus de 150 objets). Le „kandila" objet de la demande faisait donc vraisemblablement partie de ce lot, fortement soupçonné par les autorités grecques d'avoir été extrait illicitement du sol de l'île de Kéros et exporté illégalement. Il convient de noter que les autorités grecques entreprirent des démarches juridiques auprès de Hans Erlenmeyer pour récupérer certaines pièces, notamment des idoles en marbre, mais en vain. La bonne foi du collectionneur fut reconnue…»*

**Dès lors, nous vous prions de nous apporter une preuve que cet objet faisait bel et bien partie de la collection Erlenmeyer, ainsi que tout justificatif attestant d'une provenance licite de cet objet.**

3.  La pièce **TR.PLQ.129 / 32310** est en l'état insuffisamment documentée au regard de la LTBC. Nous sommes en possession d'une facture no 15-04-32 du 10.09.2015 de la société GORDIAN WEBER KUNSTHANDEL à D-Köln, relative entre autres à cet objet. Or, il appert qu'aucune documentation concrète n'est remise attestant d'une provenance licite de cet objet entre le 1er juin 2005 et le 10 septembre 2015.

    **Dès lors, nous vous prions de nous fournir une preuve que cet objet faisait bel et bien partie de la collection van der Wielen, ainsi que tout justificatif attestant d'une provenance licite de cet objet.**

4.  La pièce **TR.FIG.175** fait partie des pièces remises en consignation par le couple BEIERWALTES. Elle est également réclamée par ces derniers dans le cadre d'une procédure pénale ouverte aux USA. Cet objet a été séquestré par le MP GE en mains du transitaire ARTS-FRANC SA. **Nous constatons qu'elle ne figurait pas dans la demande de libération du 27 avril 2017.** Elle proviendrait de la collection de Robin SYMES, dans les années 1990.

    **L'AFD propose de ne pas libérer cet objet compte tenu de la provenance de Robin SYMES.**

5.  La pièce **GD.RIN.923** ne figurait pas non plus dans la demande de libération du 27 avril 2017. La documentation extraite de CRONOS pour cet objet est contestée, notamment le fait que cet objet ait été acquis auprès de Mme Fiorella COTTIER. Des divergences sont constatées quant à la provenance : d'une part nous possédons une facture d'achat de Mme COTTIER et d'autre part, dans la fiche établie par la société PHOENIX ANCIENT ART SA, nous relevons pour cet objet la mention « ancienne collection particulière, Londres ». D'un point de vue chronologique, la première apparition de cet objet dans la documentation non contestée de PHOENIX ANCIENT ART SA est le certificat IFAR du 16.08.2011. Cet objet n'est donc pas correctement documenté en regard de la LTBC entre le 1er juin 2005 et le 16 août 2011. Il est également fortement suspecté d'avoir été introduit en fraude en Suisse.

    **Veuillez nous fournir toute documentation ou explication utile relative à cet objet, afin de lever tous les doutes quant à une provenance et / ou une importation illicite.**

**Nous tenons encore à préciser que ces différentes requêtes se basent sur les prescriptions légales suivantes : « Aux termes de l'article 19 de la loi fédérale sur le transfert international des biens culturels (RS 444.1 ; LTBC), les autorités douanières contrôlent le transfert des biens culturels à la frontière. »**

Une copie de la présente est remise au Ministère Public du canton de Genève dans le cadre de la procédure P/2949/2017.

Nous restons à votre disposition pour tout complément d'information.

Nous vous accordons un délai jusqu'au **30 avril 2019** pour nous fournir toute documentation utile à lever les doutes sur ces différents objets.

Dans l'attente de votre réponse, nous vous prions d'agréer, Maître, nos meilleures salutations.

Jean-Marc Renaud
Inspecteur
Enquêtes Ouest

- Copie à: Ministère Public GE

**A-570**

| | |
|---|---|
| Département fédéral des finances DFF<br>Administration fédérale des douanes AFD<br>Direction d'arrondissement Geneve | Federal Department of Finance FDF<br>Federal Customs Administration AFD<br>Direction of district Geneva |

05.04.2017
Référence du dossier : 71-2016.19036

Apr. 5, 2017
File reference: 71-2016.19036

**Mandat d'expertise**

**Mandate of expertise**

**I. Bases légales**

**I. Legal basis**

Le mandat d'expertise est établi conformément à l'art. 43 de la Loi fédérale du 22 mars 1974 sur le droit pénal administratif (DPA ; RS 313.0), en relation avec les arts. 183 à 185. 187. 189 et 191 du Code de procédure pénale suisse du 5 octobre 2007 (CPP ; RS 312.0) ainsi que l'art. 61 de la Loi fédérale du 4 décembre 1947 de procédure civile fédérale (RS 273)

The expert mandate is established in accordance with art. 43 of the Federal Act of 22 March 1974 on Administrative Criminal Law (DPA, RS 313.0), in relation to the arts. 183 to 185. 187. 189 and 191 of the Swiss Code of Criminal Procedure of 5 October 2007 (CPP, RS 312.0) and Art. 61 of the Federal Law of 4 December 1947 on Federal Civil Procedure (RS 273)

**II. Objet du mandat**

**II. Purpose of the mandate**

La Section antifraude douanière de Lausanne (ci-après la SA) instruit une enquête relevant du droit pénal administratif à l'encontre de

The Customs Anti-Fraud Section of Lausanne (hereinafter the SA) is investigating an investigation into administrative criminal law against

**M. ABOU TAAM AH** et consorts, ainsi que la société **PHOENIX ANCIENT ART SA** et ses sociétés affiliées

**Mr. ABOU TAAM AH** and others, as well as the company **PHOENIX ANCIENT ART SA** and its affiliated companies

en raison des infractions à LTVA, à la LD ainsi qu'à la DPA (notamment soustraction de l'impôt, recel, escroquerie en matière de prestations et de contributions, entrave à l'action pénale) qu'ils sont soupçonnés d'avoir commises en lien avec des importations de marchandises (biens archéologiques).

because of the offenses against LTVA, LD and DPA (including tax evasion, receiving, fraud in respect of benefits and contributions, obstruction of criminal proceedings) that they are suspected of having in connection with imports of goods (archaeological property).

Dans le cadre de cette enquête, la SA opère en étroite collaboration avec le Ministère Public de la République et Canton de Genève (ci-après: le MP GE), en particulier avec les Procureurs Claudio Mascotto

As part of this investigation, the SA operates in close collaboration with the Public Ministry of the Republic and Canton of Geneva (hereinafter: the MP GE), in particular with the Prosecutors Claudio Mascotto

1

et Grégory Orci, lesquels instruisent une procédure pénale pour recel (art. 160 CP) et infraction à l'article 24 LTBC contre les mêmes personnes et en lien avec les mêmes marchandises.

Le présent mandat vise à faire contrôler et trier — par un pool d'archéologues et de spécialistes (voir liste ci-dessous au point III) — les différents biens archéologiques qui ont été saisis ou séquestrés (avec défense d'en disposer) par l'Administration Fédérale des Douanes (ci-après : l'AFD) et / ou par le MP GE :

- auprès de la société INANNA ART SERVICES SA, sise dans les entrepôts du Port Franc de Genève (locaux sous-douane et hors-douane) en date du 02.03.2017,

- au domicile de M. et Mme ABOU TAAM à la rue Firmin-Massot 4, en date du 28 février 2017,

- auprès de la société PHOENIX ANCIENT ART SA, Rue Verdaine 6 à Genève, en date du 28 février 2017,

- auprès de la succursale de la société PHOENIX ANCIENT ART SA, soit le magasin « YOUNG COLLECTORS », sis rue Etienne-Dumont 9 à Genève, en date du 02.03.2017,

- dans le local no 266 du SecurStorage à Carouge le 06.03.2017.

Les biens saisis par l'AFD en tant que gage douanier seront prochainement réunis dans un local sécurisé, loué auprès de la société des Ports Francs et des Entrepôts de Genève SA, afin de pouvoir procéder à l'expertise détaillée de ces objets.

and Grégory Orci, who investigate criminal proceedings for concealment (section 160 PC) and violation of section 24 LTBC against the same persons and in relation to the same goods.

The purpose of this mandate is to inspect and sort out - through a pool of archaeologists and specialists (see list below in point III) - the various archaeological properties that have been seized or sequestered (with no defense) by the Federal Customs Administration (hereinafter: AFD) and / or by the MP GE:

- with the company INANNA ART SERVICES SA, located in the warehouses of the Port Franc of Geneva (premises under customs and customs-free) on 02.03.2017,

- at the home of Mr. and Mrs. ABOU TAAM at Firmin-Massot Street 4, dated February 28, 2017,

- from PHOENIX ANCIENT ART SA, Rue Verdaine 6 in Geneva, dated February 28, 2017,

- from the branch of PHOENIX ANCIENT ART SA, the "YOUNG COLLECTORS" store, located rue Etienne-Dumont 9 in Geneva, on 02.03.2017,

- in the premises no. 266 of the SecurStorage in Carouge on 06.03.2017.

The property seized by AFD as a pledge of customs will soon be gathered in a secured premises, rented from the company of Ports Francs and Warehouses of Geneva SA, in order to proceed to the detailed expertise of these objects.

**Ainsi, il est demandé aux experts :**

1. De sélectionner les objets qui pourraient provenir de fouilles illicites et / ou de vols. S'agissant des biens sélectionnés, l'AFD ou le MP GE effectuera les demandes d'éclaircissements nécessaires en collaboration avec M. ABOU TAAM Ali.

2. Sur la base du point 1 ci-dessus, sur demande de l'AFD ou du MP GE, et selon les documents, preuves et explications fournis par M. Ali ABOU TAAM :

    a) d'établir leur authenticité,

    b) de déterminer leur provenance ainsi que les conditions de leur importation,

    c) de donner un avis sur la qualification de bien culturel selon l'article 2 al. 1 de la LTBC,

    d) d'estimer leur valeur vénale ;

3. De dresser un rapport circonstancié et conforme à la pratique du métier d'archéologue sur l'expertise des biens.

**III. Pool d'archéologues et de specialists**

Les personnes suivantes ont été désignées pour faire partie du « pool » de 3 experts indépendants en charge du présent mandat :
• Jean-Robert GISLER, ex-FedPol
• Marc-André HALDIMANN, Uni Berne
• Jean-Luc CHAPPAZ (ex-MAH, Egypte)

Ils peuvent se faire assister des collaboratrices /teurs de l'AFD suivant(e)s
....

**Thus, the experts are asked:**

1. To select objects that could come from illicit excavations and / or flights. With regard to the selected properties, the AFD or the MP GE will make the necessary clarifications requests in collaboration with Mr. ABOU TAAM Ali.

2. On the basis of point 1 above, at the request of AFD or MP GE, and according to the documents, evidence and explanations provided by Mr. Ali ABOU TAAM:

    (a) to establish their authenticity,

    (b) to determine their source and the conditions of their importation,

    c) to give an opinion on the qualification of cultural property according to Article 2 para. 1 of the LTBC,

    (d) to estimate their market value;

3. To draw up a detailed report in accordance with the practice of the profession of archaeologist on the expertise of the property.

**III. Pool of archaeologists and specialists**

The following persons have been designated to be part of the "pool" of 3 independent experts in charge of this mandate:
• Jean-Robert GISLER, former FedPol
• Marc-André HALDIMANN, Uni Berne
• Jean-Luc CHAPPAZ (former MAH, Egypt)

They can be assisted by the following AFD employees:
....

A-573

**IV. Autorisation**

Le présent mandat autorise l'/les expert(s) à faire appel à d'autres personnes travaillant sous leur responsabilité pour la réalisation de l'expertise, conformément à l'art. 184. al. 2, let.b du CPP.

Pour les cas où des rapports complémentaires ou des recherches spécifiques devaient être demandés à d'autres experts. les modalités d'engagement doivent être préalablement acceptées par l'AFD ou le MP et des mandats spécifiques établis par ces derniers.

....

**VI. Délai de remise**

Le présent mandat est valable dès le 05.04.2017.

La sélection des objets sur lesquels des soupçons subsistent quant à une infraction à la LTBC ou à la LTVA notamment doit s'effectuer pour le **30.05.2017**. Ce délai est prorogeable sur requête des experts.

Pour les biens qui posent problème au niveau de la LTBC ou de la LTVA notamment, l'expertise préliminaire doit nous parvenir au plus tard d'ici le **30.06.2017** et l'expertise finale à la date du **31.07.2017** (y compris les informations sur la valeur vénale des objets pour ce qui est des infractions à la LTVA). Ce délai est prorogeable sur requête des experts.

**VII. Faux rapport & secret de function**

Le mandataire est informé des risques qu'il encourt pénalement lors de la reddition d'un faux rapport d'expertise (Art. 307 CP):
....

**IV. Authorization**

This mandate authorizes the expert (s) to call on other persons working under their responsibility for the realization of the expertise, in accordance with art. 184. al. 2, let.b of the CPP.

For cases where additional reports or specific research should be requested from other experts. the terms of engagement must be previously accepted by the AFD or the MP and specific mandates established by them.

....

**VI. Delivery time**

This mandate is valid from 05.04.2017.

The selection of objects on which suspicions remain regarding a violation of the LTBC or LTVA in particular must be made by **May 30, 2017**. This period is extendable upon request of the experts.

For goods that are problematic at the level of the LTBC or the LTVA in particular, the preliminary expertise must reach us by **June 30, .2017** at the latest and the final expert appraisal by **July 30, 2017** (including the information on the fair market value of objects with respect to VAT infringements). This period is extendable upon request of the experts.

**VII. False report & secret function**

The representative is informed of the risks he incurs criminally when submitting a false expert report (Article 307 CC):
....

4

A-574

Le présent mandat est soumis à la confidentialité. La personne mandatée est informée de son obligation de garder le secret de fonction ainsi que des risques qu'elle encourt pénalement lors d'une violation de celui-ci (Art. 320 du CP) :

**Violation du secret de fonction**

1. Celui qui aura révélé un secret à lui confié en sa qualité de membre d'une autorité ou de fonctionnaire, ou dont il avait connaissance à raison de sa charge ou de son emploi, sera puni d'une peine privative de liberté de trois ans au plus ou d'une peine pécuniaire.

La révélation demeure punissable alors même que la charge ou l'emploi a pris fin.

2. La révélation ne sera pas punissable si elle a été faite avec le consentement écrit de l'autorité supérieure.

Il est défendu aux experts de communiquer avec la presse sur cette affaire.

**VIII. Réserve de la spécialité**

Les documents, les photos et autres rapports qui seront réalisés dans le cadre de ce mandat ne seront destinés qu'à l'usage exclusif de cette enquête et restent propriété de l'AFD et du MP GE.

**IX. Assurance risqué**

En cas de dégâts causés dans le cadre d'une enquête pénale, c'est en premier lieu la Confédération qui est responsable (voir l'article 3 de la Loi sur la responsabilité6). Elle pourrait se retourner contre l'expert qui a causé le dommage.

This mandate is subject to confidentiality. The authorized person is informed of his obligation to keep the secret of function as well as of the risks which it incurs criminally during a violation of this one (Article 320 of the CP):

**Violation of the function secret**

1. A person who discloses a secret entrusted to him as a member of an authority or official, or of which he was aware by reason of his office or his employment, shall be punished by a term of imprisonment of three years. at most, or a pecuniary sentence.

Revelation remains punishable even though the charge or employment has ended.

2. Revelation will not be punishable if it has been made with the written consent of the higher authority.

Experts are forbidden to communicate with the press on this matter.

**VIII. Reserve specialty**

The documents, photos and other reports that will be produced under this mandate will be for the exclusive use of this survey and remain the property of AFD and MP GE.

**IX. Risk insurance**

In the event of damage caused in the course of a criminal investigation, it is primarily the Confederation which is responsible (see Article 3 of the Law on Liability6). It could turn against the expert who caused the damage.

**A-575**



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Département fédéral des finances DFF
**Administration fédérale des douanes AFD**
Direction d'arrondissement Genève

05.04.2017                                       Référence du dossier : 71-2016.19036

## Mandat d'expertise

### I.  Bases légales

Le mandat d'expertise est établi conformément à l'art. 43 de la Loi fédérale du 22 mars 1974 sur le droit pénal administratif (DPA ; RS 313.0), en relation avec les arts. 183 à 185, 187, 189 et 191 du Code de procédure pénale suisse du 5 octobre 2007 (CPP ; RS 312.0) ainsi que l'art. 61 de la Loi fédérale du 4 décembre 1947 de procédure civile fédérale (RS 273).

### II.  Objet du mandat

La Section antifraude douanière de Lausanne (ci-après : la SA) instruit une enquête relevant du droit pénal administratif à l'encontre de

**M. ABOU TAAM Ali** et consorts, ainsi que la société **PHOENIX ANCIENT ART SA** et ses sociétés affiliées

en raison des infractions à LTVA[1], à la LD[2] ainsi qu'à la DPA[3] (notamment soustraction de l'impôt, recel, escroquerie en matière de prestations et de contributions, entrave à l'action pénale) qu'ils sont soupçonnés d'avoir commises en lien avec des importations de marchandises (biens archéologiques).

Dans le cadre de cette enquête, la SA opère en étroite collaboration avec le Ministère Public de la République et Canton de Genève (ci-après : le MP GE), en particulier avec les Procureurs Claudio Mascotto et Grégory Orci, lesquels instruisent une procédure pénale pour recel (art. 160 CP) et infraction à l'article 24 LTBC[4] contre les mêmes personnes et en lien avec les mêmes marchandises.

Le présent mandat vise à faire contrôler et trier – par un pool d'archéologues et de spécialistes (voir liste ci-dessous au point III) – les différents biens archéologiques qui ont été saisis ou séquestrés (avec défense d'en disposer) par l'Administration Fédérale des Douanes (ci-après : l'AFD) et / ou par le MP GE :

- auprès de la société INANNA ART SERVICES SA, sise dans les entrepôts du Port Franc de Genève (locaux sous-douane et hors-douane) en date du 02.03.2017,
- au domicile de M. et Mme ABOU TAAM à la rue Firmin-Massot 4, en date du 28 février 2017,

---

[1] Loi fédérale du 12 juin 2009 régissant la taxe sur la valeur ajoutée (LTVA, RS 641.20)
[2] Loi sur les douanes du 18 mars 2005 (LD, RS 631.0)
[3] Loi fédérale du 22 mars 1974 sur le droit pénal administratif (DPA, RS 313.0)
[4] Loi fédérale sur le transfert international de biens culturels (LTBC, RS 444.1)

Direction d'arrondissement Genève, Section antifraude douanière
Jean-Marc Renaud
Avenue Tissot 8, 1006 Lausanne
Tél. +41 58 468 63 20, Fax +41 58 468 63 01
Jean-marc.renaud@ezv.admin.ch
www.ezv.admin.ch



**A-576**

- auprès de la société PHOENIX ANCIENT ART SA, Rue Verdaine 6 à Genève, en date du 28 février 2017,
- auprès de la succursale de la société PHOENIX ANCIENT ART SA, soit le magasin « YOUNG COLLECTORS », sis rue Etienne-Dumont 9 à Genève, en date du 02.03.2017,
- dans le local no 266 du SecurStorage à Carouge le 06.03.2017.

Les biens saisis par l'AFD en tant que gage douanier seront prochainement réunis dans un local sécurisé, loué auprès de la société des Ports Francs et des Entrepôts de Genève SA, afin de pouvoir procéder à l'expertise détaillée de ces objets.

**Ainsi, il est demandé aux experts :**

1. De <u>sélectionner</u> les objets qui pourraient provenir de fouilles illicites et / ou de vols.

   S'agissant des biens sélectionnés, l'AFD ou le MP GE effectuera les demandes d'éclaircissements nécessaires en collaboration avec M. ABOU TAAM Ali.

2. Sur la base du point 1 ci-dessus, sur demande de l'AFD ou du MP GE, et selon les documents, preuves et explications fournis par M. Ali ABOU TAAM :

   a) d'établir leur authenticité,

   b) de déterminer leur provenance ainsi que les conditions de leur importation,

   c) de donner un avis sur la qualification de bien culturel selon l'article 2 al. 1 de la LTBC,

   d) d'estimer leur valeur vénale ;

3. De dresser un rapport circonstancié et conforme à la pratique du métier d'archéologue sur l'expertise des biens.

**III. Pool d'archéologues et de spécialistes**

Les personnes suivantes ont été désignées pour faire partie du « pool » de 3 experts indépendants en charge du présent mandat :

- Jean-Robert GISLER, ex-FedPol

- Marc-André HALDIMANN, Uni Berne

- Jean-Luc CHAPPAZ (ex-MAH, Egypte)

Ils peuvent se faire assister des collaboratrices /teurs de l'AFD suivant(e)s :

- Aurélie JULITA (AFD ; archéologue)

- Julien PHILIPPOZ (AFD ; archéologue)

- Maëva BOILLAT (AFD ; spécialiste inventaire Port Franc)

- Véronique PITTORI (AFD ; stagiaire SA &historienne de l'art)

2/4

A-577

### IV. Autorisation

Le présent mandat autorise l'/les expert(s) à faire appel à d'autres personnes travaillant sous leur responsabilité pour la réalisation de l'expertise, conformément à l'art. 184, al. 2, let.b du CPP.

Pour les cas où des rapports complémentaires ou des recherches spécifiques devaient être demandés à d'autres experts, les modalités d'engagement doivent être préalablement acceptées par l'AFD ou le MP et des mandats spécifiques établis par ces derniers.

### V. Facturation

Une facture sera établie pour la fin de chaque mois par chacun des experts (non salarié ou sous un autre contrat émis par l'AFD) en utilisant le modèle adéquat fourni par l'AFD.

Les coûts sont répartis également entre le MP GE et l'AFD.

Le traitement horaire des experts est fixé à fr. 150.00 TTC. Il comprend les tâches fixées au point II ci-dessus.

### VI. Délai de remise

Le présent mandat est valable dès le 05.04.2017.

La sélection des objets sur lesquels des soupçons subsistent quant à une infraction à la LTBC ou à la LTVA notamment doit s'effectuer pour le **30.05.2017**. Ce délai est prorogeable sur requête des experts.

Pour les biens qui posent problème au niveau de la LTBC ou de la LTVA notamment, l'expertise préliminaire doit nous parvenir au plus tard d'ici le **30.06.2017** et l'expertise finale à la date du **31.07.2017 (y compris les informations sur la valeur vénale des objets pour ce qui est des infractions à la LTVA)**. Ce délai est prorogeable sur requête des experts.

### VII. Faux rapport & secret de fonction

Le mandataire est informé des risques qu'il encourt pénalement lors de la reddition d'un faux rapport d'expertise (Art. 307 CP[5]) :

**Faux témoignage, faux rapport, fausse traduction en justice**

[1] Celui qui, étant témoin, expert, traducteur ou interprète en justice, aura fait une déposition fausse sur les faits de la cause, fourni un constat ou un rapport faux, ou fait une traduction fausse sera puni d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire.

[2] Si le déclarant a prêté serment ou s'il a promis solennellement de dire la vérité, la peine sera une peine privative de liberté de cinq ans au plus ou une peine pécuniaire de 180 jours-amende au moins.

---

[5] Code pénal suisse du 21 décembre 1937 (CP, RS 311.0)

[3] La peine sera une peine pécuniaire de 180 jours-amende au plus si la fausse déclaration a trait à des faits qui ne peuvent exercer aucune influence sur la décision du juge.

Le présent mandat est soumis à la confidentialité. La personne mandatée est informée de son obligation de garder le secret de fonction ainsi que des risques qu'elle encourt pénalement lors d'une violation de celui-ci (Art. 320 du CP) :

**Violation du secret de fonction**

[1] Celui qui aura révélé un secret à lui confié en sa qualité de membre d'une autorité ou de fonctionnaire, ou dont il avait connaissance à raison de sa charge ou de son emploi, sera puni d'une peine privative de liberté de trois ans au plus ou d'une peine pécuniaire.

La révélation demeure punissable alors même que la charge ou l'emploi a pris fin.

[2] La révélation ne sera pas punissable si elle a été faite avec le consentement écrit de l'autorité supérieure.

Il est défendu aux experts de communiquer avec la presse sur cette affaire.

### VIII.   Réserve de la spécialité

Les documents, les photos et autres rapports qui seront réalisés dans le cadre de ce mandat ne seront destinés qu'à l'usage exclusif de cette enquête et restent propriété de l'AFD et du MP GE.

### IX. Assurance risque

En cas de dégâts causés dans le cadre d'une enquête pénale, c'est en premier lieu la Confédération qui est responsable (voir l'article 3 de la Loi sur la responsabilité[6]). Elle pourrait se retourner contre l'expert qui a causé le dommage.

Par ma signature, je confirme avoir pris connaissance du mandat qui m'est attribué, de ma responsabilité à son égard et déclare l'accepter officiellement.

Lieu et date : _26/4/017  Genève_

Nom : M. Marc-André HALDIMANN        Signature : _____

Pour l'AFD : _Genève 18.4.17_

Pour le MP GE : _____

[6] Loi fédérale du 14 mars 1958 sur la responsabilité de la Confédération, des membres de ses autorités et de ses fonctionnaires ; RS 170.32

A-579



Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW  |  Washington, DC 20036  |  tel 202.663.8000  |  fax 202.663.8007

Stephan E. Becker
tel: +1.202.663.8277
stephan.becker@pillsburylaw.com

May 15, 2019

VIA ECF

Honorable Ronnie Abrams
United States District Court
  for the Southern District of New York
40 Foley Square, Room 2203
New York, New York 10007

> Re:   *Aboutaam v. L'C₄fice Federale de la Culture de la Cor federation
>        Suisse, et al.*, 18-cv-8248 (RA); *Beierwaltes, et al. v. L'C₄fice Federale
>        de la Culture de la Cor federation Suisse, et al.*, 18-cv-11167 (RA)

Dear Judge Abrams:

This letter is submitted on behalf of Defendants L'Office Federal de la Culture De La
Confederation Suisse and L'Administration Federale Des Douanes de la
Confederation Suisse (collectively, "the Swiss Confederation") in the above-
captioned cases, in response to Plaintiffs' letter of May 7, 2019 (*Aboutaam* Dkt. No.
53; *Beierwaltes* Dkt. No. 53).  The Swiss Confederation, jointly with co-defendant La
République et Canton de Genève, submitted a letter on May 8, 2019 requesting
permission to submit this response by May 15, 2019 (*Aboutaam* Dkt. No. 54;
*Beierwaltes* Dkt. No. 54), and the Court approved the request that same day
(*Aboutaam* Dkt. No. 55; *Beierwaltes* Dkt. No. 55).

The Swiss Confederation wishes to address several aspects of the Plaintiffs' May 7
letter.

First, the Plaintiffs' letter contains legal argument (e.g., in footnotes 3 and 5) and
factual arguments (pages 3 and 4), and purports to submit new evidence (exhibits A,
B and C).  Those aspects of the submission are a sur-reply, for which no permission
from the Court was sought or granted.  Plaintiffs are well aware that the submission of
a sur-reply is not a matter of right, and that the decision whether to permit a sur-reply
rests in the "sound discretion of the court."  *Haskins v. Ponte*, 2018 U.S. Dist. LEXIS
58484 (April 3, 2018).  Accordingly, it is our view that the Court should not give any
consideration to the legal or factual arguments in the Plaintiffs' letter.

A-580

May 15, 2019
Page 2

Second, if the Plaintiffs were genuinely interested in conducting discovery, they would have presented with their letter a discovery plan containing details of what they intended to seek and from whom, and how the information is important to the resolution of the issues before the Court on the Swiss Confederation's Motion to Dismiss.  Without the details of the proposed discovery, there is, we respectfully submit, no basis on which the Court could grant the request.  Indeed, the absence of any indication of what discovery is desired or how it would assist the Court is telling – it suggests that the letter was more designed as a sur-reply than as a genuine effort to secure discovery essential to the disposition of the pending motion.

Third, the issues for which Plaintiffs seek discovery do not require further factual development:

> Core functions of the Federal Office of Culture:  A seminal issue in this case is whether the Federal Office of Culture is a part of the Swiss Confederation or an agency or instrumentality of the Swiss Confederation.[1]  If it is a part of the Swiss Confederation, the exceptions to the FSIA that Plaintiffs seek to invoke are indisputably inapplicable.  On the question of its status, the Swiss Confederation submitted sworn evidence on the issue with its Motion to Dismiss.  That evidence, which addressed the organizational status of the Federal Office of Culture and its functions, is public information available on the Swiss Confederation's website.  Indeed, Plaintiff Aboutaam submitted as evidence the 2017 annual report of the Federal Office of Culture (Ex. 21 to Aboutaam Opposition).  Plaintiffs have not provided any justification for discovery to investigate the official, publicly available information regarding the organizational structure and function of the Swiss Confederation's Federal Office of Culture.

> Ownership/operation of property:  Plaintiffs have made only vague allegations that the Federal Office of Culture "owns or operates" the artworks, without citing evidence that the Office of Culture itself has seized property that the Plaintiffs claim belongs to them.[2]  Without any guidance on what evidence Plaintiffs seek to obtain in discovery, there is no basis on which the application should be allowed.  This especially so in light of the Supreme Court's observation that the basic objective of the FSIA is "to free a foreign sovereign from *suit*."  *Bolivarian Rep. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316-17 (2017) (emphasis in original).

---

[1]  Plaintiffs' May 7 letter does not challenge the core function of the Federal Customs Administration as predominately governmental.  *See* May 7, 2019 letter at ps. 1-2.

[2]  Appended to Plaintiffs' May 7 letter are exhibits that they suggest show that the Federal Customs Administration is involved with the seizure about which the Plaintiffs complain.  In fact, Exhibit A to Plaintiffs' letter concerns use of a VAT deferral program for items that were previously released for importation, and Exhibit B involves a review of whether certain other items can be lawfully imported into Switzerland.

A-581

May 15, 2019
Page 3

Alleged arbitrariness:  The allegations of the Plaintiffs, even if accepted as true, do not describe violations of international law, much less ones that meet the standard articulated by the Supreme Court.[3]  In short, on this record, the Plaintiffs' application is, at best, an untethered request for open-ended discovery that runs counter to the Supreme Court's teachings in *Bolivarian Rep. of Venezuela,* 137 S. Ct. at 1316-17.

Geneva's independence:  The notion that discovery is required to determine whether the Swiss Canton of Geneva is a separate entity from the Swiss federal government is so far out of bounds that it merits no discussion. Plaintiffs refer the court to no principle of Swiss law or jurisprudence to pass a "nonfrivolous" test, much less the more rigorous standard in *Bolivarian Rep. of Venezuela,* 137 S. Ct. at 1316–17.

Fourth, the Swiss Confederation renews the point made in its Reply in the *Beierwaltes* case, that those plaintiffs did not file an appropriate opposition to the Swiss Confederation's Motion to Dismiss on the record of their proceeding.  Accordingly, there can be no basis for affording discovery to the Beierwaltes.

Respectfully submitted,

 /s/ Stephan E. Becker
Stephan E. Becker
Michael Evan Jaffe
John Chamberlain
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 17th Street, NW
Washington, DC  20036
Tel. 202.663.8277
stephan.becker@pillsburylaw.com

*Counsel for Defendants L'Office Federal De La Culture De La Confederation Suisse and L'Administration Federale Des Douanes De La Confederation Suisse*

---

[3]  In *Bolivarian Rep. of Venezuela,* 137 S. Ct. at 1316, the Supreme Court opined on the requisite showing required by a plaintiff for subject matter jurisdiction: "In our view, a party's nonfrivolous, but ultimately incorrect, argument that property was taken in violation of international law is insufficient to confer jurisdiction. Rather, state and federal courts can maintain jurisdiction to hear the merits of a case only if they find that the property in which the party claims to hold rights was indeed 'property taken in violation of international law.'"

A-582

# Arnold & Porter

Marcus A. Asner
+1 212.836.7222 Direct
Marcus.Asner@arnoldporter.com

May 15, 2019

**VIA ECF**

The Honorable Ronnie Abrams
United States District Court
 for the Southern District of New York
40 Foley Square
New York, New York  10007

Re:   *Aboutaam v. L'C₂fice Federale de la Cor₂federation Suisse,*
*et al.*, 18-cv-8248 (RA); *Beierwaltes, et al. v. L'C₂fice Federale de la*
*Culture de la Cor₂federation Suisse, et al.*, 18-cv-11167 (RA)

Your Honor:

This letter responds to Plaintiffs' request for jurisdictional discovery. *See*
*Aboutaam* Dkt. 53; *Beierwaltes* Dkt. 53 ("Ltr."). The Court should deny Plaintiffs'
request for three reasons: first, the Court can and should dispose of this case based on the
legal insufficiency of Plaintiffs' allegations; second, Geneva has not raised any factual
challenge to the complaints; and third, the "facts" Plaintiffs seek from Geneva are neither
relevant nor appropriate. Plaintiffs fail to meet the high threshold required for
jurisdictional discovery from a foreign sovereign.

The Second Circuit has explained that "[b]ecause sovereign immunity protects a
sovereign from the expense, intrusiveness, and hassle of litigation, a court must be
circumspect in allowing discovery before the plaintiff has established that the court has
jurisdiction over a foreign sovereign defendant under the FSIA." *Arch Trading Corp. v.*
*Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) (internal quotation marks
omitted); *see also Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486, 493 (S.D.N.Y. 2014)
(sovereign immunity "is an immunity from trial and the attendant burdens of litigation,
and not just a defense to liability on the merits"). Accordingly, "[w]hen sovereign
immunity is at issue, discovery is warranted only to verify allegations of specific facts
crucial to an immunity determination." *Arch Trading*, 839 F.3d at 207 (internal quotation
marks omitted).[1]

---

[1] Plaintiffs incorrectly assert that they "did not have an obligation to plead facts sufficient to show that the
Court has jurisdiction." Ltr. at 2 n.3. On the contrary, it is plaintiffs' "burden to set out factual allegations
in the Complaint that amount to 'a legally valid claim' under the FSIA and its exceptions." *Hulton v.*
*Bayerische Staatsgemaldesammlungen*, 346 F. Supp. 3d 546, 549 (S.D.N.Y. 2018). *See also In re Terrorist*
*Attacks on September 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013) ("Once the defendant presents a prima

**A-583**

Honorable Ronnie Abrams
May 15, 2019
Page 2

Plaintiffs do not come close to meeting this burden with respect to Geneva. Geneva's motion to dismiss raises numerous legal deficiencies in the Complaint that preclude jurisdiction under the FSIA. For example, the Complaint fails to plausibly state a "taking," much less a taking "in violation of international law." MTD at 11–17. In addition, Geneva, as a political subdivision, can only be subject to suit under the FSIA's expropriation exception if the disputed property is present in the United States. *Id.* at 17–20. By Plaintiffs' own admission, the property remains in Switzerland. These determinations, along with other legal issues raised in Geneva's motion, are pure questions of law. That is, if Geneva has not "taken" Plaintiffs' alleged property as a matter of law, the expropriation exception does not apply on its face, and any ginned-up factual disputes are irrelevant. Plaintiffs thus are incorrect when they argue that "every element of [the expropriation] exception is impacted by the need for discovery." Ltr. at 1.

Jurisdictional discovery also is inappropriate at this stage because Geneva's motion to dismiss raises a *facial* challenge to Plaintiffs' assertion of jurisdiction, in which the Court "draws all facts—which it assumes to be true unless contradicted by more specific allegations or documentary evidence—from the complaint and the exhibits thereto." *Hulton*, 346 F. Supp. 3d at 549 (internal brackets omitted). For purposes of its motion to dismiss, Geneva has assumed the truth of well-pleaded allegations in the Complaints and the documents attached thereto. MTD at 11–20. Jurisdictional discovery is therefore "not relevant to the motion." *Lu v. Cent. Bank of Republic of China (Taiwan)*, 610 F. App'x 674, 675 (9th Cir. 2015); *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1314 (11th Cir. 2009) (abuse of discretion to order jurisdictional discovery where as a matter of law the court could find there was no *prima facie* case for jurisdiction).

Moreover, Plaintiffs' request fails to identify any non-frivolous discovery necessary to substantiate "allegations of specific facts crucial to an immunity determination." *Arch Trading*, 839 F.3d at 207. The "facts" Plaintiffs apparently seek from Geneva are irrelevant, improper, or undisputed. Plaintiffs contend that discovery is required to "investigate[]" whether Geneva "is a separate sovereign independent from Switzerland." Ltr. at 3. That contention is both legally irrelevant and facially absurd. As explained in Geneva's motion to dismiss, both Geneva and Switzerland are "foreign states" and not agencies or instrumentalities of foreign states. Their immunity thus is coextensive under the expropriation exception. In any event, Plaintiffs have conceded that Geneva is a political subdivision of Switzerland, which means that Geneva and Switzerland are not the same foreign sovereign entity, Opp. to MTD at 21. Plaintiffs' request would be like asking for discovery on whether the State of New York is a separate sovereign from the United States. No discovery is needed to establish this point.

---

facie case that it is a foreign sovereign … the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign.").

Honorable Ronnie Abrams
May 15, 2019
Page 3

Plaintiffs also wish to serve discovery on Geneva to investigate if the Swiss seizure orders at issue here were "arbitrary." As explained in Geneva's briefing in support of its motion to dismiss, a U.S. court should not be asked in a civil action to adjudicate the legal sufficiency or probable cause *under foreign law* of a foreign prosecutor's criminal law-enforcement decision. Reply at 2–3; *see also* MTD at 20–25. That comity concern is magnified further by the existence of an ongoing criminal investigation. Thus, even if "arbitrariness" were relevant to the legal analysis, the Second Circuit's decision in *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 58 (2d Cir. 2018), and other authorities cited in Geneva's motion to dismiss and reply (MTD at 11–17; Reply at 2–3) demonstrate that Plaintiffs' allegations of a taking in violation of international law are insufficient on their face. The materials Plaintiffs attach to their own Complaints amply demonstrate the propriety of official actions in the Swiss criminal proceedings.

Plaintiffs' letter request appears designed to get the "last word" on the motions to dismiss. While Plaintiffs argue discovery is needed "because Defendants' *reply briefs* … have raised issues requiring fact-finding by the Court," Ltr. at 1, Geneva did not attach evidence to or raise any new issues in its reply. The fact that Geneva disputed Plaintiffs' mischaracterizations of evidence attached to their own complaints and opposition brief does not open the door to jurisdictional discovery from a foreign sovereign.[2]

At bottom, Plaintiffs have no legal basis to bring this suit against Geneva in U.S. court concerning their objections to an ongoing criminal investigation in Switzerland. This request for jurisdictional discovery is a tactic to prolong the litigation and attempt to exert leverage over the Geneva prosecutor in an ongoing investigation 3,860 miles away. The Court should reject Plaintiffs' gambit and swiftly dismiss this action.[3]

The Republic and Canton of Geneva respectfully asks this Court to deny Plaintiffs' request for jurisdictional discovery and resolve the pending motions to dismiss. If the motion to dismiss is not granted in full, we respectfully ask the Court to identify what legal issue, if any, warrants jurisdictional discovery. This bifurcated approach preserves Geneva's right to seek immediate interlocutory review on immunity "to avoid the burden of litigation." *Funk v. Belneftekhim*, 861 F.3d 354, 364 (2d Cir. 2017).

---

[2] Plaintiffs again mischaracterize their own supporting exhibits. Plaintiffs' express a need to investigate the so-called "coincidental[ ]" release of 100 items after Plaintiffs filed their opposition brief. Ltr. at 2 n.4. This observation omits a key detail—the Swiss authorities took this action in response to an email from Plaintiffs' counsel three days prior, Dkt. 53-1 at 2. There is nothing "coincidental" about that; the piecemeal release of Plaintiffs' artifacts demonstrates proper functioning of the investigative process.

[3] Geneva reserves the right to seek relief for excessive costs under 28 U.S.C. § 1927 or other relevant law for positions taken that unreasonably and vexatiously multiply the proceedings in this case.

**A-585**

Honorable Ronnie Abrams
May 15, 2019
Page 4

Respectfully Submitted,


 /s/ Marcus A. Asner
Marcus A. Asner
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710
Tel. 212.836.7222
Marcus.Asner@arnoldporter.com

*Counsel for Défendant La République et
Canton de Genève*


cc:  All counsel (ECF)

A-586

**Kevin N. Ainsworth**
212 692 6745
kainsworth@mintz.com



MINTZ

Chrysler Center
666 Third Avenue
New York, NY  10017
212 935 3000
mintz.com

May 21, 2019

**VIA ECF**

Honorable Ronnie Abrams, U.S.D.J.
United States District Court, S.D.N.Y.
40 Foley Square
New York, NY 10007

Re:    *Aboutaam v. L'C₃fice Federale de la Culture de la Corfederation Suisse, et al.*, 18-cv-
       8248-RA; and *Beierwaltes v. L'C₃fice Federale et al.*, 18-cv-11167-RA

Dear Judge Abrams:

On behalf of Plaintiff Hicham Aboutaam and Plaintiffs Beierwaltes, we submit this letter in further
support of their request for jurisdictional discovery, as permitted by the Court.

In response to Defendants' motions asserting immunity under the Foreign Sovereign Immunities
Act ("FSIA"), we have identified a need for jurisdictional discovery on four topics: (1) the "core
function" of the Swiss Federal Office of Culture ("FOC"); (2) FOC's ownership and operation of
Plaintiffs' property; (3) the arbitrariness of the seizure of Plaintiffs' property; and (4) Geneva's
interdependence with the FOC and Swiss Customs Administration ("Customs").

Defendants created the need for discovery by offering evidence and making assertions that, they
claim, establish their immunity.  They cannot have it both ways: either the Court should ignore
their evidence and assertions and assume the truth of the allegations in the Complaints, or allow
discovery to permit fact-finding on a more developed record.

1.     **Core function of the FOC:**  In response to Plaintiffs' allegations and evidence showing
that the FOC is an "agency or instrumentality" of Switzerland (*see* ECF No. 1 ¶18; ECF No. 45 at
14-17), the FOC submitted affidavits, urged this Court to apply a "core function test," and argued
that the FOC's core function is governmental. (*See* ECF No. 48 at 4-6.)  Plaintiffs' evidence
(responding to FOC's evidence) shows that the FOC is an independent entity with a core function
that is commercial. Yet Defendants urge the Court to dismiss based solely on the FOC's
characterization of cherry-picked, self-published information.  Plaintiffs should have an
opportunity to test that evidence through discovery and to produce responsive material as well.

2.     **The FOC's Ownership or Operation of the Property**. Geneva does not address
discovery regarding the owned or operated issue. The FOC and Customs brush this aside, asserting
that discovery is unnecessary because Plaintiffs have not provided a discovery plan.[1] Here, the
Complaints allege facts showing FOC's ownership or operation of Plaintiffs' property.  (ECF No.

---

[1]    Unless jurisdictional discovery is granted, we do not feel it appropriate to burden the Court with a plan, especially
as the parties have not conferred.  We are of course prepared to do so, if the Court would find it helpful at this stage.

A-587

**MINTZ**

Honorable Ronnie Abrams, U.S.D.J.
May 21, 2019
Page 2



1 ¶¶16-24.) FOC's efforts to rebut the Complaints, presenting evidence to distance itself from Geneva's actions, emphasize the existence of a dispute that requires discovery.

**3.    Geneva's purported independence:**  Defendants mischaracterize Plaintiffs' argument about Geneva. The Complaints allege that pursuant to Swiss Federal Cultural Property Transfer Act ("CPTA" or "LTBC"), the Canton of Geneva and Customs act "at the direction of, and in concert with, the Swiss Office of Culture in all prosecutions arising under the LTBC" including the seizure of Plaintiffs' property. (ECF No. 1 ¶¶11-12.)  Defendants argue that Geneva acted independently. (*See* ECF No. 36 at 7-8; ECF No. 48 at 2; ECF No. 50 at 7.)  The FOC and Customs also submit an affidavit and argue (in their reply brief) that their evidence "outweighed" the Complaints' allegations. (*See* ECF No. 36 at 7-8; ECF No. 48 at 2; ECF No. 50 at 7.)  However, the CPTA and Plaintiffs' evidence support the Complaints' allegations. (*See* ECF No. 45 at 17-18; ECF No. 53 and exhibits.)  Defendants' conflicting evidence and argument on this point underscore that this dispute can only be resolved through discovery.[2]

**4.    The arbitrariness of the seizures:**  Contradicting the Complaints' allegations, Geneva asserts that (i) the legal process in Switzerland is functioning properly; (ii) Swiss authorities determined lawful ownership of 5,000 pieces, (iii) Plaintiffs stonewalled Swiss authorities, (iv) "facts are still being untangled in Switzerland," and (v) Swiss authorities documented "irregularities" sufficient to justify the seizure of 12,000 items.  (ECF No. 50 at 1-2.)  The Complaints allege the opposite (Geneva's motion ignores many of the allegations in the Complaints (*e.g.*, ECF No. 1 ¶¶5-6)).  Moreover, Plaintiffs' letter of May 7, 2019, includes further evidence of Defendants' arbitrariness, as does the transcript excerpt attached to this letter: Defendants' expert testified in August 2018 – 18 months after the seizure – that he does not know the country of origin of an item that Hicham acquired from his father in the 1990s, yet that item still has not been returned to Hicham.

In short, both motions to dismiss invite this Court to consider matters outside the pleadings, demonstrating a need for discovery. While the Defendants complain about the impact of limited discovery on their sovereignty, any such impact pales in comparison to the burden imposed on these Plaintiffs, American citizens impacted by the arbitrary seizure of their property, in violation of international law.

Respectfully submitted,

/s/ Kevin N. Ainsworth

Kevin N. Ainsworth
*Attorneys for Hicham Aboutaam*

Enclosure; cc: All counsel of record

**Joining in this request**

/s/ Nathaniel Z. Marmur

Nathaniel Z. Marmur
*Attorneys for Plaintiffs Lynda and William Beierwaltes*

---

[2]    Geneva lacks immunity – regardless of its purported state of independence – because the FOC meets the expropriation exception. (*See* ECF No. 45 at 20-21.) Geneva's argument focuses on the *wrong element* of the FSIA's expropriation exception. (28 U.S.C. §1605(a)(3)).  Under the correct element, the Court should assert jurisdiction over Geneva regardless of the location of the property. (*See* ECF No. 45 at 20-21.)

A-588

# EXHIBIT A

A-589

**Minutes of the Public Prosecutor's hearing on August 29, 2018**                    page 3
                                                                                     500'622

---

**Mr. Jean-Luc CHAPPAZ:**
Born on 06.05.1954, former curator of the MAH (Muséé d'Histoire et d'Art) [Art and
History Museum]
Residing at 9, rue J. F. Bautte, 1201 Geneva,
Expert, already apprised of his rights and duties,

**Mr. Marc-André HALDIMAN:**
Born on 03.29.1959, Research Associate, UNIBE, (University of Bern),
Residing at 52, chemin des Hutins, 1232 Confignon,
Expert, already apprised of his rights and duties,

The Prosecutor states that the hearing is devoted, as planned, to the follow-up of the experts' hearing.

The Prosecutor gives the experts a copy of the letter dated August 8, 2018 from Maître Didier BOTTGE
listing the objects for which the findings or recommendations of the experts have been contested.

The Prosecutor invites Maître Didier BOTTGE to question the experts informing them of the alternative
findings argued by his clients and for what reasons.

**The three experts:**

1.   Verdaine marble funerary relief, inventory AFD No. 2 (reference MOS.PA.065 incorrect)

Maître Didier BOTTGE asks the experts if it is possible to be more precise as to the origin stated,
from Turkey/Greece.

**Mr. Jean-Robert GISLER:**

For objects of Greek or Roman culture, especially, sculpture, it is difficult to distinguish the
origin between current Turkey and Greece.

The west coast of current Turkey was occupied at the time by Greek city-states. When the style is
mainstream, it is not always possible to identify the characteristics that would enable an object to
be attributed to a more specific region.

Technical analyses sometimes make it possible to determine the origin of the stone used for the
sculpture, but are not systematically used.

Maître Didier BOTTGE asks the experts if it is possible that the item comes from another country
in the sense that it might come from excavations or finds carried out in a country other than
Turkey or Greece.

[signatures]

---

P/2949/2017

A-590

**Minutes of the Public Prosecutor's hearing on August 29, 2018**          page 4
                                                                            500'623

---

**Mr. Jean-Robert GISLER:**

It cannot be excluded.

[End of translation of excerpt]

**A-591**



**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATION

I, Aurora Landman, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided SOURCE into TARGET translation(s) of the source document(s) listed below are true and accurate:

- Minutes of the Public Prosecutor's hearing on August 29, 2018

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

_____

Aurora Landman, Project Assistant

Sworn to before me this
Tuesday, May 21, 2019

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
STATE OF NEW YORK
PUBLIC

Stamp, Notary Public



**REPUBLIQUE ET CANTON DE GENEVE**
Pouvoir judiciaire
**Ministère public**

RECU le
U 7 SEP. 2018

Genève, bâtiment du Ministère public
le 29 août 2018 à 9 heures 30

**Procureur :** Claudio MASCOTTO

**Greffière :** Ana DI LENARDO

Réf : P/2949/2017
à rappeler lors de toute communication.

## PROCES-VERBAL D'AUDIENCE

*M. Jean-Marc RENAUD, chef de service, section anti-fraude douanière à Lausanne, participe à l'audience;*

Me Didier BOTTGE et Me Romain STAMPFLI, avocats, assistent :
**Monsieur Ali ABOU TAAM :**
Né le 8 novembre 1965,
Domicilié 4, rue Firmin-Massot, 1206 Genève,
Elisant domicile en l'Etude de Me Didier BOTTGE,
Bottge & Associés SA, Rue François-Bellot 1, 1206 Genève,
Prévenu, déjà rendu attentif à ses droits et devoirs,
Qui se présente sur mandat de comparution;

Me Ramon RODRIGUEZ, avocat, avisé, absent :
**Madame Biliana ABOU TAAM,**
Née le 25 juillet 1970, artiste,
Domiciliée c/o Me Ramon RODRIGUEZ, Mangeat Avocats Sàrl,
Passage des Lions 6, case postale 5653, 1211 Genève 11,
Prévenue, dont la présence n'est pas indispensable, avisée, absente;

Me Xavier LATOUR, avocat, avisé, absent :
**Monsieur Carlos ALEXANDRE NOVO,**
Né le 12 octobre 1963, profession
Domicilié c/o Me LATOUR Xavier, rue Bartholoni 6,
Case postale 5210, 1211 Genève 11,
Prévenu, dont la présence n'est pas indispensable, avisé, absent;

Me Laura PANETTI-CARUSO, avocate, avisée, absente :
**Madame Susana MARQUES DA COSTA**
Domiciliée c/o Me Laura PANETTI-CARUSO,
3, rue Michel-Chauvet, 1208 Genève,
Prévenue, dont la présence n'est pas indispensable, avisée, absente;

Procès-verbal d'audience du Ministère public du 29 août 2018

Me Gaspard COUCHEPIN, avocat, avisé, absent,
**Monsieur Andrea ZABBENI**
Né le 29 avril 1947, retraité,
Domicilié 18, chemin de Ballallaz, 1820 Montreux,
Prévenu, dont la présence n'est pas indispensable, avisé, absent,

Me Sarah PEZARD, avocate, représente :
**Monsieur André LAGNEAU**
Né le 19 avril 1935, retraité,
Domicilié, 51, rue de l'Evole, 2000 Neuchâtel,
Prévenu, dont la présence n'est pas indispensable, avisé, absent,

Me Alessia COLUCCI, avocate-stagiaire, excusant Me Pierluca DEGNI, avocat,
représente :
**Monsieur Walter HABERKORN**,
Né le 15.11.1954, profession,
Elisant domicile en l'Etude de Me Pierluca DEGNI, Archipel, route de Chêne 11, case
postale 6009, 1211 Genève,
Prévenu, dont la présence n'est pas indispensable, avisé, absent;

Me Manuel MOURO, avocat, avisé, absent :
**Monsieur Jeffrey SUCKOW**,
Né le 27.04.1965, profession,
Elisant domicile en l'Etude de Me Manuel MOURO, MBLD Associés,
Rue Joseph-Girard 20, case postale 1611, 1227 Carouge,
Prévenu, dont la présence n'est pas indispensable, avisé, absent,

Me Daniel SCHUTZ, avocat, avisé, absent :
**Monsieur Roben DIB**
Né le 12 avril 1979, ingénieur,
Domicilié 326B, Fuhlsbüttlerstrasse, 22307 Hambourg, Allemagne,
Elisant domicile en l'Etude de Me Daniel SCHUTZ,
10, rue de la Croix-d'Or, 1204 Genève,
Prévenu, dont la présence n'est pas indispensable, avisé, absent,

Me Lisa MARGOT Lisa, avocate-stagiaire, excusant Me Alessandro DE LUCIA,
avocat, représente :
**Monsieur Charles ANSERMET** :
Né le 25 avril 1940, profession,
Domicilié 68, rue des Berthoudes, 2009 Neuchâtel,
Elisant domicile en l'Etude de Me Alessandro DE LUCIA,
Perreard de Boccard SA, rue de la Coulouvrenière 29,
Case postale 5710, 1211 Genève 11,
Prévenu, dont la présence n'est pas indispensable, avisé, absent,

**Monsieur Jean-Robert GISLER** :
Né le 30.06.1951, professeur UNIFR,
Domicilié 26, avenue de Beauregard, 1700 Fribourg,
Expert, déjà rendu attentif à ses droits et devoirs,

P/2949/2017

Procès-verbal d'audience du Ministère public du 29 août 2018                                  page 00'622

**Monsieur Jean-Luc CHAPPAZ** :
Né le 05.06.1954, ancien conservateur MAH,
Domicilié 9, rue J.F. Bautte, 1201 Genève,
Expert, déjà rendu attentif à ses droits et devoirs,

**Monsieur Marc-André HALDIMANN** :
Né le 29.03.1959, chercheur associé UNIBE,
Domicilié 52, chemin des Hutins, 1232 Confignon,
Expert, déjà rendu attentif à ses droits et devoirs,

**Le Procureur indique que l'audience est consacrée comme prévu à la suite de l'audition des experts.**

**Le Procureur remet aux experts un tirage du courrier du 8 août 2018 de Me Didier BOTTGE énumérant les objets au sujet desquels les conclusions ou les préconisations des experts sont contestées.**

**Le Procureur invite Me Didier BOTTGE à interroger les experts en leur indiquant quelles conclusions alternatives ses clients soutiennent et pour quels motifs.**

**Les trois experts** :

1.  relief funéraire en marbre Verdaine, inventaire AFD n°2 (référence MOS.PA.065 incorrecte)

    Me Didier BOTTGE demande aux experts s'il est possible d'être plus précis quant à la provenance indiquée, de Turquie / Grèce.

    **M. Jean-Robert GISLER** :

    Pour les objets de culture grecque et romaine, en particulier la sculpture, il est difficile de distinguer la provenance entre la Grèce et la Turquie actuelles.

    La côte occidentale de la Turquie actuelle était occupée à l'époque par des cités grecques. Lorsque le style est dans le mainstream il n'est pas toujours possible d'identifier les caractéristiques qui permettraient d'attribuer une pièce à une région plus restreinte.

    Les analyses techniques permettent quelquefois de déterminer l'origine de la pierre utilisée pour la sculpture, mais ne sont pas systématiquement utilisées.

    Me Didier BOTTGE demande aux experts s'il est possible que la pièce provienne d'un autre pays, au sens où elle proviendrait de fouilles ou de trouvailles réalisées dans un autre pays que la Turquie ou la Grèce.

P/2949/2017

**Procès-verbal d'audience du Ministère public du 29 août 2018**                                  page 00'623

---

**M. Jean-Robert GISLER** :

On ne peut pas l'exclure.

Me Didier BOTTGE demande aux experts en quoi la pièce constituerait un témoignage sociologique précieux.

**M. Jean-Robert GISLER** :

Chaque témoignage archéologique est un témoignage en soi important pour la connaissance de la société qui la produit.

Me Didier BOTTGE demande quel est le témoignage que cette pièce apporte.

**Le Procureur rappelle que les experts sont invités à se déterminer sur l'importance du bien culturel au regard de la convention UNESCO et de la loi, et propose que le débat se concentre sur cette qualité-là.**

**M. Jean-Robert GISLER** :

La pièce n'est pas à considérer comme un objet en soi, mais comme une partie d'un ensemble. Par exemple l'ensemble des témoignages funéraires d'une société précise à un moment donné. Une source de témoignage précieuse sur le statut social de la personne qui a commandé, sur le niveau économique, par la qualité du travail accompli, parfois même par les inscriptions, comme par exemple le nom des personnes défuntes.

Nous avons accompli une étude relativement rapide. Or, il se peut qu'une étude approfondie révèle encore d'autres informations très importantes.

Ces éléments font de cet objet un bien culturel d'importance pour le patrimoine de l'Etat auquel il pourrait avoir été soustrait.

**M. Jean-Luc CHAPPAZ** :

Je partage ce que vient de dire Jean-Robert GISLER sur l'importance du contexte archéologique.

J'ajouterai qu'une fois extrait ou soustrait de son lieu de trouvaille, l'objet est également important comme témoignage du patrimoine du pays et est destiné à être exposé dans le pays d'origine, dans un musée national ou local du pays source.

*Dès cet instant, Me Sarah PEZARD quitte l'audience à 10h10*

Je précise que l'exposition dans le pays source est importante pour ce pays et sa population car l'objet contribue à illustrer et à définir l'identité historique et culturelle du pays.

Pour le dire très prosaïquement, lorsque même les musées nationaux ne possèdent pas d'équivalent des objets que nous examinons, alors leur importance est capitale. Quand il

P/2949/2017

A-596

**Kevin N. Ainsworth**
212 692 6745
kainsworth@mintz.com



MINTZ

Chrysler Center
666 Third Avenue
New York, NY 10017
212 935 3000
mintz.com

July 11, 2019

**VIA ECF**

Honorable Ronnie Abrams
United States District Judge, S.D.N.Y.
40 Foley Square
New York, NY 10007

Re:     *Aboutaam v. L'C₁fice Federale de la Culture de la Corfederation Suisse, et al.*, 18-cv-
8248-RA; and *Beierwaltes v. L'C₁fice Federale et al.*, 18-cv-11167-RA

Dear Judge Abrams:

On behalf of the Plaintiffs in these two related actions, we write to respond to a question you asked at oral argument on July 8, 2019, concerning international law, and to cite cases that you requested regarding discovery.

International Law

Your Honor asked a critical question: what international law has been violated? The answer here: the violation of the generally recognized principle protecting against *arbitrary* seizures of property and, independently, a violation of the UNESCO Convention.

*First,* all of the cases cited by the parties regarding a taking of property in violation of international law recognize that there are certain rights that are inviolate, and that nations cannot transgress those rights. This is so even without a particular international statute, treaty, or convention to measure whether a taking was in violation of international law (and as discussed below, we have one here anyway). In other words, the term "international law" as used in the FSIA does not require a codified pronouncement of law; instead, it embraces the well-accepted doctrine that nations must respect property rights. *Cf. Republic cf Venezuela v. Helmerich & Payne*, 137 S.Ct. 1312, 1320 (2017) (FSIA "creates a doctrine that by and large continues to reflect basic principles of international law"). The decision in *Agudas Chasidei Chabad v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008) is a good example: the plaintiff successfully laid claim to rare religious texts seized by a foreign nation without compensation, despite there being no specific international statutory prohibition against such seizures.

As the U.S. Congress recognized when it enacted the FSIA, "[t]he term 'taken in violation of international law' would include the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law. It

---

A-597

July 11, 2019 Letter to Hon. Ronnie Abrams
Page 2

would *also* include takings which are *arbitrary* or discriminatory in nature." H.R. Rep. No. 94-1487, at 19-20 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6614 (emphasis added). Indeed, counsel for the Swiss defendants conceded that certain seizures would violate international law despite there being no specific law that was transgressed.  July 8, 2019 Tr. at 6 ("let's say the President of the country likes your car and just wants to take it, that's not okay").

So the concept of an international law violation can rest on the foreign sovereign acting in ways that international law could not condone – in other words, arbitrarily.  Here, for various reasons mentioned in our briefing and at argument, the wholesale seizure of 12,000 pieces based on suspicions of only 7 pieces *and* without any effort to check whether the Swiss law adopting UNESCO applied to such pieces (*i.e.,* (i) post 2005 acquisition; (ii) post 2008 bilateral nation request etc.); (iii) improper shifting of burden by requiring property owner to prove ownership of pieces; (iv) holding pieces for 2½ years;  and (v) not compensating Hicham for the theft of certain priceless items under Swiss control) are actions so arbitrary as to transgress international law.

*Second,* and as an independent ground, the actions by the Defendants in our case also violated a specific international law: the UNESCO Convention, which is unquestionably international law.  *See, e.g., Flores v. Southern Peru*, 414 F.3d 233 ("treaties, conventions, and covenants . . . are proper evidence of customary international law to the extent that they create legal obligations among the States parties to them.")  The seizure of Plaintiffs' property in Geneva was for purposes of returning the property to another state party to the Convention.  But none of the seized property (and the defendants have not disputed this) has been (a) designated by any state as constituting "cultural property," as defined in article 1 to the Convention, or (b) requested by any state under article 7 to the Convention – the essential predicates for UNESCO-based seizures. No clearer violation of international law could occur.

<u>Discovery</u>

Your Honor asked whether any court has ordered jurisdictional discovery on "the question of whether a subdivision of a foreign government is the foreign state itself or an agency or instrumentality."  Several have.  *Funk v. Belneftekhim*, 861 F.3d 354, 367 (2d. Cir. 2017), held there was "no abuse of discretion in the district court's decision to order limited jurisdictional discovery as to BNTK's 'ownership and structure'" where BNTK allegedly was an organ of Belarus.  In *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449, 453 (D.C. Cir. 1990) (cited in support of our application for discovery), the court remanded for fact-finding "on the degree of control exerted by Iran over Pak Dairy and over the shareholder entities that Foremost alleges are government controlled," and the court recognized that discovery would be needed.  *Cf. Janvey v. Libyan Investment Authority*, 840 F.3d 248, 256 (5th Cir. 2016) ("[t]he parties conducted jurisdictional discovery regarding whether LFIA and LFICO [two Libyan entities] engaged in activities that fall within the scope of …. the FSIA.")

A-598

July 11, 2019 Letter to Hon. Ronnie Abrams
Page 3

Respectfully submitted,

/s/ Kevin N. Ainsworth

Kevin N. Ainsworth

/s/ Peter A. Chavkin

Peter A. Chavkin

*Attorneys for Hicham Aboutaam*

**Joining in this submission**

/s/ Nathaniel Z. Marmur
Nathaniel Z. Marmur
*Attorney for Plaintiffs Lynda and William Beierwaltes*

cc:      Counsel of Record (via ECF)

A-599



Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW  |  Washington, DC 20036  |  tel 202.663.8000  |  fax 202.663.8007

Michael Evan Jaffe
tel: +1.202.663.8068
michael.jaffe@pillsburylaw.com

July 12, 2019

**VIA ECF**

Honorable Ronnie Abrams
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:  *Aboutaam v. L'Office Federale de la Culture de la Confederation Suisse, et al.*, 18-cv-8248 (RA) (S.D.N.Y.); and *Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse, et al.*, 18-cv-11167-RA (S.D.N.Y.)

Dear Judge Abrams:

This letter is written on behalf of the Swiss Confederation Defendants in the matters identified above and with the authorization of Counsel for the Canton of Geneva.

Reference is made to the procedurally unorthodox letter submission made yesterday by the Plaintiffs. The letter was offered as a response "to a question you asked at oral argument …, concerning international law, and to cite cases that you requested regarding discovery." [Dkt. 63 (Case 1:18-cv-8248-RA), Dkt. 63 (Case No. 1:18-cv-11167-RA)]. The response offered by the Plaintiffs to the international law question is predicated on a misunderstanding of the nature of the seizure by the authorities in Switzerland assessed in the context of international legal norms. Further, the cases cited related to discovery provide no support for jurisdictional discovery in this case. Indeed, the cases cited are readily distinguished from the instant matter.

A-600

Honorable Ronnie Abrams
July 12, 2019
Page 2


If the Court is inclined to entertain Plaintiffs' July 11th submission and is of the view that comment from the Defendants would be appropriate, we are prepared to provide those comments promptly.

Respectfully,

Michael Evan Jaffe

cc:     All counsel of record

J787ABAC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------x

3    HICHAM ABOUTAAM,

4                  Plaintiff,

5          v.                              18 Civ. 8248 (RA)

6    L'OFFICE FEDERALE DE ALA CULTURE
     DE LA CONFEDERATION SUISSE,
7    et al.,

8                  Defendants.

9    --------------------------------x
                                       New York, N.Y.
10                                     July 8, 2019
                                       3:00 p.m.
11
     Before:
12
                         HON. RONNIE ABRAMS
13
                                       District Judge
14
                            APPEARANCES
15
     MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
16        Attorneys for Plaintiff Hicham Aboutaam
     BY:  KEVIN AINSWORTH
17        PETER CHAVKIN

18   LAW OFFICE OF NATHANIEL Z. MARMUR PLLC
          Attorneys for Plaintiffs Lynda and William Beierwaltes
19   BY:  NATHANIEL MARMUR

20   PILLSBURY WINTHROP SHAW PITTMAN LLP
          Attorneys for Defendant L'Office Federale
21        de la Culture de la Confederation Suisse
     BY:  MICHAEL JAFFE
22        STEPHAN BECKER

23   ARNOLD & PORTER KAYE SCHOLER LLP
          Attorneys for Defendant
24        La Republique et Canton de Geneve
     BY:  R. REEVES ANDERSON
25        MARCUS ASNER
```

J787ABAC

```
 1              (Case called)

 2              (In open court)

 3              MR. AINSWORTH:  Good afternoon, your Honor.  Kevin

 4   Ainsworth with Mintz for plaintiff Hicham Aboutaam.

 5              MR. CHAVKIN:  Your Honor, Peter Chavkin, also Mintz,

 6   for Hicham Aboutaam.

 7              MR. MARMUR:  Good afternoon, your Honor.  Nathaniel

 8   Marmur, M-a-r-m-u-r, for the Beierwaltes.

 9              MR. ANDERSON:  Good morning, your Honor.

10              MR. ABOUTAAM:  Good afternoon, your Honor.  I'm Hicham

11   Aboutaam.

12              THE COURT:  Yes, good afternoon to you.

13              MR. ANDERSON:  Reeves Anderson from Arnold & Porter

14   for the Republic and Canton of Geneva.

15              MR. ASNER:  Marcus Asner for Geneva.

16              MR. JAFFE:  Michael Jaffe from Pillsbury Winthrop on

17   behalf of the Federal defendants.

18              MR. BECKER:  Steven Becker from Pillsbury Winthrop,

19   also on behalf of the Swiss Federal defendants.

20              THE COURT:  All right.  So good afternoon all.  So,

21   we're here to discuss the pending motions to dismiss as well as

22   plaintiffs' request for jurisdictional discovery.  Who would

23   like to start on behalf of defendants?

24              MR. ANDERSON:  I will, your Honor.

25              THE COURT:  Yes.
```

3

J787ABAC

```
 1          MR. ANDERSON:  First and foremost, the Foreign
 2   Sovereign Immunities Act bars these suits, and I begin there
 3   because, first, the immunity question is a threshold
 4   jurisdictional question, and foremost because binding circuit
 5   precedent forecloses these actions.  So, let's begin with what
 6   is undisputed.  The defendants here are all foreign states, as
 7   that term is defined in the Foreign Sovereign Immunities Act.
 8   As such, they are entitled to presumptive immunity unless the
 9   plaintiffs can establish that one of the narrow exceptions to
10   immunity applies.  And the only one that they're relying on so
11   far is the expropriation exception in 1605(a)(3).  So, while
12   they bear the burden on each of those, I want to focus on the
13   three aspects that were briefed in our motion.
14          So, the first -- and the statute has been described as
15   abstruse here, so if at any point I can clarify any points here
16   we're going to be unpacking a bit, please let me know.
17          The first is there is no taking.  In general, the
18   Second Circuit in the Zappia case defined a taking as the
19   expropriation or nationalization of property.  Here the
20   defendants claim no property right in the disputed antiquities.
21   At issue here is a freezing order pursuant to equivalent of a
22   search and seizure warrant issued by the Geneva prosecutor.
23   And the Second Circuit has addressed the specific application
24   in Chettri v. Nepal Rastra Bank.  And the court said that there
25   is no authority for the proposition that a routine law
```

4

J787ABAC

1    enforcement action constitutes a taking within the meaning of

2    1605(a)(3).

3              THE COURT:  Do you think it would make a difference if

4    the property was frozen for a longer period of time, if it was

5    frozen for five years or ten years?  At what point would it

6    become a taking?

7              MR. ANDERSON:  So, your Honor, I do believe, just as

8    under U.S. juris prudence, there is a period of time where

9    perhaps it could ripen into a taking, but here that has not yet

10   elapsed.  There are cases that extend far beyond the two years

11   that are at issue in this case.  In fact, Chettri is a good

12   example, the assets were frozen, the bank account in Chettri,

13   in 2008.  In 2011 the Nepalese regulators issued an order

14   actually confiscating that and indicting the defendant there on

15   money laundering charges.  In 2014 -- so six years after the

16   initial freezing -- this court vacated the default judgment and

17   dismissed the case under the Foreign Sovereign Immunities Act

18   and the Second Circuit affirmed.  So, a much longer period than

19   we have here.

20             Now, it could be an open question on indefinite

21   detention, but here there is an ongoing criminal investigation.

22   And by the evidence that the plaintiffs have attached to their

23   complaint and put into the record, they have established that a

24   number of the antiquities that were at dispute have already

25   been released.  The investigation is going on apace, and so it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J787ABAC                                                                    5

1    would be both premature to say that this is a taking but also

2    that it has ripened into one.  So, that's the first issue on

3    the taking.

4          And here I think the U.S. analog is important.  The

5    United States takes property all the time without triggering

6    the taking clause of the Fifth Amendment.  And the restatement

7    section -- the Restatement, Third, Foreign Relations Law,

8    Section 712 -- which the plaintiffs rely on -- makes it clear

9    that the line in international law is similar to that drawn in

10   United States juris prudence for purposes of the Fifth and

11   Fourteenth Amendment when determining whether there has been a

12   taking.

13         So, I would point the Court to the two cases that we

14   raised in the motion to dismiss by the federal circuit:  The

15   Acadia Tech case, as well as the Amerisource.  It said that

16   seizing evidence for either a criminal investigation or for use

17   in a criminal investigation is not a taking, and the innocence

18   of the claimant is irrelevant.

19         And the implications here of finding a taking would be

20   serious.  First, it would embroil U.S. courts in litigation

21   over prosecutorial actions taken all over the world.  Here this

22   is a routine criminal investigation where the plaintiffs admit

23   the proper procedures of the foreign jurisdiction were

24   followed.  If this court were to assert jurisdiction, there

25   would be many more cases like it to follow.

J787ABAC

1          Second, it would be holding foreign governments liable

2    for actions that the United States undertakes all the time.

3    So, since 2017 over $3 billion worth of assets have been

4    deposited into the Department of Justice's forfeiture fund.

5    The F.B.I., ATF, DEA seize over 700,000 assets annually

6    pursuant to the search and seizure rules and the forfeiture

7    rules of the United States.  We would be holding foreign

8    governments to a standard that the United States -- holding

9    them liable for actions the United States undertakes all the

10   time.

11          Unless your Honor has questions about takings, I would

12   like to turn to the "in violation of international law".

13          THE COURT:  Let's do that.  Thanks.

14          MR. ANDERSON:  So, again the Second Circuit's decision

15   in Chettri is dispositive here.  The complaint is really about

16   the criticisms that the Geneva prosecutor has undertaken so far

17   in this case.  And the Second Circuit said, "Criticisms about

18   the manner in which Nepal has conducted its investigation are

19   insufficient to prove a violation of international law."

20          In the Hilsenrath case -- which was also against the

21   Swiss Confederation in the Ninth Circuit -- they actually found

22   that argument frivolous.  "It is frivolous to claim that

23   freezing assets during a legitimate criminal investigation

24   violated international law."

25          THE COURT:  What in your view -- or when would a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J787ABAC

1    seizure be in violation of international law, in your view?

2    So, let's say a foreign sovereign took someone's property

3    without any justification or any property.  Would a U.S.

4    district court, you know, be permitted to get involved in that

5    point, and would immunity apply?

6         MR. ANDERSON:  So, in the Zappia case from the Second

7    Circuit they identified three circumstances that may constitute

8    a violation of international law:  If the property was not

9    taken for a public purpose.  So, if it was just taken for

10   private gain, let's say the president of the country likes your

11   car and just wants to take it, that's not OK.  So, not for a

12   public purpose.  The second is if it's discriminatory.  If it

13   particularly targets nationals of another state or of another

14   race, that would be a violation of international law.  And the

15   third is if it's not done for just compensation.  And here this

16   is where the parallel to the U.S. takings juris prudence is

17   important.  Just compensation is not required unless it is a

18   taking in the first instance.

19        So, those are the three examples identified by the

20   Second Circuit reflected in the restatement section on the

21   expropriation exception, and so those are the examples that I

22   would point to.

23        And I think it's important to note here that the

24   plaintiffs can't point to any case that is analogous where

25   there has either found to be a taking or a taking in violation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J787ABAC

1    of international law where a foreign government was exercising

2    its regulatory or police powers just as the Canton of Geneva

3    was doing here with the support of the Federal defendants as

4    well.

5            Finally, the U.S. nexus.  So, the Foreign Sovereign

6    Immunities Act is not a carte blanche invitation for U.S.

7    courts to exercise jurisdiction over foreign sovereigns.  There

8    must be some connection to the United States.

9            The Foreign Sovereign Immunities Act's expropriation

10   exception creates two distinct tracks which depend on the

11   nature of the Federal -- the foreign defendant.  So, the first

12   step is to identify which foreign state's immunity is at stake.

13   Here the Canton of Geneva is admittedly a political

14   subdivision.  And there a two classes within the Foreign

15   Sovereign Immunities Act:  The first is foreign states -- so

16   foreign states proper and political subdivisions -- and then

17   agencies or instrumentalities.  And the difference between

18   those two categories pervades the FSIA.  It's in the

19   definitional provision of 1603 and the punitive damages

20   provision of 1606.  Foreign states proper are not subject to

21   punitive damages, while agencies and instrumentalities are.  It

22   also differentiates between them in service of process as well

23   as execution.  So, here is another example where it treats the

24   foreign sovereign proper differently than it treats agencies or

25   instrumentalities.

J787ABAC

1              So, the first prong says you may exercise jurisdiction

2    if the property is present in the United States in connection

3    with the commercial activity of the foreign state.  That's a

4    very high bar.  And admittedly the property is not in the

5    United States, and so the first prong which applies to foreign

6    states absolutely does not apply.  And I think that is the

7    cleanest way to dismiss this case.

8              The second prong specifically refers to agencies or

9    instrumentalities.  It says if an agency or instrumentality

10   owns or operates that property wherever in the world, and they

11   conduct commercial activities in the United States, that's a

12   sufficient U.S. nexus.  And the reason those two are different

13   is because it's more delicate to exercise jurisdiction over the

14   foreign sovereign proper than it is necessarily for a company

15   that happens to be majority owned by a foreign state.

16             So, the juxtaposition between those two prongs has

17   been recognized time and again.  In the Second Circuit, Judge

18   Cabranes' decision in Garb spent quite some time

19   differentiating the two prongs and explaining that only the

20   first prong could be used to assert jurisdiction over a foreign

21   state or a political subdivision.

22             The most extensive explication that I am aware of is

23   the de Csepel case against Hungary in the D.C. Circuit.  But

24   even as recently as early this year the United States has in an

25   amicus brief to the Supreme Court in detail explained why only

1    the first prong would apply to a foreign state.

2           Now, here, because the property is located in Geneva,

3    plaintiffs are forced to argue a novel interpretation, which is

4    that if the second prong could apply to some agency or

5    instrumentality, then those contacts must be imputed up to the

6    foreign state and perhaps every single agency or

7    instrumentality in every subdivision of the foreign state.  No

8    case has ever so held, for good reason.  It's contrary to the

9    text, structure and purpose of the Foreign Sovereign Immunities

10   Act, which treats the foreign state differently than agencies

11   or instrumentalities.

12          Finally, the agency or instrumentality that they focus

13   on here -- the Federal Office of Culture -- is not an agency or

14   instrumentality of Geneva.  So, even if their legal rule

15   applied, it wouldn't extend to Geneva.  So, it would extend to

16   perhaps Switzerland, the Swiss Confederation, but we are a

17   political subdivision, and therefore even under the legal

18   theory that they have brought for this case, it would not be

19   sufficient to assert jurisdiction over the Canton of Geneva.

20          THE COURT:  Thanks very much.

21          MR. JAFFE:  Good afternoon, your Honor.

22          THE COURT:  Good afternoon.

23          MR. JAFFE:  In assessing whether the Federal Office of

24   Culture or the customs administration is part of the central

25   government, or alternatively an agency or instrumentality, the

J787ABAC

1    Garb decision makes clear what you look at is -- you answer two

2    questions:  How are they formed and what is their purpose?

3          The "how is they formed" is reflected in two places:

4    Exhibit 3 to Mr. Becker's affidavit, where you have the Swiss

5    government announcing to the World Trade Organization the

6    structure of the central government.  And under the structure

7    of the central government you have both the Office of Culture

8    and you have the Customs Administration.  That's a declaration

9    to the world that those entities will be responding based upon

10   their central government status.  There are other tables, other

11   schedules that deal with agencies, instrumentalities, not the

12   central government.

13         Secondly, there is the Nussbaum affidavit.  Mr.

14   Nussbaum, who is with the Customs Administration and a Swiss

15   lawyer, testifies that, one, they are not separately

16   incorporated; they are parts of the departments under which

17   they are logged.  They do not have any independent existence

18   beyond the central government.  And, in addition to that, they

19   report to the executive of the central government.

20         THE COURT:  But why should I rely just on your

21   submissions as opposed to allowing jurisdictional discovery as

22   plaintiff requests?

23         MR. JAFFE:  A few reasons, your Honor.

24         First, if our evidence could be challenged, presumably

25   a Swiss lawyer or a Swiss law professor would have given an

J787ABAC

1     affidavit that says, no, no, no, Mr. Nussbaum got it wrong, Mr.

2     Nussbaum didn't give you the full story.  But these are

3     official publications of the Swiss government, the Becker

4     affidavit Exhibit 3.  Under our rules mere allegations are

5     trumped by affidavits under law.  And if there were a basis for

6     challenging them, first, the plaintiffs could have come forward

7     with an affidavit that says, no, no, no, no, they got it wrong,

8     they didn't tell you the whole story, there is more to it,

9     there is something else there.  But they didn't do any of that.

10    And these points were not made in a reply paper, they were made

11    in our opening papers, so they had plenty of opportunity to

12    address it.

13            Then when your Honor was good enough to allow them to

14    ask for jurisdictional discovery, there was no indication that

15    what they want to do is pursue Mr. Nussbaum's affidavit because

16    he was wrong, because there is a basis on which they could

17    challenge what he said.

18            When we in response said, where is your discovery

19    plan, how are you going to help the court identify the issues

20    and resolve the jurisdictional questions, their response was we

21    don't have one at this point, we don't have to have one at this

22    point, it touches all of the issues in this case.

23            Well, under the decisions that we cited in our papers

24    and which our colleagues on behalf of Geneva cited, it's not

25    enough simply to say we could do it, let us go after the

J787ABAC

1   foreign sovereign and take jurisdictional discovery.  Before

2   you can do that there has to be more than a prima facie

3   showing, more than simply a good faith allegation.  There needs

4   to be in the words of the Supreme Court in Boliviano, there

5   needs to be hard evidence that in fact there is subject matter

6   jurisdiction and then presumption that there is subject matter

7   jurisdiction, which is just the contrary of what we have here.

8           So, the answer to your Honor's question, if there was

9   something to it, the plaintiffs had more than an adequate

10  opportunity to address it.  They could have addressed it, as I

11  said before, with an affidavit from a Swiss law professor, from

12  a Swiss lawyer, from someone in a U.S. law school who is astute

13  about matters of Swiss law.

14          Secondly, when we said, where is your plan, who do you

15  want to take discovery from, how are you going to help the

16  court reach the right decision, their response was we don't

17  have one at this point but if we're allowed to take discovery

18  we will articulate it.  It seems to me that's putting the cart

19  before the horse.

20          Jurisdictional discovery is narrowly cabined in these

21  kinds of cases, and it requires a showing that in fact the

22  narrowly cabined discovery that you want to take will bear on

23  the issues that the court has to decide and will assist the

24  court in making that decision.

25          So, the first prong of the test -- are we dealing with

14

J787ABAC

 1   agencies and instrumentalities, or are we dealing with parts of

 2   the central government -- both the official pronunciations from

 3   the Swiss federal government and the Nussbaum affidavit make

 4   plain the facts set forth in those sworn papers trump the mere

 5   allegations in the complaints and, frankly, the argument of

 6   counsel.

 7           As plaintiffs themselves somewhat ironically say in

 8   their papers, the allegations or the arguments of Geneva's

 9   counsel should not be taken at face because there are other

10   allegations.  It may be so that if it's allegation versus

11   allegation you're in equipoise, but when it's sworn testimony

12   versus allegation, you're no longer in equipoise.

13           The second prong of the test is that -- actually, One

14   other point, your Honor.  When it comes to the two federal

15   departments, with respect to Customs, what is the purpose of

16   Customs?  Enforce the tax laws, enforce the importation laws.

17   Plaintiffs make no argument at all that the Customs

18   Administration is anything but part of the central government.

19           When it comes to the Office of Culture, what they do

20   is they look at not the core functions that the Garb decision

21   requires, but they look at some peripheral activities.

22           We provided to the Court the mission statement of the

23   Office of Culture, and it says that "The Federal Office of

24   Culture is the strategic body responsible for drawing up and

25   implementing the Confederation's culture policy.  It's remit

J787ABAC

1   covers tasks that are strictly reserved to the Confederation,

2   namely improving the institutional framework, drafting

3   enactments in the culture sector, reviewing the compatibility

4   of enactments in other political areas, value added tax,

5   international free trade, vocational education, languages,

6   etcetera, with the needs of culture in coordination with the

7   Federal Department of Foreign Affairs, negotiating agreements

8   in the cultural sector."  And it goes on.

9        None of that is challenged.  There isn't an affidavit

10  that says, yeah, but there is more than that, that's not the

11  core, their mission statement got it wrong, under this piece of

12  legislation or that article there is more to it.  But there is

13  no challenge to that mission statement.  It is inconceivable

14  that one would say that's a mission statement that describes a

15  commercial activity.  It's just the opposite, it's expressly

16  carrying on the functions specifically reserved to the

17  Confederation.

18       When it comes to the Customs Administration, I've

19  already indicated there is no argument that they have any

20  commercial activity.  When it comes to culture, they point to

21  some peripheral activities, for example, publishing books.

22       To be sure, there are books on the Internet that one

23  can buy where the Office of Culture is listed as the editor,

24  but there are more than 7,000 books on the Internet that one

25  can buy produced by various departments of the United States

J787ABAC

1      government, including such treatises as Defense Department's

2      book Cookbook for Large Gatherings.  The fact that the Defense

3      Department published a book or 7,000 books on a myriad of

4      topics doesn't change it from being part of the central

5      government of the United States to an agency or instrumentality

6      of the United States.

7              When it comes to owned or operated -- which is the

8      second prong that has to be satisfied -- there is no argument

9      that the Customs Administration is owning or operating

10     anything.

11             So, it comes to the Office of Culture.  And what do

12     they say in that regard?  They start off by saying that the

13     Office of Culture is responsible for repatriating goods that

14     have been confiscated.  Secondly, the Office of Culture

15     cooperates with other parts of the Swiss government.  Perhaps

16     that's like the F.B.I. cooperating with the Department of

17     Commerce, or the CIA cooperating with the Department of State.

18     That doesn't make the CIA part of the State Department, and it

19     doesn't make the State Department part of the CIA.  And the

20     same could be true for any number of federal agencies that

21     cooperate one with the other.

22             They say that the Federal Office of Culture voiced its

23     suspicions to the Geneva prosecutor and that led to the

24     seizures about which they complain.  Again, under Swiss law

25     it's entirely appropriate if one part of the federal government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J787ABAC

1    sees a problem, for them to report it to the appropriate

2    authority.  Here the appropriate authority is outside of the

3    federal government, it's the Canton of Geneva and it's the

4    prosecutor in Geneva, and that's exactly what taking the

5    allegations of the complaint at face -- it's exactly what they

6    say happened.  That doesn't put the Office of Culture as making

7    them the owner or the operator of any of the artworks.

8            Lastly, they say that because you were there at the

9    commencement -- namely you the Office of Culture raised

10   suspicion -- and you will be there if the goods are ever

11   confiscated -- which is a step beyond the seizure -- you will

12   be responsible for repatriating, therefore you must be in

13   control in the middle.  That's exactly the opposite of what the

14   Nussbaum affidavit says; it's exactly the opposite of what the

15   statutory provisions that we've cited to your Honor say.

16           In fact, during the process, the Office of Culture,

17   the Customs Administration, have no control at all over the

18   decisions being made by the prosecutor in Geneva.  And as

19   counsel has already argued, those proceedings are in accordance

20   with and accepted values of international law.

21           The last point that I think we should make -- and I

22   guess -- does your Honor want to deal separately with the

23   jurisdictional discovery issue, or should we address that at

24   this point as well?

25           THE COURT:  Either way.  I mean you're welcome to

J787ABAC

1     address it now.

2              MR. JAFFE:  Well, I think the principal arguments as

3     to why jurisdictional discovery is not appropriate here are

4     twofold:  One, there is no showing of what it's going to be or

5     how it's going to help the court.  Two, when it comes to our

6     clients, we rely solely upon the public record, the statements

7     of the Swiss central government itself both in the World Trade

8     Organization and in the statutory sections that we've called to

9     the attention of the Court; and, secondly, upon the affidavit

10    of Mr. Nussbaum.

11             If we got it wrong, as I said before, it would have

12    been an easy matter to find a Swiss law professor, a Swiss

13    lawyer, a law professor here in the United States, to say they

14    got it wrong, they left something out.  We didn't hear any of

15    that.

16             Instead, what you have when it comes to ownership and

17    control, for example, are suspicions, suggestions, a long way

18    from any evidentiary proof that this court could establish.  It

19    doesn't even pass an Iqbal test.

20             So, with respect to jurisdictional discovery under the

21    arts decision that our colleague cited in one of the letters in

22    May back to the Court -- I think it was the May 15 letter --

23    you don't undertake jurisdictional discovery without their

24    being a firm foundation for the court to see its way to say,

25    yes, if you take this discovery it could make a difference.

J787ABAC

1          Here we have no idea what discovery they want to take,

2    much less how it could make a difference.  And they've had

3    plenty of opportunity to address the court through affidavits

4    of their own, which would be commonly done if in fact there

5    were a basis for challenging either the public pronouncements

6    or interpretation of them or challenging Mr. Nussbaum's

7    testimony.

8          THE COURT:  All right.  Thank you.

9          MR. JAFFE:  Two further comments, your Honor:  One

10   with respect to the act-of-state doctrine, and secondly with

11   respect to comity.

12         The very reason for those two doctrines is that it's

13   inappropriate for U.S. courts to inject itself into regular

14   proceedings in a foreign country.  There is no suggestion

15   here -- there is certainly no proof -- that the Swiss

16   government, the Canton of Geneva, are incapable of providing a

17   fair and equitable proceeding, that it would be futile for the

18   plaintiffs to pursue their rights in Switzerland.

19         But also importantly, the only basis upon which the

20   act-of-state doctrine is challenged is the second Hickenlooper

21   Amendment.  But as we point out in our papers, that amendment

22   doesn't apply because it only deals with property located in

23   the United States.

24         So, as a matter of comity to the Swiss proceedings, as

25   a matter of law with respect to the Hickenlooper Amendment,

J787ABAC

1    neither the act-of-state doctrine nor comity are ruled out, and

2    we think that both are applicable here as reasons why this

3    Court should stay it's hand, as well as the comments made by my

4    cocounsel on behalf of Geneva.

5            THE COURT:  Thank you.

6            Who would like to be heard on behalf of plaintiffs?

7            MR. AINSWORTH:  Your Honor, I didn't hear what you

8    said.

9            THE COURT:  Sorry?

10           MR. AINSWORTH:  I did not hear what you said.

11           THE COURT:  I said who would like to be heard on

12   behalf of plaintiffs.  I know it can be hard to hear, so I'm

13   going to remind everyone to speak into the mics, including me.

14           MR. AINSWORTH:  Kevin Ainsworth, your Honor.  And is

15   this volume sufficient?

16           THE COURT:  Yes.  Just bring the microphone a little

17   closer.  And I'm going to ask you to start where Mr. Anderson

18   started, which is whether you have any cases that you can cite

19   suggesting that a seizure of this sort constituted a taking in

20   violation of international law.

21           MR. AINSWORTH:  Your Honor, this is a unique

22   situation.

23           THE COURT:  Is it?  Why is it unique?

24           MR. AINSWORTH:  For one thing, international law

25   permeates everything that was done; and the nature of what was

J787ABAC

 1   seized is unique in the cases.  Right?  So, if it weren't for

 2   the UNESCO Convention there would be no seizure.  There was an

 3   international agreement in 1970, the UNESCO Convention.

 4   Switzerland signed on to it in the early 2000s and made it

 5   effective in Switzerland in June of 2005, expressly not

 6   retroactive.  And it's not like you can walk into a store or

 7   warehouse and look at an antiquity and say, boy, that looks

 8   like it might have been stolen.  It could be thousands of years

 9   old.  It could be hundreds of years old.  You don't know where

10   it came from.  So to just look at something and say, boy, that

11   might have been stolen is ridiculous.

12           Switzerland, Geneva -- this was not seized with an

13   idea to return it to the neighbor and say this was stolen from

14   the store next door.  This was seized purportedly under the

15   implementing regulations -- implementing statute in

16   Switzerland, the Cultural Property Transfer Act, which

17   implemented the UNESCO Convention, for the purpose of

18   repatriating to another country.  No other country has laid

19   claim to this.  It's not like somebody said Mr. Hicham has got

20   our property.  The prosecutor walked in and said I'm seizing

21   all of this, some of it might have been stolen.  Right?

22           THE COURT:  But they're still investigating, right?

23           MR. AINSWORTH:  Are they?  That's what they say, your

24   Honor.  But let's take it from the beginning.

25           The Cultural Property Transfer Act, it's not

J787ABAC

1    retroactive, it doesn't apply to anything acquired before 2005.

2    Mr. Aboutaam inherited much of his collection from his father

3    in the '90s; he has collected things since then; it has been

4    stored in the warehouse there for decades. So, there is a

5    question right off the bat whether there was any good faith

6    effort to determine the date of acquisition.

7          Under the Cultural Property Transfer Act there is no

8    illicit importation into Switzerland until Switzerland has a

9    bilateral agreement with another country. The first of those

10   was 2008 with Italy. There is only a handful of others. So,

11   in order to look at something and say that was illicitly

12   imported, you have no know the country of origin and the date

13   of importation. There is no evidence that any of this was

14   known. It was just a purely arbitrary act. They had suspicion

15   as to seven items, they seized 12,000.

16         THE COURT: So let me step back. So you're focusing

17   on what is arbitrary, as you did in your papers. What's your

18   basis for even saying that an arbitrary seizure is a violation

19   of international law?

20         MR. AINSWORTH: Your Honor, I want to thank counsel

21   for repeatedly pounding the Zappia case, because, by the way,

22   the court found that there was -- that the country at issue

23   there hadn't done any taking, so there was no jurisdiction, so

24   its discussion on the expropriation is dicta. But it did cite

25   to the Congressional record as the source of its definition of

J787ABAC

1    taking, and it paraphrased, I will quote, the Congressional

2    record states:  "The term "taken in violation of international

3    law" would include the nationalization or expropriation of

4    property without payment of the prompt, adequate and effective

5    compensation required by international law.  It would also

6    include takings which are arbitrary or discriminatory in

7    nature."  So, that's the basis of Congress enacting the

8    expropriation exception, to cover arbitrary takings, with we

9    clearly have here.

10           THE COURT:  But again you don't have any cases in

11   which a court has said that law enforcement in a foreign

12   country acted arbitrarily in seizing someone's property.

13           MR. AINSWORTH:  I think if it's in our papers, your

14   Honor, we have it.  I can't think of one off the top of my

15   head.  It would have been in there.

16           What we've got is the U.S. juris prudence talking

17   about arbitrariness giving rise to constitutional rights.

18   Right?  An arbitrary action by the government gives right to

19   due process claims in the United States.  So, it's not like we

20   in the U.S. don't recognize that arbitrary actions give rise to

21   claims.

22           Defendants here are arguing they had no reason

23   whatsoever; they could seize the whole warehouse because they

24   wanted to and then investigate and that would be fine.  That's

25   not what the law is.  It says taken in violation of

J787ABAC

1    international law, and that incorporates the arbitrariness.

2              THE COURT:  Walk me through why this is a violation of

3    international law.  Like actually walk me through what aspect

4    of international law has been violated here.  Point me to

5    specific provisions and walk me through it.

6              MR. AINSWORTH:  Well, your Honor, there is the

7    restatement that we cited in our brief.

8              THE COURT:  I mean I think you talk about the CPTA,

9    but the CPTA is Swiss law, right?

10             MR. AINSWORTH:  The CPTA --

11             THE COURT:  Even if the seizure did not comply with

12   the CPTA, that wouldn't constitute a violation of international

13   law because that's Swiss law, right?

14             MR. AINSWORTH:  The CPTA law is the implementing act.

15             THE COURT:  Right, so I'm just clarifying, that's

16   Swiss law, that's not international law.

17             MR. AINSWORTH:  That's Swiss federal law, that's

18   correct.

19             THE COURT:  Right.  So then you talk about the UNESCO

20   Convention, but it was unclear to me which provision you were

21   saying again had been violated.

22             MR. AINSWORTH:  Your Honor, the UNESCO Convention

23   talks about one country making a request to another for

24   repatriation.  There was no request by any country, so there is

25   no implementing or initiating action by another country under

J787ABAC

1    the UNESCO Convection.

2          THE COURT:  So where is the violation of the

3    international law?

4          MR. AINSWORTH:  It's the arbitrary taking of the

5    rights -- of the property, your Honor, as identified in the

6    House report.  An arbitrary taking is --

7          THE COURT:  And what support do you have that even

8    defines arbitrary in any way?  I mean here we have Swiss law

9    enforcement determining that there was a sufficient

10   justification for this seizure.  Point me to any support for

11   the notion that this was an arbitrary taking.

12         MR. AINSWORTH:  Your Honor, just refer to restatement

13   712.  "An act is unfair, unreasonable and inflicts serious

14   injury to establish rights of foreign nationals."  It's in

15   reporter's note we cite on page 8 of our memorandum, your

16   Honor.

17         THE COURT:  But you don't have anything else that can

18   provide any guidance as to what constitutes arbitrary

19   conduct -- or an arbitrary seizure.

20         MR. AINSWORTH:  I point out, your Honor, that the

21   defendants themselves conceded that at some point it will ripen

22   into a taking.  Right?  So, they want to say it's not

23   arbitrary.  It's not a taking now but --

24         THE COURT:  There is a difference between the taking.

25   I think the concession at least in the response to my question

J787ABAC                                                                          26

1    is when does something become a taking.  At a certain point

2    something becomes a taking.  But then there is a taking in

3    violation of international law, which is I understand your

4    position to be where it needs to be arbitrary.  Is that right?

5            MR. AINSWORTH:  Yes, your Honor.

6            THE COURT:  I am just asking for any support in the

7    law for the notion that this seizure was arbitrary in nature

8    and in violation of international law.

9            MR. AINSWORTH:  Your Honor, we've got, as I said, the

10   restatement, the House report, and the juris prudence we had

11   cited regarding arbitrary actions under the U.S. juris

12   prudence.  So due process violations, an arbitrary action by

13   police, can be challenged for violation of due process.

14           THE COURT:  Why haven't your clients engaged in the

15   appellate process available in Switzerland?

16           MR. AINSWORTH:  Your Honor, Mr. Hicham Aboutaam is a

17   U.S. citizen; he had written to the prosecutor there and the

18   authorities, and got answers basically demanding that he prove

19   he owned the property, reversing the burden of proof under the

20   UNESCO Convention, and decided that he was going to get better

21   treatment here, and he is entitled to file a lawsuit here under

22   the FSIA, so he wanted to seek that relief here, your Honor.

23           THE COURT:  How do you respond to defendants' reliance

24   on the Chettri case with respect to the taking?

25           MR. AINSWORTH:  Chettri there was evidence of

J787ABAC

1    wrongdoing, first of all.  It was a transfer between banks, and

2    one of the banks contacted the other and said they hadn't

3    received adequate documentation of the source of the funds that

4    had been wired, so they froze it.  So, that was clearcut

5    evidence of wrongdoing.  There was actually a later forfeiture

6    action brought and criminal action brought.

7           What we didn't have is, as I say here, where you've

8    got a pitcher that could have originated from any country

9    around the world in the last thousand years and somebody said,

10   gee, I think that's suspicious, I think that was improperly

11   imported into the country.  And not only did Geneva did that

12   with regard to a pitcher, they did it with regard to 12,000

13   pieces, 5,000 of which they finally released last August after

14   the first lawsuit was filed.  That itself is an admission that

15   they had no basis to the 5,000.  So, they're still holding

16   7,000 total, 1200 of which are Mr. Aboutaam's.

17          THE COURT:  Is there anything else you'd like to say

18   today?

19          MR. AINSWORTH:  Yes, your Honor, there is quite a few

20   points that counsel made that need to be addressed.  First of

21   all, we didn't concede that they followed their procedure at

22   all.  That was in their papers and he said it today.  We have

23   not conceded that.  We have argued consistently that this was a

24   violation of, as your Honor pointed out, the Cultural Property

25   Transfer Act.

J787ABAC

```
 1          Mr. Nussbaum in his opening affirmation or his only
 2    affirmation did not discuss the core function of the Federal
 3    Office of Culture, so their argument that we didn't respond to
 4    it is specious.
 5          And, in fact, your Honor, we provided to the Court as
 6    Exhibit 21 to my declaration, which is document 46, the Federal
 7    Office of Culture's annual report, and in there at page 70 it
 8    shows a budget, your Honor, and the vast majority of their
 9    budget is on commercial purposes.  It talks about subsidizing
10    film, heritage, schools, communicational language, museums,
11    promotional cultural organizations, awards.  So, we did provide
12    evidence to suggest that the Office of Culture's core function
13    is other than governmental.
14          THE COURT:  Even if I were to agree with you with
15    respect to FOC, tell me your argument as how I could retain
16    jurisdiction as to the other two defendants.
17          MR. AINSWORTH:  Your Honor, that's an interpretation
18    of the Section 1605.  And we cited the Cassirer decision of the
19    Ninth Circuit on this point.  1605(a) begins with a foreign
20    state shall not be immune when one of these subsections are
21    satisfied.  Subsection 3 is satisfied by the Foreign Office of
22    Culture, so the foreign state being Switzerland loses its
23    immunity as a result of the Office of Culture satisfying
24    subsection 3.
25          Geneva holds the property -- your Honor, Geneva acted
```

J787ABAC

 1   purportedly in connection with the federal statute here;

 2   they're implementing Swiss federal law, or claim to be.  At the

 3   peak of that pyramid is the Office of Culture.  The CPTA puts

 4   the Office of Culture responsible not only for initiating the

 5   actions and repatriating property but for storing the property

 6   in the meantime, storing seized property, so the Office of

 7   Culture is integral to the whole process.

 8          THE COURT:  With respect to the jurisdictional

 9   discovery that you're seeking regarding whether the FOC is an

10   agency or an instrumentality of the foreign state, what would

11   that discovery look like?

12          MR. AINSWORTH:  Your Honor, we imagine first we would

13   put up document requests and interrogatories.  Right?

14          THE COURT:  But what are you looking for?

15          MR. AINSWORTH:  Well, we have seen mandate from

16   Customs to an expert who was hired to evaluate some of this

17   material, to determine whether or not it meets any of the --

18   well, apparently to determine whether or not it meets any

19   repatriation requirements.

20          THE COURT:  But you could have hired an expert at this

21   point in time.  I mean what exactly are you going to seek in

22   jurisdictional discovery?  What are you asking for?

23          MR. AINSWORTH:  We've seen enough to show that there

24   is cooperation, coordination between the Office of Culture and

25   the Geneva prosecutor, is what I'm getting it, the mandate

J787ABAC

 1   related to that.  If they want to argue that they're completely

 2   independent, I think we've got enough evidence to show that

 3   that's not true.  And if the Court needs to make a fact finding

 4   on that, then we want to have discovery as to the degree of

 5   coordination and cooperation and control by the Office of

 6   Culture over this process.

 7          THE COURT:  And do you know of any cases where

 8   jurisdictional discovery of this sort has been ordered?

 9          MR. AINSWORTH:  Your Honor, the case they cited

10   against discovery -- I need a second to find it -- in fact

11   ordered discovery.

12          THE COURT:  But I'm talking about where there is a

13   subdivision of a foreign government -- or jurisdictional

14   discovery on the question of whether a subdivision of a foreign

15   government is the foreign state itself or an agency or

16   instrumentality.  Do you have any cases where a court has

17   ordered jurisdictional discovery of that sort?

18          MR. AINSWORTH:  Your Honor, I don't recall off the top

19   of my head.  I would have to send that in if we have it.  But I

20   do point out, as I said, that we've presented evidence that the

21   Office of Culture's core function is commercial -- substantial

22   evidence.  So, I'm not even sure discovery is needed at this

23   point because their evidence is overweighed by ours.  But if

24   the Court felt that was not the case, then certainly there is a

25   fact finding to be done.  And there is Supreme Court authority

J787ABAC

1   and Second Circuit authority for the proposition of having

2   discovery to determine the facts relevant to jurisdiction.

3           Your Honor, if I may just have a moment to go over my

4   notes here.

5           THE COURT:  Sure.

6           MR. AINSWORTH:  Your Honor, the defendants cited not

7   only Chettri but Acadia and Amerisource, and the interesting

8   things about all of those cases is that there really was no

9   dispute as to the validity of the underlying investigation.

10  And that's not what is going on here.  Like I said, we can't

11  look at an antiquity and decide that looks suspicious.  There

12  is more to it than that.  And they seized a whole warehouse for

13  no reason.  It's an exercise, a flex of muscle, but it's

14  arbitrary.

15          Thank you, your Honor.

16          THE COURT:  All right.  Thank you.

17          Do you want to respond?

18          MR. MARMUR:  If I may for the plaintiffs Beierwaltes.

19          THE COURT:  Oh, yes, please.

20          MR. MARMUR:  And since we adopt the arguments of

21  Hicham Aboutaam, I'm not going to repeat those.  Some of them

22  may come up again, but I won't take more than a few minutes of

23  your time.

24          But I did think that it was important to highlight in

25  the context of the Beierwalteses why the actions here are both

J787ABAC

1    arbitrary and in violation of international law, which I think

2    are two of the issues that your Honor has focused on, and so

3    let me just paint the picture from the Beierwalteses'

4    perspective of what is going on here.

5            THE COURT:  Sure.

6            MR. MARMUR:  There are 18 pieces worth about $8

7    million that were consigned to Phoenix -- not Mr. Aboutaam but

8    Ali Aboutaam's company -- for the purpose of obtaining money to

9    repay certain creditors.  There has never been a single

10   question that they were bona fide purchasers of these items.

11   They bought them at auction.  They bought them -- and this is

12   alleged in the complaint -- with good provenance, that they

13   checked registries, they checked the UCC.  Never a question

14   that there was a problem with them.

15           Number two, those items were consigned to Phoenix in

16   2006, which is before Switzerland entered into a single

17   bilateral agreement with another country, meaning under both

18   UNESCO and as applied in Switzerland as adopted by the CPTA

19   there is no question that those pieces cannot violate the law

20   because the law says were they acquired after the adoption of a

21   bilateral agreement.  So, if they --

22           THE COURT:  Have you made those arguments been made in

23   Switzerland?

24           MR. MARMUR:  No.  And this is part of the problem,

25   your Honor, in terms of you asked what is the violation of

J787ABAC

1   international law.  UNESCO puts the burden on the country that

2   is taking the items to demonstrate that there is a problem and

3   to show that they need to be repatriated.  So, what they did

4   when we asked them to say, well, what is the problem here, they

5   turned it around on us; they said, well, show us your proof of

6   provenance, and we said, well, that's not how this works;

7   international law says you are supposed to establish that.

8           So, that is one of the answers to the question I think

9   you posed before, which is what is the violation of

10  international law.  It is shifting the burden of proof.  It's

11  like the analogy would be in our country is taking property

12  without a warrant as to at least my client's pieces and then

13  saying, well, give them back, they said, no, you tell us why

14  they're good.  That's not how it works, and it's not how it

15  works under UNESCO.

16          Now, having taken those pieces they kept them for two

17  and a half years without any request.  There is no articulable

18  suspicion as to any of the Beierwaltes pieces.  It was not the

19  one piece that originally was problematic or allegedly

20  problematic when it was discovered in a car.  It was not one of

21  only seven of 12,000 pieces that served as a basis for that

22  extraordinary seizure, and that's to a large extent the

23  Aboutaams'.  But it really is highlighted with respect to the

24  Beierwaltes, because none of that is problematic.

25          So, what that says is if a number of people consign to

J787ABAC

```
1    a dealer certain properties and they keep them in a warehouse,
2    if there is allegations that a few of those pieces as to a
3    certain consigner may be problematic, we are for every one of
4    those pieces are going to seize like 2,000 more of anybody else
5    in that warehouse.  That's like saying somebody complains about
6    a piece in the Metropolitan Museum of Art, we're going to seize
7    the entire first floor.
8            And that's not fair I don't think to them, but for my
9    clients it's certainly not fair where there has been no
10   articulable suspicion.  They continue to hold this.  There has
11   been no request for repatriation.  The facts are absolutely
12   clear that this was acquired -- or at least it's alleged and
13   there has never been a dispute that they have been acquired
14   before entering into any bilateral agreement.  They have now
15   kept them for two and a half years.  They have not told us why
16   there is a problem with it.  They have not compensated -- which
17   is the last part of the violation of international law.  If
18   you're going to take, you have to pay for it if eventually it's
19   repatriated.
20           So, to try to say, well, we haven't repatriated, we
21   are just keeping it, so we don't have to pay you, which can --
22   as I think your Honor was getting at -- last indefinitely.  And
23   while this isn't indefinite yet, there has been absolutely
24   nothing in those two and a half years to tell us why you have
25   our pieces.
```

J787ABAC

1          So, at some point we should be able to come to a New

2     York court, a federal court in the United States, under the

3     FSIA, which provides a framework, and say, look, we are

4     entitled to our pieces back, or a declaration as to that; we're

5     not required to go to Switzerland.  That is, there is no

6     exhaustion requirement.  We can do it here as long as we meet

7     the statutory criteria.

8          And I want to just hit one other piece --

9     Mr. Ainsworth covered it well -- but this point about the FOC,

10    whether it has certain governmental missions -- which is what

11    they keep saying, there is a governmental mission statement --

12    is largely an irrelevancy.  It is not the purpose of the Act,

13    the Agency's Act.  It is whether an individual, a private

14    person, can engage in those acts.

15         For example, if New York City runs the Metropolitan

16    Museum of Art, then that may have a governmental purpose of

17    promoting the arts, but it is also something that an individual

18    can do.  An individual can promote the arts.  An individual can

19    open up a Swiss arts culture program in New York to promote

20    Swiss arts and Swiss language.  And I don't believe you

21    mentioned the Failla decision, the Barnett case from about two

22    weeks ago -- I can provide the cite to you.  It just came out,

23    so it was not in our papers.

24         THE COURT:  Why don't you.

25         MR. MARMUR:  Sure.  The cite that I have is a Lexis

J787ABAC

1    cite, and it's 2019 U.S. District Lexis 104313.  And if I could

2    just summarize the facts and the holding there.  And I am using

3    this case by analogy but to illustrate the distinction between

4    a governmental act and a commercial act.

5             What happened there was Sotheby's is having an

6    auction, Greece sends a letter and says, you know, one of these

7    pieces is stolen from Greece, you can't sell it, which of

8    course calls into question the provenance of the item, and an

9    auctioneer really can't sell it because it can't guarantee

10   clear title, so there is a declaratory judgment action brought

11   by the seller, the Barnetts, saying please declare this to be

12   valid.  And the question there arises under the FSIA was Greece

13   sending that letter a governmental or a commercial act.  And

14   Greece says, of course, well, look we're doing this because

15   it's our culture heritage, it's our property taken from our

16   soil, and we want it back, and that's part of our government

17   mission in Greece, to keep our pieces.  And the Barnetts say,

18   no, no, no, it doesn't matter, that's not the point, the point

19   is that you wrote a letter to an auction house that says give

20   us this piece back, it's ours.  That's something that anybody

21   can do.  Anybody can write a letter and say return our piece.

22   And Judge Failla says that's right, it's not the purpose, it's

23   not the mission that's important, it's whether a private person

24   can do it.

25             So, I have no doubt that the Federal Office of Culture

J787ABAC

1    of Switzerland has a mission, a governmental mission or purpose

2    to support the arts and culture of Switzerland, but what they

3    do, how they carried out that mission is something that for the

4    most part anybody can do.  And the question is which

5    predominates.

6          And whereas I think both sides have put in some

7    evidence on that point, I believe we have the better of it when

8    you look at what they actually do.  But to that extent, if the

9    question is what is jurisdictional discovery going to get us,

10   on that question we can get more discovery to see whether it is

11   an instrument or whether it's an agency or instrumentality,

12   because I think that is more nuanced in terms of what

13   predominates, and we could find out who the people are who run

14   it, whether they do more governmental acts liken enacting or

15   proposing legislation or things that could be construed as

16   solely governmental.

17         And just as a final point on that, they've made these

18   arguments -- defense made these arguments that, well, just

19   because the Department of Defense publishes a book, therefore,

20   you know, we're saying that they're an instrumentality of the

21   government as opposed to part of it.  That's not what we're

22   saying at all.

23         There is no doubt that the Department of Defense has

24   an overwhelming government function and that private people

25   cannot build bombs and engage the military and carry out

J787ABAC

1   military operations.  So, that's clearly in that camp.  But the

2   whole point of this part of the statute is to recognize that

3   there are agencies and instrumentalities that don't fall into a

4   core governmental function like defense, or legislation, or

5   judicial activities, things that are uniquely reserved to the

6   government.  And on that point I believe we have the better of

7   it, but if not, I do suggest that jurisdictional discovery is

8   important.

9        So, I've wandered back into Mr. Ainsworth a little

10  bit, but I do want to stress that for my clients, the

11  Beierwalteses, there really is nothing that should prevent

12  Switzerland from returning these pieces.  As to them the

13  seizure is arbitrary.  As to them it is in violation of

14  international law because there was no articulable suspicion

15  for it.  They switched the burden on us; they've kept it; and

16  they haven't repatriated and they haven't compensated us for

17  it.

18       THE COURT:  Thank you very much.  That's helpful.

19       MR. AINSWORTH:  Your Honor, I wish I were as eloquent

20  as Mr. Marmur, and we certainly believe that the same arguments

21  apply to Mr. Aboutaam's pieces.  There were two points made

22  that I hadn't yet addressed, and I hope to briefly, and one is

23  the act of state and the other is comity.

24       Your Honor, on comity we had cited in our papers the

25  Simon v. Republic of Hungary case from the District of D.C.,

J787ABAC

1    and that case cited Republic of Argentina v. NML Capital, which

2    is a 2014 Supreme Court decision.

3           The Supreme Court decision said in a discovery context

4    it analyzed the scope of the FSIA and said that the FSIA was a

5    comprehensive replacement for the prior juris prudence of

6    jurisdiction, including comity.  And so the D.C. Circuit said

7    in light of the pronouncement by the Supreme Court in the NML

8    Capital case, there is no comity defense in FSIA cases anymore;

9    we look to the FSIA, and if we have jurisdiction we implement

10   it.

11          And it pointed out that foreign sovereigns are in a

12   unique situation in an FSIA case.  What they're basically

13   saying, the sovereign, is let us handle it, and then plaintiff

14   can come back to you.

15          A private party doesn't have that option, so the FSIA

16   says that the foreign sovereign should be liable like any other

17   private party.  But another private party doesn't have the

18   ability to say let us decide the issue.  A private party would

19   have to be subject to an independent court.  Here the sovereign

20   itself wants to decide the issue and send Mr. Aboutaam back

21   here.  And if he lost in Switzerland, they would argue then

22   that he is bound by res judicata here.  So this comity argument

23   is an end-run around the FSIA exception and shouldn't be

24   condoned.

25          On the act of state, your Honor, the Hickenlooper

J787ABAC

1    Amendment on its face is clear, the act-of-state doctrine does

2    not apply when there are takings in violation of international

3    law.

4              There is also a recent decision by the Second Circuit,

5    the plaintiffs' name is Kashef v. BNP Paribas from June 27,

6    2019.  The cite is 2019 U.S. App. Lexis 15120, and in part,

7    your Honor, that court held that the act-of-state doctrine

8    doesn't -- it only applies to official acts, and an act in

9    violation of the country's own law is not an official act.  And

10   here we pointed out that nothing that was done with regard to

11   plaintiffs' property was in conformance with the laws of

12   Switzerland.  It was in violation of their own law, and

13   therefore it can't be an official act and it can't be subject

14   to the act of state, your Honor.

15             THE COURT:  Thank you.

16             A brief response?

17             MR. ANDERSON:  I will limit it to three.

18             THE COURT:  Thank you.

19             MR. ANDERSON:  All the arguments that I just heard

20   counsel made should be made in Switzerland.  They are

21   complaining about following Swiss law and Swiss procedure.

22   They are complaining about whether there was reasonable

23   suspicion to attach assets.  It strikes me that this sounds

24   like a Rule 41(g) proceeding that we have in this court.  So

25   Criminal Rule 41(g) says that "a person aggrieved by an

J787ABAC

1    unlawful search and seizure of property, or by the deprivation

2    of property, may move for the property's return.  The motion

3    must be filed in the district where the property was seized."

4           It can't be that you can just skip the Rule 41(g)

5    procedure altogether or its equivalent in Switzerland and then

6    just sue somewhere else.  It would be like skipping a 41(g)

7    proceeding here and then going to Switzerland or Mongolia and

8    saying that the United States has taken my property in

9    violation of international law.  Whether the Geneva prosecutor

10   complied with Swiss law, that should be determined in

11   Switzerland.

12          And we talked about the delay.  We just heard counsel

13   say that they have refused to participate in helping the Geneva

14   prosecutor and the investigators in the criminal proceeding in

15   Switzerland identify the provenance and other aspects of these

16   antiquities.  These why this has taken time.  The prosecutor

17   has released by their own admission almost half of the

18   antiquities that were initially seized.

19          THE COURT:  Do you have any support for the

20   proposition that there is essentially an exhaustion

21   requirement, that there is a requirement that they participate

22   in Switzerland?

23          MR. ANDERSON:  So, there are three branches of comity

24   or flavors of comity that we raise, so I will focus directly on

25   the exhaustion.  They mentioned the Simon case from the D.C.

J787ABAC

1    Circuit.  It's contrary to the Seventh Circuit's decision in

2    Fisher.  The United States after the Simon decision came down

3    in the D.C. Circuit told the D.C. Circuit it's wrong.  Both of

4    the defendants in Simon and Philip -- there are two companion

5    cases -- are seeking cert to the U.S. Supreme Court right now.

6    So, for all of those reasons Simon does say what they say, but

7    the Seventh Circuit has held that there is an exhaustion

8    requirement.  And it's not baked into the Foreign Sovereign

9    Immunities Act, but it's an aspect of international comity.

10           And to further the good relations between countries,

11   we should allow the foreign sovereign the opportunity to hear

12   the exact arguments you just heard.  The foreign sovereign's

13   courts are more capable of addressing whether in fact there was

14   reasonable suspicion under the circumstances that Swiss law may

15   require.  They are more appropriate to determine whether a

16   Swiss prosecutor complied with Swiss law.

17           Many of the factual debates that plaintiffs have

18   addressed today are more challenging because we are 3,860 miles

19   away from Geneva today.  The Swiss courts again are the

20   appropriate forum for that.

21           Second are the cases that they mention.  We have

22   talked about Simon, and they raise the Cassirer case from the

23   Ninth Circuit.  As we explained in our brief, the Cassirer case

24   in the Ninth Circuit never addressed the two nexus prongs.  It

25   was assumed throughout the litigation that Spain never made an

J787ABAC

1    argument that it had an independent right not to be in the

2    case.  After the Ninth Circuit decided the Cassirer case, Spain

3    sought cert to the U.S. Supreme Court.  The United States brief

4    in support of Spain explained that that issue was never

5    addressed, and in fact Cassirer conceded to the United States

6    that Spain should be dismissed from the case because they could

7    not satisfy the first nexus prong.  And that issue had just

8    been missed throughout the litigation.  When that case came

9    back from the Supreme Court, in fact they did dismiss Spain

10   from the case.  And that's docket entry 119.

11          So, the case they rely on never addressed the issue.

12   And when it was you brought to their attention, they released

13   the sovereign from the case, just as we're asking your Honor to

14   do here.

15          Finally, the other issue was the act-of-state

16   doctrine.  I believe counsel just said that if the foreign

17   sovereign is alleged to have violated their own law, it can't

18   constitute an act of state.  That's exactly what the

19   act-of-state doctrine is designed to preclude.  In fact, U.S.

20   courts are not supposed to sit in judgment of the legality or

21   illegality of sovereign acts taken by a foreign government

22   within their own territory.  That's the entire point of the

23   doctrine.  They are assumed to be valid if taken within their

24   own territory.

25          And this is an issue of separation of powers.  The

J787ABAC

1    Executive branch is uniquely charged to determine whether a

2    foreign sovereign is complying with its own laws.  It's not for

3    the Judicial branch to make that determination.  So, again, I

4    respectfully submit that that was not a correct articulation of

5    the act-of-state doctrine, and in fact it precludes this Court

6    from making exactly the determination that was just asked.

7              Finally, both with respect to the legal issues and the

8    jurisdictional discovery that was requested, I think it's

9    important to keep in mind the practical effect and consequences

10   here.

11             The aggregate effect of the legal arguments that

12   counsel for the plaintiffs is making is that this court would

13   have jurisdiction over any act in exercise of a foreign

14   government's police powers if plaintiffs can allege that it

15   violated local procedures or was arbitrary, and that loss of

16   immunity would extend to every aspect of the foreign state.

17   That takes the immunity scalpel of the Foreign Sovereign

18   Immunities Act and transforms it into a sledgehammer.

19             And we need to remember that immunity is a reciprocal

20   enterprise.  The immunity that we afford to foreign sovereigns

21   in this country is the same immunity that the United States

22   enjoys abroad.  And with respect to jurisdictional discovery,

23   practical considerations highlight why the court should act

24   with great restraint before going down that road.

25             They're asking for discovery from a foreign prosecutor

J787ABAC

```
 1    to justify whether he acted arbitrarily in the midst of an
 2    ongoing investigation.  It's not clear what the end game is
 3    here.  Is it to enjoin a foreign criminal prosecutor from
 4    engaging in that investigation?  Are we going to declare the
 5    property rights of property, hundreds or thousands of pieces
 6    that are located halfway around the world?  They've already
 7    dropped claims relating to a number of the pieces of property
 8    here, and yet the complaint still asks for $90 million of
 9    compensation for assets that have not been taken.
10          These are again just the practical considerations of
11    why the Court should rightly exercise great hesitation both
12    before exercising jurisdiction but even ordering jurisdictional
13    discovery from any of the defendants here.
14          Immunity is not just immunity from liability; it's
15    immunity from the attendant burdens of litigation, and that
16    extends to discovery as the cases that we cited in our letter
17    describe.
18          If the Court has no further questions ...
19          THE COURT:  That's it.
20          All right.  Thank you all.  This was very well briefed
21    and argued.  I will reserve decision, but thanks.  Have a nice
22    afternoon.
23          (Decision reserved)
24
25
```

A-646

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LYNDA BEIERWALTES and WILLIAM BEIERWALTES, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| L'OFFICE FEDERALE DE LA CULTURE DE LA CONFEDERATION SUISSE, ET AL. | ) ) ) |
| Defendants. | ) ) |

No. 18-cv-11167 (RA)

### <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiffs Lynda Beierwaltes and William Beierwaltes ("Plaintiffs") hereby appeal to the United States Court of Appeals for the Second Circuit from the judgment entered in this action on September 25, 2019, by the District Court (ECF No. 69), including but not limited to the District Court's Opinion and Order entered in this action on September 24, 2019 (ECF No. 68), granting Defendants' motions to dismiss the Complaint, denying Plaintiffs' request for jurisdictional discovery, and closing the case.

Dated:  October 22, 2019

Respectfully submitted,

**Lynda Beierwaltes and William Beierwaltes**

By their attorneys,

/s/ Nathaniel Z. Marmur
Nathaniel Z. Marmur
500 Fifth Avenue, 40th Floor
New York, NY 10110
nmarmur@marmurlaw.com
Phone: 212-257-4894
*Attorney for Plaintiffs*