# 19-3457-cv

# United States Court of Appeals

*for the*

# Second Circuit

LYNDA BEIERWALTES and WILLIAM BEIERWALTES,

*Plaintiffs-Appellants,*

— v. —

L'OFFICE FEDERALE DE LA CULTURE DE LA CONFEDERATION
SUISSE, Federal Office of Culture of The Swiss Confederation,
L'ADMINISTRATION FEDERALE DES DOUANES DE LA
CONFEDERATION SUISSE, Federal Customs Administration of The Swiss
Confederation, LA REPUBLIQUE ET CANTON DE GENEVE, Republic
and Canton of Geneva,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

ANJU UCHIMA
WILLIAM G. PEARLSTEIN
PEARLSTEIN & MCCULLOUGH, LLP
*Attorneys for Plaintiffs-Appellants*
641 Lexington Avenue, Suite 1327
New York, New York 10022
(646) 762-7263

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ........................................................ iii

JURISDICTIONAL STATEMENT .................................................1

STATEMENT OF THE ISSUES PRESENTED ...................................2

STATEMENT OF THE CASE.........................................................3

    The Beierwaltes .................................................................4

    Phoenix and Hicham.............................................................5

    The Search and Seizure Warrant ............................................8

    The Purported Legal Basis For the Warrant...............................11

    The Beierwaltes' and Hicham's Demands For Release of
    Their Property...................................................................17

    The Investigation ..............................................................19

    Procedural History ............................................................24

SUMMARY OF ARGUMENT .....................................................26

STANDARD OF REVIEW .........................................................28

ARGUMENT ........................................................................28

    I.    The District Court Erred In Ruling That the Seizure Does Not
           Constitute a Taking In Violation of International Law Under the
           Takings Exception of the FSIA ..........................................28

           A. The Warrant and Seizure, as to the Property Owners, Lacked
              Probable Cause and Are Grossly Overbroad in Scope .................32

           B. The Investigation Is of Indefinite Duration and Is Likely to Take
              Many Decades to Complete ............................................43

i

C. The Warrant and Seizure Were Arbitrary For the Further Reason That They Were Motivated By a Coercive Purpose .......................47

D. The Property Owners Were Not Obligated to Exhaust Their Legal Remedies in Switzerland.......................................................48

E. The Swiss Authorities Have Also Violated International Law By Conducting Their Proceedings In a Manner Contrary to the Provisions of UNESCO............................................................51

II. The District Court Abused Its Discretion In Denying Jurisdictional Discovery .......................................................52

Conclusion ...............................................................................................53

# TABLE OF AUTHORITIES

<u>**Page**</u>

# <u>CASES</u>

*Acadia Technology Global Ins. v. U.S.*,
    458 F.3d 1327 (Fed. Cir. 2000) .......................................................................47

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)........................................................................................28

*Cassirer v. Kingdom of Spain*,
    580 F.3d 1048 (9th Cir. 2009) ........................................................................50

*Chettri v. Nepal Rastra Bank*,
    834 F.3d 50 (2d Cir. 2016) ........................................................................34, 35

*First City, Texas-Houston, N.A. v. Rafidian Bank*,
    150 F.3d 172 (2d Cir. 1998) .........................................................................28

*Flores v. Southern Peru Copper Corp.*,
    414 F.3d 233 (2d Cir. 2003) .........................................................................51

*Freund v. Republic of France*,
    592 F. Supp.2d 540 (S.D.N.Y. 2006) ...........................................................53

*Hilsenrath v. Swiss Confederation*,
    No. C 07-02782 WHA, 2007 WL 3119833
    (N.D. Cal. Oct. 23, 2007) ........................................................................34, 35

*Reiss v. Société Générale de Groupe des Assurances Nationales*,
    235 F.3d 738 (2d Cir. 2000) ....................................................................52-53

*Robinson v. Government of Malaysia*,
    269 F.3d 133 (2d Cir. 2001) .........................................................................28

*Stanford v. Texas*,
    379 U.S. 476 (1965)........................................................................................42

*U.S. v. Debbi*,
    244 F. Supp.2d 235 (S.D.N.Y. 2003) ...........................................................42

*U.S. Galpin*,
  720 F.3d 436 (2d Cir. 2013) ...........................................................42

*U.S. v. Ganias*,
  755 F.3d 125 (2d Cir. 2014), *rev'd en banc*, 824 F.3d 199
  (2d Cir. 2016)...................................................................42, 46

*U.S. v. Lustyik*,
  57 F. Supp.3d 213 (S.D.N.Y. 2014) ...........................................46

*U.S. v. Metter*,
  860 F. Supp.2d 205 (E.D.N.Y. 2012)...................................41, 46

*U.S. v. Tamura*,
  694 F.2d 591 (9th Cir. 1981) .......................................................42

*Williams v. Nat'l Gallery Art*,
  No. 16-CV-1978 (VEC), 2017 WL 4221084 (S.D.N.Y. Sept. 21, 2017),
  *aff'd*, No. 17-3253-cv, 2018 WL 4293327 (2d Cir. Sept. 10, 2018), *cert.
  denied*, 139 S. Ct. 1347 (2019)....................................................30

*Zappia Middle East Constr. Co., Ltd. v. Emirate of Abu Dhabi*,
  215 F.3d 247 (2d Cir. 2000) ........................................................29

## STATUTORY AUTHORITIES

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1330 ................................................................................1

28 U.S.C. § 1605(a)(3) .................................................................*passim*

28 U.S.C. § 1602 ...................................................................1, 2, 29

Fed. R. Crim P. 41(g ........................................................................46

U.S. Const. amend. IV .................................................................41, 43

UNESCO Convention on the Means of Protecting the Illicit Import, Export
  And Transfer of Ownership of Cultural Property .................................*passim*

Loi fédérale sur le transfert international des biens culturels (LTBC)............*passim*

iv

Ordonnance sur le transfert international des biens culturels (OTBC) .............14, 15

Swiss Criminal Code Art. 160 ................................................................................10

Swiss Criminal Procedure Code Art. 263 ...............................................................33

Swiss Criminal Procedure Code Art. 267 ...............................................................41

## ADDITIONAL AUTHORITIES

William Pearlstein, *White Paper: A Proposal to Reform U.S. Law and Policy
    Relating to the International Exchange of Cultural Property*, Cardozo
    Arts & Ent. L. J. 2014, Vol. 32, No. 2, 561......................................12, 40, 41

Restatement (Third) of Foreign Relations Law §712 ...........................30, 31, 32, 44

Restatement (Third) of Foreign Relations Law §713 .............................................49

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this action pursuant to 28 U.S.C. §1330 (granting district courts original jurisdiction over nonjury civil actions against foreign sovereigns and their instrumentalities) and 28 U.S.C. §1602 (providing that "[c]laims of foreign states to immunity should … be decided by courts of the United States in conformity with the principles set forth in this chapter.").

This Court's jurisdiction to hear this appeal, which is from a final decision disposing of all claims, arises under 28 U.S.C. §1291, which provides in relevant part that "[t]he courts of appeals … shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

Appellants timely filed their Notice of Appeal on October 22, 2019.

## STATEMENT OF THE ISSUES PRESENTED

1.  Whether the District Court erred in granting the motions by Appellees, foreign states within the meaning of the Foreign Sovereign Immunities Act (28 U.S.C. §§1602 et seq.) (the "FSIA"), to dismiss for lack of jurisdiction, on the ground that the expropriation exception to immunity under the FSIA (28 U.S.C. §1605(a)(3)) did not apply because Appellees' seizure of Appellants' property did not constitute a taking in violation of international law.

2.  Whether the District Court erred in denying Appellants' request for jurisdictional discovery with respect, *inter alia*, to whether Appellees' seizure of Appellants' property was arbitrary for purposes of determining the applicability of the expropriation exception to the FSIA.

## STATEMENT OF THE CASE

Plaintiffs-Appellants Lynda and William Beierwaltes ("the Beierwaltes") appeal from the Judgment entered on September 25, 2019, Special Appendix ("SPA")-13, by the United States District Court for the Southern District of New York (the "District Court"), including the Opinion & Order of the District Court (Ronnie Abrams, J.) filed September 24, 2019 (the "Opinion"), SPA-1-12, granting the motions by Defendants-Appellees to dismiss the Complaint, denying jurisdictional discovery and closing the case. The Beierwaltes, in their Complaint, sought declaratory judgment as to title, conversion and unjust enrichment against Defendants-Appellees L'Office fédérale de la culture de la Confédération Suisse (the "Swiss Office of Culture"); L'Administration fédérale des douanes de la Confédération Suisse (the "Swiss Customs Administration"); and La République et canton de Genève (the "Canton of Geneva")[1] (Appellees will be referenced collectively in this Brief as "the Swiss Authorities"). The Complaint arose out of the seizure by the Swiss Authorities of approximately 18 antiquities worth $8 million of Greek, Roman and Egyptian origin which the Beierwaltes had

---

[1] Unofficially translated as the "Federal Office of Culture of the Swiss Confederation"; the "Federal Customs Administration of the Swiss Confederation"; and the "Republic and Canton of Geneva," respectively.

3

consigned to Phoenix Ancient Art, S.A. ("Phoenix"), an art gallery in Geneva, Switzerland, for sale. A-16-98. The objects were seized along with some 12,000 antiquities by the Swiss Authorities in a broad, indiscriminate sweep in February 2017.[2] A-632-33.

**The Beierwaltes**

The Beierwaltes are citizens of the United States and residents of Colorado. A-100. Through the 1990's the Beierwaltes assembled one of the world's leading private collections of ancient art. *Id*. They acquired this material in good faith from reputable international dealers and auction houses. A-76. On June 1, 2006, the Beierwaltes signed an Exclusive Dealer Agreement with Phoenix (the "Dealer Agreement"). A-26, ¶30. Under the Dealer Agreement, the Beierwaltes consigned substantially all their antiquities collection to Phoenix for sale, A-26, ¶30, and shipped the material from Colorado to Geneva, pursuant to appropriate customs declarations. A-32, ¶42, n.17.

---

[2] The sweep also included some 1,200 antiquities worth $90 million owned by Hicham Aboutaam ("Hicham"), who filed his own action against the Swiss Authorities, which was consolidated before the Southern District of New York with the Beierwaltes' action. Both actions were dismissed in the same Judgment. Hicham's appeal of the Judgment before this Court (Case No. 19-3481), has been identified in this case as a related appeal. Form C, Docket No. 14.

In May 2013, the Beierwaltes filed a voluntary bankruptcy petition under the United States Bankruptcy Code with the United States Bankruptcy Code for the District of Colorado. A-26, ¶31. In the bankruptcy case, the Beierwaltes filed a Disclosure Statement for Plan of Reorganization which listed their collection of antiquities as the couple's most valuable asset. A-26, ¶30. The Bankruptcy Court appointed Phoenix as the bankruptcy estate's designated antiquities dealer to sell the collection for the benefit of the estate's creditors and confirmed the Dealer Agreement. *Id.* Phoenix was able to sell some, but not all, of the antiquities. A-27, ¶33. Eighteen objects (the seized antiquities) remain on consignment with Phoenix and were in Phoenix's possession in Geneva at the time of their seizure by the Swiss Authorities. *Id.*

**Phoenix and Hicham**

Phoenix was founded in the mid-1990's by Hicham, a citizen of the United States, his brother Ali Aboutaam ("Ali") and their father, Sleiman Aboutaam, who started the family business in 1968 in Beirut, Lebanon. A-101. Phoenix is perhaps the world's leading dealer of antiquities and ancient art. *Id.* Hicham and Ali took over the business upon Sleiman's death in 1998, inheriting a large collection of ancient art that included Greek, Roman, Hellenistic, Ancient Egyptian and Near Eastern material, substantially all of which Sleiman had imported into Switzerland before the end of the 1980s,

5

generally pursuant to export certificates issued by the Lebanese government. *Id*. Hicham personally owns all of the approximately 1,200 seized objects that he has stored with or consigned for sale to Phoenix in Geneva, at least a majority of which he inherited from his father and are generally "old and cold," *i.e.*, owned by Hicham for at least 20 years and, prior to that, by his father. *Id*.

Today, Ali manages Phoenix's gallery in Geneva (with two locations) and Hicham manages a New York gallery, Electrum, which serves as Exclusive Agent of Phoenix. A-101. The two galleries are separately staffed and operated and owned by different parties through different legal entities. They are not alter egos for corporate or commercial purposes. Although Phoenix and Electrum sometimes refer clients and consignments to each other, in general, Electrum acts independently of Phoenix in securing clients, consignments and other business opportunities.

Since founding Phoenix with their father, Hicham and Ali have increased the inventory of their respective businesses, bought and sold thousands of objects on the international market, exhibited material openly at both galleries and in numerous art fairs in Europe and America, published dozens of catalogues of their inventory, and maintain three web-sites with an extensive on-line catalogue of their inventory with the history of exhibition

and publication of each piece. A-101. The Aboutaams have been distinguished by their scholarship, the exceptional quality of their material and their transparency, as well as by the care they take to establish the provenance (history of ownership or chain of title) and provenience (country of origin or place of discovery or excavation) of the material they offer for sale. *Id*. Since the late 1990's, museums and auction houses in the U.S. and Europe have become increasingly careful about accepting only well-provenanced antiquities as gifts, loans or consignments. *Id*. Phoenix and Electrum thus employ a full-time staff of highly-qualified curators who are trained to the highest academic standards of provenance research, and they are careful to comply with (or exceed) the standard of care required by leading international dealer associations in the antiquities field. *Id*.

The Aboutaams generally acquire their material from well-known international private art dealers in New York or Europe, leading international auction houses, or private collectors (often old family collections). A-101. Because of the public scrutiny under which they operate, they take care to be *bona fide* purchasers with no notice of adverse claims by any third party, including any country of origin. *Id*. They purchase each object in reliance on representations from their sellers and the absence of any thefts reported to publicly available databases of stolen art, such as the Art Loss Register. *Id*.

7

In purchases from dealers in the United States, the Aboutaams rely on statutory warranties of title and merchantability under the Uniform Commercial Code and, in purchases at public auction, on warranties of title and "authorship" from the auction house. *Id*. They are extremely careful to avoid material that is likely to have been freshly looted, illegally excavated, or stolen. *Id*. Their pre-purchase "due-diligence" on potential acquisitions focuses on identifying any "red flags" that might call into question the legality of the material. *Id*. Phoenix and Electrum maintain complete records of their transactions, including the provenance and provenience of their material. *Id*.

**The Search and Seizure Warrant**

Beginning in 2012, the Swiss Office of Culture seized three sarcophagi owned by Phoenix,[3] a pair of Graeco-Phoenician origin and one of Roman origin, purportedly on suspicion of antiquities trafficking.[4] During the course

---

[3] The dispute involving the three sarcophagi was reported on October 6, 2017 in *Le Temps*, a leading French language newspaper in Switzerland. https://www.letemps.ch/suisse/2017/10/06/confessions-dali-aboutaam-marchand-dart-puissant-controverse (the "*Le Temps* Article").

[4] *Le Temps* Article. This seizure followed a visit to Phoenix by a leading collector and a Swiss academic archaeologist, Marc-André Haldimann ("Haldimann"), to view an ancient sarcophagus in which the collector had expressed an interest. Haldimann thereafter made unfounded and possibly slanderous allegations against Phoenix to the Swiss Authorities concerning the origins of its antiquities. A-102.

of a lengthy legal battle between Phoenix, on one side, and the Swiss Office of Culture and the Geneva Ministry of Justice, on the other, the authorities released the pair of Graeco-Phoenician sarcophagi to Phoenix in 2014 and 2016, but ordered the Roman sarcophagus to be restituted to the Republic of Turkey.[5]

After Phoenix appealed the restitution order, the Swiss Authorities intensified their pressure against Phoenix. In particular, the Justice Minister issued an "Ordonnance de Perquisition et de Séquestre" dated February 24, 2017 (the "Warrant") and signed by Prosecutor Claudio Mascot to ("Mascotto"), which refers to a complaint by the Swiss Office of Culture against seven objects of suspect origin or provenance in possession of Inanna Art Services S.A. ("Inanna"), an affiliate of Phoenix that leased warehouse space. A-46-48. The Warrant listed the following entities and individuals as "defendants": Inanna; Ali Aboutaam, Biliana (sic) Aboutaam (Ali's wife, "Biljana"); Carlos Alexandre Novo; Cynthia Perotti; Walter Haberkorn; Jeffrey Suckow; and Charles Ansermet. A-46. Neither the Beierwaltes nor Hicham was named as a defendant, nor does the Warrant make any mention of them or any of their property. The Warrant provided that the

_____

[5] *Le Temps* Article.

"aforementioned defendants" were suspected of "receiving stolen goods (Article 160 of the Criminal Code)" and violating "Article 24 of the LTBC,[6] with regard to the purchase, detention, or dissimulation of archaeological articles suspected of having been acquired, transported, or exported and possessed illegally." *Id.*[7]

The Warrant authorized a search of all premises owned or leased by Inanna and entities controlled by Ali in Geneva or the Freeport,[8] and the seizure and sequestration of "all objects, documents, or assets that might be restored to the injured parties; confiscated; seized with a view to executing a compensation claim, [and] used as evidence." A-47. Pursuant to the Warrant,

---

[6] "LTBC" is a reference to the Loi fédérale sur le transfert international des biens culturels of June 20, 2003. It is unofficially translated as "Federal Act on the International Transfer of Cultural Property (CPTA)." A-324-335. The District Court, in its Opinion below, referred to the LTBC as the CPTA. SPA-10.

[7] The Warrant also cites Swiss Criminal Code Article 160, A-46, which criminalizes the knowing possession of stolen property, proof of the elements of which is concurrent with the proof required for certain violations of the LTBC. SPA-20.

[8] The Geneva Freeport ("port franc") is a duty-free warehouse complex with two locations near Geneva, principally owned by the Canton of Geneva, favored by art collectors because of state-of-the-art storage facilities and certain deferrals of value added tax and customs duties on stored art.

10

the Swiss Authorities froze[9] some 12,000 antiquities, of which 18 are owned by the Beierwaltes and 1,200 belong to Hicham personally (the "Seizure").[10]

Following the Seizure, Biljana and her driver Carlos Alexandre Novo were imprisoned and held in jail. A-493. It was only when Ali and Phoenix agreed to withdraw their appeal objecting to the restitution of the third sarcophagus, which was then returned to Turkey, that the authorities released them from jail on March 14, 2017. *Id*.[11]

**The Purported Legal Basis For the Warrant**

The Warrant is based on the LTBC, a Swiss law through which Switzerland enacted the 1970 UNESCO Convention[12] ("UNESCO").

---

[9] The objects were not removed from their locations but were segregated in place, sealed-off and frozen, such that the Beierwaltes' antiquities may not be marketed or sold and the Beierwaltes cannot otherwise exercise their ownership rights to their property. A- 17, ¶13, n.2.

[10] Separately, Swiss Customs issued a "Mandat de perquisition" dated February 28, 2017, A-63-72, which functioned as a warrant authorizing the search of all objects, premises and vehicles to which Biljana Aboutaam had access in connection with an investigation into violations of the Swiss value-added tax law, the Swiss customs law and the Swiss federal law administrative penal law, in connection with which 111 objects were frozen, of which one belongs to the Beierwaltes and none belongs to Hicham. A-181, ¶¶11, 13.

[11] *See also Le Temps* Article.

[12] Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, Paris, 14 November 1970, 823 U.N.T.S. 231. A-246-68.

11

UNESCO was the first multi-national legislation that recognized and attempted to remedy the growing problem of looting of cultural artifacts and remains the leading convention governing the international transfer of antiquities and other cultural property.[13] Since it became effective on April 24, 1972, nearly 140 nations have ratified, accepted or acceded to the Convention and become "State Parties" thereunder, including the United States and Switzerland. A-19, ¶6, n.5.

UNESCO includes the following provisions:

- international restitution of objects documented as stolen from the inventory of a cultural institution must be made at the expense of the claimant with just compensation paid to *bona fide* purchasers or to persons with valid title to the property; the requesting party must furnish, at its expense, the documentation and other evidence necessary to establish its claim for restitution (Art. 7(b)(ii));

- any State Party whose cultural patrimony is in jeopardy from pillage of archeological or ethnological materials may call upon other State Parties to participate in a "concerted international effort" to

---

[13] "UNESCO is widely perceived as the first multi-national legislation recognizing and attempting to remedy the growing problem of looting cultural artifacts. But UNESCO is often cited for what it is not. On its face, UNESCO is neither an endorsement of universal national retention nor a mandate for universal restitution. UNESCO acknowledges the reality of domestic and international markets for cultural property and attempts to regulate the trade, not eliminate it. The overall tenor of UNESCO is moderate and weighted more to protection of important national heritage than to universal protection of archaeological context." William Pearlstein, *White Paper: A Proposal To Reform U.S. Law And Policy Relating To The International Exchange Of Cultural Property*, Cardozo Arts & Ent. Law Journal, 2014, Vol. 32, No. 2, 561, 615-617 (hereinafter "White Paper").

> implement controls of the export, import and international commerce in the materials concerned (Art. 9); and

- "antique [sic]" dealers are required "to maintain a register recording the origin of each item of cultural property, names and addresses of the supplier, description and price of each item sold and to inform the purchaser of export prohibitions to which such property may be subject (Art. 10(a)).

A-245-47.

UNESCO is not self-executing and State Parties are required to affirmatively ratify, accept or accede to the Convention.[14]  Switzerland became a State Party in 2003, when it enacted the LTBC, which became effective on June 1, 2005.  A-324-35.  The primary legislative history of the LTBC frankly states that, by the early 2000's, Switzerland had the reputation of being a "turnstile" for illicit traffic in cultural goods and had become an ideal location for international traffickers of art and money laundering.[15]

Given this context, the LTBC and the regulations thereunder (Ordonnance sur le transfert des biens culturels, "OTBC") were conceived as

---

[14] For example, the U.S. did not become a State Party to UNESCO until December 1983 when Congress enacted the Convention on Cultural Property Implementation Act after more than a decade of contentious debate among stakeholders, including the art trade, archaeologists, the State Department and the Justice Department.  *See* White Paper, at 589 *et seq*.

[15] *See* https://www.admin.ch/opc/fr/federal-gazette/2002/505.pdf

13

a comprehensive legal framework to address the difficult problems presented

by the international antiquities market while allowing the continued conduct

of a regulated trade, setting the ground rules for the import, export and sale of

cultural property in Switzerland, customs matters specific to the antiquities

trade, and civil and criminal penalties for non-compliance. A-337-47.

The provisions of the LTBC (as supplemented by the OTBC) most

relevant to the Warrant and Seizure are those relating to the following:

- **Repatriation.** Switzerland may conclude treaties ("Bilateral Agreements") with other State Parties on the import and repatriation of cultural property[16]; such State Parties have the right to sue anyone who possesses cultural property illicitly imported into Switzerland for repatriation of the property[17] and **bear the burden of showing that the cultural property is of significant importance to their cultural heritage and was imported illicitly** (Art. 7, 9).[18] A-326, 327.

---

[16] Under Article 2 of the LTBC, "cultural property is defined as significant property from a religious or universal standpoint for archeology, pre-history, history, literature, arts or sciences belonging to the categories under Article 1 of [UNESCO]." A-324.

[17]Pursuant to Article 9 of the LTBC, Switzerland has entered into Bilateral Agreements with Italy (effective April 27, 2008), Egypt (effective February 20, 2011), and Greece (effective April 13, 2011). *See Bilateral Agreements to the LTBC*, Federal Office of Culture, *available at* https://www.bak.admin.ch/bak/en/home/cultural-heritage/transfer-of-cultural-property/bilateral-agreements.html (last visited September 7, 2018).

[18] The State Party's claims are subject to a statute of limitation of one year after its authorities gain knowledge of where and with whom the cultural property is located and such claims may not be brought more than 30 years after the cultural property was illicitly exported. (Art. 9). A-327.

14

- **Compensation**. Good faith acquirors have a claim for compensation from the State Party payable at the time of return, based on the purchase price plus necessary and useful expenses for protecting and maintaining the cultural property, and the right to retain the property until such compensation is paid (Art. 9). A-327.

- **Duty of Diligence**. Article 16 creates a "duty of diligence." Thus, in the art trade and auctioning business, cultural property may only be transferred when the transferor may assume, under the circumstances, that the property was not stolen, lost against the will of the owner, illegally excavated or illicitly imported. (Art. 16(1)). In addition, "persons active in the art trade and auctioning business" are obligated to (i) establish the identity of the supplier or seller and require a written declaration from the same of his or her right to dispose of the cultural property; and (ii) maintain written records on the acquisition of cultural property by specifically recording the origin of the cultural property "to the extent known," and the name and address of the supplier or seller, a description as well as the sales price of the cultural property (Art. 16(2)).[19] A-329.

- **Interagency Cooperation; Inspection; Seizure**. The LTBC mandates an interagency relationship and concerted action among the Swiss Office of Culture, which is appointed the "specialized body" to administer the execution of the LTBC; the Swiss Customs Administration and the criminal authorities of each Canton. To inspect adherence to the duty of diligence, LTBC Article 17 gives the Swiss Office of Culture access to the business rooms and storage areas of persons active in the art trade and auctioning business. When the Swiss Office of Culture has "reasonable suspicion" that criminal activity is present under the LTBC, it is required to file a complaint with the criminal prosecutors of the applicable Canton.

---

[19] The OTBC exempts from the duty of diligence (Art. 16) and the right of inspection (Art. 17) cultural property with a purchase price or estimated price of less than 5,000 Swiss francs except for products "of archaeological excavations or discoveries or elements from the dismemberment of artistic or historical monuments and archaeological sites." A-343.

The competent criminal prosecution authorities of each Canton are empowered to order the seizure of cultural property "when suspicion exists that the cultural property was stolen, lost against the will of the owner or illicitly imported into Switzerland" and prosecuting and assessing criminal activities pursuant to the LTBC. (Arts. 20 and 27). A-330, 331, 333.

- **Criminal Sanctions and Fines**. There are criminal penalties of imprisonment or fines for a person who imports, exports or sells stolen cultural property or illicitly imports cultural property or incorrectly declares the same during import or transit (Art. 24).[20] A-332.

- **No Retroactivity**. The LTBC is not applicable retroactively (Art. 33). Thus, it is not applicable to acquisition activities that took place prior to the effective date of the LTBC (*i.e.*, June 1, 2005). A-335.

As the Warrant reflects, the purpose of the Seizure was to obtain "all objects, documents, or assets" that could be "restored to the injured parties; confiscated; seized with a view to executing a compensation claim; [and] used as evidence." A-47. The focus, accordingly, was the confiscation, for the purpose of repatriation pursuant to LTBC Article 9, of illicitly imported objects of cultural property belonging to State Parties and the settlement of

---

[20] For intentional conduct, the penalty may be up to one year's imprisonment or a fine up to 100,000 Swiss Francs and, for negligent conduct, a fee of up to 20,000 Swiss Francs. If the offender acts on a professional basis, the penalty is jail for up to two years or a fine of up to 200,000 Swiss Francs. Article 25 further provides that persons in the art trade may be fined up to 20,000 Swiss Francs for disregarding the duty of diligence under LTBC Article 16 or frustrating inspections under Article 17. A-332.

such claims. As the Federal Customs Administration acknowledged, the essential inquiry is whether any of the seized objects should be returned to their respective countries of origin. A-120.

**The Beierwaltes' and Hicham's Demands For Release of Their Property**

By letter to Mascotto dated May 7, 2018, the Beierwaltes demanded the immediate release of their property. A-76-77. Through counsel, the Beierwaltes asserted that the seizure was illegal, as they had purchased their property from leading, well-known international art dealers in New York and London, as well as from prominent international auction houses. A-76. They also asserted that they were *bona fide* purchasers for value with no notice of any adverse claims by any third party, including those of any country of origin. *Id*. They relied on express or implied warranties, representations or assurances from dealers and auction houses on the absence of any thefts reported to publicly available databases of stolen art, such as the Art Loss Register. *Id*. In purchases from dealers in the U.S., they also relied on statutory warranties of title and merchantability under the Uniform Commercial Code. *Id*. In purchases at public auction, they relied on warranties of title and "authorship" from the auction house. *Id*. They further stated that Phoenix had been contracted as the Beierwaltes' exclusive art dealer to assist them in marketing and selling their art collection to raise funds

17

for the payment of creditors and that the Seizure was preventing Phoenix from selling the property and thwarting their ability to pay their judgment creditor. A-76-77.

By letter dated May 11, 2018, Mascotto responded, requesting that counsel produce complete documentation relating to: (i) the acquisition of the object and payment of the purchase price, (ii) the "legal provenance of the object ('due diligence')," and (iii) the delivery of the object to Phoenix (including contracts, correspondence in writing and email, shipping and insurance, receipts), and (iv) a copy of the bankruptcy proceedings and the consignment of the Beierwaltes' property to Phoenix. and submit to a deposition in June or August 2018 in Geneva. A-82-83. He stated that the property seized was suspected of violations against patrimony under the LTBC and that an investigation was in progress. A-83. He also stated that the Beierwaltes had 10 days after receipt to appeal his decision in the court of criminal appeals in Geneva. *Id*.

By letter dated June 6, 2018, the Beierwaltes' counsel replied to Mascotto, repeating that he had failed to state the legal basis for the seizure, and made only vague, unsupported allegations of suspected violations of the LTBC without alleging any specific facts relating to any of the Property Owners or their property, intended to hold the objects indefinitely pending the

18

outcome of the ongoing investigation, at the end of which he would restitute the objects without compensation to some arbitrarily selected countries of origin. A-87-88. Counsel reiterated its demand for release of the objects and threatened litigation in the United States. A-88. By separate letters dated July 5, 2018, counsel, on behalf of both the Beierwaltes and Hicham (collectively, the "Property Owners") sent a final demand for the release of the antiquities to the Swiss Customs Administration, the President of the Council of State of the Canton of Geneva, the Swiss Federal Department of Finance and the Geneva Prosecutor, A-100-115, all of whom responded through separate letters declining to take any action to release the Property Owners' property. A-117-33.

**The Investigation**

The investigation authorized by the Warrant (the "Investigation") was led by Mascotto, who had a reputation as an aggressive, publicity-seeking prosecutor in a number of high-profile investigations.[21] A-478. In the nearly three years since the Investigation was opened, amazingly little progress has been made. In November 2019, Ali, Phoenix and Inanna filed legal papers

---

[21] https://www.letemps.ch/suisse/geneve-procureurs-desertent-section-affaires-complexes. Effective December 31, 2019, Mascotto resigned from his position in order to run for public office. The Investigation is currently led by his successor. *Id.*

19

before the Canton of Geneva Criminal Court requesting review of the refusal by the Geneva Ministry of Justice to grant their request that the three experts (who include Haldimann) appointed to assist in the Investigation be removed for failure to carry out their mandates (the "Request for Review"). The Request for Review, which is pending, set forth a number of grounds to challenge the experts' conduct of the Investigation.

Under the Mandates of Expertise appointing the experts for the Investigation, the experts were, preliminarily, to make a selection of objects that could have originated from illicit excavations or thefts and, as to those objects: establish their authenticity; determine their places of origin and the conditions of their import into Switzerland; assess whether the objects qualified as "cultural property" under the LTBC; estimate the market value of the objects; and prepare a report. A-572. The goal of the selection process was the expeditious release of items that would not be pertinent to the investigation and allow the owners to resume their business activities. The preliminary selection process was to have been completed by May 30, 2017 (with extensions possible at the experts' request). A-573. The experts were required to submit a report by June 30, 2017 concerning seized objects with potential problems under the LTBC and a final report by July 31, 2017 (the

express termination date of the experts' mandate), which dates could be extended by request. *Id*.

More than two years after the final deadline, the Request for Review noted, the experts have made no attempt to perform the preliminary selection process and have simply ignored their deadlines. Instead, they have decided to examine every object, one by one, in an effort to search for indicia of potential legal violations. As reflected in a letter dated March 4, 2019, the experts, despite having evidence that seized objects are "old and cold," *i.e*., imported into Switzerland well before the effective date of the LTBC, persist in "investigating" the pieces, demanding that Phoenix furnish documentation as to every step in the chain of provenance, a standard that has no basis in law. A-566-67. As of the date of the Request for Review, the experts had performed an incomplete physical examination of just 173 of the more than 7,000 objects still under seizure, a rate that would take them some 68 years to complete a physical examination of all of the objects.

The experts have focused solely on trying to identify physical or scientific indicia of potential unscientific excavation (such as fractures, restoration or the absence thereof, traces of dirt), on the assumption that unscientific excavation implies illegal export or theft from the country of first discovery. But the experts have failed to determine any archeological find

21

spots or specific countries of origin or first discovery of the items,[22] or to show that any of the seized objects was illegally excavated from a particular find spot or illegally exported.

The Request for Review also took issue with unprofessional, unscientific assertions made by one of the experts that appeared to reflect "rancor" against Phoenix, such as that certain objects must have originated from illicit excavations based solely on traces of dirt found on certain artifacts or the absence of restoration; and that Phoenix could be financing terrorist activity by ISIS based on the presence of dirt on certain artifacts of possible Syrian or Iraqi origin.[23]

Remarkably, during the time the seized property was in the exclusive custody and under the control of the Geneva Prosecutor, 23 seized objects were stolen or disappeared under mysterious circumstances in May 2018. A-482-85.

---

[22] In one notable example, one of the experts admits he cannot determine whether a particular seized object of "Greek or Roman culture" belonging to Hicham originated in Turkey or Greece or exclude the possibility that the item may have come from yet another country. A-589-90. Despite the expert's inability to make that crucial finding, that object has not been returned to Hicham. A-587.

[23] *See Le Temps* Article.

On August 8, 2018, the day the Beierwaltes filed their complaint in the United States District Court for the District of Colorado, Mascotto partially lifted the search and seizure order and released approximately 5,000 objects located at the Geneva freeport.  A-492-95.  In his letter to Phoenix's counsel, Mascotto asserted that it was impossible under the circumstances for the investigators to dispel the suspicions of illicit provenance and to establish the licit origins of the remaining material which remained sequestered.  A-508. In reality, the released objects were among those that Phoenix had notarized in its registry as pre-LTBC imports, including a small number of Hicham's objects.  A-494.  In other words, after more than a full year of investigation, the Prosecutor and his experts had done nothing more than identify the material that Phoenix had previously documented as exempt from the LTBC, and focused not on whether Phoenix had complied with its due diligence obligations under the LTBC with respect to the remaining material but on trying to establish the "licit origin" of each piece, a standard which is not required or defined by Swiss law.[24]

_____

[24] In anticipation of the enactment of the LTBC, and in light of its non-retroactivity under Article 33, Phoenix had undertaken the significant task of reviewing its inventory, identifying those objects imported into Switzerland prior to the effective date of the LTBC on June 1, 2005 (either by Sleiman Aboutaam prior to his death in 1998 or thereafter) and therefore exempt from the LTBC, and having the entries notarized in the Phoenix registry.  A-494.

23

**Procedural History**

The Beierwaltes filed their Complaint on August 8, 2018 in the United States District Court for the District of Colorado (Case Number 1:18-cv-0211-MSK-MEH) against the Swiss Authorities asserting claims for declaratory judgment as to title, conversion, unjust enrichment and civil theft. A-16-98. The action was transferred to the District Court on November 12, 2018, and accepted by the District Court as related to the action filed by Hicham in the District Court against the Swiss Authorities on March 29, 2019 asserting claims for declaratory judgment as to title, conversion and unjust enrichment. A-7, Docket Nos. 20-21; A-8. On January 25, 2019, the Swiss Authorities filed motions to dismiss both actions on the primary ground that they were immune from suit under the FSIA. A-137-39; 239-40. Prior to the hearing on the motions, Plaintiffs, by letters to the Court dated May 7, 2019, requested jurisdictional discovery concerning elements of the "expropriation," or "takings," exception to immunity set forth in FSIA §1605(a)(3). A-552-78. The Swiss Authorities opposed the request in letters dated May 15, 2019. A-

---

Approximately 5,000 such objects were included. Unfortunately, due to the scale and expense of this project, it was never completed and only a small number of Hicham's objects was notarized as pre-LTBC imports even though at least a majority of them were imported by Sleiman Aboutaam during the 1980's. None of the Beierwaltes' objects was so notarized either because they were all imported into Switzerland after June 1, 2005. A-32, ¶42, n.17.

24

579-81; 582-85.  Plaintiffs responded in letters dated May 21, 2019.  A-586-87.

In the Opinion, the District Court granted the motions to dismiss, rejecting Plaintiffs' argument that FSIA §1605(a)(3) applied, finding, *inter alia*, that the Plaintiffs had not established that there had been a "taking in violation of international law."  SPA-11.  In doing so, the District Court did not reach either the issue of whether the "commercial activity" or "nexus" requirement had been met or the other arguments raised in support of dismissal based on the act of state doctrine and principles of comity.  SPA-11, 11 n.3.  The District Court also denied the Plaintiffs' request for jurisdictional discovery.  SPA-11.  On September 25, 2019, the District Court entered a Judgment dismissing the Complaint and denying jurisdictional discovery on the basis of the Opinion and closing the case.  SPA-13.  On October 22, 2019, the Beierwaltes filed a Notice of Appeal to this Court of the Judgment.   A-646.  Hicham's appeal of the Judgment (Case No. 19-3481) is identified in Form C in this case as a related appeal.  Docket No. 14.

25

## SUMMARY OF ARGUMENT

The District Court erred in granting the Swiss Authorities' motions to dismiss on the ground that the Swiss Authorities were immune from suit under the FSIA and denying Plaintiffs' motion for jurisdictional discovery. In doing so, the District Court found, incorrectly, that the expropriation, or "takings," exception to immunity under the FSIA did not confer jurisdiction because the Seizure did not violate international law because it was effected in connection with an ongoing criminal investigation in Switzerland into the antiquities' origins, was not arbitrary or discriminatory and was temporary rather than "extended or indefinite."

Contrary to the District Court's holding, the Seizure violates both international law and Swiss law and the Investigation is being conducted in an arbitrary, irrational and discriminatory manner. Thus, the "violation of international law" element of the expropriation exemption is satisfied, and the case should be remanded to the District Court to determine whether Switzerland satisfies the nexus or "commercial activity" requirement of the expropriation exemption, in connection with which this Court should reverse the District Court and grant the Property Owners' request for jurisdictional discovery.

No probable cause has ever been asserted or alleged against either the Property Owners or their material. The Property Owners' objects were seized in an indiscriminate dragnet simply because they were in the possession of Phoenix or Inanna. Further, the Investigation, contrary to the District Court's finding, is open-ended and indefinite and, at the rate it is proceeding, will take decades to complete. In effect, the District Court has handed the Swiss Authorities a perpetual license to conduct a fishing expedition to uncover some physical or scientific indicia of unscientific excavation that might imply some potential (but unproven and potentially unprovable) legal defect with the seized material, which to date, after three years, they have not. Instead, the description, provenience and provenance of the seized material provided to the Swiss Authorities all indicate that the Property Owners are *bona fide* purchasers with good title, have satisfied their duty of due diligence under Swiss law and that the Property Owners and the seized material otherwise comply in all material respects with Swiss law. The Seizure thus amounts to a *de facto* conversion triggering the requirement for compensation under international and Swiss law, which the Swiss Authorities have violated.

## STANDARD OF REVIEW

The dismissal by a District Court of a complaint for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act is subject to *de novo* review. *First City, Texas-Houston, N.A. v. Rafidian Bank*, 150 F.3d 172, 175 (2d Cir. 1998). *See also Robinson v. Government of Malaysia*, 269 F.3d 133, 138 (2d Cir. 2001) (standard of review applicable to a District Court's decision under the Foreign Sovereign Immunities Act is *de novo* for legal conclusions). The standard of review for denial of jurisdictional discovery in connection with issues concerning subject matter jurisdiction under the Foreign Sovereign Immunities Act is abuse of discretion. *First City, Texas-Houston*, 150 F.3d at 175-76.

## ARGUMENT

## I

## THE DISTRICT COURT ERRED IN RULING THAT THE SEIZURE DOES NOT CONSTITUTE A TAKING IN VIOLATION OF INTERNATIONAL LAW UNDER THE TAKINGS EXCEPTION OF THE FSIA

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign government," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989), and, accordingly, "a foreign sovereign and its instrumentalities are immune from suit in the United States unless a specific

28

statutorily defined exception applies." *Zappia Middle East Constr. Co., Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247 (2d Cir. 2000). As the District Court found, the Swiss Authorities are each "foreign states" for purposes of the FSIA. SPA-5.

One of those "statutorily defined exception(s)," the "expropriation," or "takings," exception, applies "in any case . . . (1) in which rights in property taken in violation of international law are in issue and (2) that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]" 28 U.S.C. § 1605(a)(3).

Although the FSIA does not elaborate on what constitutes property "taken in violation of international law," the Second Circuit has explained that this phrase refers to 'the nationalization or expropriation of property *without payment of the prompt adequate and effective compensation required by international law*,' including 'takings which are *arbitrary* or discriminatory in nature.'" *Zappia,* 215 F.3d 251 (quoting H.R.Rep. No. 19-1487, at *19-20 (1976)) (emphases added). Thus, "[a] violation of international law . . .

29

requires . . . that the taking not be for a public purpose, or that the taking be discriminatory, *or not accompanied by provision for just compensation*." SPA-7 (*citing Smith Rocke Ltd. v. Republica Bolivariana de Venezuela,* 12-CV-7316 (LGS), 2014 WL 288705, at *7 (S.D.N.Y. Jan. 27, 2014) (*citing Restatement (Third) of Foreign Relations Law* § 712 (1987)) (emphasis added).

It is undisputed that the Seizure in the present case was a taking. *See Williams v. Nat'l Gallery Art*, No. 16-CV-1978 (VEC), 2017 WL 4221084 (S.D.N.Y. Sept. 21, 2017), *aff'd*, No. 17-3253-cv, 2018 WL 4293327 (2d Cr. Sept. 10, 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (to "take," within the meaning of FSIA §1605(a)(3), is 'to get into one's hands or into one's possession, power, or control [citation omitted]" and includes a government's "modification of an individual's property rights [citation omitted]"). *See also* Restatement (Third) of Foreign Relations Law ("Restatement") §712, Comment g ("A state is responsible for an expropriation of property … when it subjects alien property to action that is confiscatory, *or that prevents, unreasonably interferes with, or unduly delays, effective enjoyment of an alien's property*.") (emphasis added). It is further undisputed that there has been no compensation by the Swiss Authorities to the Property Owners for the Seizure.

The District Court ruled that the Property Owners had not met the burden of showing that their property was "taken in violation of international law." SPA-11. That determination was in error. In particular, the District Court accorded undue and uncritical deference to the Warrant, Seizure and "ongoing criminal investigation" conducted by the Swiss Authorities. SPA-7. A close look beneath the official veneer of governmental propriety, however, reveals that these proceedings have been, and continue to be, for a number of reasons, conducted in an arbitrary manner.

As noted in Restatement §712, Reporter's Note 11, "[a]rbitrary refers to an act that is unfair and unreasonable, and inflicts serious injury to established rights of foreign nationals." The Swiss Authorities' proceedings, as discussed below, are indeed "unfair and unreasonable" and there is no question that it has inflicted "serious injury" to their rights, because they lack probable cause and are unreasonably overbroad in scope as to the Property Owners, are motivated by a coercive intent and conducted in wholesale disregard of the LTBC, the very law upon which the proceedings are based, and motivated by a retributive purpose. Further, the Investigation is of indefinite duration, proceeding at an extremely slow pace and likely to last for decades at the current rate, a very extended period of time. Finally, the Swiss Authorities are violating international law for the further reason that they are

31

conducting the Seizure and Investigation in a manner contrary to the requirements of UNESCO.

## A.  The Warrant and Seizure, as to the Property Owners, Lacked Probable Cause and Are Grossly Overbroad in Scope

The District Court found that "the seizure does not appear to have been arbitrary or discriminatory, since,…the property was seized pursuant to search and seizure orders that articulated a non-discriminatory basis for *suspecting that individuals connected to the seized property had violated Swiss law*." SPA-7. (Emphasis added).  That conclusion, as to the Property Owners and their seized objects, was erroneous.

As a simple review of the Warrant shows, the Geneva Justice Ministry set forth no basis to suspect that any of the Property Owners or any object they own was involved in a violation of law.  None of the Property Owners is among the parties listed as "Defendants" in the Warrant, nor is there any mention of them or any of their property.  A-46.  The Warrant, indeed, specifies that it was the "aforementioned defendants" who were "suspected" of infractions with regard to the "purchase, detention, or dissimulation of archaeological articles suspected of having been acquired, transported, or exported and possessed illegally."  *Id*.  Seizure of the Property Owners' objects in the absence of any suspicion articulated in the Warrant as to any

32

illegal conduct on the part of the Property Owners is contrary to requirements of probable cause that underlie provisions of Swiss law.

Swiss Criminal Procedure Code ("SCPC") Article 263 articulates a need for probable cause in requiring that a seizure "shall be ordered on the basis of a written warrant containing a brief statement of the grounds." SPA-24. There was no such "statement of the grounds" as to the Property Owners or their property. Similarly, under LTBC Article 20, competent criminal prosecution authorities can order seizure of cultural property only "when suspicion exists that the cultural property was stolen, lost against the will of the owner or illicitly imported into Switzerland." A-330. Again, no such suspicion was articulated in the Warrant as to the Property Owners or their property.

Yet, pursuant to that Warrant, 18 objects owned by the Beierwaltes and some 1,200 objects belonging to Hicham were indiscriminately swept up in a blunderbuss search and seizure of some 12,000 objects at various locations associated with the listed defendants.[25] Though there is no basis in the

---

[25] The aggressively indiscriminate, sweeping – and uninformed – nature of the Seizure is memorably and graphically illustrated by its inclusion of a terracotta object, which the Swiss Authorities, who initially identified it as "Mesopotamian" in origin, were forced to release after realizing, on closer inspection, that it had been inscribed "With love, for Daddy" by the creator of the piece, Ali Aboutaam's 11-year-old daughter. A-494, 502-04.

33

Warrant to suspect that the Property Owners had violated any laws, the District Court incorrectly conflated the Property Owners with the named defendants in finding that, as to the Property Owners' objects, the Warrant articulated a basis to suspect that "individuals connected to the seized property had violated Swiss law." SPA-7. As to the Property Owners, the Swiss Authorities are, to put it simply, on a fishing expedition to uncover some physical or scientific indicia of arguably unscientific excavation that might imply some potential, but ultimately unprovable, legal defect with the seized material.

The lack of any articulated basis to suspect the Property Owners or their objects of any involvement in illegal conduct easily distinguishes the present case from the two decisions, *Chettri v. Nepal Rastra Bank*, 834 F.3d 50 (2d Cir. 2016) and *Hilsenrath v. Swiss Confederation*, No. C 07-02782 WHA, 2007 WL 3119833 (N.D. Cal. Oct. 23, 2007), upon which the District Court relied in finding that the Seizure did not constitute a taking in violation of international law. SPA-8. In both those decisions, the government's suspicions of illegal conduct related *directly* to the frozen property belonging to the plaintiff. Thus, in *Chettri*, there was no issue that the seized asset – $1,000,000 that had been wired to the bank account of one of the plaintiffs, as to which there had been "anomalies" – was the object of suspicion on the part

34

of the Nepalese government, which opened a money laundering investigation into the source of the funds. Similarly, in *Hilsenrath*, there was no issue that the seized assets, which belonged to the plaintiff – an individual for whom the Swiss government had issued an international arrest warrant – was the same property the Swiss government suspected of having been stolen from a California-based company.[26] Thus, there was no issue as to probable cause and, therefore, no arbitrary taking with respect to the seizures in either *Chettri* or *Hilsenrath*, in contrast to the present case, which involves an indiscriminate dragnet that happened to include objects belonging to the Property Owners.

Compounding the problems with the lack of specificity and overbreadth of the Warrant and Seizure as to the Property Owners and their objects are the fact that the Swiss Authorities have (i) refused to release that property despite repeated demands by the Property Owners in letters to Mascotto detailing the reasons why their objects do not fall within the scope of the LTBC; (ii) improperly demanded that the Property Owners prove the "legal provenance"

---

[26] Hilsenrath sued for damages in connection with the defendants' freezing of his assets notwithstanding his having entered into a plea agreement in which he explicitly promised to repatriate all monies and assets held by the Swiss authorities and withdraw any claim to such assets. It was undoubtedly in light of this remarkable factual background that the court characterized the plaintiff's challenge to the Swiss authorities' investigation as "frivolous." 2007 WL 3119833, at *4.

of their objects, thus seeking to foist upon them a burden of proof the LTBC places upon a "country filing suit" under the LTBC; and (iii) failed to take steps to determine whether the Property Owners' objects fall within the parameters of the LTBC.

In their demands to Mascotto for release of their objects, the Property Owners demonstrated why their property falls outside the scope of the LTBC. First, since the LTBC is non-retroactive and, therefore, "not applicable to acquisition activities that took place prior to this Act entering into force," *i.e.*, June 1, 2005, the Beierwaltes' property, which was acquired in the 1990's, is exempt from the LTBC, as is most of Hicham's property, at least a majority of which was acquired by his father and imported into Switzerland in the 1980's and then inherited by Hicham in 1998. A-101.

Further, with respect to any of Hicham's objects that he did not inherit in 1998 and were acquired after June 1, 2005, Phoenix's compliance with its duty of diligence under the LTBC could easily have been determined by the Swiss Authorities' experts from a review of the documents already in their possession. Finally, in light of the statute of limitations and other restrictions under LTBC Article 9[27] on restitution claims by State Parties, any claims by

---

[27] One year after knowledge of location, not to exceed 30 years after their export; in addition, the State Party claimant has the burden of showing that

36

Italy, Greece or Egypt under their respective Bilateral Agreements with Switzerland would likely have been time-barred, subject to potentially meritorious defenses, or even if successful, subject to the payment of compensation.

Despite being on notice of facts indicating that the Property Owners' objects are exempt from the LTBC, Mascotto, in his response to the Property Owners' request for release of their property, instead of addressing the points raised and taking steps to determine whether the Property Owners' objects fall within the scope of the LTBC, demanded that the Property Owners furnish documentation relating to the "legal provenance" – an undefined and unclear legal standard that does not appear in UNESCO or the LTBC – of each of their objects.  A-82.  In doing so, he sought to reverse the burden of proof that LTBC Article 9.1 explicitly places upon "the country filing suit" to "show that the cultural property … was imported illicitly."  A-327.  The Geneva Ministry of Justice and experts are so focused on finding material looted by ISIS ten years ago or from Iraq 20 years ago that they are blind to the fact that the seized material was excavated decades, centuries or even or even millenia earlier.  They appear to have no interest in conceding that the LTBC likely

---

the cultural property is of significant importance to its cultural heritage and was imported illicitly.  A-327.

exempts the Property Owners' "old and cold" material from restitution claims and seek instead to raise the bar for the Property Owners in order to prolong the Investigation in the hope of someday finding some physical or scientific indicia of arguably unscientific excavation that might raise some ultimately unprovable legal defect with the seized material.[28]

The experts' focus on physical or scientific factors, moreover, is patently insufficient. Any inference of illegality raised by such factors must be confirmed by a legal analysis of illegality which depends on a factual determination of the actual time, place and circumstances of excavation and/or export and a corresponding legal analysis of the laws of the country of excavation or export in effect at the time of excavation or export.[29] The first

---

[28] Although not set forth in the letters, the Beierwaltes, who are private collectors whose art sales activities are limited to selling the remainder of their once extensive collection of art and antiquities, A-25-27, ¶¶29-33, are not subject to the LTBC because the limited nature of those activities exempts them from the definition of "art dealers" under Article 1(e)(2) of the LTBC. A-338. Hicham's seized objects, moreover, are not subject to the LTBC for the further reason that the LTBC applies, by its terms, to transfers ("*transfers*") of cultural property. A-324. Thus, the LTBC does not apply to Hicham's property, which has simply been in storage with Phoenix and not consigned for sale or transfer. *See* Article 16(1). A-329.

[29] Whether an antiquity is stolen depends on proof of theft from the possession of a person or entity, or, in the case of constructive theft, on proof that the object was exported without a valid export permit at a time when the laws of the country of export vested the state with constructive ownership of all

38

phase of the Investigation is wholly inadequate to determine the licit or illicit origin of any of the seized objects.  Nor is there any indication that anyone involved in the Seizure and Investigation contemplates making (or is competent to make) any of the mixed factual and legal determinations required to prove that any of the seized objects were illegally exported or stolen from the country of excavation or export.  Given the absence of any mechanism in the Investigation to make these determinations, the Investigation is fatally flawed, no matter how many purported question marks the experts raise over cracked pots, traces of dirt or potential Near Eastern origin.  By itself, moreover, this physical phase of the Investigation will take six decades or more to complete at the current rate.

Because they are unable to make the factual and legal determinations needed to prove that any of the seized objects were stolen, Mascotto and the experts have used the Investigation to reverse the burden of proof, taking the position that they have not received any documentation proving what Mascotto calls "legal provenance," which might include archaeological records showing that the items came from an official excavation or were exported pursuant to an export certificate issued by the country of

---

undiscovered archeological objects within its borders.  *See* White Paper at 568, 596-589, notes 15 and 55-60 and accompanying text.

39

export. They also appear to conflate illegal export with theft[30] without performing the legal analysis necessary to establish theft. They have also avoided making the relatively easy determination regarding whether the Property Owners satisfied their duty of diligence under the LTBC and whether the seized objects comply with the standards of the LTBC.

Critically, the experts assisting in the Investigation have opted not to perform the quick preliminary selection of objects that could have originated from illicit excavations or thefts and analyze those objects to determine, *inter alia*, "find" spots or countries of origin and whether they qualify as "cultural property" under the LTBC. That choice has ensured that items not pertinent to the Investigation would not be released in an expeditious manner and would instead be kept under seizure in order to permit an indefinite review of the objects to search for crimes. That sort of fishing expedition is not permitted under Swiss law. Notably, to date, the Swiss Authorities have not conclusively determined that a single piece was stolen or illicitly imported.

---

[30] In this connection, it should be noted that courts in common law jurisdictions such as the United States and the United Kingdom have historically not enforced claims of illegal export by the country of export. By contrast, United States federal courts have enforced claims for return of stolen property if an antiquity is knowingly exported in violation of a clear national ownership law. *See* White Paper at 568, 596-589, notes 15 and 55-60 and accompanying text, *citing* Paul M. Bator, *An Essay on the International Trade In Art*, 34 Stan. L. Rev. 275 (1982).

SCPC Article 267.1 provides that "[i]f the grounds for seizure no longer apply, the public prosecutor or court shall revoke the seizure order and hand over the property or assets to the person entitled to them." SPA-22. Clearly, the intention of that provision is to ensure that property unconnected to a crime not be kept under seizure for any longer than necessary.

The conduct by the Swiss Authorities of the proceedings connected to the Seizure and Investigation, in addition to violating Swiss law, offend principles of fairness and reasonableness well-established in United States law, in particular, those underlying the Fourth Amendment's Warrants Clause (U.S. Const. amend. IV),[31] the overarching purpose of which is to ensure that "those searches deemed necessary should be as limited as possible." *U.S. v. Metter*, 860 F. Supp.2d 205, 212 (E.D.N.Y. 2012). To achieve that goal, the Warrants Clause requires particularity and forbids overbreadth. Specifically, warrants must (i) establish probable cause to believe the search will uncover evidence of a specific crime and (ii) state with particularity the areas to be

---

[31] Under the Warrants Clause, "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

searched and the items to be seized. *U.S. v. Ganias*, 755 F.3d 125, 134 (2d Cir. 2014), *rev'd en banc*, 824 F.3d 199 (2d Cir. 2016).[32]

Thus, in *U.S. v. Debbi*, 244 F. Supp.2d 235, 237-38 (S.D.N.Y. 2003), the government seized seven boxes of materials from the defendant's home that included materials that fell outside the scope of the warrant's parameters (which established probable cause) and made no attempt, over a period of eight months, to separate responsive evidence from other materials seized. It was only after repeated demands from the defendant's counsel that even a limited portion of improperly seized materials - one box - was returned to the defendant. Finding that the government had chosen to "blatantly disregard the very limitations that saved the warrant from overbreadth," the court ordered to be suppressed and returned all evidence the government had not to date determined was within the scope of the subpoena. *See also U.S. v. Tamura*, 694 F.2d 591 (9th Cir. 1981) (finding that the "wholesale seizure" by the government of documents that included many materials outside the scope

---

[32] The chief evil that prompted the framing and adoption of the Fourth Amendment was the "indiscriminate searches and seizures" conducted by the British "under the authority of general warrants." *U.S. v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013). The British Crown had used these questionable instruments to enter a political opponent's home and seize all his books and papers, hoping to find among them evidence of criminal activity. *See Stanford v. Texas*, 379 U.S. 476, 482-85 (1965). *U.S. v. Ganias*, 755 F.3d at 134.

of the warrant and its refusal to return such materials constituted the type of overbroad investigation that the Fourth Amendment was "designed to prevent.").

Similarly, in the present case, the lack of probable cause, overbreadth and intent on the part of the Swiss Authorities to keep the Property Owners' objects under seizure violate basic principles of fairness and reasonableness.

## B. The Investigation Is of Indefinite Duration and Is Likely to Take Many Decades to Complete

The District Court further found that, "as the property was temporarily seized pending the results of an ongoing criminal investigation, and has not been frozen for an 'extended or indefinite period,' Plaintiffs are not owed compensation for their property at this juncture." SPA-7. That conclusion was also erroneous. The Investigation, in fact, is a probe of indefinite duration that is moving at an extremely slow pace for what will likely be a very "extended" period.

It has been nearly three years since the Seizure and, in that time, the experts retained to assist in the Investigation have performed, as of November 2019, a partial physical inspection of only 173 (approximately 2.5%) of the 7,000 pieces that remain under seizure. At that rate, the physical phase of the Investigation would take **many decades** to complete, a very "extended"

period indeed, during which the Property Owners will have no ability to exercise their property rights to their seized objects. After the physical phase of the Investigation is complete, an additional period of years (or decades) will be required to make the factual and legal determinations necessary to prove that any of the objects was indeed stolen within the meaning of the laws of the country of excavation or export. This indefinite deprivation of property is a *de facto* conversion that requires compensation. *See* Restatement §712, Reporter Note 6 ("A temporary deprivation of control, as by a freezing of assets … may become [a taking] …if deprivation is for an extended or indefinite period" (*citing Sardino v. Fed. Res. Bank*, 361 F.2d 106, 111, (2d Cir.), *cert. denied*, 385 U.S. 898 (1966)).

The District Court, in ruling that there was no "taking in violation of international law," was influenced in part by the Swiss Authorities' "partial lifting" in August 2018 of their seizure with respect to some 5,000 items which, the court believed, reflected that the Swiss Authorities are proceeding expeditiously with the Investigation and releasing items once they had determined there was "no further cause for their seizure." SPA-9. That conclusion, however, was also in error.

Those 5,000 items all appear in Phoenix's officially court-certified registry as pieces that had been imported into Switzerland before June 1, 2005,

44

the effective date of the LTBC and, as such, are clearly outside the scope of any legitimate legal inquiry. A-494. Though this fact could easily and quickly have been determined, it took the Swiss Authorities some *17 months* of "investigation" to release these objects and they did so only after the Property Owners had given them notice of their intent to commence legal action within 10 days to enforce their rights and the Beierwaltes filed their Complaint. The "partial lifting" of the seizure with respect to these items, therefore, was in no way indicative of the pace of the investigation and did not reflect any desire on the part of the Swiss Authorities to release items beyond the scope of their probe in an expeditious manner. It was, rather, the combined effect of the letters to the Swiss Authorities and threat of imminent suit that forced their hand and accelerated the release of the objects. In the 17 months since this "partial lifting" in August 2018, the Swiss Authorities have released a mere 137 additional objects, almost none of which belong to the Property Owners. To date, moreover, not a single seized object has been conclusively determined to have been stolen or illicitly imported.

In addition, the experts, in conducting an incomplete analysis of 173 of the 7,000 pieces remaining under seizure, have not even attempted to make determinations critical to the question of whether those objects meet the parameters of the LTBC, including whether they were in fact stolen, exported

45

in violation of the laws of their countries of origin at the time of export or of "significant importance" to the cultural heritage of those countries.

It is well-established in American case law that, to comport with the Fourth Amendment, the manner in which the government executes a warrant must be reasonable. *U.S. v. Lustyik*, 57 F. Supp.3d 213, 230 (S.D.N.Y. 2014) ("Like all activities governed by the Fourth Amendment, the execution of a search warrant must be reasonable") (*citing U.S. v. Ramirez*, 523 U.S. 65, 71 (1998). In particular, the government must complete its review, *i.e.*, execute the warrant, within a reasonable period of time. *See U.S. v. Ganias*, 755 F.3d at 136 (government's retention for two-and-a-half years of copies of defendant's personal records, which were beyond the scope of the warrant, deprived defendant of exclusive control over those files for an unreasonable amount of time and interfered with his possessory rights in violation of the Fourth Amendment); *U.S. v. Metter*, 860 F. Supp.2d at 215 (government's delay for more than 15 months in reviewing seized evidence to determine whether any of it fell outside the scope of the search warrant constituted unreasonable seizure under the Fourth Amendment).[33]

---

[33] Significantly, Fed. R. Crim. P. 41(g) provides "a person aggrieved by an unlawful search and seizure of property or by the deprivation of property" the right to move for the property's return and obligates the court to "receive evidence on any factual issue necessary to decide the motion" and, if the court

As these decisions reflect, the indefinite deprivation of property caused by the Seizure is unjustified, unreasonable and arbitrary. As such, the Seizure is a taking that requires the payment of adequate and effective compensation to the Property Owners.

### C. The Warrant and Seizure Were Arbitrary For the Further Reason That They Were Motivated By a Coercive Purpose

The Swiss Authorities, in connection with the Warrant and the Seizure, have acted with a coercive motive against Ali and Phoenix which has its roots in unfounded and possibly slanderous allegations made against Phoenix by Haldimann, A-102, that led to a dispute between the Swiss Authorities and Ali over three sarcophagi the Swiss Authorities had seized. *See Le Temps* Article. Those parties litigated for years the propriety of the seizures and the Swiss Authorities were eventually required to release two of the pieces after an appeals court determined that those pieces had been imported into Switzerland prior to the effective date of the LTBC. When Ali appealed the determination to repatriate the third sarcophagus to Turkey,[34] the Swiss

---

grants such motion, to "return the property to the movant" with, if appropriate, any reasonable conditions to protect access to the property. SPA-18. Courts have recognized a similar right in the civil forfeiture context as well. *See, e.g., Acadia Technology Global Ins. v. U.S.*, 458 F.3d 1327 (Fed. Cir. 2006).

[34] The third sarcophagus was also originally imported into Switzerland pre-LTBC but subsequently exported and then reimported post-LTBC.

47

Authorities launched a new investigation resulting in the Warrant and Seizure to employ as leverage. In connection with that new probe, they jailed Ali's wife and driver for two weeks and released them only when Ali agreed to a settlement with the Swiss Authorities that required him to withdraw his appeal of the determination to repatriate the third sarcophagus. A-493; *Le Temps* Article. The vagueness and overbreadth of the Warrant, as well as the indefinite fishing expedition conducted by the Swiss Authorities are consistent with the coercive motive underlying these proceedings and further reflect their arbitrary and improper nature.[35]

### D. The Property Owners Were Not Obligated to Exhaust Their Legal Remedies in Switzerland

The District Court found that, because the Property Owners "neither participated in Defendants' investigation nor pursued the appellate process available to them in Switzerland," they "cannot complain that a taking or other

---

[35] To further increase the pressure on Phoenix, Mascotto obtained the cooperation of a Belgian court which seized a Second Century A.D. Roman bust that had been consigned to Electrum in New York, Hicham's gallery, and offered for sale through an unaffiliated gallery in Brussels, Belgium. The bust remained in custody for eight months despite comprehensive documentation establishing good title and lawful export, including a 1966 export permit from the Republic of Italy, which is considered to be the "gold standard" of legal provenance in the international art market, before an appeals court ordered it released in January 2020.

48

economic injury has not been fairly compensated and hence violates international law." SPA-10. That conclusion was also in error.

FSIA §1605(a)(3) sets forth no requirement that one asserting a legal claim against a foreign state must exhaust remedies in that country and there is no legislative history that addresses that issue. *Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1060-61 (9th Cir. 2009) (concluding that the FSIA does not require exhaustion of remedies and that the court, instead of imposing such a requirement as a jurisdictional matter, should engage in a "prudential" analysis of various factors, including, *inter alia*, whether exhaustion of remedies in the foreign country would be futile). *See* Restatement §713, comment e ("Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate or their application is unreasonably prolonged. There is no need to exhaust local remedies where the claim is for injury for which the respondent firmly denies responsibility …").

For many of the reasons discussed above, any recourse by the Property Owners to Swiss legal remedies is likely to be futile. The Swiss Authorities appear intent on proceeding with a fishing expedition of indefinite duration without probable cause as to the Property Owners in an effort to find some

49

physical or scientific indicia of arguably unscientific excavation that might imply some legal defect with the seized material that they can use to justify confiscating the property. They refuse to address or acknowledge the strong reasons the Property Owners have provided them to conclude their objects are exempt from the LTBC and instead seek to reverse the burden of proof set forth in the law by requiring the Property Owners to prove "licit provenance," – whatever that means - thus turning concepts of probable cause and fundamental fairness on their head.

The Property Owners were advised by Swiss counsel that there is no basis under Swiss law to require the Property Owners, who are not "defendants" suspected under the Warrant of legal violations, to produce documentation or physically appear in Switzerland for questioning. A-102. Indeed, considering that the Swiss Authorities imprisoned Biljana and her driver for weeks and held them hostage against legal concessions, in the absence of any assurance by Mascotto of immunity, safe harbor or safe passage, the invitation to the Property Owners to travel to Geneva to participate in the Investigation could well have been a trap to confer jurisdiction and create potential criminal liability where none otherwise existed.

**E.    The Swiss Authorities Have Also Violated International Law By Conducting Their Proceedings In a Manner Contrary to the Provisions of UNESCO**

UNESCO is international law.  *See, e.g., Flores v. Couthern Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003) ("treaties, conventions, and covenants … are proper evidence of customary international law to the extent that they create legal obligations among the State parties to them").  The professed aim of the Seizure and Investigation is the return of "cultural property" to countries of origin.  However, UNESCO requires, *inter alia*, that (i) any "appropriate steps to recover and return … cultural property" be at the request of a "State Party of origin"; (ii) "the requesting State shall pay just compensation to an innocent purchaser or to a person who has valid title to that property"; and (iii) the "requesting Party shall furnish, at its expense, the documentation and other evidence necessary to establish its claim for recovery and return."  A-255, Art. 7(b)(ii).

In the present case, there has been no request by a "State Party of origin."  Nor are the Swiss Authorities making any attempt to determine whether the seized property constitutes "cultural property" within the meaning of Article 1 of UNESCO.[36]

---

[36] See definition of "cultural property" in UNESCO Article 1.  A-249.

## II

## THE DISTRICT COURT ABUSED ITS DISCRETION
## IN DENYING JURISDICTIONAL DISCOVERY

The District Court denied the Property Owners' request for jurisdictional discovery with respect to the issue of whether the Swiss Authorities' conduct in connection with the Warrant, Seizure and Investigation of the seized pieces is arbitrary.[37] In doing so, it noted that "a district court may deny jurisdictional discovery demands made on a foreign sovereign if the party seeking discovery cannot articulate a reasonable basis for the court first to assume jurisdiction [citation omitted]." SPA-11. This determination was clearly in error.

As discussed above, the Property Owners have articulated a strong basis for the Court to find that a taking in violation of international law without compensation has occurred. To the extent questions remain about whether the Swiss Authorities' actions with respect to the Warrant, Seizure and Investigation have been arbitrary, discovery is appropriate to aid the Court in its determination. *See Reiss v. Société Générale du Groupe des Assurances*

---

[37] The Property Owners also seek jurisdictional discovery in connection with the nexus to the United States of the property in question for purposes of 28 U.S.C. §1605(a)(3). The District Court did not reach this issue. SPA-11, n.3.

*Nationales*, 235 F.3d 738, 748 (2d Cir. 2000) (finding it "essential for the district court to afford the parties the opportunity to present evidence material at a hearing on the question of FSIA jurisdiction … and afford broad latitude to both sides in this regard to resolve factual matters by issuing findings of fact."); *Freund v. Republic of France*, 592 F. Supp.2d 540, 562 (S.D.N.Y. 2006)[38] ("'[W]here jurisdictional facts are placed in dispute, [a] district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction … [The Court] must 'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction' [*citing APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)].").

Accordingly, jurisdictional discovery should have been granted.

## Conclusion

For the foregoing reasons, the Court should reverse the District Court's dismissal of the Complaint, remand the action for a determination of the

---

[38] The District Court cited *Freund* for the proposition that concerns of international comity "strongly militate against approving Plaintiffs' request for jurisdictional discovery under the circumstances." SPA-12. The key considerations the *Freund* court articulated for its decision to deny discovery, however -  a request for broad documentary discovery on behalf of a potentially large class that would require access to a foreign state's closed archives and was inconsistent with the letter and spirit of an Executive Agreement between the United States and France – do not exist in the present case. *Freund*, 592 F. Supp.2d at 563-64.

applicability of 28 U.S.C. §1605(a)(3) and grant jurisdictional discovery in connection with issues relevant to such determination.

Dated:      New York, New York
            January 31, 2020

                              Respectfully submitted,

                              Pearlstein & McCullough LLP
                              *Attorneys for Plaintiffs-Appellants*
                              *Lynda and William Beierwaltes*

                              By:  /s/ Anju Uchima
                              Anju Uchima
                              William G. Pearlstein
                              641 Lexington Avenue, 13th floor
                              New York, NY 10022
                              Telephone: (646) 762-7263
                              Facsimile: (212) 634-6311
                              Email: auchima@pmcounsel.com
                                   wpearlstein@pmcounsel.com

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains <u>12,115</u> words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word

in 14-point Times New Roman type style.

Dated: January 31, 2020

# SPECIAL APPENDIX

**i**

## TABLE OF CONTENTS

                                                          **Page**

Opinion and Order of the Honorable Ronnie
    Abrams, dated September 24, 2019, Appealed
    From........................................................................ SPA-1

Judgment, dated September 25, 2019, Appealed
    From........................................................................ SPA-13

Federal Rules of Criminal Procedure Rule 41 ........... SPA-14

Swiss Criminal Code 311 (Article 160)...................... SPA-19

Swiss Criminal Procedure Code 312 (Article 267.1).... SPA-21

Swiss Criminal Procedure Code 312 (Article 263) ... SPA-23

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/24/19

HICHAM ABOUTAAM,

                              Plaintiff,

          -against-

L'OFFICE FEDERALE DE LA CULTURE
DE LA CONFEDERATION SUISSE, ET
AL.,

                      Defendants.

18-CV-8248 (RA)

LYNDA BEIERWALTES, ET AL.,

                              Plaintiffs,

          -against-

L'OFFICE FEDERALE DE LA CULTURE
DE LA CONFEDERATION SUISSE, ET
AL.,

                      Defendants.

18-CV-11167 (RA)


OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs Hicham Aboutaam and Lynda and William Beierwaltes bring these related actions for, *inter alia*, conversion and declaratory judgment as to title against Defendants the Federal Office of Culture of the Swiss Confederation (the "FOC"), the Federal Customs Administration of the Swiss Confederation (the "FCA"), and the Republic and Canton of Geneva. Plaintiffs, who maintain collections of ancient art, allege that Defendants unlawfully ordered their antiquities to remain frozen in a warehouse in Geneva pending the outcome of a criminal investigation into the antiquities' origins. Before the Court are Defendants' motions to dismiss the

SPA-2

complaints, principally on the ground that Defendants are immune from suit under the Foreign Sovereign Immunities Act. For the reasons that follow, Defendants' motions are granted.

## BACKGROUND[1]

Hicham Aboutaam is an international dealer of ancient art who is a citizen and resident of New York. Together with his brother, Ali Aboutaam, he co-founded Phoenix Ancient Art S.A. ("Phoenix"), an art gallery which is located in Geneva, Switzerland. Hicham also manages an affiliated gallery, Electrum, which is located in New York. Lynda and William Beierwaltes are art collectors who are citizens and residents of Colorado. In 2006, they granted Phoenix the exclusive right to sell their antiquities collection, and in 2013, they filed for Chapter 11 bankruptcy and designated Phoenix as the antiquities dealer of their bankruptcy estate. As the Beierwaltes' dealer, Phoenix was able to sell some, but not all, of the Beierwaltes' antiquities. At the time of the events giving rise to this lawsuit, 18 of the Beierwaltes' antiquities remained in Phoenix's possession in Geneva.

On February 28, 2017, approximately 1,200 of Hicham's antiquities, and 18 of the Beierwaltes' antiquities, were seized as part of a larger seizure of approximately 12,000 objects and frozen by Swiss authorities in the Geneva warehouse where they were stored. The items were seized pursuant to two search and seizure orders, one issued by the Geneva Prosecutor and one issued by the FCA.[2] The orders referenced complaints from both the FCA and the FOC, which described the "sudden and suspicious" movement of cultural property and identified various

---

[1] The factual background is taken from the complaints and the exhibits attached thereto.

[2] The FCA and the FOC argue that Plaintiffs fail to adequately allege that either the FCA or the FOC directed, or were otherwise responsible for, the seizure of Plaintiffs' property. Because, as explained below, the Court dismisses the complaints as to all Defendants on other grounds, the Court does not here decide whether Plaintiffs' complaints adequately linked the FCA and FOC to the seizure of their property.

2

antiquities of suspicious provenance, or chain of title. Specifically, the warrants stated that on December 20, 2016, the FCA intercepted two individuals at the border in possession of a fraudulently imported antique oil lamp. Upon further investigation, the FCA discovered that property was moved out of a Geneva warehouse in the early morning hours of December 21, 2016. Ali Aboutaam's wife, Biliana Aboutaam, was identified on surveillance cameras in connection with the movement of that property. The warrants explained that criminal and customs inquiries were being conducted into potential violations of Swiss law regarding the importation and exportation of cultural property.

In May of 2018, Plaintiffs attempted to secure the release of their property by submitting a demand letter to the Geneva Prosecutor. In response, the Geneva Prosecutor informed Plaintiffs that their property could not yet be released because the investigation was ongoing. The Geneva Prosecutor requested Plaintiffs' cooperation in the investigation and further informed them that they had the right to appeal pursuant to the relevant provisions of the Swiss Criminal Procedure Code. Rather than appeal pursuant to those procedures, Plaintiffs wrote a subsequent letter demanding the release of their property and threatening to sue Defendants in the United States. Both the Geneva Prosecutor and the FCA responded, reiterating that the investigations were ongoing and again requesting Plaintiffs' cooperation. The Geneva Prosecutor further noted that, if Plaintiffs were to file suit in the United States, Defendants would contest the legitimacy of the suits as well as the jurisdiction of the American courts.

Plaintiffs then brought suit in the United States. On August 8, 2018, the Beierwaltes filed a complaint in the United States District Court for the District of Colorado, bringing claims against Defendants for declaratory judgment as to title, conversion, unjust enrichment, and civil theft. That same day, the Geneva Prosecutor partially lifted the seizure as to approximately 5,000 of the

seized objects. On September 11, 2018, Hicham filed a complaint in this Court, similarly bringing claims against Defendants for declaratory judgment as to title, conversion, and unjust enrichment. On November 12, 2018, the United States District Court for the District of Colorado granted Defendants' motion to transfer the Beierwaltes' case to the Southern District of New York. This Court subsequently accepted the Beierwaltes' case as related to the Hicham action.

Defendants in both actions filed the instant motions to dismiss. Their principal argument is that the Court lacks subject matter jurisdiction over these cases because they do not fall within any of the exceptions to foreign sovereign immunity outlined in the Foreign Sovereign Immunities Act. Defendants also argue, in the alternative, that the actions should be dismissed under the Act of State Doctrine and principles of comity. After briefing on Defendants' motions was complete, Plaintiffs requested jurisdictional discovery. The Court held oral argument on Plaintiffs' request for discovery and Defendants' motions to dismiss.

## STANDARD OF REVIEW

"In a motion to dismiss on FSIA grounds, the movant must first make a *prima facie* showing that it is a 'foreign state' under the Act." *Freund v. Republic of France*, 592 F. Supp. 2d 540, 552 (S.D.N.Y. 2008). "Once the movant makes that showing, the opposing party 'has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted[.]'" *Id.* (quoting *Cabiri v. Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999)). "Where the plaintiff satisfies its burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply." *Peterson Energia Inversora S.A. v. Argentine Republic and YPF S.A.*, 895 f.3D 194, 204 (2d. Cir. 2018).

4

SPA-5

"On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). "A district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003).

## DISCUSSION

### I.   Immunity

Defendants argue that the complaints must be dismissed because Defendants are immune from suit under the Foreign Sovereign Immunities Act (the "FSIA" or the "Act"). The FSIA provides the "sole basis for obtaining jurisdiction over a foreign government." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). "Under the FSIA a foreign sovereign and its instrumentalities are immune from suit in the United States courts unless a specific statutorily defined exception applies." *Zappia*, 215 F.3d at 247. "Absent such an exception, the immunity conferred by the FSIA strips courts of both subject matter and personal jurisdiction over the foreign state." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 199 (2d Cir. 2016).

It is undisputed that Defendants are "foreign state[s]" under the FSIA, presumptively immune from suit unless one of the Act's exceptions apply. 28 U.S.C. § 1604. Plaintiffs argue, however, that one of the statutory exceptions—the "expropriation exception" or "takings exception"—exempts Defendants from immunity in this case. This exception states that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or

5

SPA-6

instrumentality is engaged in a commercial activity in the United States[.]" 28 U.S.C. § 1605(a)(3).

Thus, "in order to establish jurisdiction pursuant to the FSIA expropriation exception, a plaintiff must show that: (1) rights in property are in issue; (2) that the property was 'taken'; (3) that the taking was in violation of international law; and (4) that one of the two nexus requirements is satisfied." *Zappia*, 215 F.3d at 251. As to the nexus requirements, a plaintiff must show either "that property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or "that property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." *Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006).

Defendants argue that Plaintiffs have failed to meet their burden of showing that the property at issue here was "taken in violation of international law." The Court agrees. "[A] federal court[] can maintain jurisdiction to hear the merits of a case only if [it] find[s] that the property in which the party claims to hold rights was indeed 'property taken in violation of international law.'" *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017). "[A] party's nonfrivolous, but ultimately incorrect, argument that property was taken in violation of international law is insufficient to confer jurisdiction." *Id.* Although the FSIA does not elaborate on what constitutes property "taken in violation of international law," the legislative history of the Act explains that the FSIA was intended to "codify the . . . 'restrictive' principle of sovereign immunity," which sought to "recognize immunity in cases based on a foreign state's public acts, but not in cases based on commercial or private acts." H.R.Rep. No. 19-1487, at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6618; *see also Garb*, 440 F.3d at 585–86. Consistent with this principle, the Second Circuit has explained that "the phrase 'taken in violation

6

SPA-7

of international law' refers to 'the nationalization or expropriation of property without payment of

the prompt adequate and effective compensation required by international law,' including 'takings

which are arbitrary or discriminatory in nature.'" *Zappia*, 215 F.3d 251 (quoting H.R.Rep. No.

19-1487, at *19–20 (1976)).  Thus, "[a] violation of international law . . . requires . . . that the

taking not be for a public purpose, or that the taking be discriminatory, or not accompanied by

provision for just compensation." *Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, 12-

CV-7316 (LGS), 2014 WL 288705, at *7 (S.D.N.Y. Jan. 27, 2014) (citing *Restatement (Third) of

Foreign Relations Law* § 712 (1987)).

    The conduct at issue here does not satisfy any of these requirements.  First, the property

was seized in connection with an ongoing criminal investigation, which serves a public purpose,

not a commercial or private one. *Cf. Credit Suisse v. U.S. District Court for the Cen. Dist. of Cal.*,

130 F.3d 1342, 1344 (9th Cir. 1997) (explaining, for the purposes of the Act of State Doctrine, that

a foreign government's asset freeze orders, issued pending the results of a criminal investigation,

were "not the type of act that a private person can exercise" and were "paradigmatically sovereign

in nature.").  Second, the seizure does not appear to have been arbitrary or discriminatory, since,

as described above, the property was seized pursuant to search and seizure orders that articulated

a non-discriminatory basis for suspecting that individuals connected to the seized property had

violated Swiss law.  Finally, as the property was temporarily seized pending the results of an

ongoing criminal investigation, and has not been frozen for an "extended or indefinite period,"

Plaintiffs are not owed compensation for their property at this juncture. *See Restatement (Third)

of Foreign Relations Law* § 712, Rep. Note 6 ("a temporary deprivation of control, as by a freezing

of assets . . . is probably not a taking but may become one if deprivation is for an extended or

indefinite period."); *Chettri v. Nepal Bangladesh Bank Ltd.*, 10-CV-8470 (PGG), 2014 WL

4354668, at *18 (S.D.N.Y. Sept. 2, 2014), *affirmed* 834 F.3d 50 (2d Cir. 2016) ("Plaintiffs cite no authority suggesting that a freeze of assets for a two year period—while an active criminal investigation is proceeding—constitutes a taking for purposes of the 'takings' exception of the FSIA."); *Cf. Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (For Fifth Amendment purposes, "[w]hen property has been seized pursuant to the criminal laws . . . such deprivations are not 'takings' for which the owner is entitled to compensation.").

The temporary restriction on the movement of property, pending the outcome of a criminal investigation, has, in analogous circumstances, been found not to constitute a "tak[ing] in violation of international law." For example, in *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 58 (2d Cir. 2016), the defendants—agencies and instrumentalities of the Nepali government—froze the plaintiffs' financial assets for more than two years pending the outcome of an ongoing money laundering investigation. The plaintiffs argued that the asset freeze constituted a taking in violation of international law, such that the defendants could be sued pursuant to the expropriation exception to the FSIA. The Second Circuit rejected the argument, noting that the plaintiffs had failed to plausibly establish that the account freeze "was a taking, much less a taking in violation of international law," and that "[u]nsurprisingly, [the plaintiffs] offer[ed] no authority for the proposition that a routine law enforcement action . . . constitutes a taking within the meaning of § 1605(a)(3)." *Id.* Similarly, in *Hilsenrath v. Swiss Confederation*, No. C 07-02782 WHA, 2007 WL 3119833, at *4 (N.D. Cal. Oct. 23, 2007), *affirmed* 402 F. App'x 314 (9th Cir. 2010) (memorandum), the Northern District of California held that the takings exception did not apply to the freezing of assets pending the outcome of a criminal investigation, noting that it was "frivolous to claim that freezing assets during a legitimate criminal investigation violated international law."

**SPA-9**

Plaintiffs, citing the legislative history of the FSIA and language from the Circuit's decision in *Zappia*, nevertheless argue that the expropriation exception applies here because the seizure in this case was "arbitrary." *See* 215 F.3d at 251 ("the phrase 'taken in violation of international law' refers to 'the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law,' including 'takings which are *arbitrary or discriminatory* in nature.'") (emphasis added).  In support, they point out that Defendants' warrants specifically identified only seven items of suspicious provenance, and did not articulate a specific reason to suspect each of the 12,000 items that were seized.  They further rely on the fact that the Swiss authorities released approximately 5,000 of the seized items on the same day that the Beierwaltes filed their complaint in this action to suggest that the investigation is proceeding in an arbitrary manner.  Plaintiffs, however, offer no authority to support the proposition that either of these allegations renders the seizure arbitrary in violation of international law.  To the contrary, that the seizure has been partially lifted suggests that the investigation remains ongoing and that the items are being released when it is determined that there is no further cause for their seizure.  Moreover, "[u]nder the principles of international comity, United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States." *Federal Treasury Enterprise Sojuzplodoimport, OAO v. Spirits Int'l B.V.*, 809 F.3d 737, 742–43 (2d Cir. 2016).  Here—where the items were seized pursuant to warrants articulating a non-discriminatory justification for their seizure—neither the timing of the items' release nor the level of specificity of the warrants furnishes an appropriate basis to scrutinize a foreign sovereign's ongoing criminal investigation.  As in *Chettri*, the "complaints['] conclusory criticisms of the

**SPA-10**

manner in which [Switzerland] has conducted its investigation are insufficient to prove a violation of international law." *Chettri*, 834 F.3d at 58.

Plaintiffs also argue that the seizure of their property violated international law because Defendants did not follow the procedures outlined in the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property (the "Convention") or Switzerland's federal law implementing the Convention, the Cultural Property Transfer Act ("CPTA"). The procedures Plaintiffs refer to, however, apply when a foreign nation has requested repatriation of cultural property—which Plaintiffs do not allege occurred here. *See* CPTA Art. 9; Convention Art. 7. Nothing in either the UNESCO Convention or the CPTA precludes a foreign sovereign from temporarily seizing property within its own borders, pending the outcome of an investigation into suspected violations of that sovereign's laws. To the extent that Plaintiffs argue that their property falls outside the scope of the CPTA (a Swiss federal law), those allegations go to whether the seizure comported with the requirements of Swiss law, but do not suggest that the seizure was arbitrary in violation of international law. Indeed, under principles of international law, ordinarily "a claimant cannot complain that a taking or other economic injury has not been fairly compensated, and hence violates international law, unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." *Greenpeace, Inc. v. State of France*, 946 F. Supp. 773, 783 (C.D. Cal. 1996). As explained above, Plaintiffs here have neither participated in Defendants' investigation nor pursued the appellate process available to them in Switzerland. Neither the Convention nor the CPTA furnishes any basis to find that the property at issue here was "taken in violation of international law" within the meaning of the FSIA.

SPA-11

Because the property at issue in these cases was not taken in violation of international law, the expropriation exception to the FSIA does not apply. Since Plaintiffs do not argue that Defendants are subject to suit under any other exception to the FSIA, these cases must be dismissed for lack of subject matter and personal jurisdiction. The Court, accordingly, does not reach Defendants' alternative arguments for dismissal based on the Act of State Doctrine and principles of comity.[3] *See Freund*, 592 F. Supp. 2d 540, 551 (S.D.N.Y. 2008) ("[B]ecause the act of state doctrine is substantive rather than jurisdictional, courts may not consider its application prior to establishing the subject matter jurisdiction exists.") (internal citations omitted).

## II.    Jurisdictional Discovery

The Court also rejects Plaintiffs' request for jurisdictional discovery. "Because sovereign immunity protects a sovereign from the expense, intrusiveness, and hassle of litigation, a court must be circumspect in allowing discovery before the plaintiff has established that the court has jurisdiction over a foreign sovereign defendant under the FSIA." *Arch Trading Corp.*, 839 F.3d at 206–07. "Accordingly, a district court may deny jurisdictional discovery demands made on a foreign sovereign if the party seeking discovery cannot articulate a reasonable basis for the court first to assume jurisdiction." *Id.*

Here, Plaintiffs assert that jurisdictional discovery is necessary in order to determine whether the seizure of Plaintiffs' property was arbitrary.[4] They again contend that Defendants'

---

[3] Nor does the Court reach Defendants' arguments concerning the property's nexus to the United States. Because the property at issue here was not taken in violation of international law, the case must be dismissed irrespective of whether either of the nexus requirements is met. *See Smith Rocke*, 2014 WL 288705, at *7 (holding that it was "irrelevant" whether the defendants were agencies or instrumentalities of the foreign state, or the foreign state itself, because "[t]he expropriation exception cannot apply to foreign states or their agencies or instrumentalities where there is no violation of international law.").

[4] Plaintiffs have also requested discovery related to the property's nexus to the United States, specifically with respect to: (1) the core function of the FOC, (2) whether the FOC owns or operates Plaintiff's property, and (3)

11

SPA-12

release of approximately 5,000 seized objects immediately after the filing of the Beierwaltes' complaint in this action demonstrates that Defendants acted arbitrarily, thus providing a basis for the Court to assume jurisdiction and permit discovery. The Court again disagrees. Contrary to Plaintiffs' contentions, and as explained above, the release of the seized items does not indicate that the seizure was arbitrary—if anything, it suggests that Defendants are continuing to pursue their investigation and are releasing the seized property when they deem it appropriate to do so. The Court thus does not agree that such actions provide a reasonable basis for the Court to assume jurisdiction over these cases. Moreover, the discovery Plaintiffs seek—an inquiry into the purported arbitrariness of a foreign sovereign's ongoing criminal investigation—raises significant international comity concerns that strongly militate against approving Plaintiffs' request for jurisdictional discovery under the circumstances. *See Freund*, 592 F. Supp. 2d at 564 (denying request for jurisdictional discovery in part because "[a]ppropriate deference to principles of international comity strongly suggests that discovery is inappropriate under these circumstances."). For those reasons, Plaintiffs' request for jurisdictional discovery is denied.

### CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted. Plaintiffs' request for jurisdictional discovery is denied. The Clerk of Court is respectfully directed to terminate all pending motions and to close these cases.

SO ORDERED.

Dated:     September 24, 2019
           New York, New York

_____
Ronnie Abrams
United States District Judge

---

whether Geneva is an independent sovereign. Because, as explained above, the Court lacks jurisdiction over these cases whether or not the nexus requirement is satisfied. Plaintiffs' request for discovery on these topics is denied.

12

SPA-13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
HICHAM ABOUTAAM,

                              Plaintiff,

         -against-

L'OFFICE FEDERALE DE LA CULTURE
DE LA CONFEDERATION SUISSE, ET AL.,

                              Defendants.
------------------------------------------------------------X
LYNDA BEIERWALTES, ET AL.,

                              Plaintiff,

         -against-

L'OFFICE FEDERALE DE LA CULTURE
DE LA CONFEDERATION SUISSE, ET AL.,

                              Defendants.
------------------------------------------------------------X

18 **CIVIL** 8248 (RA)

**JUDGMENT**

18 **CIVIL** 11167 (RA)

**JUDGMENT**

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated September 24, 2019, Defendants' motions to dismiss

are granted; Plaintiffs' request for jurisdictional discovery is denied; accordingly, these cases are

closed.

**Dated:** New York, New York

         September 25, 2019

RUBY J. KRAJICK
_____
Clerk of Court

BY:
_____
Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _9/25/2019_

Case 19-3457, Document 53, 01/31/2020, 2767028, Page77 of 87

SPA-14

1/28/2020                    Rule 41. Search and Seizure | Federal Rules of Criminal Procedure | US Law | LII / Legal Information Institute

# Rule 41. Search and Seizure

(a) SCOPE AND DEFINITIONS.

(1) *Scope.* This rule does not modify any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances.

(2) *Definitions.* The following definitions apply under this rule:

(A) "Property" includes documents, books, papers, any other tangible objects, and information.

(B) "Daytime" means the hours between 6:00 a.m. and 10:00 p.m. according to local time.

(C) "Federal law enforcement officer" means a government agent (other than an attorney for the government) who is engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant.

(D) "Domestic terrorism" and "international terrorism" have the meanings set out in 18 U.S.C. §2331.

(E) "Tracking device" has the meaning set out in 18 U.S.C. §3117 (b).

(b) VENUE FOR A WARRANT APPLICATION. At the request of a federal law enforcement officer or an attorney for the government:

(1) a magistrate judge with authority in the district—or if none is reasonably available, a judge of a state court of record in the district—has authority to issue a warrant to search for and seize a person or property located within the district;

(2) a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;

(3) a magistrate judge—in an investigation of domestic terrorism or international terrorism—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district;

Case 19-3457, Document 53, 01/31/2020, 2767028, Page78 of 87

**SPA-15**

1/28/2020                    Rule 41. Search and Seizure | Federal Rules of Criminal Procedure | US Law | LII / Legal Information Institute

(4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both; and

(5) a magistrate judge having authority in any district where activities related to the crime may have occurred, or in the District of Columbia, may issue a warrant for property that is located outside the jurisdiction of any state or district, but within any of the following:

(A) a United States territory, possession, or commonwealth;

(B) the premises—no matter who owns them—of a United States diplomatic or consular mission in a foreign state, including any appurtenant building, part of a building, or land used for the mission's purposes; or

(C) a residence and any appurtenant land owned or leased by the United States and used by United States personnel assigned to a United States diplomatic or consular mission in a foreign state.

(6) a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if:

(A) the district where the media or information is located has been concealed through technological means; or

(B) in an investigation of a violation of 18 U.S.C. § 1030(a)(5), the media are protected computers that have been damaged without authorization and are located in five or more districts.

(c) PERSONS OR PROPERTY SUBJECT TO SEARCH OR SEIZURE. A warrant may be issued for any of the following:

(1) evidence of a crime;

(2) contraband, fruits of crime, or other items illegally possessed;

(3) property designed for use, intended for use, or used in committing a crime; or

(4) a person to be arrested or a person who is unlawfully restrained.

(d) OBTAINING A WARRANT.

(1) *In General.* After receiving an affidavit or other information, a magistrate judge—or if authorized by Rule 41(b), a judge of a state court of record—must issue the warrant if there is probable cause to search for and seize a person or property or to install and use a tracking device.

Case 19-3457, Document 53, 01/31/2020, 2767028, Page79 of 87

**SPA-16**

1/28/2020                    Rule 41. Search and Seizure | Federal Rules of Criminal Procedure | US Law | LII / Legal Information Institute

(2) *Requesting a Warrant in the Presence of a Judge.*

(A) *Warrant on an Affidavit.* When a federal law enforcement officer or an attorney for the government presents an affidavit in support of a warrant, the judge may require the affiant to appear personally and may examine under oath the affiant and any witness the affiant produces.

(B) *Warrant on Sworn Testimony.* The judge may wholly or partially dispense with a written affidavit and base a warrant on sworn testimony if doing so is reasonable under the circumstances.

(C) *Recording Testimony.* Testimony taken in support of a warrant must be recorded by a court reporter or by a suitable recording device, and the judge must file the transcript or recording with the clerk, along with any affidavit.

(3) *Requesting a Warrant by Telephonic or Other Reliable Electronic Means.* In accordance with Rule 4.1, a magistrate judge may issue a warrant based on information communicated by telephone or other reliable electronic means.

(e) ISSUING THE WARRANT.

(1) *In General.* The magistrate judge or a judge of a state court of record must issue the warrant to an officer authorized to execute it.

(2) *Contents of the Warrant.*

(A) *Warrant to Search for and Seize a Person or Property.* Except for a tracking-device warrant, the warrant must identify the person or property to be searched, identify any person or property to be seized, and designate the magistrate judge to whom it must be returned. The warrant must command the officer to:

(i) execute the warrant within a specified time no longer than 14 days;

(ii) execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time; and

(iii) return the warrant to the magistrate judge designated in the warrant.

(B) *Warrant Seeking Electronically Stored Information.* A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

(C) *Warrant for a Tracking Device.* A tracking-device warrant must identify the person or property to be tracked, designate the magistrate judge to whom it must be returned, and specify a reasonable length of time that the device may be used.

The time must not exceed 45 days from the date the warrant was issued. The court may, for good cause, grant one or more extensions for a reasonable period not to exceed 45 days each. The warrant must command the officer to:

(i) complete any installation authorized by the warrant within a specified time no longer than 10 days;

(ii) perform any installation authorized by the warrant during the daytime, unless the judge for good cause expressly authorizes installation at another time; and

(iii) return the warrant to the judge designated in the warrant.

(f) Executing and Returning the Warrant.

(1) *Warrant to Search for and Seize a Person or Property.*

(A) *Noting the Time.* The officer executing the warrant must enter on it the exact date and time it was executed.

(B) *Inventory.* An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person. In a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied. The officer may retain a copy of the electronically stored information that was seized or copied.

(C) *Receipt.* The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property. For a warrant to use remote access to search electronic storage media and seize or copy electronically stored information, the officer must make reasonable efforts to serve a copy of the warrant and receipt on the person whose property was searched or who possessed the information that was seized or copied. Service may be accomplished by any means, including electronic means, reasonably calculated to reach that person.

(D) *Return.* The officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant. The officer may do so by reliable electronic means. The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.

Case 19-3457, Document 53, 01/31/2020, 2767028, Page81 of 87

SPA-18

1/28/2020                    Rule 41. Search and Seizure | Federal Rules of Criminal Procedure | US Law | LII / Legal Information Institute

(2) *Warrant for a Tracking Device.*

(A) *Noting the Time.* The officer executing a tracking-device warrant must enter on it the exact date and time the device was installed and the period during which it was used.

(B) *Return.* Within 10 days after the use of the tracking device has ended, the officer executing the warrant must return it to the judge designated in the warrant. The officer may do so by reliable electronic means.

(C) *Service.* Within 10 days after the use of the tracking device has ended, the officer executing a tracking-device warrant must serve a copy of the warrant on the person who was tracked or whose property was tracked. Service may be accomplished by delivering a copy to the person who, or whose property, was tracked; or by leaving a copy at the person's residence or usual place of abode with an individual of suitable age and discretion who resides at that location and by mailing a copy to the person's last known address. Upon request of the government, the judge may delay notice as provided in Rule 41(f)(3).

(3) *Delayed Notice.* Upon the government's request, a magistrate judge—or if authorized by Rule 41(b), a judge of a state court of record—may delay any notice required by this rule if the delay is authorized by statute.

(g) MOTION TO RETURN PROPERTY. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

(h) MOTION TO SUPPRESS. A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides.

(i) FORWARDING PAPERS TO THE CLERK. The magistrate judge to whom the warrant is returned must attach to the warrant a copy of the return, of the inventory, and of all other related papers and must deliver them to the clerk in the district where the property was seized.

## NOTES

(As amended Dec. 27, 1948, eff. Oct. 20, 1949; Apr. 9, 1956, eff. July 8, 1956; Apr. 24, 1972, eff. Oct. 1, 1972; Mar. 18, 1974, eff. July 1, 1974; Apr. 26 and July 8, 1976, eff. Aug. 1, 1976; Pub. L. 95–78, §2(e), July 30, 1977, 91 Stat. 320, eff. Oct. 1, 1977; Apr. 30, 1979, eff. Aug. 1, 1979; Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 25, 1989, eff. Dec. 1, 1989; May 1, 1990, eff. Dec. 1, 1990; Apr. 22, 1993, eff. Dec. 1, 1993; Pub. L. 107–56, title II, §219, Oct. 26, 2001, 115 Stat. 291; Apr. 29, 2002, eff.



The Federal Council (http://www.admin.ch/gov/en/start.html)     ☰   Q

DE (/opc/de/classified-compilation/19370083/index.html); FR (/opc/fr/classified-compilation/19370083/index.html); IT (/opc/it/classified-compilation/19370083/index.html) RM (/opc/rm/classified-compilation/19370083/index.html) EN (/opc/en/classified-compilation/19370083/index.html)

Contact (http://www.admin.ch/gov/en/start/contact/contact-form.html)    Advanced search (http://www.admin.ch/opc/search/search.php?lang=en)

| Q   Search |

Federal Council

▾

Federal Presidency

▾

Departments

▾

Federal Chancellery    (

▾

Federal law

▾

Documentation

▾

> Sub-navigation

‹ Start (http://www.admin.ch/gov/en/start.html)

Federal law (http://www.admin.ch/gov/en/start/federal-law.html)

Search (http://www.admin.ch/gov/en/start/federal-law/search.html)

Classified compilation

˅ Additional informations

# 311.0

expand all | article overview | collapse all | 🖶 (/opc/en/print.html)

*English is not an official language of the Swiss Confederation. This translation is provided for information purposes only and has no legal force.*

Any person who acts in the same manner in his capacity as the manager of a business but without specific instructions is liable to the same penalty.

If the offender acts with a view to securing an unlawful financial gain for himself or another, a custodial sentence of from one to five years may be imposed.

2. Any person who, with a view to securing an unlawful gain for himself or another, abuses the authority granted to him by statute, an official order or a legal transaction to act on behalf of another and as a result causes that other person to sustain financial loss is liable to a custodial sentence not exceeding five years or to a monetary penalty.

3. Criminal mismanagement to the detriment of a relative or family member is prosecuted only on complaint.

Art. 159 1. Offences against property / Misuse of salary deductions (index.html#a159)

Misuse of salary deductions

Any employer who breaches his obligation to make use of a deduction from an employee's salary for the payment of taxes, duties, insurance premiums or contributions or in any other way for the benefit of the employee and thus causes loss to the employee is liable to a custodial sentence not exceeding three years or to a monetary penalty.

Art. 160 1. Offences against property / Handling stolen goods (index.html#a160)

Handling stolen goods

1. Any person who takes possession of, accepts as a gift or as the subject of a pledge, conceals, or assists in the disposal of goods which he knows or must assume have been acquired by way of an offence against property is liable to a custodial sentence not exceeding five years or to a monetary penalty.

The offender is liable to the penalty applicable to the original offence if that penalty is reduced.

If the original offence is prosecuted only on complaint, the handling of stolen goods is prosecuted only if a complaint has been made in respect of the original offence.

2. If the offender acts for commercial gain, he is liable to a custodial sentence not exceeding ten years or to a monetary penalty of not less than 90 daily penalty units.

Art. 161 (index.html#a161)[1] (index.html#a161)

[1] Repealed by No II 3 of the FA of 28 Sept. 2012, with effect from 1 May 2013 (AS 2013 1103 (http://www.admin.ch/ch/d/as/2013/1103.pdf); BBl 2011 6873 (http://www.admin.ch/ch/d/ff/2011/6873.pdf)).

Art. 161bis (index.html#a161bis)[1] (index.html#a161bis)

[1] Inserted by Art. 46 of the Stock Exchange Act of 24 March 1995 (AS 1997 68; BBl 1993 I 1369). Repealed by No II 3 of the FA of 28 Sept. 2012, with effect from 1 May 2013 (AS 2013 1103; BBl 2011 6873 (http://www.admin.ch/ch/d/ff/2011/6873.pdf)).

Art. 162 2. Breach of manufacturing or trade secrecy (index.html#a162)



DE (/opc/de/classified-compilation/20052319/index.html)  FR (/opc/fr/classified-compilation/20052319/index.html)  IT (/opc/it/classified-compilation/20052319/index.html)  RM (/opc/rm/classified-compilation/20052319/index.html)  EN (/opc/en/classified-compilation/20052319/index.html)

Contact (http://www.admin.ch/gov/en/start/contact/contact-form.html)   Advanced search (http://www.admin.ch/opc/search/search.php?lang=en)

Q   Search

🔴 The federal Council (http://www.admin.ch/gov/en/start.html)                    ≡  Q

Federal Council

▾

Federal Presidency

▾

Departments

▾

Federal Chancellery

▾

Federal law

▾

Documentation

▾

> Sub-navigation

‹ Start (http://www.admin.ch/gov/en/start.html)

Federal law (http://www.admin.ch/gov/en/start/federal-law.html)

Search (http://www.admin.ch/gov/en/start/federal-law/search.html)

Classified compilation

˅ Additional informations

312.0                    expand all | article overview | collapse all | 🖨 (/opc/en/print.html)

*English is not an official language of the Swiss Confederation. This translation is provided for information purposes only and has no legal force.*

[3] If immovable property is seized, an inhibition shall be ordered; this shall be recorded in the Land Register.

[4] The seizure of a debt shall be notified to the debtor, who shall be advised that repayment to the creditor will not settle the debt.

[5] Property that is subject to rapid depreciation or requires expensive maintenance, as well as securities or other assets with a stock exchange or market price may be sold immediately in accordance with the Federal Act of 11 April 1889[1] on Debt Enforcement and Bankruptcy (DEBA). The proceeds shall be seized.

[6] The Federal Council shall regulate the investment of seized assets.

[1] SR 281.1 (http://www.admin.ch/ch/e/rs/c281_1.html)

Art. 267 Decision on seized property and assets (index.html#a267)

[1] If the grounds for seizure no longer apply, the public prosecutor or court shall revoke the seizure order and hand over the property or assets to the person entitled to them.

[2] Where it is undisputed that a person has as a direct result of the offence been deprived of an item of property or an asset belonging to him or her, the criminal justice authority shall return the property or asset to the person entitled to it before the conclusion of the proceedings.

[3] Unless the order to seize an item of property or an asset has already been revoked, a decision on its return to the entitled person, its use to cover costs or its forfeiture in shall be made in the final judgment.

[4] If two or more persons lay claim to an item of property or an asset in respect of which the seizure order is to be revoked, the court may decide on the issue.

[5] The criminal justice authority may award property or assets to a person and set the other claimants a time limit within which to raise a civil action.

[6] If at the time when the seizure order is revoked the identity of the person entitled to the property or assets is unknown, the public prosecutor or the court shall give public notice that the property or assets are available to be claimed. If no one makes a claim within five years of notice being given, the seized property and assets shall pass to the canton or to the Confederation.

Art. 268 Seizure to cover costs (index.html#a268)

[1] Assets belonging to the accused may be seized to the extent that is anticipated to be required to cover:

a.    procedural costs and damages;
b.    monetary penalties and fines.

[2] The criminal justice authority shall take account of the financial circumstances of the accused and his or her family when deciding on seizure.

DE (/opc/de/classified-compilation/20052319/index.html)   FR (/opc/fr/classified-
compilation/20052319/index.html)   IT (/opc/it/classified-compilation/20052319/index.html)   RM
(/opc/rm/classified-compilation/20052319/index.html)   EN (/opc/en/classified-compilation/20052319/index.html)

Contact (http://www.admin.ch/gov/en/start/contact/contact-form.html)   Advanced search (http://www.admin.ch/opc/search/search.php?
lang=en)



Q   Search

📛 The federal Council (http://www.admin.ch/gov/en/start.html)    ☰  Q

Federal Council

▼

Federal Presidency

▼

Departments

▼

Federal Chancellery

▼

Federal law

▼

Documentation

▼

> Sub-navigation

‹ Start (http://www.admin.ch/gov/en/start.html)

Federal law (http://www.admin.ch/gov/en/start/federal-law.html)

Search (http://www.admin.ch/gov/en/start/federal-law/search.html)

Classified compilation

ⱽ Additional informations

312.0    expand all | article overview | collapse all | 🖨 (/opc/en/print.html)

*English is not an official language of the Swiss Confederation. This translation is provided for
information purposes only and has no legal force.*

[3] Documents identifying persons other than the accused must be destroyed as soon as the proceedings against the accused have been concluded or abandoned or it has been decided not to bring proceedings.

[4] If it becomes clear before the expiry of the time limits under paragraphs 1–3 that there is no longer any interest in retaining or using the identifying documents, they shall be destroyed.

**Art. 262** Handwriting and voice samples (index.html#a262)

[1] Accused persons, witnesses and persons providing information may be required to provide handwriting or voice samples for comparison with other such samples.

[2] Any person who refuses to provide such a sample may be issued with a fixed penalty fine. The foregoing does not apply to the accused and, where such rights apply, persons who have the right to remain silent or to refuse to testify.

# Chapter 7 Seizure (index.html#id-ni25-ni32)

**Art. 263** Principle (index.html#a263)

[1] Items and assets belonging to an accused or to a third party may be seized if it is expected that the items or assets:

a.    will be used as evidence;
b.    will be used as security for procedural costs, monetary penalties, fines or damages;
c.    will have to be returned to the persons suffering harm;
d.    will have to be forfeited.

[2] Seizure shall be ordered on the basis of a written warrant containing a brief statement of the grounds. In urgent cases, seizure may be ordered orally, but the order must thereafter be confirmed in writing.

[3] Where there is a risk in any delay, the police or members of the public may provisionally seize items or assets on behalf of the public prosecutor or the courts.

**Art. 264** Restrictions (index.html#a264)

[1] The following items may not be seized irrespective of their location and of when they were created:

a.    documents used in communications between the accused and his or her defence lawyer;
b.    personal records and correspondence belonging to the accused if the interest in protecting his or her privacy outweighs the interest in prosecution;
c.[1]  items and documents used in communications between the accused and persons who may refuse to testify in accordance with Articles 170–173 and who are not accused of an offence relating to the same case;
d.[2]  items and documents used in communications between another person and his or her lawyer provided the lawyer is entitled to represent clients before Swiss courts in