# 19-3457-cv

## 19-3481-cv (related)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

——————➤➤ ◄◄——————

LYNDA BEIERWALTES, WILLIAM BEIERWALTES,
*Plaintiffs-Appellants*,

*v.*

L'OFFICE FEDERALE DE LA CULTURE DE LA CONFEDERATION SUISSE,
L'ADMINISTRATION FEDERALE DES DOUANES DE LA CONFEDERATION SUISSE,
LA REPUBLIQUE ET CANTON DE GENEVE,
*Defendants-Appellees*.

———————————————————————————————

On Appeal from the United States District Court for the
Southern District of New York, No. 18-cv-11167 (Abrams, J.)

## BRIEF OF APPELLEE LA REPUBLIQUE ET CANTON DE GENEVE

Robert Reeves Anderson
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 863-1000
Reeves.Anderson@arnoldporter.com

May 22, 2020

Marcus A. Asner
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Marcus.Asner@arnoldporter.com

[*Additional counsel on signature page*]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

STATEMENT OF JURISDICTION ................................................................ 1

ISSUES PRESENTED ................................................................................... 1

INTRODUCTION ......................................................................................... 1

STATEMENT OF THE CASE ...................................................................... 3

    A.    The Parties ................................................................................. 3

    B.    Legal Background ...................................................................... 5

    C.    The Property Investigation ........................................................ 8

    D.    Procedural Background ............................................................ 13

    E.    The Decision Below ................................................................. 14

SUMMARY OF ARGUMENT ..................................................................... 16

STANDARD OF REVIEW .......................................................................... 18

ARGUMENT ............................................................................................... 18

I.    The FSIA's expropriation exception does not abrogate the Canton of
Geneva's immunity ................................................................................ 18

    A.    Plaintiffs' property was not "taken" ....................................... 20

    B.    Plaintiffs' property was not taken in violation of international law ... 28

    C.    Plaintiffs cannot establish a requisite nexus to the United States ....... 40

II.    The district court did not abuse its discretion by denying jurisdictional
discovery. ............................................................................................. 48

CONCLUSION ........................................................................................... 52

CERTIFICATE OF COMPLIANCE ............................................................ 53

CERTIFICATE OF SERVICE ..................................................................... 54

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acadia Tech., Inc. v. United States*,
  458 F.3d 1327 (Fed. Cir. 2006) ...................................................22, 30

*Air Line Pilots Ass'n, Int'l v. O'Neill*,
  499 U.S. 65 (1991)...........................................................................32

*AmeriSource Corp. v. United States*,
  525 F.3d 1149 (Fed. Cir. 2008) ...........................................22, 23, 24

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*,
  698 F.3d 171 (4th Cir. 2012) .............................................................39

*Arch Trading Corp. v. Republic of Ecuador*,
  839 F.3d 193 (2d Cir. 2016) ......................................................*passim*

*Bennis v. Michigan*,
  516 U.S. 442 (1996)..........................................................................23

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
  137 S. Ct. 1312 (2017)..........................................21, 26, 27, 32, 48

*Butler v. Sukhoi Co.*,
  579 F.3d 1307 (11th Cir. 2009) ........................................................49

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
  991 F.2d 1012 (2d Cir. 1993) ...........................................................19

*Cassirer v. Kingdom of Spain*,
  616 F.3d 1019 (9th Cir. 2010) ..........................................................44

*Chettri v. Nepal Rastra Bank*,
  834 F.3d 50 (2d Cir. 2016) .......................................16, 21, 22, 26, 29

*de Csepel v. Republic of Hungary*,
  859 F.3d 1094 (D.C. Cir. 2017)...................................................41, 43

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*,
  462 U.S. 611 (1983)..........................................................................46

ii

*Freund v. Republic of France,*
    592 F. Supp. 2d 540 (S.D.N.Y. 2006) ................................................50

*Garb v. Republic of Poland,*
    440 F.3d 579 (2d Cir. 2006) .......................................................41, 43

*Hilsenrath v. Swiss Confederation,*
    No. 07-02782, 2007 WL 3119833 (N.D. Cal. Oct. 23, 2007) ..........................22

*Holy Land Foundation for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2003) ................................................27

*Kuo v. Government of Taiwan,*
    802 F. App'x 594 (2d Cir. 2020) (summary order) ................................41

*Lu v. Cent. Bank of Republic of China (Taiwan),*
    610 F. App'x 674 (9th Cir. 2015) ................................................49

*McKesson Corp. v. Islamic Republic of Iran,*
    672 F.3d 1066 (D.C. Cir. 2012) ..................................................47

*Nicosia v. Amazon.com, Inc.,*
    834 F.3d 220 (2d Cir. 2016) .....................................................4

*Official Stanford Investors Comm. v. Bank of Antigua,*
    No. 13-0762, 2018 WL 3956470 (N.D. Tex. Aug. 17, 2018) ..........................30

*Permanent Mission of India to the United Nations v. City of New York,*
    551 U.S 193 (2007).............................................................25

*Propper v. Clark,*
    337 U.S. 472 (1949)............................................................27

*Reiss v. Societe Generale du Groupe des Assurances Nationales,*
    235 F.3d 738 (2d Cir. 2000) ...................................................50

*Republic of Argentina v. NML Capital, Ltd.,*
    573 U.S. 134 (2014)............................................................51

*Simon v. Republic of Hungary,*
    812 F.3d 127 (D.C. Cir. 2016)..................................................43

iii

*Swarna v. Al-Awadi,*
    622 F.3d 123 (2d Cir. 2010) ...............................................................19

*Tran Qui Than v. Regan,*
    658 F.2d 1296 (9th Cir. 1981) ...........................................................27

*U.S. Dep't of Interior v. 16.03 Acres of Land, More or Less,*
    26 F.3d 349 (2d Cir. 1994) ................................................................32

*United States v. $7,990.00 in U.S. Currency,*
    170 F.3d 843 (8th Cir. 1999) .............................................................23

*United States v. Mask of Ka-Nefer-Nefer,*
    752 F.3d 737 (8th Cir. 2014) .............................................................35

*Williams v. National Gallery of Art,*
    No. 16-6978, 2017 WL 4221084 (S.D.N.Y. Sept. 21, 2017) ......................24, 25

*Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,*
    215 F.3d 247 (2d Cir. 2000) ......................................20, 21, 29, 31, 32

**Statutes**

5 U.S.C. § 552(b)(7)........................................................................51

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1330(a) .........................................................................1

28 U.S.C. § 1603(a) ........................................................................19

28 U.S.C. § 1605(a)(3)..............................................................*passim*

50 U.S.C. § 1701 ...........................................................................27

50 U.S.C. § 1702(a)(1)(B) .................................................................27

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ..................................................3

Federal Rule of Criminal Procedure 41(g) .................................................31

**Other Authorities**

Brief for the United States as Amicus Curiae, *de Csepel v. Republic of Hungary*, No. 17-1165, 2018 WL 6382956 (U.S. Dec. 4, 2018) ......................43

Brief for the United States as Amicus Curiae, *Kingdom of Spain v. Cassirer*, No. 10-786, 2011 WL 2135028 (U.S. May 27, 2011).................44, 45

Constitution de la République et Canton de Genève (Oct. 14, 2012) ......................5

Customs Act of 18 March 2005 ............................................................................5, 6

Federal Act on the International Transfer of Cultural Property .....................7, 8, 39

Federal Constitution of the Swiss Confederation (Apr. 18, 1999) ...........................5

Federal Judicial Center, *The Foreign Sovereign Immunities Act: A Guide for Judges* (2d ed. 2018) ...........................................................44

H.R. Rep. No. 94-1487 (1976)................................................................................41

Office of the Inspector General, U.S. Department of Justice, *Audit of the Assets Forfeiture Fund and Seized Asset Deposit Fund Annual Financial Statements Fiscal Year 2019* (Dec. 2019)..........................................28

Ordinance on the International Transfer of Cultural Property (Apr. 13, 2005) ........8

Petition for Writ of Certiorari, *Federal Republic of Germany v. Philipp*, No. 19-351 (U.S. Sept. 16, 2019) .......................................................37

Restatement (Second) of Foreign Relations Law .......................................25, 26, 32

Restatement (Third) of Foreign Relations Law. ...............................................*passim*

Restatement (Fourth) of Foreign Relations Law .........................................41, 44, 46

Swiss Criminal Code Article 160 ............................................................................8

Value Added Tax Act of 12 June 2009.................................................................5, 6

UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, 823 U.N.T.S. 231 (1972) ...............................................................6, 39

## STATEMENT OF JURISDICTION

Plaintiff Hicham Aboutaam (No. 19-3481) and Plaintiffs Lynda and William Beierwaltes (No. 19-3457) invoked the district court's jurisdiction under 28 U.S.C. § 1330(a). AA16; AB21. The district court issued its opinion and order dismissing Plaintiffs' lawsuits on September 24, 2019, and entered judgment on September 25, 2019. SPA1–12, SPA13. Plaintiffs filed their notices of appeal on October 22, 2019. AA625; AB646. This Court has jurisdiction under 28 U.S.C. § 1291.[1]

## ISSUES PRESENTED

1. Whether the district court correctly held that the Canton of Geneva is immune from suit under the Foreign Sovereign Immunities Act because the statute's expropriation exception, 28 U.S.C. § 1605(a)(3), does not apply.

2. Whether the district court abused its discretion in denying Plaintiffs' request for jurisdictional discovery.

## INTRODUCTION[2]

Plaintiffs filed these lawsuits against three Swiss sovereign defendants, including the Republic and Canton of Geneva, to challenge and invalidate an

---

[1] "AA" refers to the joint appendix filed in *Aboutaam* (No. 19-3481). "AB" refers to the joint appendix filed in *Beierwaltes* (No. 19-3457). "SPA" refers to the special appendix to Plaintiffs' opening briefs; the special appendix is identical in both cases.

[2] The Canton of Geneva is submitting identical versions of this brief in both *Aboutaam* (No. 19-3481) and *Beierwaltes* (No. 19-3457). In the district court, Plaintiffs' related cases were litigated together and resolved in a single opinion and

(*footnote continued on next page*)

ongoing criminal and customs investigation in Switzerland. That investigation is governed by Swiss law and relates to property seized and located exclusively in Switzerland. The district court held that no exception to the Foreign Sovereign Immunities Act provided a basis for exercising jurisdiction over the sovereign defendants and properly dismissed these suits for lack of subject matter jurisdiction.

The genesis of this dispute began in the small Swiss town of Veyrier, located on the French border, when Swiss border agents discovered a fraudulently imported antique oil lamp during a routine vehicle inspection. Hours later, officials captured video footage of suspicious activity at a warehouse in Geneva connected to the vehicle's owners. In response, Swiss federal authorities filed formal denunciations and the Public Prosecutor's Office of the Canton of Geneva opened a criminal investigation, issuing a search warrant pursuant to Swiss law and seizing approximately 12,000 artifacts. The seized art and antiquities, including objects allegedly owned by Plaintiffs, are required to remain in Switzerland during the investigation or until released by Swiss authorities.

Plaintiffs never challenged the seizure in Swiss courts, though they were advised of their right to do so. They have refused to cooperate with the Swiss

---

order. On appeal, Plaintiffs again designated the cases as related. Although they filed separate opening briefs, the legal arguments presented in their briefs are substantively identical. This brief uses the term "Plaintiffs" to refer collectively to the plaintiffs in both cases, and refers to the appendices filed in both cases as necessary.

authorities' investigation into the provenance of the antiquities. Plaintiffs instead filed these lawsuits in the United States, seeking over $98 million in damages from the Swiss federal defendants and the Canton of Geneva. To overcome foreign sovereign immunity, Plaintiffs alleged that the defendants have "taken" their property "in violation of international law." 28 U.S.C. § 1605(a)(3).

The district court correctly rejected Plaintiffs' theory, which fails for several independent reasons. Most notably, this Court has already held that a temporary seizure of assets in the course of a criminal investigation does not amount to a taking, let alone a taking in violation of international law. Nor can any suit be maintained against the Canton of Geneva relating to property that indisputably remains outside the United States. Any grievances about the Swiss investigation can and should be heard in Swiss courts. This Court therefore should affirm the district court's dismissal.

## STATEMENT OF THE CASE

### A.    The Parties

Hicham Aboutaam is a citizen and resident of New York. AA15.[3] In 1998, Hicham and his brother Ali Aboutaam co-founded Phoenix Ancient Art S.A., an

---

[3] For purposes of this appeal arising from the grant of defendants' motions to dismiss, the Canton of Geneva accepts the well-pleaded factual allegations in the complaints as true. Although the Court may rely on material outside the complaint on a Rule 12(b)(1) challenge, the complaints and materials attached thereto are

(*footnote continued on next page*)

antiquities dealership. AA21, AA69. Today, Ali manages Phoenix's gallery in Geneva, and Hicham manages an "affiliated gallery" in New York. AA12. Over the past 25 years, Hicham has acquired a large personal collection of antiquities, many of which are stored with or consigned for sale to Phoenix in Geneva. AA28.

Lynda and William Beierwaltes are citizens and residents of Colorado. AB19. The Beierwaltes are collectors of fine art and antiquities. AB17. In the early 2000s, the Beierwaltes decided to liquidate their collection to pay the claims of creditors. AB25. In June 2006, the Beierwaltes entered into an agreement granting Phoenix the exclusive right to sell their antiquities collection. AB26. In May 2013, the Beierwaltes filed for bankruptcy, and the bankruptcy court appointed Phoenix as the estate's designated antiques dealer. AB26. Phoenix proceeded to sell some, but not all, of those antiquities; the remaining objects were stored in Phoenix's warehouse in Geneva at the time of their seizure. AB27. Although their bankruptcy proceeding has now settled and the liens of secured creditors have been satisfied, the Beierwaltes still owe a judgment creditor approximately $1.8 million. *Id.*

The République et Canton de Genève (the "Canton of Geneva") is a political subdivision of the Government of Switzerland. The Swiss structure of government

---

sufficient to resolve the issue of defendants' immunity. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (court may consider all documents attached to or incorporated by reference in a complaint to resolve a motion to dismiss). To the extent this brief refers to additional factual material in the appendix, all citations are to exhibits that Plaintiffs themselves submitted below.

4

is similar to that of the United States: the Swiss Confederation is a federal nation, which allocates its powers between the federal government, the cantons (which are also called states), and localities.[4] The Canton of Geneva is a democratic State and sovereign canton of the Swiss Confederation.[5] The Canton of Geneva has its own parliament, government, courts, and constitution.[6]

### B.     Legal Background

The investigation that gave rise to these lawsuits implicates several provisions of Swiss law that relate to trade in cultural property.

Switzerland, like most nations, has laws governing the import and export of goods. Subject to specific exceptions, all articles imported into Switzerland must be declared for assessment of customs duties and value added tax (VAT). *See* Customs Act of 18 March 2005, art. 25 (AA164); Value Added Tax Act of 12 June 2009 (AA171–75). Swiss law authorizes the Federal Customs Administration (FCA) to

---

[4] *See* Federal Constitution of the Swiss Confederation (Apr. 18, 1999) ("Swiss Constitution"), art. 1; *see also id.* Tit. III, Ch. 1 ("Relations between the Confederation and the Cantons"), https://www.admin.ch/opc/en/classified-compilation/19995395/index.html.

[5] *See* Swiss Constitution, Tit. I, art. 3 ("The Cantons are sovereign except to the extent that their sovereignty is limited by the Federal Constitution. They exercise all rights that are not vested in the Confederation."); Constitution de la République et Canton de Genève (Oct. 14, 2012) ("Geneva Constitution"), Tit. I, art. 1 ("The Republic of Geneva is a democratic State….") (translation from French), https://www.ge.ch/constitution/doc/nouvelle-constitution.pdf.

[6] *See* Geneva Constitution, Tit. IV (Authorities).

5

prosecute persons suspected of evading customs obligations by, for example, importing articles without paying VAT. Customs Act, art. 128 (AA166); Value Added Tax Act, art. 103 (AA175–76).

Switzerland also has adopted laws and regulations that specifically govern trade in cultural property, including art and antiquities. In 1975, Switzerland ratified the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, 823 U.N.T.S. 231 (1972) (AA225–47). The Convention was founded upon the recognition that "the illicit import, export and transfer of ownership of cultural property is an obstacle" to the mutual understanding among nations. *Id.*, pmbl. (AA226). The Convention requires participating nations to undertake specific measures to achieve the treaty's objectives. States must, among other things, prohibit the unauthorized export of cultural property, prohibit the import of any cultural property stolen from another state party, and impose civil and criminal penalties for violating these prohibitions. *Id.*, arts. 6–8 (AA232–36). Moreover, in cases of stolen cultural property, states agree to "take appropriate steps to recover and return" the property "at the request of the [country] of origin." *Id.*, art. 7(b)(ii) (AA234). In a repatriation case, the country of origin must "pay just compensation" to "an innocent purchaser" or a person with "valid title to that property." *Id.*

6

Because the Convention is not self-executing, each state must enact domestic legislation to implement the Convention within its territory. Switzerland enacted the Federal Act on the International Transfer of Cultural Property (CPTA) (AA303–14) in June 2003. The CPTA expresses Switzerland's "desire[] to make a contribution to the maintenance of the cultural heritage of mankind and prevent theft, looting, and illicit import and export of cultural property." CPTA, art. 1(2) (AA303). As particularly relevant here, the CPTA provides for criminal penalties for any person who intentionally "imports, sells, distributes, procures, acquires, or exports cultural property stolen or otherwise lost against the will of the owner"; who "appropriates excavation finds"; or who "illicitly imports cultural property or incorrectly declares the same during import or transit." *Id.*, art. 24 (AA311).

The CPTA charges multiple divisions of the Swiss government with enforcing its provisions. The Swiss cantons, including the Canton of Geneva, have primary responsibility for "prosecuting and assessing criminal activities" under the CPTA. *Id.*, art. 27 (AA312). Among other things, governmental authorities may "order the seizure" of cultural property "when suspicion exists that the cultural property was stolen, lost against the will of the owner or illicitly imported into Switzerland." *Id.*, art. 20 (AA310). The CPTA separately authorizes Swiss customs officials to "inspect the transfer of cultural property at the border"; to "withhold suspicious cultural property during import, transit, and export"; and to report suspicious activity

to criminal authorities. *Id.*, art. 19 (AA309–10). In addition, the CPTA authorizes a specialized body within the Swiss Federal Office of Culture (FOC) to monitor adherence by art dealers to the special obligations imposed by the statute, including the duty of diligence and the duty to maintain certain records. *Id.*, arts. 16–18 (AA308–09); Ordinance on the International Transfer of Cultural Property, art. 22 (Apr. 13, 2005) (AA323). As with the customs authorities, the FOC must file a complaint with the relevant criminal authorities when it has "reasonable suspicion that criminal activity is present." CPTA, art. 17 (AA309).

Finally, many cases involving cultural property will also implicate Switzerland's general prohibition on the knowing possession of stolen goods. Article 160 of the Swiss Criminal Code makes it unlawful for any person to "take[] possession of … goods which he knows or must assume have been acquired by way of an offence against property." SPA20. Together, these provisions form the Swiss legal framework governing this case.

## C.    The Property Investigation

The investigation that gave rise to this dispute began in December 2016. On December 20, a Swiss border agent stopped and inspected a vehicle registered to Phoenix, the company co-founded by the Aboutaam brothers. AA56. The border agent discovered a fraudulently imported antique oil lamp and receipts for a storage

warehouse in Geneva. AA56. After questioning the passengers, the agent released them in the early morning hours.

Shortly after this encounter at the border, surveillance footage captured Ali Aboutaam's wife, Biljana Aboutaam, participating in "several movements of merchandise" at the warehouse. AA56. Based on this information, the FCA developed a "strong suspicion" that other archaeological property had been fraudulently imported and was stored on the premises. *Id.* The FCA thus issued a denunciation alleging that Biljana and other individuals were responsible for "the sudden and suspicious move … of a number of articles of cultural property." AA39. Separately, the FOC issued a complaint alleging that Inanna Art Services S.A.—a Phoenix affiliate that leased warehouse space from Phoenix in Geneva—possessed "seven objects of suspicious provenance or origin." AA39.

Based on these complaints, the Public Prosecutor's Office of the Canton of Geneva issued a Search and Seizure Order in February 2017, naming as defendants Ali Aboutaam, Biljana Aboutaam, Inanna Art Services, and several others. AA39–41. The Order explained that the defendants "are suspected … of receiving stolen goods" in violation of Article 160 of the Swiss Criminal Code and of illegally trafficking in cultural property in violation of Article 24 of the CPTA. AA39. It noted there were "grounds for presuming that locations possessed or used directly or indirectly by Inanna Art Services or the companies controlled by Ali Aboutaam,"

including specifically "Phoenix Ancient Art," would "contain information, articles, or objects likely to be[] seized." *Id.* The Order thus authorized the search of "companies controlled by Ali Aboutaam within the canton of Geneva" and the seizure of "all objects" that "might be restored to the injured parties, confiscated[,] seized with a view to executing a compensation claim, [or] used as evidence." AA40–41. The Order informed the defendants and any interested parties of their right to seek judicial review of the decision under Swiss law. AA41.[7] The Geneva Prosecutor executed the Order and seized a cache of antiquities, 1,200 of which allegedly belong to Hicham and 18 of which allegedly belong to the Beierwaltes. AA12; AB17.

Days later, the FCA issued a separate search warrant. AA56. This warrant explained that the FCA was conducting a "criminal customs inquiry" into potential violations, including "importation without declaration." *Id.* The FCA's warrant authorized the search of all premises to which Biljana Aboutaam had access, with the goal of "investigat[ing] and secur[ing]" "[f]raudulently imported merchandise" and any evidence relating to importation violations. *Id.* The FCA executed the warrant, "seizing" 111 additional objects as a customs lien but "le[aving] [them]

---

[7] The Order stated: "This decision may be subject to an appeal formulated at the criminal board of appeals of the Court of [J]ustice, P.O. Box 3108, 1211 Geneva 3, by filing the written and justifiable conclusions within a period of 10 days of being notified of this decision (Article 393, paragraph 1, letter a of the Criminal Procedure Code)." AA41.

with their holder." AA57. The seizure report signed by Biljana likewise makes clear that she could appeal the decision under Swiss law: "Seizure is subject to appeal. The appeal must be addressed in writing within a deadline of 30 days from the notification of the decision to the Arrondissement Office, P.O. Box 1211, Geneva 28." AA58.

Over a year later, on May 7, 2018, Hicham and the Beierwaltes sent separate letters to the Geneva Prosecutor to demand the immediate release of their property. AA69–71; AB76–77. The Prosecutor responded on May 11, noting that Plaintiffs purported to be "third parties affected by a seizure." AA76. The Prosecutor explained that the seized objects are "suspected to be the products of property infractions or of infractions against the Swiss law on the transfer of cultural property," and that "[a]nalyses and expert opinions" were underway. AA77. He asked Plaintiffs' counsel to provide information about the objects claimed by Hicham or the Beierwaltes, including documentation relating to their acquisition and provenance. AA76. He further requested documents related to the Beierwaltes' bankruptcy proceedings, and asked about Plaintiffs' availability for questioning in Geneva in June or August 2018. AA76–77. Finally, he explained that Plaintiffs had the right to appeal his decision to the Criminal Appeal Chambers of the Court of Justice. AA77.

11

Plaintiffs did not appeal the Prosecutor's decision and did not provide the requested documentation. The parties instead exchanged additional letters in June 2018. Plaintiffs reiterated their view that the Prosecutor had failed to provide a sufficient legal basis for the seizure and that none of the seized objects violates the CPTA; they did not address whether the objects violated Swiss customs law or any other legal provisions. AB87–88. In response, the Prosecutor explained that he was actively seeking information from Inanna about the seized objects, and also repeated his request for Plaintiffs to provide documentation that could enable his office to verify their claims and assess whether to lift the seizure. AB93–94.

On July 5, 2018, Plaintiffs sent a final demand to the Prosecutor, the FCA, and other Swiss officials, threatening to sue for theft if their property was not returned. AA81–84, AA85–88, AA89–92, AA93–96. The Prosecutor reiterated in response that Plaintiffs' cooperation was "essential" to verifying their ownership claims and resolving the investigation, particularly since the Beierwaltes' list of the 18 objects consigned to Phoenix "only correspond[ed] partially" to the list of seized objects registered in their name. AA111. As for Plaintiffs' threatened litigation, the Prosecutor explained that Swiss authorities had not committed theft simply by "perform[ing] … their functions and duties within the scope of the law." AA112. He expressed "doubt" that a suit for damages in the United States would be

12

"compatible with the principles governing relations between Switzerland and the United States." *Id.*

Similarly, the FCA's response explained that officials had to "determine[] whether the goods in question were duly announced and declared upon their entry into Switzerland." AA101. It further noted that Plaintiffs were welcome to provide "proof [of] their legitimate ownership of the seized objects" and to "submit[] all customs documents in their possession which attest to the proper importation of the aforementioned merchandise into Switzerland." AA102.

Plaintiffs did not comply with either request for cooperation and instead filed these lawsuits in the United States. Since that time, the investigation has continued apace. On August 8, 2018, the Geneva Prosecutor released approximately 5,000 of the 12,000 objects that had been seized. AA27, AA471–74, AA487. And in April 2019, the FCA requested additional information from Plaintiffs about a number of objects (AA545–46) and later released six additional objects belonging to Hicham (AA536–37). The investigation remains ongoing.

### D.    Procedural Background

In August 2018, the Beierwaltes filed a complaint in the District of Colorado bringing claims for declaratory judgment as to title, conversion, unjust enrichment, and civil theft and seeking $8 million in damages. AB33–40. In September 2018, Hicham filed a similar complaint in the Southern District of New York seeking

$90 million in damages. AA27–33. The Beierwaltes' complaint was transferred to New York and accepted as related to Hicham's case. SPA4.

Defendants moved to dismiss on the grounds of sovereign immunity, the act of state doctrine, and international comity. AA118–19. After the briefing on the motions to dismiss was complete, Plaintiffs filed a letter requesting jurisdictional discovery on four topics: (1) whether the FOC is an agency or instrumentality of Switzerland; (2) whether the FOC owns or operates the property in question; (3) whether Defendants acted arbitrarily in seizing Plaintiffs' property; and (4) whether the Canton of Geneva is a separate sovereign independent of Switzerland. AA531–34. Defendants opposed the request, arguing, among other things, that none of the issues identified by Plaintiffs required any further factual development and that, independently, Plaintiffs' allegations were insufficient on their face to support jurisdiction. AA558–60, AA561–64.

### E. The Decision Below

On September 24, 2019, the district court dismissed the complaints in their entirety, holding that Plaintiffs failed to meet their burden of showing that the property in question was "taken in violation of international law." SPA6. The court recognized that "the phrase 'taken in violation of international law' refers to 'the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law'" and could "includ[e]

14

'takings which are arbitrary or discriminatory in nature.'" SPA6–7.

The court found that none of the criteria for a taking in violation of international law were met here. The property was seized for a public purpose—*i.e.*, an ongoing criminal investigation. SPA7. The seizure was neither arbitrary nor discriminatory in nature, since it took place "pursuant to search and seizure orders that articulated a non-discriminatory basis for suspecting that individuals connected to the seized property had violated Swiss law." *Id.* And because the property was only *temporarily* seized pending the outcome of the investigation and had not been frozen for an extended or indefinite period, Plaintiffs were "not owed compensation for their property at this juncture." *Id.*

The court also rejected Plaintiffs' request for jurisdictional discovery to determine whether the seizure orders were arbitrary. The only basis Plaintiffs had given for requesting discovery on this issue was the fact that Swiss officials had released 5,000 of the seized objects around the time Plaintiffs filed their complaints. But the court correctly noted that the release of those objects "does not indicate that the seizure was arbitrary"; "if anything, it suggests that Defendants are continuing to pursue their investigation and are releasing the seized property when they deem it appropriate to do so." SPA11–12. Particularly in light of the "significant international comity concerns" that Plaintiffs' requested discovery raised, the court found no basis on which to grant their request. SPA12.

15

## SUMMARY OF ARGUMENT

**I.**     The Canton of Geneva is immune from these lawsuits under the Foreign Sovereign Immunities Act (FSIA). Plaintiffs invoke only the exception to immunity relating to expropriations, 28 U.S.C. § 1605(a)(3), but that exception does not apply here for three independent reasons. First, this Court has already held that a routine asset freeze in the course of an ongoing criminal investigation does not amount to a "taking." *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 58 (2d Cir. 2016). U.S. courts have long applied the same principle in the Fifth Amendment context, and it is consistent with international practice both today and at the time of the FSIA's enactment. Accepting Plaintiffs' alternative interpretation would turn every foreign criminal investigation involving the seizure of personal property into an actionable expropriation suit in the United States. And it would invite other sovereign nations reciprocally to adjudicate claims against the United States arising from asset freezes and forfeitures that routinely take place in this country.

Second, Plaintiffs fail to show that the seizure amounted to a "violation of international law." Unlike in the typical expropriation case, Plaintiffs have not alleged that their property was nationalized or that the seizure was discriminatory in any way. Instead, they allege that the seizure was not supported by probable cause or failed to comply with other provisions of *Swiss* law. But in *Chettri*, this Court rejected the notion that a seizure violates international law whenever the property

16

owner takes issue with the underlying investigation. Plaintiffs cannot overcome this binding precedent.

Finally, Plaintiffs cannot establish the required nexus between their property and commercial activity in the United States. To sue a foreign state or its political subdivision under the expropriation exception, a plaintiff must demonstrate that the relevant property is "present in the United States." 28 U.S.C. § 1605(a)(3). Here, the seized property undisputedly remains in a Geneva warehouse, precluding jurisdiction over the Canton of Geneva. Recognizing that problem, Plaintiffs contend that jurisdiction over the Canton of Geneva is proper so long as one of the *other* Swiss defendants has the requisite contacts in the United States. But Plaintiffs cite no authority for this "bootstrapping" theory, which has been rejected by other courts and cannot be reconciled with the FSIA's text or purpose.

**II.** The district court did not abuse its discretion by denying Plaintiffs' request for sweeping jurisdictional discovery from a foreign prosecutor about an ongoing criminal investigation. This Court has admonished trial courts to be "circumspect" in ordering jurisdictional discovery against a foreign sovereign; discovery is appropriate only to verify specific factual allegations that are necessary to resolve the question of immunity. *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016). To this day, Plaintiffs have not identified any specific facts they seek to confirm in discovery or any basis for concluding that

17

discovery would alter the Court's analysis under the FSIA. Particularly in light of the comity concerns raised by intrusive discovery into a foreign law enforcement investigation, the district court correctly denied Plaintiffs' request.

## STANDARD OF REVIEW

**I.** "On appeal of a dismissal for lack of subject matter jurisdiction under the FSIA, [the Court] review[s] the district court's legal conclusions concerning sovereign immunity *de novo* and its factual findings for clear error." *Arch Trading*, 839 F.3d at 199 (quoting *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007)).

**II.** This Court "review[s] a district court's denial of jurisdictional discovery for abuse of discretion, always mindful that a district court has 'wide latitude to determine the scope' of discovery." *Arch Trading*, 839 F.3d at 206 (quoting *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009)).

## ARGUMENT

**I.    The FSIA's expropriation exception does not abrogate the Canton of Geneva's immunity.**

"Under the FSIA, a foreign sovereign and its instrumentalities are immune from suit in the United States courts unless a specific statutorily defined exception applies." *Arch Trading*, 839 F.3d at 200 (internal citation and quotation marks omitted). This Court applies a burden-shifting framework in determining whether an

18

exception applies: "Once the defendant presents *prima facie* evidence that it is a foreign sovereign, the burden falls on the plaintiff to establish by a preponderance of the evidence that an exception under the FSIA permits jurisdiction over the foreign sovereign." *Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010). If "the plaintiff satisfies her burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply." *Id.* If no exception applies, "the court lacks both subject matter jurisdiction and personal jurisdiction" over the foreign sovereign, and the case must be dismissed. *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993).

Here, Plaintiffs do not dispute that the Canton of Geneva qualifies as a foreign sovereign under the FSIA. Aboutaam Br. 29; *see* 28 U.S.C. § 1603(a) (defining "foreign state" to include "a political subdivision of a foreign state"). Accordingly, Plaintiffs must demonstrate by a preponderance that one of the FSIA's exceptions applies. Plaintiffs invoke only the "expropriation exception," which provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

28 U.S.C. § 1605(a)(3). To establish jurisdiction under this exception, a plaintiff must therefore "show that: (1) rights in property are in issue; (2) that the property was 'taken'; (3) that the taking was in violation of international law; and (4) that one of the two nexus requirements is met." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000). Plaintiffs' claims fail for three independent reasons: Their property has not been "taken" within the meaning of the FSIA; there has been no taking "in violation of international law"; and their claims lack the requisite nexus to the United States.

## A. Plaintiffs' property was not "taken"

Plaintiffs suggest it is "undisputed" that the seizure of their property qualifies as a "taking" under the FSIA. Aboutaam Br. 30. That is categorically false. The Canton of Geneva argued below that a routine asset freeze by a foreign sovereign during the course of an ongoing criminal and customs investigation does not amount to a taking.[8] The district court agreed. SPA7–8 (explaining that Plaintiffs "are not owed compensation for their property at this junction" because the property has only been "temporarily seized pending the results of an ongoing criminal investigation"). That conclusion is compelled not only by binding circuit precedent,

---

[8] *See* The Republic and Canton of Geneva's Memorandum of Law in Support of Its Motion to Dismiss at 11–14, *Aboutaam*, No. 18-cv-08248, Dkt. 40 (S.D.N.Y. Jan. 1, 2019) ("MTD").

but also by longstanding international practice, by Fifth Amendment takings jurisprudence, and by the principles underlying the FSIA.

1.     It is well-settled that not every governmental interference with property rights constitutes a "taking." A classic taking occurs when a foreign sovereign engages in the "nationalization or expropriation of property," thereby acquiring a legal interest in that property. *Zappia Middle E. Constr. Co.*, 215 F.3d at 251 (quoting H.R. Rep. No. 94-1487, at 19 (1976)); *see, e.g.*, *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017) (nationalization of oil rigs). Here, as Plaintiffs recognize, the Geneva Public Prosecutor's Office claims no legal interest in the seized property. That office and Swiss customs authorities have simply restricted the movement of certain assets pending an ongoing investigation. *See* Aboutaam Br. 10 n.9 (noting that the seizure order "segregate[s]" Plaintiffs' property "in place" and restrains them from "exercising [their] ownership rights").

This Court and others have repeatedly rejected takings claims arising from the seizure or freezing of assets during a criminal investigation. In *Chettri*, 834 F.3d at 54, the Nepalese Department of Revenue ordered the plaintiffs' financial assets frozen "pending further investigation," after the plaintiffs wired a significant sum to a bank in Nepal. This Court squarely held that the FSIA's expropriation exception did not apply to the asset freeze. The Court found no authority for the proposition

that "a routine law enforcement action such as this constitutes a taking within the meaning of § 1605(a)(3)." *Id.* at 58; *see also Hilsenrath v. Swiss Confederation*, No. 07-02782, 2007 WL 3119833, at *4 (N.D. Cal. Oct. 23, 2007) ("It is frivolous to claim that freezing assets during a legitimate criminal investigation violated international law."), *aff'd*, 402 F. App'x 314 (9th Cir. 2010).

This conclusion is consistent with the meaning of a "taking" in the analogous context of Fifth Amendment takings. *See* Restatement (Third) of Foreign Relations Law § 712 rpt. n.6 (1987) ("In general, the line in international law is similar to that drawn in United States jurisprudence for purposes of the Fifth and Fourteenth Amendments in determining whether there has been a taking requiring compensation."). In a case alleging a Fifth Amendment violation for the seizure of goods by U.S. customs authorities, the Federal Circuit held that "[w]hen property has been seized pursuant to the criminal laws or subjected to *in rem* forfeiture proceedings, such deprivations are not 'takings' for which the owner is entitled to compensation." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006). That court similarly held that the seizure of evidence during a criminal investigation does not amount to a compensable "taking." *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153–54 (Fed. Cir. 2008). "Once the government has lawfully seized property to be used as evidence in a criminal prosecution," the court

22

explained, "it has wide latitude to retain it so long as the investigation continues, regardless of the effect on that property." *Id.* at 1154.

These decisions reflect the well-settled rule that no compensable taking occurs when the government "lawfully acquire[s]" property "under the exercise of governmental authority other than the power of eminent domain." *Bennis v. Michigan*, 516 U.S. 442, 452–53 (1996); *see also United States v. $7,990.00 in U.S. Currency*, 170 F.3d 843, 845–46 (8th Cir. 1999) (because "the forfeiture of contraband is an exercise of the government's police power, not its eminent domain power," the "government's temporary possession of seized property … is not a 'taking' for Fifth Amendment purposes"). The Restatement makes precisely this point: A foreign government "is not responsible for loss of property or for other economic disadvantage resulting from bona fide general taxation, regulation, forfeiture for crime, or other action of the kind that is commonly accepted as within the police power of states." Restatement (Third) of Foreign Relations Law § 712 cmt. g.

These principles control here. Plaintiffs acknowledge that the property was "seized pursuant to [a] Swiss law enforcement action." AA24. The Search and Seizure Order stated on its face that the seized objects could be "confiscated" or "used as evidence" in ongoing criminal proceedings. AA40–41. Thus, Plaintiffs fail to allege an actionable "taking."

23

Plaintiffs attempt to distinguish *Chettri* and *Hilsenrath* on the grounds that the authorities in those cases had "suspicions of illegal conduct related *directly* to the frozen property," whereas this case "involves an indiscriminate dragnet that happened to include [Plaintiffs'] objects." Aboutaam Br. 34–35. That argument is both factually and legally wrong. The Search and Seizure Order articulates specific bases to suspect that Plaintiffs' property, held by Phoenix, was connected to illegal activity. The Order recounts, for example, Inanna Art Services' possession of "seven objects of suspicious provenance or origin," as well as evidence of suspicious movements of merchandise at Phoenix's warehouse in December 2016, AA39–40, which followed the discovery of a fraudulently imported object in a car registered to Phoenix, AA56. In any event, the relevant question under *Chettri* and similar cases is whether the property was seized in the course of a law enforcement investigation—not whether the property owners themselves committed a crime or whether the seizure order was overbroad. *See, e.g.*, *AmeriSource*, 525 F.3d at 1154 (the question is "the character of the government action, not the culpability or innocence of the property holder"). There is no question that the property at issue here was seized in the course of a law enforcement investigation.

On appeal, Plaintiffs erroneously rely on *Williams v. National Gallery of Art*, No. 16-6978, 2017 WL 4221084 (S.D.N.Y. Sept. 21, 2017), *aff'd*, No. 17-3253, 2018 WL 4293327 (2d Cir. Sept. 10, 2018), *cert. denied*, 139 S. Ct. 1347 (2019), to

suggest that the Swiss defendants' actions constitute a taking. Aboutaam Br. 30. As Plaintiffs note, the district court in that case discussed the common dictionary definitions of the word "take," *i.e.*, "to get into one's hands or into one's possession, power, or control." *Williams*, 2017 WL 4221084, at *4. But it did so to address (and reject) the entirely distinct argument that a "taking" occurs whenever a foreign sovereign refuses to return property that it has previously acquired. *See id.* ("To refuse to return property is not to get property into one's possession or control…."). The court did not hold—or even suggest—that *any* acquisition of property by a sovereign is always a "taking" under the FSIA.

2.     This Court's precedent that asset freezes do not amount to "takings" is consistent with two principal purposes of the FSIA. *First*, the FSIA was intended to "codif[y] … international law at the time of the FSIA's enactment." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S 193, 200 (2007). For that reason, the Supreme Court has looked to "[t]he most recent restatement of foreign relations law at the time of the FSIA's enactment" in interpreting the scope of the statutory exceptions. *Id.* That Restatement defined a "taking" as "[c]onduct attributable to a state that is intended to, and does, effectively deprive an alien of *substantially all* the benefit of his interest in property." Restatement (Second) of Foreign Relations Law § 192 (1965) (emphasis added). As particularly relevant here, the Restatement explained that "[t]he temporary blocking or freezing" of foreign

25

nationals' accounts, "suspending the right of withdrawal but *not affecting ownership*, does not appear to have been regarded as a taking of property," though it "might well be treated as such" "[i]f continued indefinitely." *Id.* § 192 rpt. n.2 (emphasis added); *see also* Restatement (Third) of Foreign Relations Law § 712 cmt. g (noting that "[d]epriving an alien of control of his property, as by an order freezing his assets, might become a taking if it is long extended").

As to the latter point, the district court correctly found that Plaintiffs' property "has not been frozen for an 'extended or indefinite period.'" SPA7. Indeed, the Beierwaltes' counsel conceded during oral argument that the freezing of Plaintiffs' property "isn't indefinite yet," AA613, for good reason. The investigation has remained active for the past three years. And contrary to Plaintiffs' assertions that "amazingly little progress has been made," Aboutaam Br. 19, the Geneva Prosecutor has already released thousands of objects, AA487, notwithstanding the delays caused by Plaintiffs' intransigence. In any event, courts have rejected takings claims even where the property remained under seizure for much longer than three years. *See, e.g.*, *Chettri*, 834 F.3d at 54 (assets had been seized for eight years).

*Second*, the FSIA was meant "to induc[e] each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own." *Helmerich & Payne*, 137 S. Ct. at 1319 (internal quotation marks omitted). Thus, in interpreting the FSIA, the Supreme Court has paid close

attention to whether an expansive interpretation of the statutory exceptions would lead "some [countries] to reciprocate" and "embroil the United States in expensive and difficult litigation." *Id.* at 1322 (internal quotation marks omitted). A rule treating temporary asset seizure as a "taking" would produce precisely this unsettling result.

To take just one example, the U.S. government has long exercised broad authority to safeguard U.S. interests by freezing assets belonging to certain foreign nationals. *See* 50 U.S.C. §§ 1701, 1702(a)(1)(B) (authorizing the President to "block" the transfer of foreign nationals' property "during the pendency of an investigation" upon declaring a national emergency); *Propper v. Clark*, 337 U.S. 472, 481–82 (1949) (upholding statute authorizing asset freezes). Courts have consistently rejected the argument that freezing orders under this statute (or its predecessor) amount to unconstitutional takings. *See, e.g.*, *Tran Qui Than v. Regan*, 658 F.2d 1296, 1301 (9th Cir. 1981) (holding that, although an order blocking assets "involves a deprivation of the enjoyment of a property interest," the "deprivation is temporary" and "is not equivalent to vesting"); *Holy Land Foundation for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 78–79 (D.D.C. 2003) (similar). A ruling in Plaintiffs' favor would open the door to courts across the world scrutinizing not only these asset freezes, but also any routine seizure by U.S. customs agents, law enforcement, or other government officials of property belonging to foreign

27

nationals. That would dramatically expand the exposure of the United States to takings claims: In fiscal year 2019 alone, the Department of Justice's Assets Forfeiture Fund acquired more than $2 billion in forfeiture revenue.[9] Congress could not have intended the expropriation exception to extend to such claims.

### B. Plaintiffs' property was not taken in violation of international law

Even if Plaintiffs could demonstrate that a taking of their property occurred, the district court correctly held that they cannot establish their property was "taken in violation of international law." SPA6. Plaintiffs' principal arguments—that the seizure violates either a rule against "arbitrary" takings or the UNESCO Convention—fundamentally misapprehend the governing law.

### 1. A taking violates international law only in limited circumstances

As the district court correctly recognized, a taking in violation of international law generally requires that "the taking not be for a public purpose, or that the taking be discriminatory, or not accompanied by provision for just compensation." SPA7 (quoting *Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, No. 12-7316, 2014 WL 288705, at *7 (S.D.N.Y. Jan. 27, 2014)); *see also* Restatement (Third) of Foreign Relations Law § 712 (same). A typical case thus involves "the

---

[9] Office of the Inspector General, U.S. Dep't of Justice, *Audit of the Assets Forfeiture Fund and Seized Asset Deposit Fund Annual Financial Statements Fiscal Year 2019*, at 9 (Dec. 2019), https://bit.ly/3e0Dly2.

nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law." *Zappia*, 215 F.3d at 251 (quoting H.R. Rep. No. 94-1487, at 19).

Nothing of the sort happened here. Plaintiffs do not dispute the district court's finding that the property was seized for "a public purpose"—namely, an ongoing criminal and customs investigation. SPA7. Nor have they alleged that the seizure was "discriminatory"—*i.e.*, that Swiss authorities froze their property because of Plaintiffs' nationalities. Any such allegation would be meritless; the district court correctly found that the Search and Seizure Order "articulated a non-discriminatory basis for suspecting that individuals connected to the seized property had violated Swiss law." SPA7. Finally, unlike in a typical expropriation case where the sovereign acquires the plaintiff's property outright, international law does not require compensation for a temporary seizure of assets during an ongoing criminal investigation. *See* SPA7 (citing, *inter alia*, Restatement (Third) § 712 rpt. n.6; *Chettri*, 834 F.3d at 58; *Acadia Tech.*, 458 F.3d at 1331).

## 2. The property seizure was not "arbitrary" in violation of international law

Plaintiffs maintain that the seizure of their property nevertheless violates international law because the investigation has been "conducted in an arbitrary manner." Aboutaam Br. 31. This argument is squarely foreclosed by circuit precedent. In *Chettri*, this Court held that "conclusory criticisms of the manner in

29

which [a foreign sovereign] has conducted its investigation are insufficient to prove a violation of international law." *Chettri*, 834 F.3d at 58; *see also Official Stanford Investors Comm. v. Bank of Antigua*, No. 13-0762, 2018 WL 3956470, at *4 (N.D. Tex. Aug. 17, 2018) (plaintiff failed to allege that a seizure constituted a taking in violation of international law despite plaintiff's argument that the seizure was "illegitimate" and "pretextual"). Plaintiffs provide no basis to depart from that precedent. On the contrary, their interpretation of "arbitrary"—as including any purportedly unlawful seizure of property—would undermine the well-settled principle that "a takings claim is separate from a challenge to the lawfulness of the government's conduct." *Acadia Tech.*, 458 F.3d at 1330.

Moreover, Plaintiffs' allegations of arbitrariness primarily concern whether the seizure was lawful *under domestic* (*Swiss*) *law*, not whether the purported taking violated international law. Aboutaam Br. 32–47 (quoting, *e.g.*, Swiss Criminal Procedure Code Article 263). To make this argument, Plaintiffs analogize to Fourth Amendment cases and principles, including the requirement that a seizure be supported by probable cause. Of course, the Fourth Amendment to the U.S. Constitution does not apply to Swiss law enforcement officials, and neither the Fourth Amendment nor the corresponding provisions of Swiss law define the parameters of a lawful seizure under *international* law. Otherwise, *any* seizure that violated the Fourth Amendment in some respect could give rise to a compensable

30

international takings claim. That has never been the case. U.S. law instead gives aggrieved parties the opportunity under Federal Rule of Criminal Procedure 41(g) to move for the return of unlawfully seized property. That motion, importantly, "*must* be filed in the district where the property was seized"—not in a foreign jurisdiction. Fed. R. Crim. P. 41(g) (emphasis added). Plaintiffs' reference to Rule 41(g) (Br. 46–47 n.34) thus only underscores that their arguments about the conduct of the investigation under Swiss law are properly directed to Swiss tribunals, not to this Court.

Plaintiffs' expansive interpretation of "arbitrary" is also unquestionably at odds with the FSIA's purpose of "minimiz[ing] irritations in foreign relations" caused by lawsuits like this one. *Zappia*, 215 F.3d at 251 (internal quotation marks omitted). Again, Plaintiffs ask this Court to sit in judgment of the manner in which a foreign sovereign is conducting an ongoing law enforcement investigation. *See, e.g.*, Aboutaam Br. 18 (criticizing Geneva prosecutor as "aggressive" and "publicity-seeking"); *id.* at 21 (criticizing experts' "unprofessional, unscientific assertions" regarding the origin of certain seized objects). Indeed, Plaintiffs' main argument on appeal is that the district court erroneously failed to "look beneath the official veneer of governmental propriety" and instead "accorded undue and uncritical deference" to the Swiss authorities' investigation. *Id.* at 31. Allowing purported irregularities under *local* law to strip the Swiss authorities of immunity would not only fail "to

31

respect [their] independence and dignity"; it would invite other countries to return the favor by passing judgment on any law enforcement investigation conducted by federal, state, or local authorities in the United States. *Helmerich & Payne*, 137 S. Ct. at 1319.

Plaintiffs nonetheless place great weight on *Zappia*'s statement that the phrase "taken in violation of international law" "includ[es] takings which are arbitrary or discriminatory in nature." *Zappia*, 215 F.3d at 251 (internal quotation marks omitted). The term "arbitrary" in that sentence is best understood to refer to takings that are so irrational as to serve no public purpose. The domestic takings context again provides a useful analogy. A U.S. court may set aside a taking as "arbitrary" only where it finds the official's "conduct so egregious that the taking at issue can serve no public use" and effectively amounts to an abuse of authority. *U.S. Dep't of Interior v. 16.03 Acres of Land, More or Less, Located in Rutland Cty., Vt.*, 26 F.3d 349, 356 (2d Cir. 1994); *cf. Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (an act is "arbitrary only if, in light of the factual and legal landscape at the time … [the] behavior is so far outside a wide range of reasonableness as to be irrational" (internal citation and quotation marks omitted)).

That domestic principle, if extended to the international sphere, would be consistent with international practice insofar as a taking can be "wrongful under international law" if "not for a public purpose." Restatement (Second) of Foreign

Relations Law § 185 & cmt. a; *see also* Restatement (Third) of Foreign Relations Law § 712 & cmt. e (noting that a "seizure by a dictator or oligarchy for private use could be challenged under this rule"). The seizure here is plainly not arbitrary in that sense; as the district court noted, the "property was seized in connection with an ongoing criminal investigation, which serves a public purpose." SPA7.

Nor do other notes in the Restatement suggest that an arbitrarily conducted investigation violates international law. Plaintiffs point to the Restatement's discussion of "arbitrary" acts as those that are "unfair and unreasonable, and inflict[] serious injury to established rights of foreign nationals." Aboutaam Br. 31 (quoting Restatement (Third) of Foreign Relations Law § 712 rpt. n.11)). But the remainder of that sentence *distinguishes* arbitrary acts from actions that qualify as takings under international law. The full sentence states: "['Arbitrary'] refers to an act that is unfair or unreasonable, and inflicts serious injury to established rights of foreign nationals, *though falling short of an act that would constitute an expropriation*." Restatement (Third) of Foreign Relations Law § 712 rpt. n.11 (emphasis added). This discussion thus provides no basis for concluding that an "arbitrary" deprivation can (let alone must) be considered a taking in violation of international law. In fact, the black letter in Restatement § 712 treats "arbitrary" acts as a different category altogether from "takings." Elsewhere in that same section, the Restatement explains that no taking occurs when the government engages in "forfeiture for crime" or "other action of

33

the kind that is commonly accepted as within the police power of states." *Id.* § 712 cmt. g. That is precisely the case here. *See supra* pp. 22–23.

In any event, even accepting Plaintiffs' interpretation of "arbitrary" at face value, there is no merit to their suggestion that the seizure here was arbitrary. *First*, as the district court found, the seizure order articulates a reasonable basis for suspecting violations of Swiss law. SPA7. Plaintiffs have never disputed that the order provides a sufficient basis for suspecting that Ali Aboutaam—Hicham's brother and the co-owner of Phoenix—and his wife were engaged in criminal activity. Nor do they dispute that at the time of the seizure, all of the seized property was in Phoenix's possession in Geneva. Those facts alone supply an adequate basis for suspecting that the seized property was implicated in criminal activity or could be evidence of criminal conduct.

Plaintiffs take issue with the fact that the Swiss authorities have "refused to release [their] property" despite letters from their counsel that allegedly explain why "most" (though not all) of the seized property falls outside the scope of the CPTA. Aboutaam Br. 35–36. But the Swiss authorities had no obligation to take Plaintiffs at their word, particularly when Plaintiffs refused to provide documentation that could corroborate their claims. In requesting that documentation, the Swiss authorities did not improperly shift the burden to Plaintiffs to "prove the 'legal provenance' of their objects." *See id.* at 35. There is nothing in either the UNESCO

34

Convention, the CPTA, or Swiss law more generally that prevents a prosecutor from seeking the cooperation of persons in a criminal investigation. Nor were the Swiss authorities required to accept Plaintiffs' self-serving assertions that the Aboutaams are "distinguished by the care they take" to ensure legal provenance, AA70; *see also* Aboutaam Br. 5–7, particularly given prior allegations that Hicham was involved in smuggling ancient artifacts. *See, e.g.*, *United States v. Mask of Ka-Nefer-Nefer*, 752 F.3d 737, 745 n.9 (8th Cir. 2014) (Murphy, J., concurring) (noting the United States' statement that "the owners [of Phoenix], Ali and Hicham Aboutaam, were each convicted in 2004 of smuggling ancient artifacts").

*Second*, Plaintiffs criticize the allegedly slow pace of the investigation, speculating that it "will take decades to complete." Aboutaam Br. 27, 39–40, 43–47. As an initial matter, many of the factual allegations Plaintiffs offer to support this claim do not appear anywhere in the record. For example, their November 2019 challenge in the Canton of Geneva's criminal court to the conduct of the investigation postdates not only their complaints, but also the decision below. *See id.* at 19–21. Plaintiffs' reliance on these unsupported extra-record allegations is improper.

Equally important, the investigation has continued apace in the three years since the initial seizure, as demonstrated by Plaintiffs' own submissions to the district court below. The Geneva Prosecutor is systematically working with experts

35

to establish the provenance of the antiquities. *See, e.g.*, AA549–50 (mandate dated April 5, 2017, appointing "archaeologists and specialists" to "to inspect and sort out … the various archaeological properties that have been seized or sequestered"); AA568–69 (minutes of August 2018 hearing held by Geneva Prosecutor regarding experts' findings and recommendations). Notably, as the district court found, the Geneva Prosecutor lifted the seizure order for approximately 5,000 objects in August 2018, AA487, upon determining there was "no further cause for their seizure." SPA9.

Plaintiffs attempt to discount the significance of this development by noting that all 5,000 items appeared in Phoenix's notarized registry as items imported before the effective date of the CPTA. Aboutaam Br. 44–45. Even if that is true,[10] it is unsurprising that it would take the authorities time to ensure the accuracy of Phoenix's registry and process many thousands of objects for release. And, in any event, Plaintiffs cannot criticize the pace of the investigation when they were repeatedly advised that their refusal to cooperate would result in such delay. *See* AA77 ("Until such time as these explanations are made … your request for the

---

[10] Plaintiffs did not raise this argument below, instead arguing that the timing of the objects' release (the same day that the Beierwaltes filed their complaint) was "highly suspicious" and supported their claim that the seizure was arbitrary. AA533 n.4; *see also* Memorandum of Law Opposing Defendants' Motions to Dismiss at 5, 10, 13, *Aboutaam*, No. 18-cv-08248, Dkt. 45 (S.D.N.Y. Mar. 29, 2019) ("MTD Opposition").

seizure to be lifted cannot be immediately granted."); AA111 ("Without your cooperation, the Public Prosecutor's Office will simply not be able to rule upon your request [for the immediate release of property]."). [11]

Finally, there is no merit whatsoever to Plaintiffs' speculation that an improper "coercive motive" led to the seizure of their property. Plaintiffs insinuate that Swiss authorities seized the property in order to pressure the Aboutaams to withdraw an appeal of repatriation claims involving a sarcophagus. Aboutaam Br. 47–48; *see also id.* at 7–10. But the complaints here contain no reference to the dispute over the sarcophagus or to any other prior investigations into cultural property owned by Phoenix. In their subsequent filings, Plaintiffs have provided no

---

[11] The district court similarly concluded that in light of Plaintiffs' failure to participate in the Swiss investigation or appeals process, Plaintiffs "cannot complain that a taking or other economic injury has not been fairly compensated and hence violates international law." SPA10. Plaintiffs point to that statement as evidence that the district court improperly dismissed their claims for lack of exhaustion. Aboutaam Br. 48–49. That is incorrect. The district court considered Plaintiffs' failure to raise their claims in Switzerland as part of the takings analysis; absent any attempt to challenge the seizure or obtain compensation from Swiss authorities, Plaintiffs could not credibly claim that they had been denied just compensation. Because the district court did not rely on exhaustion as a standalone basis for dismissal (and did not reach the Canton of Geneva's alternative argument that principles of international comity justified dismissal on exhaustion grounds, *see infra* note 13), the dispute over whether the FSIA's expropriation exception permits an exhaustion defense is not implicated here. *See* Petition for Writ of Certiorari at 30–31, *Federal Republic of Germany v. Philipp*, No. 19-351 (U.S. Sept. 16, 2019) (noting split on this issue); *see also* Order List, 589 U.S. __ (Jan. 21, 2020) (slip op. 1) (inviting Solicitor General to file a brief expressing the views of the United States).

support, aside from a news article based on an interview with Ali's lawyer, for the proposition that the investigations are somehow related. AA472.

In sum, even assuming, contrary to *Chettri*, that disagreements over the conduct of a criminal investigation could establish a violation of international law, Plaintiffs have not come close to alleging any valid bases here.

### 3. The seizure did not violate the UNESCO Convention

Plaintiffs also contend that the Swiss defendants violated international law by conducting their investigation in a manner that conflicts with the UNESCO Convention. Aboutaam Br. 51. Among other things, Plaintiffs allege that the UNESCO Convention permits the Swiss authorities to take "steps to recover and return … cultural property" only "at the request of a 'State Party of origin,'" and that no such request was made here. *Id.* This argument is flawed at every step.

*First*, Plaintiffs' argument rests on the premise that "[t]he professed aim" of the seizure is "the return of 'cultural property' to countries of origin" under the UNESCO Convention. Aboutaam Br. 51. That is wrong. The seizure orders made clear that the Swiss authorities were investigating not just potential cultural property violations, but also property crimes and customs violations under Swiss law. AA40, AA56; *see also* AA40–41 (explaining that seized objects could be "used as evidence"). As the district court explained, "[n]othing in either the UNESCO Convention or the CPTA precludes a foreign sovereign from temporarily seizing

38

property within its own borders, pending the outcome of an investigation into suspected violations of that sovereign's laws." SPA10.

*Second*, Plaintiffs misconstrue the nature of Switzerland's obligations under the UNESCO Convention and the CPTA. Plaintiffs apparently believe that Swiss authorities may *only* investigate potential cultural property violations if another state party specifically identifies the stolen property and requests its repatriation. *See* Aboutaam Br. 37, 51. That reading of the Convention—as *curtailing* Switzerland's authority to investigate cultural property violations outside the repatriation context—ignores the treaty's text and undermines its purpose.

The Convention's text clearly imposes obligations on states parties that are independent of repatriation. It requires them to "prevent by all appropriate means transfers of ownership of cultural property likely to promote the illicit import or export of such property." Convention, art. 13 (AA238). The CPTA implements that provision by, among other things, requiring prosecutors to "order the seizure of [] cultural property when suspicion exists that the cultural property was stolen, lost against the will of the owner or illicitly imported into Switzerland." CPTA, art. 20 (AA310). These obligations, no less than the repatriation provisions, serve the Convention's purpose of "protect[ing] articles of cultural significance from 'the dangers of theft, clandestine excavation, and illicit export.'" *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 698 F.3d 171, 175 (4th Cir. 2012)

(quoting Convention, pmbl.). Accordingly, far from violating international law, the sovereign acts challenged in this case furthered the treaty's purpose and effectuated Switzerland's international obligations.

### C. Plaintiffs cannot establish a requisite nexus to the United States

Although the district court dismissed the complaints before reaching the final prong of the FSIA's expropriation exception, this Court can also affirm the judgment on the ground that Plaintiffs failed to satisfy the nexus requirement of § 1605(a)(3) because the contested property indisputably is not "present in the United States."

### 1. Plaintiffs concede that their property is not present in the United States, as required for jurisdiction over the Canton of Geneva

The text of the expropriation exception sets forth two ways to establish a sufficient nexus between the "taken" property and the United States: A plaintiff must show that either (1) the property "is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or (2) the property "is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

Determining which of these two nexus requirements applies depends on whether the defendant is the "foreign state" or an agency or instrumentality of a foreign state. As this Court has recognized, the first clause deliberately "sets a higher

threshold of proof for suing foreign states in connection with alleged takings by requiring that the property at issue be 'present in the United States.'" *Garb v. Republic of Poland*, 440 F.3d 579, 589 (2d Cir. 2006); *see also Kuo v. Government of Taiwan*, 802 F. App'x 594 (2d Cir. 2020) (summary order) (noting that where the defendant is a foreign state, the plaintiff must "satisfy the more stringent [nexus] requirement" by showing the property is present in the United States); *de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1106–07 (D.C. Cir. 2017) ("the nexus requirement for jurisdiction over foreign states 'differs' from that over agencies and instrumentalities"), *cert. denied*, 139 S. Ct. 784 (2019).

To establish jurisdiction over the Canton of Geneva, Plaintiffs must satisfy the "higher threshold" applicable to claims against "foreign states." This Court has held that "political subdivisions" of a foreign state are treated as the foreign state for purposes of the nexus requirement. *Garb*, 440 F.3d at 590; *see also* H.R. Rep. No. 94-1487, at 19 (explaining that the first clause applies to a "foreign state, or political subdivision, agency or instrumentality of the foreign state" whereas the second clause applies only to an agency or instrumentality). And there can be no dispute that the Canton of Geneva is a "political subdivision" of Switzerland, just as the State of New York is a political subdivision of the United States. *See Garb*, 440 F.3d at 596 ("The term 'political subdivisions' includes all governmental units beneath the central government, including local governments." (quoting H.R. Rep. No. 94-

1487, at 15)); Restatement (Third) of Foreign Relations Law § 452 cmt. b (explaining that, under the FSIA, "constituent units of federal unions," including "cantons," "are entitled to sovereign immunity to the same extent as the federal state itself"); Restatement (Fourth) of Foreign Relations Law § 452 rpt. n.2 ("States and provinces are political subdivisions under the FSIA.").

Plaintiffs admittedly cannot carry their burden of showing under the first clause that the disputed property "is present in the United States." 28 U.S.C. § 1605(a)(3). In fact, they expressly concede that all of the seized property remains in Switzerland. *See* AA17 n.2 (conceding that the Swiss authorities "have not removed [the seized property] from the Geneva warehouse in which it is stored"); AB17 n.2 (same); *see also* Aboutaam Br. 10 n.9 ("The objects were not removed from their locations but were segregated in place, sealed-off and frozen[.]"). Thus, the district court cannot exercise jurisdiction over the Canton of Geneva under the expropriation exception.

### 2. Plaintiffs cannot bootstrap jurisdiction over the Canton of Geneva under the second nexus clause

Plaintiffs argued below that jurisdiction over *all* defendants was proper under the nexus requirement's second clause because the FOC purportedly "owned or operated" the seized property and engaged in sufficient commercial activity in the United States. 28 U.S.C. § 1605(a)(3). *See* MTD Opposition at 20. That argument fails for several reasons, including that the FOC defendant is properly treated as the

42

foreign state itself rather than as an agency or instrumentality. But even if the Court *could* properly assert jurisdiction over the FOC under the second clause, that would not provide a basis for asserting jurisdiction over the Canton of Geneva, which can only be sued under the first clause.

As this Court has explained, the first clause of the nexus requirement imposes a "higher threshold" for takings claims against foreign states than similar claims against agencies or instrumentalities. *Garb*, 440 F.3d at 589. That distinction would be rendered meaningless if a foreign state lost its immunity from takings claims whenever some other agency or instrumentality satisfies the nexus requirement under the second clause. For that reason, the D.C. Circuit has declared that "a foreign state retains its immunity unless the first clause of the commercial-activity nexus requirement is met." *de Csepel*, 859 F.3d at 1107; *see also Simon v. Republic of Hungary*, 812 F.3d 127, 148 (D.C. Cir. 2016) (dismissing Hungary from takings case despite finding that Hungarian agency or instrumentality had a sufficient nexus to the United States); *cf. Arch Trading*, 839 F.3d at 205–06 (declining to resolve this question). The U.S. Government and the Restatement (Fourth) of Foreign Relations Law both agree with the D.C. Circuit's reading of the statute.[12]

---

[12] *See* Br. for the United States as Amicus Curiae at 11, *de Csepel v. Republic of Hungary*, No. 17-1165, 2018 WL 6382956 (U.S. Dec. 4, 2018) ("Th[e] text and structure as a whole is most naturally read as establishing two distinct tracks for obtaining jurisdiction…. The statutory context, history, and purpose powerfully

*(footnote continued on next page)*

The Ninth Circuit's decision in *Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010), is not to the contrary. *See* MTD Opposition at 20. The Ninth Circuit there affirmed a district court's exercise of jurisdiction over both Spain *and* its agency or instrumentality after finding the agency or instrumentality had engaged in sufficient commercial activity in the United States to satisfy the second nexus clause. *Id.* at 1032–34, 1037. But Spain did not raise the argument that the Canton of Geneva makes here; it argued only that the agency or instrumentality had not engaged in commercial activity in the United States. *Id.* at 1022; *see Arch Trading*, 839 F.3d at 206 (noting that *Cassirer* provided no "independent analysis" of jurisdiction over Spain).

Indeed, when Spain filed a petition for certiorari seeking Supreme Court review of the Ninth Circuit's decision, the United States pointed out in an amicus brief that the parties had "erroneous[ly]" assumed that "if Section 1605(a)(3) permits jurisdiction over the Foundation, it also permits jurisdiction over the Kingdom of Spain." Br. for the United States as Amicus Curiae at 15–16, *Kingdom of Spain v. Cassirer*, No. 10-786, 2011 WL 2135028 (U.S. May 27, 2011). It further noted that

---

support that interpretation."); Restatement (Fourth) of Foreign Relations Law § 455 rpt. n.9 (2018) ("That interpretation would accord more closely with respect for agencies and instrumentalities as separate entities."); *see also* Federal Judicial Center, *The Foreign Sovereign Immunities Act: A Guide for Judges* 70 (2d ed. 2018) ("If the suit is against the foreign state itself, the seized property in question (or property exchanged for such property) must be present in the United States….").

respondent had agreed not to "oppose a motion to dismiss the Kingdom of Spain from this case." *Id.* at 16. Consistent with that representation, the parties on remand stipulated to dismissing Spain from the case. *See* Order Granting Dismissal of Defendant Kingdom of Spain, *Cassirer v. Kingdom of Spain*, No. 05-cv-03459, Dkt. 119 (C.D. Cal. Aug. 12, 2011). Thus, even if it were correct that the FOC is an agency or instrumentality of Switzerland and that it engaged in the requisite commercial activities in the United States, there is no authority to support Plaintiffs' argument that the court can exercise jurisdiction over *the Canton of Geneva* on that basis.

Plaintiffs' argument fails for other reasons, as well. The relevant text of the expropriation exception provides that "[a] *foreign state* shall not be immune" where the relevant property "is owned or operated by an agency or instrumentality *of the foreign state* and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3) (emphases added). Plaintiffs argue that the FOC is an agency or instrumentality of *Switzerland*, not an agency or instrumentality of *the Canton of Geneva*. MTD Opposition at 13–14. Accordingly, even if their bootstrapping theory had merit, it could at most create jurisdiction over Switzerland (the "foreign state" proper that is the alleged *direct* sovereign of FOC).

The implications of Plaintiffs' theory show the absurdity of their statutory interpretation. According to Plaintiffs, the commercial dealings of one foreign

agency or instrumentality in the United States (say, a central bank or a state-owned railway) would be enough to strip immunity from every *other* agency, instrumentality, and political subdivision of the foreign state. To take a U.S.-based analogy, the overseas commercial activity of Amtrak (owned by the U.S. government) could confer foreign jurisdiction over not just the United States, but also the U.S. Department of Education, the State of New York, the City of Albany Water Board, and every other constituent part of the United States. That position cannot be reconciled with basic FSIA principles, which require analyzing the immunity of *each* defendant separately based on its connection to the United States. *See, e.g.*, Restatement (Fourth) of Foreign Relations Law § 452 ("Agencies and instrumentalities of a foreign state are presumptively distinct from the foreign state and from each other for the purposes of immunity and substantive liability."); *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626–27 (1983) ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.").

* * *

In sum, Plaintiffs failed to establish the necessary elements of the FSIA's expropriation exception. The Swiss authorities' temporary seizure of property in Switzerland as part of an ongoing investigation does not amount to a "taking"; it does not violate international law; and it does not have the requisite nexus to

commercial activity in the United States. The district court properly dismissed Plaintiffs' complaints for lack of jurisdiction.

To hold otherwise would require this Court to adopt a series of expansive interpretations of the FSIA that are exponentially more alarming in combination. Specifically, it would mean that a plaintiff could vitiate a foreign sovereign's immunity simply by alleging an "arbitrary" interference with property rights under *local* law, even when that interference is temporary and even when it occurs in the course of a legitimate criminal investigation. What's more, that mere allegation would strip immunity not just from the foreign state itself, but also every governmental agency, entity, and subdivision of the foreign state, even those with no contacts whatsoever with the United States. That position, if accepted, would turn the "narrowly drawn" FSIA exception on its head, contrary to all evidence of congressional intent. *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012).[13]

---

[13] In the district court, the Canton of Geneva made two additional arguments in support of dismissal: (1) the act of state doctrine bars Plaintiffs' claims, and (2) principles of international comity justify dismissal because, among other things, Plaintiffs have not attempted to exhaust available remedies in Switzerland. *See* MTD at 20–25. Because the district court dismissed both complaints for lack of jurisdiction under the FSIA, the district court did not reach these issues. SPA11. If these cases are allowed to continue in any respect, the Canton of Geneva reserves its right to press these alternative arguments on remand.

**II.    The district court did not abuse its discretion by denying jurisdictional discovery.**

Because sovereign immunity protects a sovereign not only from liability but also from "the expense, intrusiveness, and hassle of litigation," this Court has made clear that "a court must be circumspect in allowing discovery before the plaintiff has established that the court has jurisdiction over a foreign sovereign defendant under the FSIA." *Arch Trading*, 839 F.3d at 206 (internal quotation marks omitted); *Helmerich & Payne*, 137 S. Ct. at 1317 (reaffirming that "foreign sovereign immunity's basic objective" is "to free a foreign sovereign from *suit*"). A party can obtain jurisdictional discovery "only to verify allegations of specific facts crucial to an immunity determination." *Arch Trading*, 839 F.3d at 207 (internal quotation marks omitted). A district court thus does not abuse its discretion in denying jurisdictional discovery "if the party seeking discovery cannot articulate a reasonable basis for the court first to assume jurisdiction." *Id.* at 206–07 (internal quotation marks omitted).

The district court plainly did not abuse its discretion in denying Plaintiffs' request for jurisdictional discovery into the alleged "arbitrariness" of the ongoing investigation by the Geneva Prosecutor. For the reasons explained above, Plaintiffs failed to allege that the seizure was "arbitrary" in any way that could plausibly violate international law; at most, they allege possible violations of *Swiss* law, *i.e.*, insufficient justification for the Seizure Order. *See supra* pp. 30–31. Any discovery

48

on this score would add nothing to their complaint. Plaintiffs' request simply repeated their contention that the Swiss authorities' partial release of seized objects was evidence of arbitrariness. AA532–33. The district court correctly rejected that argument, finding that "if anything, [the partial release] suggests that Defendants are continuing to pursue their investigation and are releasing the seized property when they deem it appropriate to do so." SPA12. On appeal, Plaintiffs make no effort to refute that finding, and again fail to set forth *any* facts that they expect to verify in discovery that could substantiate jurisdiction over the Canton of Geneva. *See* Aboutaam Br. 53 (stating only that discovery is appropriate "[t]o the extent questions remain" about whether prosecutorial actions were arbitrary). As this Court has made clear, "the FSIA protects defendants" from exactly this kind of "fishing expedition." *Arch Trading*, 839 F.3d at 207.

Moreover, the requested jurisdictional discovery is irrelevant to other dispositive legal defenses that require dismissal, including that the Canton of Geneva, as a political subdivision, can only be subject to suit under the FSIA's expropriation exception if the disputed property is present in the United States. By Plaintiffs' own admission, the property remains in Switzerland. The Canton of Geneva's facial challenge to Plaintiffs' assertion of jurisdiction means that discovery simply is "not relevant to the motion." *Lu v. Cent. Bank of Republic of China (Taiwan)*, 610 F. App'x 674, 675 (9th Cir. 2015); *Butler v. Sukhoi Co.*, 579 F.3d

1307, 1313–14 (11th Cir. 2009) (finding abuse of discretion in ordering jurisdictional discovery where, as a matter of law, the court could find there was no *prima facie* case for jurisdiction).

Neither of Plaintiffs' cited cases supports jurisdictional discovery here. In *Reiss v. Societe Generale du Groupe des Assurances Nationales*, 235 F.3d 738 (2d Cir. 2000), the district court initially authorized the depositions of two persons employed by a foreign instrumentality, but then proceeded to dismiss the case on non-FSIA grounds. *Id.* at 747–48. This Court reversed and remanded for the district court to first consider whether the FSIA's commercial activity exception applied. In doing so, the Court indicated that the previously authorized discovery "would be helpful" in making that jurisdictional determination, as it could resolve discrete factual disputes about the employment relationship between the plaintiff and the foreign instrumentality. *Id.* at 747. The case has no bearing whatsoever on whether the district court here was *required* to grant wide-ranging discovery into an ongoing criminal investigation after determining as a matter of law that it lacked jurisdiction. And *Freund v. Republic of France*, 592 F. Supp. 2d 540 (S.D.N.Y. 2006), is even less helpful to Plaintiffs. The court in that case *denied* the plaintiffs' request for discovery for two reasons: the plaintiffs had failed to demonstrate that discovery "would be fruitful" or "alter the Court's FSIA analysis," and the broad discovery they sought "raise[d] serious comity concerns." *Id.* at 562–63.

Here, too, the district court properly relied not just on Plaintiffs' failure to substantiate their discovery request, but also on "significant international comity concerns that strongly militate[d]" against granting discovery in this case. SPA12; *see, e.g.*, *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 146 n.6 (2014) (judges should consider comity interests and "the burden that the discovery might cause to the foreign state"). Plaintiffs sought to probe "the purported arbitrariness of a foreign sovereign's *ongoing* criminal investigation." SPA12 (emphasis added). The district court correctly chose to tread lightly before ordering broad and intrusive discovery of potentially sensitive information. *Cf.* 5 U.S.C. § 552(b)(7) (provision of the Freedom of Information Act permitting agencies to withhold "records or information compiled for law enforcement purposes" where, *e.g.*, disclosure would reveal "techniques and procedures for law enforcement investigations or prosecutions").

The district court thus did not abuse its discretion in denying Plaintiffs' request for jurisdictional discovery.

51

## CONCLUSION

For the foregoing reasons, the Canton of Geneva respectfully asks the Court to affirm the decision below.

Respectfully submitted,

*/s/ R. Reeves Anderson*

Robert Reeves Anderson
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 863-1000
Reeves.Anderson@arnoldporter.com

Marcus A. Asner
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Marcus.Asner@arnoldporter.com

Janine M. Lopez*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
Janine.Lopez@arnoldporter.com

*Admitted only in Massachusetts;
practicing law in the District of
Columbia during the pendency of her
application for admission to the D.C.
Bar and under the supervision of
lawyers of the firm who are members in
good standing of the D.C. Bar

*Counsel for La République et Canton de
Genève*

52

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Local Rule 32.1(a)(4)(A) because it contains 12,325 words, exclusive of the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.

Dated: May 22, 2020

*/s/ R. Reeves Anderson*
Robert Reeves Anderson

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on May 22, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 22, 2020

*/s/ R. Reeves Anderson*
Robert Reeves Anderson