# 19-3457-cv

## United States Court of Appeals

*for the*

## Second Circuit

LYNDA BEIERWALTES and WILLIAM BEIERWALTES,

*Plaintiffs-Appellants,*

– v. –

L'OFFICE FEDERALE DE LA CULTURE DE LA CONFEDERATION
SUISSE, Federal Office of Culture of The Swiss Confederation,
L'ADMINISTRATION FEDERALE DES DOUANES DE LA
CONFEDERATION SUISSE, Federal Customs Administration of The Swiss
Confederation, LA REPUBLIQUE ET CANTON DE GENEVE, Republic
and Canton of Geneva,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

ANJU UCHIMA
WILLIAM G. PEARLSTEIN
PEARLSTEIN & MCCULLOUGH, LLP
*Attorneys for Plaintiffs-Appellants*
641 Lexington Avenue, Suite 1327
New York, New York 10022
(646) 762-7263

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.......................................................................... iii

INTRODUCTION ........................................................................................1

ARGUMENT..................................................................................................3

I     THE SWISS AUTHORITIES FAIL TO REBUT THE BEIERWALTES' ARGUMENT THAT THEIR PROPERTY WAS TAKEN IN VIOLATION OF INTERNATIONAL LAW ............................................................3

     A.     The Warrant, Seizure and Investigation Effect an "Arbitrary" Deprivation of Property ...............................3

          1.     An Unfair and Unreasonable Deprivation of Property Is an "Arbitrary" Taking ........................3

          2.     The Warrants and Seizure Were Arbitrary Because They Lacked Probable Cause .................6

          3.     Without Probable Cause, the Investigation is Arbitrary, Open-Ended and Indefinite..............10

     B.     The Swiss Authorities' Other Arguments Relating to the Seizure are Unavailing .........................................15

II     THE SWISS AUTHORITIES FAIL TO DEMONSTRATE THAT THE NEXUS REQUIREMENT OF FSIA §1605(a)(3) ENTITLES THEM TO IMMUNITY ...........................................................17

     A.     The Office of Culture is an "Agency or Instrumentality" of Switzerland .....................................18

          1.     The Office of Culture is a Separate Legal Person....................................................................19

          2.     The Office of Culture is an "Organ" of Switzerland...........................................................23

i

3.      The Office of Culture is Not a Citizen of the United States or Created Under the Laws of a Third Country ....................................................25

4.      The Seized Property Is "Owned or Operated By" the Office of Culture .....................................25

5.      The Office of Culture Engages in Commercial Activity in the United States ..........26

B.      Because the Office of Culture Satisfies the Nexus Requirement, Neither the Customs Administration nor Geneva is Immune Under the FSIA .........................27

III      THE FEDERAL AGENCIES FAIL TO ESTABLISH THEIR AFFIRMATIVE DEFENSES .....................................28

IV      THE SWISS AUTHORITIES FAIL TO REBUT THE BEIERWALTES' ARGUMENT THAT THE DISTRICT COURT SHOULD HAVE ORDEREDJURISDICTIONAL DISCOVERY ......................30

CONCLUSION ...........................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Agudas Chasidei Chabad of the U.S. v. Russian Fed'n*,
  528 F.3d 934 (D.C. Cir. 2009) ............................................................20, 27

*Altmann v. Republic of Austria*,
  317 F.3d 954 (9th Cir. 2002), *amended on denial of reh'g*,
  327 F.3d 1246 (9thCir. 2003), *aff'd*, 541 U.S. 1032 (2011) ..........21, 27, 28

*Arch Trading Corp. v. Republic of Ecuador*,
  839 F.3d 193 (2d Cir. 2016).................................................................20, 28

*Cassirer v. Kingdom of Spain*,
  616 F.3d 1019 (9th Cir. 2010)...........................................................*passim*

*Chettri v. Nepal Rastra Bank*,
  834 F.3d 50 (2d Cir. 2016).......................................................................14

*Corporacion Mexicana de Servicios Maritimos, S.A. v. M/T Respect*,
  89 F.3d 650 (9th Cir. 1996)......................................................................24

*de Csepel v. Rep. of Hungary*,
  714 F.3d 591 (D.C. Cir. 2013) ...........................................................20, 22

*Filler v. Harvit Bank*,
  378 F.3d 213 (2d Cir. 2004)......................................................................24

*Fischer v. Magyar Allamvasutak Zrt*,
  777 F.3d 847 (7th Cir. 2015)....................................................................30

*Garb v. Republic of Poland*,
  440 F.3d 579 (2d Cir. 2006)......................................................................19

*Hilsenrath v. Swiss Confederation*,
  No. C 07-02782 WHA, 2007 WL 3119833 (N.D. Cal. Oct. 23, 2007) .....14

*Hyatt Corp. v. Stanton*,
  945 F. Supp. 675 (S.D.N.Y. 1996)............................................................22

*Leopard Marine & Trading Ltd. v. Easy St. Ltd.*,
  896 F.3d 174 (2d Cir. 2018).....................................................................29

iii

*Peninsula Asset Mgmt (Cayman) Ltd. v. Hankook Tire Co.*,
  476 F.3d 140 (2d Cir. 2007) .........................................................................21

*Philipp v. Federal Republic of Germany*,
  894 F.3d 406 (D.C. Cir. 2018) ....................................................................29

*Reiss v. Societe Generale du Groupe des Assurances Nationales*,
  235 F.3d 738 (2d Cir. 2000) ........................................................................31

*Republic of Argentina v. NML Capital, Ltd.*,
  573 U.S. 134 (2014) .....................................................................................29

*Republic of Argentina v. Weltover*,
  504 U.S. 607 (1992) .....................................................................................20

*Rukoro v. Republic of Germany*, No. 17 CV 62-LTS,
  2019 U.S. Dist. LEXIS 36098 (S.D.N.Y. March 6, 2019).........................26

*Simon v. Republic of Hungary*, No, 10-cv-1770 (BAH),
  2020 WL 1170485 (D.D.C. March 11, 2020) ......................................20, 22

*Smith Rocke Ltd. v.Republica Boliviana de Venezuela*,
  No. 12 cv-7316 (LGS), 2014 U.S. Dist. LEXIS 9692
  (S.D.N.Y. Jan. 27, 2014) .............................................................................28

*Stowe v. Devoy*,
  588 F.2d 336 (2d Cir. 1978) ..........................................................................8

*Sun v. Taiwan*,
  201 F.3d 1105 (9th Cir. 2000).....................................................................23

*United States v. $23,407.69 in United States Currency*,
  715 F.2d 162, *reh'g denied*, 720 F.2d 1291 (5th Cir. 1983) ........................5

*United States v. $7,990.00 in United States Currency*,
  170 F.3d 843 (8th Cir. 1999) .........................................................................5

*United States v. An Antique Platter of Gold*,
  991 F. Supp. 222 (S.D.N.Y. 1997), *aff'd*, 184 F.3d 131 (2d Cir. 1999)....15

*United States v. Kramer*, No. 1:06-cr-200,
  2006 WL 354026 (E.D.N.Y. Dec. 8, 2006) ...................................................5

*United States v. One (1) Nissan 300 ZX*,
  711 F. Supp. 1570 (N.D. Ga. 1989) ..............................................................5

iv

*United States v. Schultz*,
  333 F.3d 393 (2d Cir. 2003), *cert. denied*, 540 U.S. 1106 (2004) .............15

*United States v. Toscanino*,
  500 F.2d 267 (2d Cir. 1974) ......................................................................8

*Zappia Middle East Constr. Co., Ltd. v. Emirate of Abu Dhabi*,
  215 F.3d 247 (2d Cir. 2000) ......................................................................3


**Statutes & Other Authorities:**

U.S. Const. amend. IV ...................................................................................8

18 U.S.C. § 983(a)(3)(B) ..........................................................................5, 6

22 U.S.C. § 2370(e)(2) ...............................................................................28

28 U.S.C. § 1603(b) .....................................................................................19

28 U.S.C. § 1605(a)(3) .................................................................................32

Fed. R. Crim. P. 41(g) ...........................................................................5, 6, 12

FSIA § 1603(d) ............................................................................................20

Restatement (Third) of Foreign Relations Law § 712 ................................4, 5

v

## INTRODUCTION

The Swiss Authorities[1] argue that their Seizure in February 2017 of 1,200 antiquities owned by the Beierwaltes does not violate international law under FSIA §1605(a)(3) because it was part of a "routine" criminal investigation and only "temporary." However, the Seizure lacked probable cause. The Warrants failed to mention the Beierwaltes, their Property or any facts supporting subsequently alleged, but unsubstantiated, "suspicions" that they trafficked antiquities and lacked title to their Property. To justify their continued retention of the Beierwaltes' Property, the Swiss Authorities have imposed the unreasonable burden of proving the "legal provenance" of all their objects, an impossible task that would require documenting each change in title from the time of excavation to the present.

In the absence of probable cause, the Investigation is an open-ended fishing expedition, with "experts" fruitlessly examining 7,000 remaining objects for physical evidence of potential illegality that may retroactively justify the Seizure. It has stretched well past its July 30, 2017 deadline and will take decades to complete at the current rate. The Swiss Authorities' indefinite deprivation of the Beierwaltes' Property is an "arbitrary" taking

---

[1] Unless otherwise noted, capitalized terms in this Reply Brief have the meanings set forth in the Beierwaltes' opening Brief.

within the meaning of FSIA §1605(a)(3) that violates international law and the Beierwaltes' current right either to release or compensation under UNESCO, the LTBC or Switzerland's treaties with likely claimants.

The Swiss Authorities raise alternative arguments the District Court did not reach. They contend that, as "foreign states," they are immune under FSIA §1605(a)(3) because the Property is not in the United States. However, the Swiss Office of Culture (the "Office of Culture") is an "agency or instrumentality" of Switzerland rather than a foreign state with nexus created by its commercial activities in the United States. That strips the Swiss Customs Administration (the "Customs Administration") and the Canton of Geneva ("Geneva") of any immunity. The Office of Culture and the Customs Administration (the "Federal Agencies") also argue that the act of state doctrine and international comity, their affirmative defenses, justify dismissal. However, the act of state doctrine does not apply to takings in violation of international law and comity is not a defense available to a foreign state.

Finally, jurisdictional discovery is necessary to the extent there are factual issues concerning the arbitrary nature of the Seizure or the Office of Culture's nexus, including whether it is an agency or instrumentality, has a commercial core function or engages in commercial activity in the United States.

2

# ARGUMENT

## I

## THE SWISS AUTHORITIES FAIL TO REBUT THE BEIERWALTES' ARGUMENT THAT THEIR PROPERTY WAS TAKEN IN VIOLATION OF INTERNATIONAL LAW

The Swiss Authorities contend that the Beierwaltes' Property was not "taken in violation of international law" under FSIA §1605(a)(3), arguing that foreign states are effectively immune when seizing an alien's property during criminal investigations. Their arguments lack merit and ignore that (i) foreign states are limited in such actions by basic concepts of fairness and reasonableness underlying FSIA §1605(a)(3); and (ii) the record reflects that the Warrant, Seizure and Investigation are arbitrary, unreasonable and indefinitely deprive the Beierwaltes of their Property in violation of international law.

### A. The Warrant, Seizure and Investigation Effect an "Arbitrary" Deprivation of Property

#### 1. An Unfair and Unreasonable Deprivation of Property Is an "Arbitrary" Taking

According to the FSIA's legislative history, the phrase "taken in violation of international law" in FSIA §1605(a)(3) includes "'takings which are arbitrary or discriminatory in nature.'" *Zappia Middle East Constr. Co., Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) (quoting H.R.

3

Rep. No. 19-1487, at *19-20 (1976)).[2] The word "arbitrary" includes unfairness and unreasonableness, as reflected in (i) Restatement (Third) of Foreign Relations Law §712 ("Restatement §712"), Comment g ("taken in violation of international law" encompasses, among other things, an act that is "confiscatory, or that prevents, unreasonably interferes with, or unduly delays, effective enjoyment of an alien's property"); and (ii) Restatement §712, Rptr. n. 11 (an "arbitrary" act is one that is "unfair and unreasonable, and inflicts serious injury to established rights of foreign nationals").[3] Restatement §712 Comment g specifies that an order freezing an alien's assets "might become a taking if it is long extended" and Restatement §712 Rptr n. 6 specifies that "a temporary deprivation of control as by a freezing of assets" may become a taking "if deprivation is for an extended or indefinite period."

"[T]he line in international law is similar to that drawn in United States jurisprudence for purposes of the Fifth and Fourteenth Amendments in

---

[2] This language is in the FSIA's legislative history and not merely dictum from *Zappia,* as Geneva suggests (*i.e.,* "*Zappia*'s statement"). (Brief of Canton of Geneva ("Geneva Br.") at 32).

[3] Geneva suggests that this definition applies only to acts "falling short" of expropriations or other takings described in Restatement §712, Comment g. (Geneva Br. at 33). However, that definition is consistent with and applicable to the conduct described in Comment g that "unreasonably interferes with, or unduly delays" an alien's enjoyment of his property.

4

determining whether there was been a taking requiring compensation." (Geneva Br. at 22, *citing* Restatement §712, Rptr. n.6). As that explanation makes clear, seizures of an alien's property by a foreign state are limited by due process considerations. Thus, courts have ordered the return of seized property on due process grounds under Fed. R. Crim. P. 41(g) and 18 U.S.C. §983(a)(3)(B) where, as here, the property has been detained for an excessive time without the institution of proceedings that would justify the seizure and retention of the property. *See United States v. Kramer*, No. 1:06-cr-200, 2006 WL 354026, at *3-4 (E.D.N.Y. Dec. 8, 2006) (granting Rule 41(g) motion where government did not comply with deadlines set by 18 U.S.C. §983(a)(3)(B)); *United States v. $7,990.00 in United States Currency*, 170 F.3d 843, 846 (8th Cir. 1999) (13 months); *United States v. $23,407.69 in United States Currency*, 715 F.2d 162, 165, *reh'g denied*, 720 F.2d 1291 (5th Cir. 1983) (13 months); *United States v. One (1) Nissan 300 ZX*, 711 F. Supp. 1570, 1572-74 (N.D. Ga. 1989) (18 months).[4] The "line in international law" corresponds to the Restatement's note in Comment g that an order freezing an alien's assets "might become a taking if it is long extended." Relief under

---

[4] As discussed in the Beierwaltes' opening Brief, the Fourth Amendment also requires the government to complete its review of property obtained pursuant to a warrant within a reasonable time.

Rule 41(g) and section 983(a)(3)(B) is, accordingly, analogous to compensation for an arbitrary taking under international law under FSIA §1605(a)(3).[5]

Geneva contends that the term "arbitrary" is "best understood to refer to takings that are so irrational as to serve no public purpose," employing a standard used for review of administrative actions. (Geneva Br. at 32). That statement rests on nothing more than Geneva's unsupported assertion and cannot be squared with the broader concepts of due process, fairness and reasonableness underlying FSIA §1605(a)(3).

### 2. The Warrants and Seizure Were Arbitrary Because They Lacked Probable Cause

The Swiss Authorities portray their proceedings in the most anodyne terms, describing the Warrants as well-grounded, targeted and precise, the Seizure as temporary and non-confiscatory, and the Investigation, efficient, timely and well-managed.[6] The record establishes otherwise. The Swiss

---

[5] Although Geneva argues that Rule 41(g) requires suit to be brought in the same district in which the property was seized (Geneva Br. at 31), the Beierwaltes are not seeking relief under Rule 41(g) but, rather, analogizing to it, much like the Swiss Authorities in comparing the Seizure to a "typical" domestic forfeiture.

[6] Thus, Geneva asserts that "[t]he Search and Seizure Order articulates specific bases to suspect that Plaintiff's property, held by Phoenix, was connected to illegal activity" (Geneva Br. at 24); the Swiss Authorities "have

Authorities concede that Warrants do not name the Beierwaltes among the "Defendants" in the Warrant "suspected" of antiquities trafficking or state any basis to suspect that they or their Property were involved in a violation of law. (A-46).[7] The Swiss Authorities gloss over this glaring omission by conflating the Beierwaltes, with no evidence, with the "Defendants" and imputing to them suspicions of illegal activity by others based solely on the fact that their Property was in Phoenix's possession. (Geneva Br. at 34; Fed. Br. at 15-16).

For antiquities trafficking, probable cause would require fact-based allegations that a particular object was illegally excavated or illegally exported under the laws of the country of first discovery or export in a manner that amounted to actual or constructive theft. Seizing the Beierwaltes' Property without articulating such conduct by them or any title defect in their Property is contrary to requirements for probable cause that underlie Swiss

---

simply restricted the movement of certain assets pending an ongoing investigation" (*id*. at 35); "the investigation has continued apace in the three years since the initial seizure" and "the Geneva Prosecutor is systematically working with experts to establish the provenance of the antiquities." (*Id*. at 36). The Federal Agencies assert that the "seizures in Switzerland were directed precisely at the items about which the Swiss authorities had concerns." (Brief of Federal Agencies ("Fed. Br.") at 15).

[7] Thus, the District Court's factual finding that the Property "was seized pursuant to search and seizure orders that articulated a non-discriminatory basis for suspecting that individuals connected to the seized property had violated Swiss law" (SPA-7) was clear error.

7

and United States law. *See* U.S. Const. amend. IV; Swiss Criminal Procedure Code Article 263 (SPA-24) and LTBC Article 20. (A-324).[8]

The Beierwaltes represented to the Swiss Authorities that they are *bona fide* acquirors of their Property, with good title and no knowledge of adverse claims, and that their Property either satisfied the requirements of the LTBC or was exempt thereunder. (A-76-77). Instead of engaging the Beierwaltes on those assertions, which would entitle them to the release of or compensation for their Property, Prosecutor Mascotto demanded that the Beierwaltes furnish full documentation to prove the "legal provenance" (*i.e.*, ownership history) of the Property and that they travel to Geneva for questioning, giving them ten days to appeal those demands in a Swiss criminal court. (A-82-83). These demands were unreasonable, especially given the absence of probable cause with respect to the Beierwaltes and their Property.

---

[8] The Beierwaltes do not argue, as the Swiss Authorities contend, that the Investigation is governed by the Fourth Amendment or that this Court must apply the Swiss Criminal Procedure Code (Geneva Br. at 30-31; Fed. Br. at 17-18). They cite them to emphasize the lack of probable cause that permeates the Seizure and Investigation and renders them arbitrary. *Stowe v. Devoy*, 588 F.2d 336 (2d Cir. 1978) and *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), cited by the Federal Agencies (Fed. Br. at 18), are inapposite because they involved claims specifically brought under the Fourth Amendment.

The demand to document "legal provenance," a term undefined in UNESCO or the LTBC, was an overreaching attempt to compensate for lack of probable cause by foisting an unreasonable burden on the Beierwaltes[9] that would require them to produce, with respect to each of their 18 objects, an excavation permit from the country of first discovery, export permits and import declarations from every country through which the Property ever transited, and bills of sale or other instruments of transfer from every seller to every owner in the chain of title from the time of excavation to the present. Except in rare instances (such as well-documented, state sanctioned excavations), furnishing absolute proof of "legal provenance" is impossible.[10] Moreover, such proof of "legal provenance" is often irrelevant to show a downstream holder's good faith or good title with respect to an object.

This demand was also problematic because the Beierwaltes are not party to any legal proceedings in Switzerland. They have never been served with process or summons or charged with any offense by a Swiss court in

---

[9] Although Geneva asserts that Mascotto did not shift to the Beierwaltes the burden of proving "legal provenance" (Geneva Br. at 34), Mascotto's letter did exactly that. (A-82).

[10] Like other personal property, antiquities are often under-documented. Unlike securities, there are no transfer agents or registrars; unlike real estate, there are no plats or other official title registries; unlike vehicles, there are no certificates of title.

connection with the Seizure. They were, and are not, subject to the personal jurisdiction of the Swiss courts in any matter. Complying with the demand that the Beierwaltes voluntarily submit to an extra-judicial meeting in Switzerland and produce documents regarding their Property would have subjected them to jurisdiction in Switzerland where none otherwise existed and to the risk of criminal prosecution and incarceration without probable cause.[11]

### 3. Without Probable Cause, the Investigation is Arbitrary, Open-Ended and Indefinite

The absence of probable cause has fundamentally infected the Investigation. With no basis to suspect illegal activity by the Beierwaltes, the Swiss Authorities' experts have engaged in an ill-defined fishing expedition to search for some retroactive justification for the Seizure. That process entails, initially, inspecting each of the currently remaining 7,000 antiquities for signs of potential fresh excavation or suspect place of origin and then, in some future second phase, performing a mixed analysis of fact and law to determine whether an object was actually or constructively stolen or illegally

---

[11] The Beierwaltes knew that the Swiss Authorities had jailed Ali's wife and driver for two weeks and released them only after Ali withdrew his appeal opposing restitution of a sarcophagus. (A-472). Although the Swiss Authorities complain that the Beierwaltes failed to protect their rights in Switzerland, it would have inadvisable, dangerous and futile to try to do so.

10

exported from a specific country of origin or export at a specific time. At least as to the Beierwaltes' Property, the Investigation is at best an open-ended, indefinite undertaking and, at worst, an exercise in futility.

The experts' probe, which remains "ongoing" (Geneva Br. at 13), is already almost three years past the July 30, 2017 deadline in the Mandate of Expertise. (A-573). The experts have yet to determine that a single item was stolen or illegally imported. That the Swiss Authorities have taken more than three years to release just six pieces to Hicham Aboutaam (A-557-58)[12] and none to the Beierwaltes indicates that the Investigation will take decades to complete at the current rate.[13] Although the experts are engaged in an effort to determine the "legal provenance" of each object (A-566-67), without probable cause they can only speculate on the country of origin (provenience) without determining the chain of title (provenance). Unsurprisingly, they are struggling and unable to determine whether a particular object of "Greek or

---

[12] Aside from the few exempt objects belonging to Hicham among the 5,000 objects released in August 2018.

[13] The Swiss Authorities object to the Beierwaltes' reference to certain facts not in the record. (Geneva Br. at 35; Fed. Br. at 9-10). These were included to update on the progress of the ongoing Investigation. By themselves, the facts in the record make clear that the Investigation is open-ended, indefinite and likely to continue for decades.

Roman culture" originated in Turkey or Greece or some other country. (A-589-90).[14]

Although the Swiss Authorities portray the Seizure as "temporary," the Investigation is necessarily extended and indefinite as to the Beierwaltes; as per Restatement §712 Rptr n. 6 and Comment 6, an asset freeze becomes a "taking" for purposes of FSIA §1605(a)(3) if it lasts for an "extended" or "indefinite" period. That is precisely the situation that obtains under the Warrant, Seizure and Investigation. The extended deprivation of the Beierwaltes's ability to enjoy their Property gives rise to relief under FSIA §1605(a)(3) analogous to that afforded under Fed. R. Crim. P. 41(g).

Geneva argues that the partial release of 5,000 pieces in August 2018 demonstrates that the Investigation is proceeding in timely fashion. (Geneva Br. at 36). That is wrong. The released items all appear in Phoenix's notarized registry as having been imported into Switzerland before June 1, 2005, the effective date of the LTBC. (A-335, A-346, A-494) and were obviously exempt from the LTBC. Though the Swiss Authorities could easily have

---

[14] The experts' focus is on finding illegal provenance and no longer, as the Federal Agencies argue, whether customs duty or value-added tax are owed on the import of the Beierwaltes' Property. (Geneva Br. at 38). The Swiss Authorities have already concluded that inquiry, with Federal Customs assessing Ali for VAT owed on only one of the Beierwaltes items based on the value declared by Phoenix on import. (A-160, ¶¶11, 12).

determined this fact, it took *15 months* to release these objects, which were exempt from seizure to begin with.[15] Thus, the release did not reflect the progress of the Investigation or any intent by the Swiss Authorities to timely release items beyond the scope of the Investigation.

Geneva excuses the glacial pace of the Investigation by blaming the Beierwaltes for not providing the documentation Mascotto demanded. (Geneva Br. at 36-37). That argument is unavailing. The Beierwaltes voluntarily delivered to Mascotto a list of all their Property, together with photographs, dimensions and a description of provenience, to the extent known, as required by the LTBC.  (A-77).  They advised that they had acquired the 18 objects on the list in the 1990s at auction or from established dealers and had consigned this material to Phoenix pursuant to a 2006 agreement that was publicly filed in 2014 in their bankruptcy proceeding.  (A-76-77).  Though any surviving invoices from those purchases would establish the Beierwaltes' ownership claim, they would not satisfy Geneva's demand to document "legal provenance."  Any documentation held by Phoenix relating to the acquisition, provenience or provenance of any of the

---

[15] Geneva asserts that "it is unsurprising that it would take the authorities time to ensure the accuracy of Phoenix's registry." (Geneva Br. at 36).  However, the registry, a notarized document, was judicially recognized as accurate and did not require independent verification.

13

Beierwaltes' Property was also seized and has been in the exclusive possession of the Swiss Authorities for the last 3-1/2 years.[16]

In arguing that their activities are shielded from review by the United States courts, the Swiss Authorities rely heavily on *Chettri v. Nepal Rastra Bank*, 834 F.3d 50 (2d Cir. 2016) and *Hilsenrath v. Swiss Confederation*, No. C 07-02782 WHA, 2007 WL 3119833 (N.D. Cal. Oct. 23, 2007). Those decisions are fundamentally distinguishable because there was no issue as to arbitrary conduct as the government's suspicions of illegality related directly to the plaintiffs' frozen property. Therefore, the seizures were supported by probable cause, the freezes were "temporary" and the investigations were focused and "routine," yielding, in *Chettri*, formal charges against the plaintiff in 2-1/2 years and, in *Hilsenrath*, a plea agreement with the plaintiffs within two years. *See Chettri*, 834 F.3d at 54; *Hilsenrath*, 2007 WL 3119833 at *3.

As to the Beierwaltes, the Warrant, Seizure and Investigation have been arbitrary[17] and the Seizure is a "taking" in violation of international law.

---

[16] In addition, the Swiss Authorities have simply ignored the fact that the Beierwaltes are not subject to the LTBC because their limited art sale activities exempt them from the definition of "art dealers" under Article 1(e)(2)) of the OTBC. (A-338).

[17] The Warrant and Seizure appear to have been motivated by an improper purpose, further reflecting the arbitrary nature of the proceedings. (A-102, A-29-30, ¶38, A-37, ¶75, A-493).

**B.    The Swiss Authorities' Other Arguments Relating
to the Seizure are Unavailing**

Geneva argues that a ruling in the Beierwaltes' favor would open the floodgates and lead "courts around the world" to disregard international comity and "dramatically expand the exposure of the United States to takings claims" (Geneva Br. at 28).  That is a false alarm.

Rule E of Federal Rules of Civil Procedure, Title XIII – the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which governs asset forfeiture cases in the United States, safeguards against abusive forfeitures based merely on unsubstantiated suspicions.  It requires the Government to state sufficient particularity in its pleading to enable a claimant to investigate the facts and frame a response.  Supplemental Rule G(2)(4) further requires "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." That burden is infinitely higher than that borne by the Geneva Prosecutor in the present case. Thus, the forfeiture cases this Court has adjudicated involving art and antiquities have, as a rule, been well-pleaded by the government.  *See, e.g., United States v. An Antique Platter of Gold*, 991 F. Supp. 222 (S.D.N.Y. 1997), *aff'd*, 184 F.3d 131 (2d Cir. 1999); *United States v. Schultz*, 333 F.3d 393 (2d Cir. 2003), *cert. denied*, 540 U.S. 1106 (2004)

15

(pleadings stated the factual and legal bases for alleged illegal excavation, export and import).

What happened to the Beierwaltes in Switzerland would not happen to a foreign claimant in a federal court in the United States. Due to the high standards of pleading required for forfeiture cases in the United States, foreign claimants would have no reason to rush to foreign courts to challenge seizures here.

Geneva argues that the Beierwaltes have not demonstrated that the Swiss Defendants violated international law by conducting the Investigation in a manner that conflicts with UNESCO. (Geneva Br. at 38). Geneva focuses on just one of the UNESCO requirements cited by the Beierwaltes (*i.e.*, the return of cultural property at the request of a "State Party of origin") and ignores the requirement of "just compensation to an innocent purchaser or to a person who has valid title to that property" under UNESCO Art. 7(b)(ii). Given that the Investigation is an open-ended, indefinite taking, the Beierwaltes, innocent purchasers with good title, are currently entitled to either release of the Property or compensation under UNESCO or Switzerland's agreements pursuant to the LTBC with Italy, Greece and Egypt, the likely claimants.

## II

## THE SWISS AUTHORITIES FAIL TO DEMONSTRATE
## THAT THE NEXUS REQUIREMENT OF FSIA §1605(a)(3)
## <u>ENTITLES THEM TO IMMUNITY</u>

The Swiss Authorities argue that, aside from whether there was a "taking in violation of international law," the Judgment should be affirmed on an alternative ground the District Court did not reach: that the Swiss Authorities lack the requisite nexus to the United States under FSIA §1605(a)(3).[18]  (Geneva Br. at 40-46; Fed. Br. at 22-24).

FSIA §1605(a)(3) provides that where the defendant is a "foreign state," under the first nexus clause, the property at issue must be "present in the United States in connection with a commercial activity carried on in the United States by the foreign state."  Where the defendant is an "agency or instrumentality of the foreign state" under the second nexus clause, however, the property need not be present in the United States but must be "owned or

---

[18] FSIA §1605(a)(3) requires the satisfaction of one of two requirements establishing nexus with the United States: (i) "property … is present in the United States in connection with a commercial activity carried on in the United States by the foreign state"; or (ii) "property … is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

17

operated" by the "agency or instrumentality," which must be "engaged in a commercial activity in the United States."

As the Property is in Switzerland and not the United States, all the Swiss Authorities assert they are the "foreign state" and thus immune under the first nexus clause. However, none of them is immune because (i) the Office of Culture is an agency or instrumentality of Switzerland[19] and satisfies the second nexus clause; and (ii) the nexus established through the Office of Culture strips the "foreign state," which includes the Customs Administration and Geneva, of any immunity.

### A. The Office of Culture is an "Agency or Instrumentality" of Switzerland

The Office of Culture argues that it is an "integral element[] of the Swiss Federation" and should therefore be considered part of the "foreign state" rather than an "agency or instrumentality" thereof. (Fed. Br. at 23). That contention relies on a vague reference to "publicly available information as well as evidence provided by the Swiss Confederation" and the bare assertion that the Office of Culture does not "have a legal identity distinct

---

[19] The Beierwaltes do not contend that the Customs Administration or Geneva are "agencies or instrumentalities."

from the Swiss Confederation." (Fed. Br. 23; A-179).[20]  That conclusory and self-serving statement is contradicted by the facts in the record.

The FSIA defines an "agency or instrumentality" as an entity:

> (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof … and (3) which is neither a citizen of a State of the United States … nor created under the laws of any third country.

28 U.S.C. §1603(b).

## 1. The Office of Culture is a Separate Legal Person

In determining whether an entity is a separate legal person from a foreign state, the Second Circuit has applied the "core function" test.  *See Garb v. Republic of Poland*, 440 F.3d 579, 594 (2d Cir. 2006).  Under that test, the inquiry is "whether the core functions of the foreign entity are predominantly governmental or commercial." *Id*.  If those functions are mostly governmental, the entity is deemed part of the state and therefore a "foreign state." If the functions are primarily commercial, the entity is considered an "agency or instrumentality."

---

[20] The assertion by the Office of Culture that it is not "separately incorporated" from the Swiss Confederation (Fed. Br. at 23) is not probative, as FSIA §1605(b) provides that the separate status of a legal person may be "corporate or otherwise."

19

The term "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act," *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 200 (2d Cir. 2016), and "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." FSIA §1603(d). *See Agudas Chasidei Chabad of the U.S. v. Russian Fed'n*, 528 F.3d 934, 946-48 (D.C. Cir. 2009) (applying FSIA §1603(d) to "core function" analysis under FSIA §1605(a)(3)). The key issue is whether the activities of the entity are the "type of action by which a private party engages in trade and traffic or commerce." *de Csepel v. Rep. of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013).

Thus, the existence of a sovereign objective in the performance of a commercial activity will not prevent a finding that the activity was commercial. *See Republic of Argentina v. Weltover*, 504 U.S. 607, 615 (1992) (bonds issued by Argentina to assist in sovereign act of currency regulation involved "everyday commercial activity" because bonds may be held by private parties, are negotiable and may be traded on international market); *Simon v. Republic of Hungary*, No, 10-cv-1770 (BAH), 2020 WL 1170485 (D.D.C. March 11, 2020) (Hungary's purchase of military equipment from U.S. government under military sales program was "commercial" because it

20

involved "the "purchase of goods"). Although the Office of Culture asserts that its official mission "covers tasks that are strictly reserved to the Confederation" (Supplemental Appendix filed by the Federal Agencies ("SA") -11) and that it engages in "self-evidently governmental functions" (SA-69), its core function and activities are "commercial" in nature. Nor does the performance of some sovereign functions prevent a finding that an entity is an agency or instrumentality. *See Peninsula Asset Mgmt (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 142 (2d Cir. 2007) (entity exercising oversight functions over Korean government's financial supervisory and securities and futures commissions was agency or instrumentality).

The core functions of the Office of Culture are the "type of actions by which a private party engages in trade and traffic or commerce." They involve carrying out cultural policies and promoting and supporting Swiss culture (A-164), to which end it authors, edits, publishes, holds and/or sells a variety of publications and holds intellectual property in its name, as evidenced by its copyright ownership in books and reports. (A-272, A-416-69, A-515-51). *See Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1032 (9th Cir. 2010) ("commercial" activities include buying and selling books); *Altmann v. Republic of Austria*, 317 F.3d 954, 958 (9th Cir. 2002), *amended on denial of reh'g*, 327 F.3d 1246 (9th Cir. 2003), *aff'd*, 541 U.S. 1032 (2011) (authoring,

21

editing, publishing and asserting copyright ownership in a book found to be "commercial" activities).

The Office of Culture purchases artworks and loans them to museums. (A-521-26).  *See Cassirer*, 616 F.3d at 1032 ("commercial" activities include "borrowing and loaning artworks" and "licensing reproductions of images [of artworks]"); *de Csepel*, 714 F.3d at 599 ("act of lending art pieces" is commercial, and not sovereign, in nature); *Simon* 2020 WL 1170485 (purchasing goods is commercial).  It also engages in contractual activity such as editing, publishing and selling books; buying and loaning art; commissioning culture-related reports and studies and "negotiat[ing] agreements in the cultural sector."[21]  (A-550).  Such activities are "commercial" in nature.  *See de Csepel*, 714 F.3d at 599 (conduct relating to contracts, including repudiation, is "precisely the type of activity in which a 'private player within the market' engages. [citation omitted].").[22]

---

[21]  The Office's registration of a copyright in its name together with a publishing company for a book authored by a third person (A-396, 398), necessarily entailed entering into contracts with the author and the publishing company.

[22]  The Office of Culture also satisfies another standard, the "legal characteristics" test.  *See, e.g., Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 681 (S.D.N.Y. 1996) ("[A]n entity is an agency or instrumentality if, under the law of the foreign state where it was created, the entity can sue or be sued in its own name, contract in its own name, or hold property in its own name.").

22

Another key function of the Office of Culture is promotional activity for cultural heritage and cultural creativity, involving transfers of cultural assets, museums, collections, films, awarding cash prizes for art, design and books, and acquiring artworks by Swiss artists and designers and loaning them to museums and cultural organizations. (A-522, A-524-26, A-550). These are "commercial" acts. *See Cassirer*, 616 F.3d at 1032 (sending press releases, brochures and general information to Spain's tourism offices in the United States); *Sun v. Taiwan*, 201 F.3d 1105, 1107-08 (9th Cir. 2000) (operating cultural tour of Taiwan for youth to promote understanding of Chinese culture and history).

Accordingly, the Office of Culture is a legal person separate from Switzerland.

## 2. The Office of Culture is an "Organ" of Switzerland

The Office of Culture is an "organ" of Switzerland. Although the FSIA does not define "organ," the Second Circuit has identified four factors, not all of which need to be satisfied: (i) whether the foreign state created the entity for a national purpose; (ii) whether the foreign state actively supervises the entity; (iii) whether the foreign state requires the hiring of public employees and pays their salaries; (iv) whether the entity holds exclusive rights to some

23

right in the [foreign] country; and (v) how the entity is treated under foreign state law. *Filler v. Harvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004).

The Office of Culture satisfies most, if not all, of the *Filler* factors. It was created by Switzerland to serve a national purpose and is described as the "strategic body responsible for drawing up and implementing the [Swiss] Federation's cultural policy." (A-550). It operates under the supervision of the Swiss Federal Council, which heads the Executive Branch of the Swiss Federal Government. (A-179). Its employees are hired and paid by the state.[23] The Office likely has exclusive rights to perform culture-related functions, such as holding cultural competitions and awarding cash prizes for art and design and purchasing art for federal art collections. (A-516-31). *See Corporacion Mexicana de Servicios Maritimos, S.A. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996) (government-created petroleum-refining company, an "agency or instrumentality" of Mexico, was an "organ," as it was "an integral part of the United Mexican State" and "created by the Mexican Constitution, Federal Organic Law, and Presidential Proclamation; is entirely owned by the Mexican Government; is controlled entirely by government employees;

---

[23] The Office of Culture purports to distinguish *Peninsula* on the ground that the Korean government did not pay the salaries of the agency in that case or require the hiring of public employees. (SA -70).

24

employs only public servants; and is charged with the exclusive responsibility of refining and distributing Mexican government property.").

### 3. The Office of Culture is Not a Citizen of the United States or Created Under the Laws of a Third Country

As for the final requirement of "agency or instrumentality," the Office of Culture is not a citizen of the United States and was not created under the laws of a third country.

### 4. The Seized Property Is "Owned or Operated By" the Office of Culture

The Office of Culture owns or operates the Property for nexus purposes because the Office of Culture possesses the Property under the LTBC. *See Agudas*, 729 F. Supp.2d at 147 ("possession is sufficient to satisfy the "owned or operate" requirement [citation omitted]").[24]

The Office of Culture is responsible for repatriating any property under UNESCO and determining where the seized property is stored until repatriation. (A-346). Designated as the "specialized body" responsible for administering prosecutions arising under the LTBC, the Office of Culture

---

[24] The theft of 23 seized objects while under the Swiss Authorities' custody (A-482-85) without compensation is evidence that the Office of Culture owns the seized Property.

initiated, and has been overseeing, the Seizure. (A-330, A-346). Significantly, the LTBC mandates concerted interagency action among the Office of Culture, the Customs Administration and the Geneva prosecutor. (A-330-31).

### 5. The Office of Culture Engages in Commercial Activity in the United States

Many of the Office of Culture's "commercial acts" take place in the United States. It purchases art from artists in the United States and from American museums, exhibits Swiss art in the United States, promotes Swiss films to American audiences, entered a film in the 2016 Academy Awards and promotes Swiss culture and cultural enterprises in the United States. (A-21-23, ¶20).[25] It holds intellectual property rights in the United States, having registered at least one copyright with the United States Copyright Office (A-417), and generates income from the United States, as evidenced by several dozen books currently sold in the United States for which the Office of Culture is named as publisher, editor and/or author. (A-419-69).

Such activities satisfy the requirement that the Office of Culture be "engaged in commercial activity in the United States." *See, e.g., Cassirer*,

---

[25] Plaintiff's allegations in a complaint are assumed true for purposes of a motion to dismiss. *See Rukoro v. Republic of Germany*, No. 17 CV 62-LTS, 2019 U.S. Dist. LEXIS 36098 at *20 (S.D.N.Y. March 6, 2019). The Office of Culture has not denied these allegations.

616 F.3d at 1032 ("commercial" activity in United States of museum that was agency or instrumentality of Spain included paying United States citizens to write for exhibit catalogs; shipping gift shop items to purchasers in United States; selling posters and books to United States residents and businesses; licensing reproductions of images; sending press releases, brochures and general information to Spain's tourism offices in United States; and distributing museum bulletin in United States); *Altmann*, 317 F.3d at 969 ("commercial" activities in United States of gallery that was agency or instrumentality of Austria included authoring, publishing, selling and asserting copyright ownership in, exhibition book and gallery guidebook).

### B. Because the Office of Culture Satisfies the Nexus Requirement, Neither the Customs Administration nor Geneva is Immune Under the FSIA

The Office of Culture's satisfaction of the nexus requirement strips the Customs Administration and Geneva of immunity under FSIA §1605(a)(3).

FSIA §1605(a) provides that "a *foreign state* shall not be immune" when the requirements of any of the subsections are satisfied. (Emphasis added). Thus, once an agency or instrumentality of a foreign state satisfies the second clause of the nexus provision, the foreign state itself may not claim immunity under FSIA §1605(a)(3). *See Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1032-34 (9th Cir. 2010); *Agudas Chasidei Chabad of U.S. v.*

*Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008); *Altmann v. Republic of Austria*, 317 F.3d at 958 (9th Cir. 2002).[26]

Because the Office of Culture satisfies the second nexus clause, the Customs Administration and Geneva, which are the "foreign state,"[27] cannot claim immunity. Accordingly, the Swiss Authorities' nexus arguments should be rejected.

## III

### THE FEDERAL AGENCIES FAIL TO
### ESTABLISH THEIR AFFIRMATIVE DEFENSES

The Federal Agencies fail to satisfy their burden of proving their affirmative defenses of "act of state" and "comity." (Fed. Br. at 24-27).

First, under the Second Hickenlooper Amendment, 22 U.S.C. §2370(e)(2), the act of state doctrine does not apply to claims of takings in violation of international law. *Smith Rocke Ltd. v. Republica Boliviana de Venezuela*, No. 12 cv-7316 (LGS), 2014 U.S. Dist. LEXIS 9692, at *36 (S.D.N.Y. Jan. 27, 2014). Because the Beierwaltes have stated a claim based

---

[26] The Second Circuit has not yet determined this issue. *See Arch Trading*, 839 F.3d at 206 (noting different results reached by various courts and declining to reach the issue).

[27] Although Geneva argues that it is immune because the Office of Culture is an agency or instrumentality of Switzerland and not Geneva (Geneva Br. at 45), Geneva is a political subdivision of Switzerland and included in the definition of "foreign state" under FSIA §1603(a).

upon a taking that violates international law, the act of state doctrine does not apply.

Second, comity and its subsidiary argument, exhaustion, are precluded by FSIA §1606, which provides that "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 … , the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances…." *See Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141 (2014). Because comity is not a defense available to a private individual, the District Court must exercise jurisdiction under the FSIA. *See Philipp v. Federal Republic of Germany*, 894 F.3d 406, 415-16 (D.C. Cir. 2018) (*pet'n for cert. pending*, S. Ct. Dkt. No. 19 19-520) (rejecting arguments of comity and exhaustion and affirming denial of motion to dismiss).

"The mere existence of parallel foreign proceedings does not negate the district courts' 'virtually unflagging obligation…to exercise the jurisdiction given them,'" *Leopard Marine & Trading Ltd. v. Easy St. Ltd.,* 896 F.3d 174, 190 (2d Cir. 2018) (citations omitted), unless "'exceptional circumstances … justify the surrender of that jurisdiction.'" *Id.* (citations omitted). The Federal Agencies have failed to provide any.

The Investigation is not a "parallel foreign proceeding" which may be owed deference. Nor does the FSIA require exhaustion of domestic remedies, *see Cassirer*, 580 F.3d at 1060-61, as "domestic" remedies need not be pursued if it would be futile to do so. *Fischer v. Magyar Allamvasutak Zrt*, 777 F.3d 847 at 858 (7th Cir. 2015); *Cassirer,* 580 F.3d at 1063 (futility exists where "local remedies [are] ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.").[28]

**IV**

**THE SWISS AUTHORITIES FAIL TO REBUT
THE BEIERWALTES' ARGUMENT THAT THE
DISTRICT COURT SHOULD HAVE ORDERED
JURISDICTIONAL DISCOVERY**

In opposition to the Beierwaltes' contention that the District Court should have ordered jurisdictional discovery, the Swiss Authorities argue that the Beierwaltes have not "articulate[d] a reasonable basis for the court first to assume jurisdiction." (Geneva Br. at 48-51; Fed. Br. at 28-32). To the contrary, the Beierwaltes have set forth numerous reasons why the Seizure of his Property was an arbitrary taking "in violation of international law" within

---

[28] Finally, the Federal Agencies argue that the balance of contacts favors Switzerland and compels comity. (Fed. Br. at 26-27). These contacts, however, are outweighed by the Beierwaltes' extraordinary interest in obtaining release or compensation for the arbitrary seizure of $8 million of their Property.

30

the meaning of FSIA §1605(a)(3): the lack of probable cause supporting the Warrant and Seizure; the attempt to foist upon the Beierwaltes the undefined, impossible burden of proving "legal provenance"; and the open-ended and indefinite nature of the Investigation, which, as to the Beierwaltes' Property, is an exercise in concocting retroactive justification for the Seizure likely to last decades.[29] To the extent factual issues exist relating to the Warrant, Seizure or Investigation, jurisdictional discovery is appropriate.

The Beierwaltes have also demonstrated why the Swiss Authorities may not claim immunity based on the nexus provision of FSIA §1605(a)(3). To the extent factual issues exist with respect to whether the Office of Culture is a "separate legal person" from Switzerland; performs a commercial core function; is an "organ" of Switzerland; "owns or operates" the seized Property or engages in commercial activity in the United States, discovery is appropriate. *See Reiss v. Societe Generale du Groupe des Assurances Nationales*, 235 F.3d 738, 747 (2d Cir. 2000) (reversing dismissal of action and remanding to district court for determination as to whether commercial activity exception applied, noting that discovery would be helpful in such determination).

---

[29] It is ironic that Geneva characterizes jurisdictional discovery as a "fishing expedition" (Geneva Br. at 48) when the Investigation is a classic example.

## **CONCLUSION**

For the foregoing reasons, the Court should reverse the District Court's dismissal of the Complaint, remand the action for a determination of the applicability of 28 U.S.C. §1605(a)(3) and grant jurisdictional discovery in connection with the issues relevant to such determination.

Dated:      New York, New York
June 12, 2020

Respectfully submitted,

Pearlstein & McCullough LLP
*Attorneys for Plaintiffs-Appellants*
*Lynda Beierwaltes and William*
*Beierwaltes*

By: /s/ Anju Uchima
Anju Uchima
William G. Pearlstein
641 Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (646) 762-7263
Facsimile: (212) 634-6311
Email: auchima@pmcounsel.com
       wpearlstein@pmcounsel.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,925 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
        June 12, 2020